# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

INTERNATIONAL RIGHTS ADVOCATES
Plaintiff-Appellant,

v.

ALEJANDRO MAYORKAS, *et al.*,
Defendants-Appellees.

---

On Appeal from the United States Court of
International Trade, Case No. 23-00165
Honorable Claire R. Kelly

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, DC 20002
Phone: 202-543-5811
Email: tc@iradvocates.org

***Counsel for Plaintiff-Appellant***
***International Rights Advocates***

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number:**    24-2316

**Short Case Caption:**    INTERNATIONAL RIGHTS ADVOCATES v. MAYORKAS, *et al.*,

**Filing Party/Entity:**    INTERNATIONAL RIGHTS ADVOCATES

I certify the following information is accurate and complete to the best of my knowledge.

Date:    November 12, 2024

Signature:

Name:    Terrence P. Collingsworth

1. **Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case:   Plaintiff-Appellant International Rights Advocates.

2. **Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities: None/Not Applicable.

3. **Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities: None/Not Applicable.

4. **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who

have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4): None/Not Applicable.

5. **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? No.

6. **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6). None/Not Applicable.

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, undersigned counsel for Plaintiff-Appellant International Rights Advocates states that he is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. In addition, counsel is not aware of any cases before the United States Court of International Trade that may be affected by this Court's decision in the pending appeal.


Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, DC 20002
Phone: 202-543-5811
Email: tc@iradvocates.org

**Counsel for Plaintiff-Appellant**
**International Rights Advocates**

# TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................I

II.  STATEMENT OF JURISDICTION ...............................................................3

III. STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ...................4

IV.  STATEMENT OF THE CASE ....................................................................4

   A.   Procedural History ...........................................................................4

   B.   Factual Background ..........................................................................5

     1. Child Labor is Pervasive in Cocoa Harvesting in the Ivory Coast and the Major Importing Companies Continue Their Reliance on Forced Child Labor.....................................................................................5

     2. Since at Least 2001, CBP Has Known About and Failed to Take Required Action to Enforce Section 307 to Ban Cocoa from the ivory Coast Harvested by Forced Child Labor.............................................8

V.   STANDARD OF REVIEW........................................................................13

VI.  SUMMARY OF ARGUMENT...................................................................13

VII. ARGUMENT

   The CIT Erred in Finding IRAdvocates Lacked Article III Standing to Sue CBP for Failing to Enforce Section 307 of the Tariff Act..................16

   A.   IRAdvocates Suffered an "Injury-In-Fact.".........................................18

     1.   CBP's Failure to Enforce Section 307 Caused Injury to IRAdvocates by Depriving it of an Important Tool to Achieve its Core Mission of Ending Forced Child Labor in Cocoa Harvesting.................................................................................19

     2.   IRAdvocates Suffered a Concrete Injury When It Was Required to Drain its Resources in an Effort to Convince CBP to Enforce Section 307................................................................................29

   B.   IRAdvocates' Injury Was Caused by CBP's Failure to Act on the Petition as Required by Section 307.........................................43

i

C. IRAdvocates' Injury Would Be Redressed by CIT's Order to CBP to Enforce Section 307.................................................................45

VIII. CONCLUSION...............................................................................55

**CASES**

*A&D Auto Sales, Inc. v. United States*
    748 F.3d 1142 (Fed. Cir. 2014)....................................................17

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*
    469 F.3d 129 (D.C. Cir. 2006)..................................................24-25

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*
    946 F.3d 615 (D.C. Cir. 2020)......................................................26

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)..............................................................13, 17

*Attias v. CareFirst, Inc.*
    865 F.3d 620 (D.C. Cir. 2017)......................................................17

*Digitalis Educ. Sols., Inc. v. United States*
    664 F.3d 1380 (Fed. Cir. 2012)....................................................13

*Doe v. Apple, Inc.*
    96 F.4th 403 (D.C. Cir. Mar. 5, 2024)......................................17, 22

*Elliot v. Michael James Inc.*
    507 F.2d 1179 (D.C. Cir. 1974)....................................................45

*Food and Drug Administration v. Alliance of Hippocratic Medicine*
    602 U.S. 367 (2024)..........................................4, 19, 34, 37-39, 42

*Havens Realty Corp. v. Coleman*
    455 U.S. 363 (1982)..........................14, 19, 23-24, 30, 37, 43-44

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*
    572 U.S. 559 (2014)..................................................................13

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*
    681 F.3d 1323 (Fed. Cir. 2012)................................................34-35

*Int'l Labor Rights Fund v. United States*
    391 F. Supp. 2d 1370 (C.I.T. 2005)...................................................9

*Larson v. Valente*
    456 U.S. 228 (1982)........................................................................52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
    572 U.S. 118 (2014)........................................................................43

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)..............................................................16, 43-44

*Massachusetts v. E.P.A.*
    549 U.S. 497 (2007)..............................................................46, 51-52

*Matsushita Elec. Indus. Co. v. United States*
    750 F.2d 927 (Fed. Cir. 1984)........................................................51

*McKinney v. U.S. Dep't of Treasury*
    799 F.2d 1544 (Fed. Cir. 1986)......................................................45

*Military-Veterans Advocacy v. Sec'y of Vet. Affs.*
    7 F.4th 1110 (Fed. Cir. 2021)...................................................19, 28

*Nalco Co. v. Chem-Mod, LLC*
    883 F.3d 1337 (Fed. Cir. 2018)......................................................34

*Nat'l Treasury Empl.Union v. United States*
    101 F.2d 1423 (D.C. Cir. 1996)................................................24-25

*Neitzke v. Williams*
    490 U.S. 319 (1989)..............................................................34, 44

*Norton v. Southern Utah Wilderness Alliance*
    524 U.S. 55 (2004)........................................................................47

*Nucor Corp. v. United States*
    33 C.I.T. 157 (2009)................................................................50-51

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*
    797 F.3d 1087 (D.C. Cir. 2015).....................................................26

*Wanxiang Am. Corp. v. United States*
    12 F.4th 1369 (Fed. Cir. 2021)............................................13, 17

*Warth v. Seldin*
    422 U.S. 490 (1975)...................................................14, 17, 19

**RULES**

Fed. R. Civ. P. 12(b)(1)...................................................................4

Fed. R. Civ. P. 12(b)(6)............................................................34, 44

**STATUTES**

5 U.S.C. § 555 (e).........................................................................53

5 U.S.C. § 702.............................................................................46

5 U.S.C. § 706(1).......................................................................2, 47

5 U.S.C. § 706(2)(A).....................................................................54

18 U.S.C. § 1595...........................................................................20

19 U.S.C. § 1307........................................................................2, 3

28 U.S.C. § 1295(a)(5)....................................................................3

28 U.S.C. § 1350...........................................................................20

28 U.S.C. § 1581(i)(1)(c)..................................................................3

Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016).................................10

**REGULATIONS**

19 C.F.R. § 12.42(c).................................................................12, 40

19 C.F.R. § 12.42(e)..............................................................................10

19 C.F.R. § 12.42(f)..............................................................................50

19 C.F.R. § 12.42(g)........................................................................11, 50

**OTHER AUTHORITIES**

161 Cong. Rec. E1817-03.......................................................................49

161 Cong. Rec. E1817-03, E1817............................................................49

*Administrative Procedure Act: Legislative History*, S. Doc. No. 79-248, at 1
(1946).............................................................................................46

CBS News, *Children as Young as 5 Found Harvesting Cocoa Used by Major
Corporations in Ghana*, CBS
NEWS, https://www.cbsnews.com/news/children-harvesting-cocoa-used-by-
major-corporations-ghana/ (last visited Nov. 7, 2024)................................8

*Forced Labor*, U.S. CUSTOMS AND BORDER PROT.,
https://www.cbp.gov/trade/forced-labor (last visited Oct. 16, 2024)...28, 48

Matthew M. Higgins, *Closed Loophole, Open Ports: Section 307 of the Tariff Act
and the Ongoing Importation of Goods Made Using Forced Labor*,
75 STAN. L. REV. 917, 958-67 (April 2023).........................................26-27

Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)...................................46

Shanni Alon, *Enforcing the Forced Labor Prohibition: Increasing Transparency
and Mandating Supply Chain Due Diligence*, 31 Fed. Circuit B.J. 377
(2023).............................................................................................49

# I.    INTRODUCTION

Plaintiff-Appellant International Rights Advocates ("IRAdvocates") is a non-profit corporation that "advocates for and with working people around the world . . . and is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy." Appendix ("Appx.") at 65 (Complaint ¶ 117). IRAdvocates "promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." *Id*.

One of IRAdvocates' major priorities is to stop the major chocolate companies, such as Nestlé, Cargill, Mars, Mondelez, and Hershey, from using forced child labor to harvest cocoa in the Ivory Coast (a/k/a Côte d'Ivoire) and Ghana. Appx. at 55-61 (Complaint ¶¶ 93-104). As the United States Court of International Trade ("CIT") acknowledged:

> Forced child labor in the Ivory Coast's cocoa production is well documented and recognized not only by humanitarian organizations and nonprofits, but also by the courts and the U.S. chocolate companies themselves. *See, e.g.*, Compl. at ¶¶ 10–92 (citing sources). Despite this recognition, leading chocolate producers continue to use and profit from forced child labor in the Ivory Coast. *Id*. at ¶ 29.

Appx. at 156 (Decision at 3).

One of the major tools to fight forced child labor is Section 307 of the Tariff Act, 19 U.S.C. § 1307 ("Section 307"). It provides products made "***wholly or in part*** in any foreign country by . . . forced labor . . . "***shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited***." *Id.* (emphasis added). In this case, IRAdvocates filed a detailed Petition[1] under Section 307 requesting that U.S. Customs and Border Protection ("CBP") issue a Withhold Release Order ("WRO") blocking the importation to the U.S. of cocoa from the Ivory Coast produced with forced child labor. There is universal agreement that cocoa *is* harvested in the Ivory Coast with forced child labor. *See* Appx. at 156-57 (Decision at 3-4).

When CBP took no action on the Petition ***after three years and five months***, IRAdvocates filed its Complaint against the U.S. Department of Homeland Security ("DHS"), DHS Secretary Alejandro Mayorkas, CBP, and CBP Acting Commissioner Troy A. Miller, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), asking the CIT to "compel agency action unlawfully withheld or unreasonably delayed." The CIT ultimately dismissed the case, erroneously finding that IRAdvocates had failed to show the requisite "injury-in-fact" required for Article III standing, and that even if there was an injury, it was not caused by

---

[1] The Petition is Exhibit A to the Complaint. See Appx. at 71.

CBP's inaction and would not be redressed by a decision of the CIT. Appx. at 166-72 (Decision at 14-20).

As IRAdvocates demonstrates below, it suffered an injury-in-fact that can be linked to CBP's unlawful inaction and could be redressed by the CIT's decision. The CIT's decision finding IRAdvocates lacked standing must be reversed.

## II.   STATEMENT OF JURISDICTION

The CIT had exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1581(i)(1)(c). IRAdvocates' claim arose out of Section 307, which is a law of the United States that provides for "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(1)(c), *see* 19 U.S.C. § 1307.

The CIT dismissed the case on August 8, 2024 (Appx. at 153, 166-72), giving this Court appellate jurisdiction under 28 U.S.C. § 1295 (a)(5) as this is a final judgment of the CIT.

IRAdvocates filed a timely Notice of Appeal on September 9, 2024 (ECF No. 36).

## III.    STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The sole issue on appeal is whether the CIT erred in finding that
IRAdvocates lacked Article III standing to sue for its claim against CBP and DHS
under the APA and dismissing the case based on Fed. R. Civ. P. 12(b)(1).

## IV.    STATEMENT OF THE CASE

### A. Procedural History

IRAdvocates filed the Complaint in this case on August 15, 2023. Appx. at
1. On December 15, 2023, CBP and DHS filed their Joint Motion and
Memorandum in Support of Motion to Dismiss (ECF No. 16). On February 23,
2024, IRAdvocates filed its Opposition to the Motion to Dismiss (ECF No. 17)
("Opp. MTD"), and on May 3, 2024, CBP and DHS replied (ECF No. 21).

On June 17, 2024, the CIT requested supplemental briefing from the parties
to discuss the application of the Supreme Court's decision in *Food and Drug
Administration v. Alliance of Hippocratic Medicine* ("Alliance"), 602 U.S. 367
(2024). The parties filed supplemental briefs. *See* ECF No. 27 (Defendants' brief)
and ECF No. 29-1 (Plaintiff's brief).

On July 16, 2024, the Court heard oral argument on the Motion to Dismiss.
*See* ECF No. 33.

The CIT issued a decision dismissing IRAdvocates' claim on August 8, 2024 (Appx. at 153). IRAdvocates filed a timely Notice of Appeal on September 9, 2024 (ECF No. 36).

## B. Factual Background

### 1. Child Labor is Pervasive in Cocoa Harvesting in the Ivory Coast and the Major Importing Companies Continue Their Reliance on Forced Child Labor.

U.S. imports of cocoa products from the Ivory Coast are produced wholly or in part by forced labor, which the CIT explicitly acknowledged. Appx. at 156 (CIT Decision at 3). Further, the record is clear that CBP and DHS have long been aware that the cocoa sector in the Ivory Coast is dependent on forced child labor and other child labor performed in violation of ILO Convention No. 182's "Worst Forms of Child Labor." Over 23 years ago, in 2001, the major chocolate companies, including those named in the Petition (Nestlé, Mars, Hershey, Barry Callebaut, Blommer Chocolate Co., Cargill, Mondelēz, and Olam),[2] to preclude mandatory legislation, signed the Harkin-Engel Protocol ("Protocol") and gave their explicit promise to "phase out" by 2005 their use of the "Worst Forms of

---

[2] These are the major chocolate producers that control the industry and lead efforts to avoid compliance with their promise in the Protocol to end their system of reliance on illegal child labor to harvest cocoa in West Africa. *See* Appx. at 20-54 (Complaint ¶¶ 29-92).

Child Labor," including forced child labor. Appx. at 29, 103 (Complaint ¶ 29 and Exhibit C).

The language of the Protocol is a specific admission by the industry that there **is** forced child labor in their cocoa harvesting operations in the Ivory Coast. The leading chocolate companies pledged that by 2005, they would have in place "industry-wide standards of public certification . . . that cocoa beans and their derivative products have been grown and/or processed without any of the worst forms of child labor." Appx. at 106 (Protocol at p. 3).

Rather than keep their pledge, the major companies, acting through their trade association, the World Cocoa Foundation ("WCF"), have merely given themselves a series of unilateral extensions of time. In 2005, the WCF admitted the Protocol goals would not be "fully met" by the 2005 deadline, but assured consumers and regulators they were "committed to achieving a certification system . . . within three years." Appx. at 15 (Complaint ¶ 22). Three years later, in 2008, the WCF again unilaterally extended their self-imposed deadline by another two years. *Id*. When that unmet deadline passed in 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by 70% the use of child labor in the cocoa industry. At the 8th Annual WCF Meeting in July 2018, the industry effectively abandoned any hard deadline and admitted it was not likely it would meet its "aspiration for 2020" nor

other targets "for the eradication of child labor by 2025." *Id*. ***Each major***
***extension of time by the industry condemned another group of hundreds of***
***thousands of children to a life of poverty, malnutrition, and lack of education in***
***a system of child slavery imposed by the major companies to enhance their***
***profits***.

IRAdvocates and others have utilized all available tools to compel the major
cocoa companies to honor their commitment to the Protocol, as well as their own
internal "policies," *see* Appx. at 20-54 (Complaint ¶¶ 29-92), in order to end their
reliance on illegal child labor. IRAdvocates has brought direct litigation against the
responsible companies and has collaborated with filmmakers and media to launch a
public campaign to pressure the companies to keep their promise to end their
reliance on forced child labor to harvest cocoa. *See* Appx. at 55-61, 81-83
(Complaint ¶¶ 93-104 and Petition [Exhibit A] at 11-13).

Nothing has changed in the cocoa sector in the Ivory Coast since the major
companies signed the voluntary Protocol. Indeed, the companies' use of illegal
***child labor has increased*** in the ***23 years*** since the companies signed the Protocol.
A 2020 study funded by the U.S. Department of Labor concluded that ***1.56 million***
child laborers were harvesting cocoa in the Ivory Coast and Ghana, an increase of
14 percent since their 2015 study, and 1.48 million child laborers engaged in
hazardous work during this period. Appx. at 62 (Complaint ¶ 107). As recent as

November 29, 2023, a CBS News crew accompanied IRAdvocates to Ghana and produced a story graphically showing that children as young as five years old are harvesting cocoa for the U.S. market and performing the "worst forms of child labor:" ECF No. 17 (Opp MTD), at 7, n.10.[3]

> ## 2. Since at Least 2001, CBP Has Known About and Failed to Take Required Action to Enforce Section 307 to Ban Cocoa from the Ivory Coast Harvested by Forced Child Labor.

Since the 1990s, IRAdvocates' predecessor organization, the International Labor Rights Forum ("ILRF"), has been fighting to end forced child labor and other worst forms of child labor in cocoa harvesting in West Africa. When IRAdvocates formed in 2007, its number one priority was to continue the fight to end child slavery in cocoa harvesting because generations of West African children have been, and continue to be, forced into child slavery to harvest cocoa for some of the most wealthy and powerful corporations on the planet. This is a preventable crime that continues only because the major companies have not yet been held accountable, something CBP could remedy by simply doing its job and enforcing

---

[3] The link to the referenced CBS news story is: https://www.cbsnews.com/news/children-harvesting-cocoa-used-by-major-corporations-ghana/.

the mandatory provisions of Section 307. CBP, housed within DHS,[4] is the sole

agency responsible for investigating and enforcing Section 307.

In an early effort to harness the power of the CBP to address child slavery in

cocoa harvesting, in 2002, the ILRF filed a petition seeking a WRO on all cocoa

imported from the Ivory Coast because it was produced "in whole or in part" by

forced child labor in violation of Section 307.[5] That 2002 Petition was well-

documented with extensive evidence that forced child labor was pervasive in cocoa

harvesting in the Ivory Coast, and certainly put CBP on notice of the extent of the

problem. In response to that first Petition, ***just as in this case***, CBP unreasonably

delayed taking any action to enforce Section 307, and when no action was taken in

over two years and CBP failed to respond to ILRF's inquiries, ILRF filed suit

under the APA seeking an order requiring CBP to enforce the law. *See Int'l Labor*

*Rights Fund v. United States*, 391 F. Supp. 2d 1370, 1372-1373 (C.I.T. 2005).

At the time of the ILRF lawsuit, Section 307 had a "domestic consumptive

demand" exemption, which required that there be sufficient domestic production of

---

[4] DHS is named as a party solely due to its control over CBP. The conduct complained of in this case is failure of CBP to perform its statutory duty to enforce Section 307.

[5] IRAdvocates' legal staff was part of the team at ILRF that did the field research and filed the 2002 Petition with CBP. In 2007, the legal department of ILRF formed IRAdvocates to focus on using the rule of law to address international human rights violations.

cocoa to replace the domestic demand for cocoa that would be needed if CBP issued a WRO banning the importation of cocoa from Ivory Coast. As there was little or no domestic production of cocoa at that time, the CIT dismissed the case based on the exemption. *Id*. at 1374-76.

In 2015, Congress removed the "domestic consumptive demand" exemption from Section 307, leaving CBP free to take action to prevent cocoa harvested with forced child labor from entering any U.S. ports. *See* Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016).

When five years passed and CBP still failed to take action on its own initiative to revisit the cocoa issue, as it has always had the power to do, *see* 19 C.F.R. § 12.42(e), IRAdvocates and its co-Petitioners filed a new Petition on February 14, 2020. See Appx. at 71 (Exhibit A to Complaint). The Petition provided detailed evidence that forced child labor remains endemic to cocoa harvesting in the Ivory Coast. IRAdvocates filed the Petition because it was clear that, for some inexplicable reason, ***CBP was giving the large multinational chocolate companies like Nestlé, Cargill, Mars, and Hershey, a free pass, allowing them to import cocoa to the U.S. market that, without doubt, was harvested "in whole or in part" by forced child labor in violation of Section 307***.

A CBP Petition seeking an import ban under Section 307 is a powerful tool that, rather than targeting a specific company for using forced child labor, targets the tainted product, in this case cocoa from the Ivory Coast. IRAdvocates expected CBP to comply with its statutory duty under Section 307 and issue a WRO. This would have prohibited the cocoa companies from importing cocoa from the Ivory Coast "*unless the importer establishes by satisfactory evidence that the merchandise was not . . . manufactured in any part with the use of a class of labor specified in the finding.*" 19 C.F.R. § 12.42(g) (emphasis added). Such a result would have accomplished the objectives of IRAdvocates' efforts to impose accountability on the major cocoa companies. Companies would be prohibited from importing cocoa to the U.S. market unless they created a verifiable system to establish their cocoa was not harvested by forced child labor, exactly what they all promised to do in 2001 when they signed the Protocol. This outcome would also be consistent with Congress's intention when it removed the "domestic consumptive demand" exemption and cleared the way for Section 307 to be used as tool for ending forced child labor.

However, CBP did nothing in response to the Petition. Rather than merely accept CBP's unlawful failure to utilize the powerful tool Congress provided in enacting Section 307, IRAdvocates was forced to divert significant time and

resources in attempting to get CBP to comply with the law. Among other things,[6] IRAdvocates and its co-Petitioners submitted two supplemental filings (Appx. at 122 and 146 [Exhibits E and H]) with additional and updated evidence that cocoa from the Ivory Coast was harvested with forced child labor. This required multiple research trips to the Ivory Coast. IRAdvocates and its co-Petitioners also met with CBP several times, but never received any feedback or updates on CBP's planned action on the Petition. Appx. at 156-58 (Decision at 4-6).

On December 13, 2022, CBP responded for the first time with a letter claiming that, despite the Petition being timely when it was submitted, the information IRAdvocates had provided was dated. Appx. at 158-59 (Decision at 6-7). After years doing nothing with the Petition, this was the first time CBP raised such concerns, and it came well beyond the "prompt[]" response period required by 19 C.F.R. § 12.42(c). Appx. at 158-59 (Decision at 6-7). Further, this late response was in violation of the APA, 5 U.S.C. § 555 (e), which required that CBP must provide "[p]rompt notice" "of the denial in whole or in part of a written . . . petition . . ."

Due to CBP's inexplicable and unreasonable delay in acting on the Petition, and apparent lack of good faith in labeling timely-submitted information as

---

[6] See section VII.A.2, *infra*, for a detailed listing of the costly actions IRAdvocates undertook to encourage CBP to fulfill its statutory mandate.

"dated," IRAdvocates was forced to file this case to require CBP to meet its statutory duty under Section 307. CBP's steadfast refusal to take any action in response to the Petition leaves hundreds of thousands of child slaves harvesting cocoa that is exported to the U.S. in clear violation of the mandatory prohibition of Section 307.

## V.  STANDARD OF REVIEW

The sole legal issue raised in this appeal, whether IRAdvocates satisfies the requirement for Article III standing to sue, raises an error of law by the CIT in interpreting and applying the standing doctrine and thus is reviewed by this Court *de novo*. *See Highmark Inc. v. Allcare Health Mgmt. Sys.*, Inc., 572 U.S. 559 (2014); *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("We review determinations of standing *de novo.*") (citation omitted).

## VI.  SUMMARY OF ARGUMENT

The CIT held that IRAdvocates lacked standing to sue CBP to compel Section 307 enforcement because IRAdvocates lacked the Article III requirements for standing: injury-in-fact, causation, and redressability. Appx. at 166-72 (Decision at 14-20). In so holding, the CIT erred in failing to take IRAdvocates' allegations as true and provide IRAdvocates all reasonable inferences to be drawn

from the allegations as is clearly required in assessing a motion to dismiss. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Wanxiang Am. Corp. v. United States*, 12 F.4th 1369, 1373 (Fed. Cir. 2021). Here, not only did the CIT fail to take IRAdvocates' allegations as true, in significant ways, the CIT disagreed with the allegations. Further, in assessing standing, the CIT was required to assume the merits of the underlying legal claim. *See, e.g. Warth v. Seldin,* 422 U.S. 490, 501-02 (1975). The CIT clearly failed to do this.

If the CIT had complied with the legal requirements for assessing standing in the context of a motion to dismiss, IRAdvocates would have satisfied the three elements of standing. IRAdvocates suffered an injury-in-fact in that CBP's failure to enforce Section 307 in response to IRAdvocates' Petition deprived IRAdvocates of a major tool in its foundational purpose of ending forced child labor in cocoa harvesting. Violating pleading rules, the CIT factually sided with CBP, rather than IRAdvocates, when speculating that IRAdvocates' mission was not compromised by CBP's failure to enforce Section 307. The Complaint makes clear that CBP's effective denial of the Section 307 remedy to IRAdvocates was a major setback. Further, IRAdvocates was forced to expend significant time and resources to encourage CBP to comply with its statutory duty to enforce Section 307. These injuries meet the Supreme Court's standard for injury-in-fact, which is established

when a defendant's actions impair an organization's activities, resulting in a drain on its resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Additionally, there is no question that IRAdvocates' injury is fairly traceable to or caused by CBP's failure to act. CBP is the sole agency charged with enforcing Section 307, and when it failed to do so, IRAdvocates expended resources specifically directed to requiring CBP to comply with its statutory duty to enforce the law. The CIT erroneously disagreed with the allegations and concluded that IRAdvocates' expenses were made in routine operations, rather than in direct response to CBP's inaction. The CIT's finding against IRAdvocates' allegations on a factual issue is reversible error.

Finally, if the CIT had ordered CBP to act to enforce Section 307, IRAdvocates' injury would have been redressed. The CIT incorrectly concluded that compelling CBP to act would not "guarantee" an end to forced child labor in the Ivory Coast, grossly overstating the relief IRAdvocates' actually requested, which was simply an order to CBP to enforce Section 307 and act of the Petition. Establishing CBP's duty to act on a viable Petition would have revived Section 307 as a major tool in addressing forced labor in the global economy, as opposed to a mere discretionary option for CBP to use at its whim. IRAdvocates maintains that it is likely that, if ordered to act on IRAdvocates' Petition, CBP would have had to issue a WRO to ban the importation of cocoa from the Ivory Coast, forcing the big

chocolate companies to keep their 2001 promise to end their use of child slaves to harvest cocoa. Furthermore, even if in response to the CIT's order to promptly act on IRAdvocates' Petition, CBP found the Petition lacked merit, this would still fulfill the primary objective of IRAdvocates' case: establishing that Section 307 requires CBP to act on any legitimate Petition and does not allow it the discretion to simply ignore a Petition.

The CIT fundamentally erred in finding that IRAdvocates lacked standing by assuming facts against IRAdvocates and failing to assume the merits of its claim. Had the CIT complied with fundamental rules in assessing standing on a motion to dismiss, it would have found that IRAdvocates has standing to compel CBP to enforce Section 307.

## VII. ARGUMENT – The CIT Erred in Finding IRAdvocates Lacked Article III Standing to Sue CBP for Failing to Enforce Section 307.[7]

Article III Constitutional standing requires that (1) the plaintiff has suffered an injury-in-fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which may be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The CIT erroneously concluded that IRAdvocates failed to demonstrate any of the three elements required for

---

[7] To the extent that it requires a distinct analysis, IRAdvocates also established it has prudential standing. *See* ECF No. 17 (Opp MTD), at 18-23. The CIT did not reach this issue in its decision.

Article III standing. *See* Appx. at 166-72 (Decision at 14-20). In reaching this erroneous conclusion, the CIT failed to apply established law in this Court and the Supreme Court that IRAdvocates' allegations must be taken as true and all reasonable inferences must be drawn in favor of the allegations.[8] *See Ashcroft*, 556 U.S. at 678; *Wanxiang Am. Corp,* 12 F.4th at 1373.

Further, in assessing the standing issue, the CIT improperly failed to assume the merits of IRAdvocates' core claim that Section 307 created a mandatory duty for CBP to act on IRAdvocates' legitimate Petition. *See, e.g. Warth,* 422 U.S. at 501-02 (assuming validity of legal theory for purposes of standing analysis). "When assessing standing at the pleading stage, we assume that the plaintiffs' view of the statute is correct and that they will be successful on the merits of their claim." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *Doe v. Apple, Inc.*, 96 F.4th 403, 409-10, 416 (D.C. Cir. 2024).

Assuming the merits, CBP's failure to act on its mandatory duty under Section 307 to act on the Petition for over three and a half years was "unreasonable

---

[8] Additionally, this Court has confirmed that the inquiry focuses primarily on the allegations in the complaint, but also includes documents "incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotations omitted). This would include IRAdvocates' initial Petition to CBP (Exhibit A) and the additional Exhibits B-H attached to the Complaint. See Appx at 71-152.

delay" under section 706(1) of the APA. CBP's failure to act on the Petition injured IRAdvocates by depriving it of a powerful tool to fight child slavery and caused it to expend time and resources to pressure CBP to comply with its statutory duty. Further, an order to CBP to enforce Section 307 would have obtained for IRAdvocates the precise relief it sought.

If the law is properly applied to IRAdvocates' allegations, as is demonstrated below, IRAdvocates has standing to sue CBP for ignoring IRAdvocates' Petition and failing to enforce the mandatory requirements of Section 307.

## A. IRAdvocates Suffered an "Injury-In-Fact."

IRAdvocates suffered concrete injuries that satisfy the injury-in-fact requirement. First, in failing to act upon IRAdvocates' Petition and claiming that Section 307 is completely discretionary, requiring CBP to do nothing at all, CBP deprived IRAdvocates of a major tool in its fight against forced child labor in cocoa harvesting in the Ivory Coast and impaired its institutional mission. Second, once IRAdvocates filed its Petition under Section 307 and CBP did nothing to enforce the law, IRAdvocates suffered concrete injuries in attempting to get CBP to fulfill its statutory duty to enforce Section 307, including the diversion of time and resources to return to the Ivory Coast multiple times to gather new information to supplement the Petition.

These injuries meet the Supreme Court's standard in *Havens*, where the
Court held that injury-in-fact for an organization is established when the
defendant's actions or inaction have "perceptibly impaired" the organization's
activities, causing a "concrete and demonstrable injury" resulting in a "consequent
drain on the organization's resources." *Havens*, 455 U.S. at 379. Recently, in
*Alliance*, 602 U.S. at 369-70, the Supreme Court confirmed the ongoing viability
of the *Havens* standard for organizational injury.

The allegations in IRAdvocates' Complaint demonstrate that it satisfies the
*Havens* test for organizational injury-in-fact. Based on its loss of a critical tool due
to CBP's failure to act on its Section 307 Petition and the consequent drain on its
resources in attempting to convince CBP to take the required statutory action,
IRAdvocates has demonstrated it has suffered the requisite "injury-in-fact" and
therefore has a "'personal stake in the outcome of the controversy.'" *Military-
Veterans Advocacy v. Sec'y of Veteran Affs.*, 7 F.4th 1110, 1121 (Fed. Cir. 2021)
(quoting *Warth*, 422 U.S. at 498)).

1. **CBP's Failure to Enforce Section 307 Caused Injury to IRAdvocates
   by Depriving it of an Important Tool to Achieve its Core Mission of
   Ending Forced Child Labor in Cocoa Harvesting**.

Taking the allegations in IRAdvocates' Complaint as true, there is no
question that IRAdvocates was founded as a legal advocacy organization dedicated
to achieving just and humane treatment for workers worldwide. Appx. at 65

(Complaint ¶ 117). IRAdvocates represents and advocates for working people around the world, including in the Ivory Coast, and is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy. *Id.* IRAdvocates promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government, and business groups. *Id.* Moreover, IRAdvocates has for years made part of its core mission using Section 307 to end the importation into the United States of cocoa products that are made using forced child labor. *See* Appx. at 55-61 (Complaint ¶¶ 93-104).

Improperly disputing facts in the context of their motion to dismiss, Defendant CBP mischaracterized IRAdvocates' mission as being limited to acting as an "advocacy organization." ECF No. 16, at 16. As the Complaint makes clear, IRAdvocates does much more than "advocate" to end forced child labor in cocoa harvesting. Appx. at 55-61 (Complaint ¶¶ 93-104). One of the key tools IRAdvocates has used in its effort to stop forced child labor in cocoa harvesting is litigation. For example, IRAdvocates filed a claim under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, against Nestlé and Cargill, two major companies that intentionally profit from child slavery in the Ivory Coast. Appx. at 55-56 (Complaint ¶ 94). IRAdvocates also filed a claim under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595 *et. seq.*, against all the

major chocolate companies for using trafficked and forced child labor to harvest cocoa in the Ivory Coast. Appx. at 60 (Complaint ¶ 103). And, IRAdvocates filed a Petition under Section 307 seeking to ban the importation of cocoa produced by the major companies that IRAdvocates established with substantial evidence were using forced child labor to harvest in the Ivory Coast. Appx. at 61-62 (Complaint ¶ 105).

CBP's failure to act on the Petition denied IRAdvocates a major tool in its limited arsenal to use litigation to force the major companies to keep the pledge they made in 2001 in signing the Harkin-Engel Protocol to stop using forced child labor in cocoa harvesting. *See* Appx. at 13-14 (Complaint ¶ 19). According to CBP, its total failure to enforce Section 307 does not prevent IRAdvocates from continuing to "promote the enforcement of labor rights." ECF No. 16, at 16. The CIT agreed, stating "IRAdvocates has not shown that its mission has been inhibited." Appx. at 167 (Decision at 15, n.3). Since the major companies are ***still*** profiting from child slavery after promising in 2001 to stop the horrific practice, it is clear that every possible tool must be employed to end the seemingly intractable problem of major chocolate companies profiting from child slavery in cocoa harvesting.

More fundamentally, the CIT's position factually siding with CBP that IRAdvocates mission was not compromised by CBP's failure to enforce Section 307 violated fundamental pleading rules in assessing a motion to dismiss based on lack of standing. When standing is challenged on a motion to dismiss, the underlying claim must be assumed to be meritorious. *See, e.g., Apple,* 96 F.4th at 416. Here, the key merits issue, not reached by the CIT due to its erroneous conclusion that IRAdvocates lacked standing, was IRAdvocates' claim under section 706(1) of the APA that CBP's failure to act on the Petition for three years and five months after submission was "unreasonable delay" because CBP was *required* to take prompt action under Section 307 to ban the importation of cocoa harvested with forced child labor. Section 307 is made mandatory by, among other things, the language that cocoa harvested by forced child labor "***shall not*** be entitled to entry at any of the ports of the United States." *See* ECF No. 17 (Opp MTD), at 24-32 (detailing CBP's statutory and regulatory violations in failing to act on IRAdvocates' Petition). *See also*, Appx. 67-69 (Complaint ¶¶ 123-34). IRAdvocates thus asserted that CBP had no discretion to decline to act on their Petition and the CIT's Order confirming this would have revitalized Section 307 as a major tool to fight forced labor.

CBP took the contrary position on the merits and asserted it had complete discretion as to whether to take any action at all on any Petition filed. CBP further

argued there is no mandatory action or time frame required by Section 307 and the implementing regulations. *See* ECF No. 16, at 3-4, 18, 22-29. According to CBP, Section 307 is merely optional and does not bind CBP to take any action at all.

Certainly, if CBP's position controlled, then IRAdvocates would not have suffered a concrete injury by CBP's refusal to act under Section 307 because no action would have been required. However, because the ***CIT was required to assume the merits of IRAdvocates' position***, for purposes of assessing standing, CBP's failure to act was unlawful and deprived IRAdvocates of the remedy it sought – CBP's mandatory review of its Petition on the merits. As is established in section VII.C below in the discussion of redressability, CBP's mandatory review of the Petition should have resulted in a WRO that banned the importation of cocoa harvested by child slaves. CBP's failure to act thus did more than impair or impede IRAdvocates' institutional objective; it unlawfully blocked the possibility of a mandatory ban that would have achieved IRAdvocates' mission.

It utterly defies the allegations of the Complaint to conclude that denying IRAdvocates an important tool designed to prevent forced child labor, thus meeting a key objective of IRAdvocates' foundational mission, does not cause injury to IRAdvocates. In *Havens*, HOME, an organization dedicated "to make equal opportunity in housing a reality in the Richmond Metropolitan Area," sued Havens

Realty for racial steering in violation of the Section 804 of the Fair Housing Act of 1968 ("FHA"). 455 U.S. at 363, 368. The Court found that HOME had standing because Havens Realty's racial steering practices impaired HOME's core mission. *Id.* at 379 ("If . . . petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services . . . there can be no question that the organization has suffered injury in fact.").

Here, CBP's effective nullification of Section 307 by claiming it has absolute discretion to ignore the law directly blocked a key tool for IRAdvocates to accomplish its core mission of ending forced child labor in cocoa production. CBP's unlawful failure to act on a statutory mandate was much more harmful to IRAdvocates than a single violator of the FHA, Havens Realty, was to HOME's mission. The equivalent to this case would have been if the Office of Fair Housing and Equal Opportunity ("FHEO") refused to enforce the FHA, thereby allowing Havens Realty, and all others who so chose to implement discriminatory racial steering practices, depriving HOME's clients of their statutory protection against racial discrimination and causing HOME to expend resources to require FHEO to perform its statutory duty.

CBP's failure to take mandatory action to stop the importation of cocoa harvested by child slaves in response to IRAdvocates' Petition creates "a direct

conflict between the defendant's conduct and the organization's mission." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citing *Nat'l Treasury Empl.Union v. United States*, 101 F.2d 1423, 1429-30 (D.C. Cir. 1996)). In *Abigail Alliance*, the court found institutional injury where the organization's activities – providing "counseling, referral, advocacy, and educational services" to assist terminally ill patients in "accessing potentially life-saving drugs" – were impeded by Food and Drug Administration ("FDA") regulations that forced the organization "to divert significant time and resources from these activities towards helping its members and public address the unduly burdensome requirements that the FDA impose[d] on experimental treatments." *Id.* at 132-133. The D.C. Circuit found an injury based on the FDA's imposition of barriers to the statutory remedy *Abigail Alliance* sought to obtain to forward its institutional objectives. Here, CBP's failure to enforce Section 307 is akin to the FDA in *Abigail Alliance* negating the FDA regulations by refusing to approve ***any*** experimental treatments rather than by merely imposing new burdensome regulations that still allowed the treatments.

In another example of agency inaction causing injury by depriving an organization of a statutory tool to accomplish its mission, the D.C. Circuit found that an organization's mission – "to protect and raise awareness about the plight of captive birds, and to serve as an educational resource for the humane community,

law-makers, and the general public" and to "respond to complaints [of] cruelty of birds" – was impaired by the failure of the U.S. Department of Agriculture ("USDA") to promulgate federal standards for the humane treatment of birds under the Animal Welfare Act ("AWA"). *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020). Specifically, the USDA had "repeatedly reiterated its intention to issue such standards," but its "decision-making process . . . remain[ed] unconsummated" for "many years." *Id.* at 620. In the absence of USDA standards, the organization was "compelled to fill the void" by developing and promoting its own guidance on bird welfare, which was "not part of [the organization's] normal annual expenditure until the efforts became necessary due to USDA's clear inaction" and "caused a consequent drain on the organization's resources." *Id.* at 619 (internal quotation and citation omitted).

The *Am. Anti-Vivisection Soc'y* Court relied strongly on *People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015). In both cases, the USDA deprived the concerned organizations of a tool to achieve their organizational goals when it failed to draft regulations to activate the AWA. Here, CBP deprived IRAdvocates of an important statutory tool by failing to enforce its existing regulations, claiming nonexistent discretion to decline to act.

Section 307 was intended by Congress to be, and if CBP actually does its job, could be one of the most effective tools to fight forced labor in the global economy. *See, e.g.*, Matthew M. Higgins, *Closed Loophole, Open Ports: Section 307 of the Tariff Act and the Ongoing Importation of Goods Made Using Forced Labor*, 75 STAN. L. REV. 917, 958-67 (April 2023). Depriving IRAdvocates of this tool, when other legal avenues have been largely foreclosed, is a major injury to IRAdvocates' institutional mission of using litigation to stop forced child labor.

As noted, the CIT and CBP both took the position that because there were other avenues to battle child slavery, CBP's failure to enforce Section 307 did not impair IRAdvocates' organizational mission. *See* Appx. at 167 (Decision at 15, n.3); ECF No. 16, at 16. While it is IRAdvocates' organizational and strategic decision as to how best to procced in using litigation to end child slavery, as alleged in the Complaint, the other potential avenues have been legally foreclosed or limited. IRAdvocates' ATS case was ultimately dismissed by the Supreme Court and the ATS was largely denuded by the Court's decision. Appx. at 55-56 (Complaint ¶ 94). IRAdvocates' TVPRA case was initially dismissed by the District Court and is on appeal to the D.C. Circuit Court. *Id*. ¶ 103.

These negative court decisions left Section 307 as the most significant remaining legal tool available to IRAdvocates to end child slavery. CBP's utter failure to act in response to the Petition severely restricts IRAdvocates' mission of

putting an end to forced labor. CBP's refusal to act also sends a message to the major chocolate companies that the highest mountain of evidence regarding forced child labor will not stop their imports of cocoa from entering the United States, even despite the explicit statutory prohibition of such conduct. This gave the companies a green light to continue to profit from harvesting cocoa with child slaves, and, since illegal child labor in cocoa harvesting has increased in recent years, CBP's inaction has signaled to the industry that it need not take steps to end its reliance on child labor.

In ignoring that the merits of IRAdvocates' claim must be assumed in assessing standing and arguing that IRAdvocates could not show a concrete injury, CBP relied heavily on *Military-Veterans Advocacy,* 7 F.4th at 1129. There, the relevant organization's mission was to guide veterans through the benefits process. This Court concluded that the agency's action "[fell] short of a 'perceptibl[e] impair[ment]'" to the organization's operations and missions when the agency did not "foreclose claimants from obtaining benefits" or "impair or unwind" the organization's other efforts. *Id.* at 1130.

In the present case, IRAdvocates' ***only*** path towards enforcement of the legal prohibition on imports produced with forced child labor is through CBP taking the mandatory action required by law. As the CBP states on its website, under Section 307, "CBP is responsible for preventing the entry of products made with forced

labor into the U.S. market by investigating and acting upon allegations of forced labor in supply chains." *Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor (last visited Oct. 16, 2024). "CBP's forced labor enforcement mission supports ethical and humane trade . . . CBP is the only U.S. government agency, and one of the few in the world, with the legal authority to take enforcement action against goods produced with forced labor to prevent entry into domestic commerce." *Id.*

Unlike the agency action in *Military-Veterans Advocacy* that merely created ***surmountable hurdles***, assuming the merits of IRAdvocates' claim, CBP's unlawful failure to enforce Section 307 in response to the Petition absolutely blocked the remedy that IRAdvocates sought – a ban on imports of cocoa harvested by forced child labor. CBP's assertion of absolute discretion as to whether to enforce Section 307 in response to IRAdvocates' Petition, despite what the CIT agreed was strong evidence of forced child labor in cocoa harvesting, *see* Appx. at 156 (Decision at 4), conflicts with the requirements of Section 307, as alleged in IRAdvocates' Complaint. CBP's total denial of the remedy of Section 307 by its discretionary and unlawful refusal to enforce the law can only be upheld if IRAdvocates' claim is ***not*** assumed to be meritorious, in violation of indisputable precedent.

## 2. IRAdvocates Suffered a Concrete Injury When it Was Required to Drain its Resources in an Effort to Convince CBP to Enforce Section 307.

In addition to suffering the concrete injury of being denied access to a major tool to end forced child labor by CBP's unlawful failure to enforce Section 307, IRAdvocates suffered the additional concrete injury of being required to divert substantial resources to persuade CBP to take the action it was required to take by law. Again, assuming the merits of IRAdvocates' legal claim as is required, CBP had a mandatory obligation to enforce Section 307 following IRAdvocates' filing of the Petition. When CBP unreasonably delayed taking action to enforce the law, IRAdvocates was forced to expend additional resources to vindicate the law and obtain the relief it sought in the Petition.

The Supreme Court has found the requisite injury-in-fact exists when an organization is forced to divert resources to counteract an illicit harm. *See Havens,* 455 U.S. at 379 (finding that HOME's consequent drain on resources in response to the defendant's racially discriminatory steering practices constituted an injury-in-fact). There, the Court wrote "there can be no question" that the drain and diversion of HOME's resources, because of Havens Realty's violation, constituted a "concrete and demonstrable injury to the organization's activities." *Id*.

Here, the harm that IRAdvocates suffered is even more direct: IRAdvocates expended time and resources in an attempt to remedy CBP's unlawful failure to

enforce Section 307 in response to IRAdvocates' Petition. The equivalent analogy to *Havens* would be if the Office of Fair Housing and Equal Opportunity (FHEO) refused to enforce the FHA, allowing Havens Realty to implement discriminatory racial steering practices, and HOME was required to expend resources to require FHEO to perform its statutory duty. "[T]here can be no question" that if the Supreme Court found concrete injury when HOME expended resources to try to force a single violator of the FHA, Havens Realty, to comply with the law the Court would also find a concrete injury if HOME was forced to more broadly counteract FHEO's unlawful failure to enforce the FHA, as was the situation with CBP in this case.

IRAdvocates filed its lawful Petition on February 14, 2020. The CIT acknowledged the "Petition detailed both statistical and first-hand evidence of forced and trafficked child labor collected by IRAdvocates, as exhibited in direct accounts from IRAdvocates investigators and victims of forced child labor in the Ivory Coast." Appx. at 156 (Decision at 4). The filing of the Petition was a strategic choice by IRAdvocates to enlist the powerful tool established by Section 307 to use the threat of lack of access to the attractive U.S. market to require private companies' compliance with the prohibition on using forced child labor.

When CBP failed to act on the Petition, IRAdvocates was then forced to expend time and resources to encourage CBP to perform its statutory duty. Among

the costly steps IRAdvocates took to attempt to obtain CBP compliance with the

law are:

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP's Office of Trade on March 23, 2021. Compl. ¶ 106.

- IRAdvocates diverted additional resources towards collecting additional evidence of trafficking and forced labor in the Ivorian cocoa industry to include in a supplemental petition that was filed on June 25, 2021. *Id.* ¶ 107 and Exhibit E. The resources included three trips to Western Africa in August, November, and December of 2020, which uncovered evidence that the impact of COVID-19 had worsened the situation of forced and child labor due to a loss of farmer income and the consequent increased in farmer indebtedness, which led to more children being trafficked into Côte d'Ivoire. *Id.* The investigators visited five regions in Côte d'Ivoire – Aboisso, Abengourou, Daloa, Duékoué, and Soubré – and uncovered evidence of forced labor in each of these regions. *Id.* This included numerous interviews and observations of children who discussed their work in the cocoa industry. *Id.*

- IRAdvocates also diverted substantial resources preparing reports, summaries of interviews, affidavits, description of photos, and transcripts of video and audio recording to document the new evidence of forced labor in its June 25, 2021 supplemental petition. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on September 10, 2021. *Id.* ¶ 108.

- IRAdvocates diverted additional resources towards organizing a February 14, 2020 letter that was joined by many important civil society stakeholders and that urged CBP to take statutorily required action on the Section 307 Petition. *Id.* ¶ 109 and Exhibit B. IRAdvocates' senior staff spent significant time interacting with the leadership of the 36 major civil society organizations that signed the

letter, including the AFL-CIO, the National Consumers League, and the Child Labor Coalition, as well as the 16 ethical cocoa companies and 41 individual signatories. These concerned entities and individuals joined to stress to CBP the key role it had in enforcing Section 307 to protect children from forced labor in cocoa harvesting. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on August 15, 2022. *Id.* ¶ 110.

- IRAdvocates diverted additional resources towards preparing a January 17, 2023 letter responding to a December 13, 2020 letter from CBP in which IRAdvocates once again urged CBP to act on the Section 307 Petition. *Id.* ¶ 112 and Exhibit G.

- Finally, IRAdvocates diverted additional resources working with Corporate Accountability Lab to conduct additional research and obtain new evidence to submit on February 14, 2023 yet another supplemental petition regarding ongoing forced child labor in Côte d'Ivoire cocoa harvesting. *Id.* ¶ 113 and Exhibit H.

As IRAdvocates alleged, and which must be taken as true, there is no question IRAdvocates would not have had to expend any of these additional resources if CBP had not unreasonably withheld and delayed action based on IRAdvocates' original Petition. *See* Appx. at 62-64 (Complaint ¶¶ 106-114).

The CIT improperly disputed IRAdvocates' allegations and rejected the factual allegations that IRAdvocates' expenditures in response to CBP's unlawful failure to act on IRAdvocates' Petition were a concrete injury. The CIT stated: "IRAdvocates' post-Petition expenditures fall squarely within the category of resources used for advocacy, litigation, or educational purposes—the types of

expenses that have been consistently rejected as a basis for Article III injury in fact." Appx. at 170 (Decision at 18). The CIT reasoned:

> Rather than relating to a business activity independent from its issue-advocacy functions, the expenditures appear to directly further IRAdvocates' claimed goal of "public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." *See* Compl. at ¶ 117. IRAdvocates cannot "spend its way into standing" by expending resources to gather information and advocate against forced-child labor in the Ivory Coast, be that at the outset of advocacy activities or in the middle. *See Alliance*, 602 U.S. at 394. Accordingly, IRAdvocates fails to demonstrate that it suffered any injury in fact as required to assume organizational standing under Article III.

*Id*. The CIT went on to speculate and dispute factually whether IRAdvocates' travel and other expenditures it alleged were required to encourage CBP to fulfill its statutory duty and enforce section 307 could have possibly been for different purposes. *Id*. n.16.

As a matter of fundamental law, the CIT must take IRAdvocates' allegations as true when evaluating a motion to dismiss and certainly cannot dispute those facts and make findings contrary to the factual allegations, as the CIT did in this case. *See, e.g.*, *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) ("Nalco's pleading clearly exceeds the minimum requirements under Rule 12(b)(6), especially as 'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.'

The district court's failure to credit these allegations as true is reversible error.")
(quoting *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d
1323, 1335 (Fed. Cir. 2012)).

Taken as true, the detailed allegations above of expenditures made by
IRAdvocates indicate that they were directly caused by CBP's failure to act and
were made solely and explicitly to prompt CBP to comply with its legal duty to
enforce section 307. For example, on June 25, 2021, more than 16 months after the
original Petition was filed, IRAdvocates invested resources to prepare and submit a
detailed Supplemental Petition to CBP with additional and updated evidence of
forced child labor in cocoa harvesting. Appx. at 62, 122 (Exhibit E and Complaint
¶ 107).

As Exhibit E makes clear, the information was compiled during ***three***
research trips to the Ivory Coast, and that information was gathered to file Exhibit
E with CBP in an effort to get CBP to enforce Section 307 and issue a WRO on
cocoa from the Ivory Coast. *See* Appx. at 122-26 (Exhibit E at 1-4). The CIT was
required by law to take it as true that the significant time and expense required for
the three research trips and the preparation of Exhibit E were directed at getting
CBP to enforce Section 307.[9] It was reversible error for the CIT to dispute these

---

[9] In another example showing the expenditures were exclusively to force CBP to
properly enforce Section 307, IRAdvocates expended significant time and
resources to draft a letter to CBP and obtain the signatures from numerous

allegations in the context of a motion to dismiss based on its own speculation as to what caused IRAdvocates to make these expenditures. *See* Appx. at 170 (Decision at 18, n.16).

The allegations of the Complaint make clear IRAdvocates ***was*** spending significant time and resources to force CBP to comply with the law and to protect the integrity of Section 307 as an important tool to end forced child labor in cocoa harvesting, a major institutional objective for IRAdvocates. This was specifically summed up in IRAdvocates' Complaint ¶ 114 (Appx. at 64):

> CBP has continuously shirked its duties to answer widely-substantiated claims that cocoa producers are importing cocoa into the United States that has been produced by forced child labor. IRAdvocates, CAL, and UCI have suffered financial harm [due] to the inaction of CBP, requiring ongoing and expensive investigations to provide updated information. This prolonged indecision and failure to act by CBP has left vulnerable and endangered children at risk for exploitation.

Distinct from the CIT's fundamental error in disregarding or disputing IRAdvocates' factual allegations, the CIT also erred in finding that IRAdvocates lacked standing based on the reasoning in *Alliance*. By disputing and ignoring IRAdvocates' allegations of injury, the CIT diminished the injuries and compared them to the mere advocacy injuries alleged in *Alliance*: "IRAdvocates has devoted

---

organizations and individuals with a shared interest in ending child slavery. The letter was directed to Defendant Miller and had no purpose other than encouraging CBP's compliance with Section 307. *See* Appx. at 63, 95 (Complaint ¶ 109 and Exhibit B).

resources to persuading [CBP] to act in accordance with its wishes." Appx. at 167 (Decision at 15). The Supreme Court distinguished *Alliance* from *Havens* by contrasting the abstract advocacy in *Alliance* with the interference with counseling services resulting in increased costs caused by the false information Havens Realty provided to HOME's clients. 602 U.S. at 395. This distinction is operative here.

In *Alliance*, medical associations asserted standing based on the costs they incurred to oppose the FDA's actions, which "caused" them "to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks." *Id*. at 393. The Supreme Court denied standing and opined that neither policy interests nor public advocacy is enough for standing purposes: "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. at 394.

In contrast, in *Havens*, HOME successfully established standing because racial steering practices "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Havens*, 455 U.S. at 369. The harm was concrete because HOME's counseling had directed its clients to Havens Realty, which lied about available housing to those clients and to an employee of HOME. *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 366, 368).

Consequently, HOME had to "devote significant resources to identify and counteract" the "racially discriminatory steering practices" of the defendant. *Id.* at 379. The Court stressed that this injury was "more than simply a setback to the organization's abstract social interests" because HOME was not only an advocacy organization, but also operated a counseling service as a core business. *Id*. at 379. The Court wrote "there can be no question" that the drain and diversion of HOME's resources, because of Havens Realty's violation, constituted a "concrete and demonstrable injury to the organization's activities." *Id*. The *Alliance* Court characterized the core injury that gave HOME standing as the fact that Havens Realty intentionally provided HOME with false information – which the Supreme Court analogized to "defective goods" – that "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id*. at 395.

IRAdvocates' injury is analogous to the injury suffered by HOME. First, contrary to the CIT's erroneous conclusion, and unlike the medical associations in *Alliance*, IRAdvocates did not expend money and time to oppose, challenge, or spread awareness of a mere policy interest. *See* Appx. at 167 (Decision at 15). Rather, as is catalogued at pages 31-33, *supra*, IRAdvocates expended significant time and resources to specifically target CBP's unlawful failure to take the action required by Section 307 and act upon IRAdvocates' meritorious Petition. Again,

assuming the merits of IRAdvocates' legal claim against CBP, the agency was required to act on the Petition and unlawfully failed to do so. IRAdvocates then was forced to spend time and resources to force CBP to perform its legal duty under Section 307, funds and time IRAdvocates would not have spent had CBP not violated the law.[10] Like HOME, IRAdvocates was forced to divert resources to address a serious violation of law that blocked its efforts to accomplish its core mission.

Similarly, CBP's failure to act and the bad faith explanation that CBP in Exhibit F (Appx. at 142) provided to justify that delay – that IRAdvocates' evidence of child labor had become too dated ***after three years of unreasonable delay by CBP*** – is like the "defective goods" analogy the *Alliance* Court made to distinguish *Havens*. *See* 602 U.S. at 395.

Here, CBP failed to provide accurate information about its now-clear position that it viewed Section 307 as a discretionary option and that it did not view Section 307 as requiring ***any*** action in response to IRAdvocates' Petition.

---

[10] IRAdvocates agrees *Alliance* prevents an organization that is outraged by child labor in the cocoa industry in West Africa – and appalled enough at CBP's failure to take any action against imports of cocoa harvested by forced child labor to spend money to engage in general advocacy against CBP– from establishing standing to challenge CBP's failure to enforce the law. Only organizations like IRAdvocates that have filed a lawful Section 307 petition ***and then*** expended funds in an effort to get CBP to take statutorily required action to enforce the law have standing to challenge CBP's inaction.

Many of IRAdvocates' actions were taken because it was led to believe by CBP that CBP would act after IRAdvocates devoted additional resources to developing and providing additional information. As the CIT acknowledged, CBP did not indicate to IRAdvocates in the early phases that there was any issue with the timeliness or quality of evidence in the Petition. Appx. at 157 (Decision at 5). Indeed, 19 C.F.R. § 12.42(c) of the regulations implementing Section 307 required CBP to either notify IRAdvocates of any defects in the Petition or forward it to the CBP Commissioner "*within 10 days*" (emphasis added). Since CBP did not notify IRAdvocates of any defects in its Petition within 10 days, IRAdvocates reasonably assumed CBP was proceeding in good faith.

As is detailed at pages 31-33, *supra*, IRAdvocates continued to engage with CBP and, with CBP's encouragement, IRAdvocates and its partners provided two Supplemental Petitions, believing that the Petition was still pending and that the CBP-encouraged supplemental materials would result in action taken on the Petition. *See* Appx. at 60-65 (Complaint ¶¶ 103-116)

After nearly *three years* of official silence, CBP, through its Acting Commissioner and Defendant, Troy Miller, then asserted in a letter *for the first time* that the information in the Petition was not timely. *See* Appx. at 63, 142 (Complaint ¶ 111 and Exhibit F). Defendant Miller's letter ended with the assertion that "if evidence reasonably indicates that merchandise is produced by forced labor

. . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." *Id.* This assertion has proven to be unequivocally false as CBP never acted on the Petition, which the CIT found to provide substantial evidence of forced child labor in cocoa harvesting. Appx. at 156 (Decision at 4).

CBP's official silence for three years before Defendant Miller then declared the evidence untimely demonstrates unreasonable delay. As IRAdvocates pointed out in response to Defendant Miller's letter, the information in the original and supplemental petitions was timely when submitted, and CBP's failure to act on the information until CBP unilaterally declared it untimely is irrefutable evidence of "unreasonable delay" under section 706(1) of the APA section. *See* Appx. at 143 (Exhibit G).

If CBP had communicated the truth – that it (unlawfully) viewed Section 307 as optional, and CBP's position was that it had complete discretion to act or not act and was not going to act in the cocoa sector regardless of evidence of forced child labor, then IRAdvocates would not have spent enormous time and resources gathering new evidence and taking other actions to encourage CBP to perform its statutory duty. A truthful admission by CBP that, for whatever reason, it was not going to comply with its statutory duty to enforce Section 307 would have provided IRAdvocates with a clear basis to file its claim under the APA

alleging CBP was refusing to perform its statutory duty without the need to spend

three years and vast resources to get CBP additional information to encourage CBP

to perform its statutory duty. IRAdvocates was ultimately forced to spend the time

and resources, but, regardless of the strong evidence of forced child labor in cocoa

harvesting, CBP **then** asserted its unlawful position that Section 307 is merely an

optional course of action for CBP, subject to CBP's complete discretion.

IRAdvocates had no choice but to then file this case to use the APA to obtain

CBP's compliance with its mandatory obligations under Section 307.

CBP's defective (and unlawful) failure to timely act upon the Petition

directly affected and interfered with IRAdvocates' core mission of using an

extremely important tool, Section 307, to fight the exploitation of forced child

labor in cocoa harvesting. As a small public advocacy organization, IRAdvocates

does not have unlimited resources to spend its way into standing based on any

ideological mission. Instead, its clients and constituents, who rely upon

IRAdvocates to achieve just results through advocacy, litigation, research, and

other means, are denied the same levels of representation while IRAdvocates must

dedicate its limited resources to compel CBP to do its statutory duty. Thus, like

HOME in *Havens*, IRAdvocates suffered an injury to its core business.[11]

---

[11] The CIT again disregarded the factual allegations of the Complaint in asserting
that IRAdvocates had a "mere ideological objection to the [CBP's] choices." Appx
at 168 (Decision at 16) (quoting *Alliance*, 602 U.S. at 396–97). IRAdvocates' clear

Forcing IRAdvocates to expend substantial time and money to combat

CBP's unlawful failure to enforce Section 307 "perceptibly impaired" its ability to

protect and assist current and former child slaves. *See Havens*, 455 U.S. at 379.

CBP's unlawful failure to act required IRAdvocates to divert resources that could

have been devoted to finding other potentially effective ways to end forced child

labor in cocoa harvesting and end other serious human rights violations in the

global economy. *See* Appx. at 12-13, 20, 55-61, 65-66 (Complaint ¶¶ 17-18, 29,

93-104, 117, 119).

B. **IRAdvocates' Injury Was Caused By CBP's Failure to Act on the Petition as Required by Section 307**.

To satisfy causation, the plaintiff need only show that the injury is "fairly

traceable" to the defendant's conduct. *Lujan*, 504 U.S. at 560-561. *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate

causation is not a requirement of Article III standing, which requires only that the

plaintiff's injury be fairly traceable to the defendant's conduct").

---

position is that CBP did not have a "choice" to disregard Section 307, which
established a mandatory obligation for CBP to enforce the law. IRAdvocates is
properly opposing CBP's unlawful failure to enforce the law and is not expressing
any ideology other than that government agencies such as CBP must comply with
their statutory duties.

Turning to the CIT's specific reasoning in erroneously finding that IRAdvocates had not demonstrated causation, the CIT relied solely on its conclusion that "IRAdvocates' expenses resulted from CBP's inaction related to those made in the routine operations of an organization seeking 'to achiev[e] just and humane treatment for workers worldwide.'" Appx. at 171 (Decision at 19). As was discussed in relation to injury-in-fact in section VIII.A.2, *supra*, the allegations of IRAdvocates' Complaint make clear that the time and resources expended following CBP's failure to act on the Petition, including multiple trips to the Ivory Coast to develop supplemental evidence, were all done in an effort to encourage CBP to take the action it was required to take under Section 307. For the CIT to find against IRAdvocates because it merely disagreed with factual allegations is reversible error. As the Supreme Court has made clear, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke,* 490 U.S. at 327.

The time and resources IRAdvocates expended when CBP unlawfully failed to take required action under Section 307 were solely for the specific purpose of attempting to get CBP to act, not for a more general purpose. Taking IRAdvocates' allegations as true, causation is clearly established under the traditional *Lujan* test. *See Lujan*, 504 U.S. at 560-561.

Further, the *Havens* test for organizational standing, discussed in section VII.A above, also contains a causation requirement: whether the defendant's conduct "perceptibly impaired" the plaintiff organization's activities. *Havens*, 455 U.S. at 379. By satisfying the more stringent causation requirement in the *Havens* test, *supra*, IRAdvocates naturally satisfies this basic requirement to show causation for Article III standing.

### C. **IRAdvocates' Injury Would Be Redressed by CIT's Order to CBP to Enforce Section 307.**

With a perfunctory analysis of just a few lines, the CIT concluded that IRAdvocates' claim was not redressable, reasoning "[t]here is no ***guarantee*** that action from CBP will immediately, or even eventually, put an end to forced child labor in the Ivory Coast." Appx. at 171 (Decision at 19) (emphasis added). This was clear error as the relief requested in the Complaint was to require CBP to enforce Section 307 and act on IRAdvocates' Petition, not to "end to forced child labor in the Ivory Coast." *See* Appx. at 69 (Complaint ¶¶ 132-34; Requests for Relief A and B).

As an initial matter, to satisfy redressability, a plaintiff need only show that the injury is "likely to be redressed should the court grant the relief requested."

*McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1549–50 (Fed. Cir. 1986). IRAdvocates' injury can "likely"[12] be redressed by a favorable court decision.

Here, IRAdvocates is asserting a procedural right under the APA, which is a law designed "to improve the administration of justice by prescribing fair administrative procedure," which it does by "creat[ing] a foundation for protecting the rights of individuals and enterprises against the abuse of power by unelected officials." *Administrative Procedure Act: Legislative History*, S. Doc. No. 79-248, at 1 (1946). The APA provides legal protection by granting the right of judicial review to any person suffering from a legal wrong due to agency (in)action. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof"). Because IRAdvocates is seeking a procedural right under the APA, it can pursue its right of judicial review without "meeting all the normal standards for redressability and immediacy." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007).

---

[12] The closest analogy to a standard for "likely" is the more probable than not standard for civil litigation. *See, e.g.*, *Elliot v. Michael James Inc.*, 507 F.2d 1179, 1184 (D.C. Cir. 1974) ("'it is enough that [plaintiff] introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not'") (*quoting* Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)).

The CIT's conclusory decision quoted above is legal error. First, as noted, IRAdvocates' Complaint was ***not*** seeking an Order from the CIT to end child labor in the Ivory Coast cocoa harvesting, but very specifically sought the limited ***procedural*** remedy established by the APA that the CIT order CBP to act under Section 307 in response to IRAdvocates' Petition. There is no question this requested relief could have been redressed by a favorable decision in this action because the CIT has the authority to compel agency action under the APA to redress the harms of unlawfully withheld or unreasonably delayed agency action. 5 U.S.C. § 706(1); *see also, Norton v. Southern Utah Wilderness Alliance*, 524 U.S. 55, 61 (2004) ("The APA provides relief for a failure to act in § 706(1): 'The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed'").

Whether any action taken by CBP after the limited relief sought by IRAdvocates ultimately has an impact on ending forced child labor is pure speculation and is essentially irrelevant to whether the CIT could redress IRAdvocates' core complaint – that CBP did nothing in response to the Petition and could be ordered by CIT to enforce Section 307 and act upon the Petition.

However, even if the redressability assessment also includes the question of whether CBP's action on the Petition would lead to a reduction of forced child labor in cocoa harvesting in the Ivory Coast, based on the allegations of the

Complaint and other documents in the record, it is very "likely" it would. As the CIT acknowledged, the Petition meets all the requirements of CBP's regulations and "detailed both statistical and first-hand evidence of forced and trafficked child labor collected by IRAdvocates, as exhibited in direct accounts from IRAdvocates investigators and victims of forced child labor in the Ivory Coast." Appx. at 156 (Decision at 4). Further, there is no question that on two occasions, IRAdvocates supplemented the Petition with updated and detailed additional evidence of forced child labor in cocoa harvesting. See Appx. at 62, 64 (Complaint ¶¶ 107, 113).

According to CBP's Acting Commissioner, Defendant Miller, if a Petition is submitted with evidence that "reasonably indicates that merchandise is produced by forced labor . . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." *See* Appx. at 142 (Exhibit F). CBP's website confirms its obligation to act on a meritorious Petition and ban goods made with forced labor: "CBP is the only U.S. government agency, and one of the few in the world, with the legal authority to take enforcement action against goods produced with forced labor to prevent entry into domestic commerce." *Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor. Thus, based on CBP's own admission, if it reviews a Petition that includes evidence of forced child labor, it will issue a WRO and ban the importation of the concerned products.

It is not clear why CBP failed to timely review and act on IRAdvocates'

Petition, but if the CIT had granted the relief requested and ordered CBP to review

the meritorious Petition, it is "likely" that CBP would have issued a WRO based on

its own requirements. As noted in discussing injury-in-fact, the key merits issue in

this case is CBP's position that it has total discretion as to whether to act in

response to any petition. An order from CIT that CBP *must* act in response to a

Petition would likely have triggered a WRO.

In addition, there is every reason to conclude it is "likely" that CBP's

issuance of a WRO banning cocoa from the Ivory Coast would have had a

dramatic impact on reducing forced child labor. The very premise of Section 307 is

that access to the massive U.S. market provides a strong incentive for companies to

comply with the law and avoid losing access. Thus, the law is precisely designed to

reduce, and ultimately eliminate, forced labor. *See* Shanni Alon, *Enforcing the*

*Forced Labor Prohibition: Increasing Transparency and Mandating Supply Chain*

*Due Diligence*, 31 Fed. Circuit B.J. 377, 381 (2023).

Further, to improve Section 307's ability to prevent forced labor, Congress

closed the consumptive demand loophole in 2016 which eliminated "a provision

that previously allowed some imports into the United States made, in whole or in

part, with forced labor, including child labor." Signing Statement for H.R. 644,

2016 WL 737735, at *1. Members of Congress lauded the "strong provisions to put

an end to importation of products made by child and forced labor" describing it as "a bipartisan compromise." 161 Cong. Rec. E1817-03, 161 Cong. Rec. E1817-03, E1817.

Congress established Section 307 as a tool to keep products made with forced labor out of U.S. markets. Once a WRO is issued, the implementing regulations allow any specific importer to restore access to the U.S. market if "the *importer* establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42(f) and (g) (emphasis added). It is very likely that rather than lose access to the U.S. market, the major cocoa companies named in the Petition as using forced child labor to harvest cocoa would finally opt to keep the promise they made in signing the 2001 Protocol and, at long last, stop profiting from child slavery and establish transparent, independent monitoring to demonstrate their cocoa was not harvested in violation of Section 307.

In improperly disagreeing with the premise of the Complaint by speculating that a WRO would not have an impact on ending forced child labor in cocoa harvesting, the CIT also erred in ignoring numerous statutory provisions within U.S. trade law as well as court cases that recognize that withholding access to the U.S. market is a powerful tool in obtaining compliance with legal obligations. Indeed, the Federal Circuit has frequently noted that the United States is one of the

largest and most attractive markets in the world due to its being relatively open and commanding higher prices than other markets. *See, e.g., Nucor Corp. v. United States*, 33 C.I.T. 157, 182 (2009) (recognizing the "fact that the U.S. market is particularly attractive to foreign producers due to the relatively open U.S. market and its higher prices"); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 931 (Fed. Cir. 1984) (discussing the attractiveness of the U.S. market).

CBP has not disputed that a WRO denying access to the U.S. market is an effective tool established by Section 307 to obtain the elimination of forced labor in foreign countries. CBP disputes whether Section 307 mandates that CBP act on a viable Petition, an issue that must be assumed in IRAdvocates' favor in assessing standing on a motion to dismiss.

Even if the CIT was correct in requiring IRAdvocates to show an order from the CIT must further IRAdvocates' broader mission of ending forced child labor, instead of showing the CIT could issue the order to CBP that IRAdvocates requested, CBP clearly erred in demanding a "guarantee" that such action would "put an end to forced child labor in the Ivory Coast." Appx. at 171 (Decision at 19).

First, immediacy is **not** a requirement when plaintiffs are accorded procedural rights, such as in this case where IRAdvocates is asserting the right of agency review under the APA. *See Massachusetts,* 549 U.S. at 517-18 (holding a

plaintiff can challenge unlawfully withheld agency inaction without meeting the normal standard of immediacy). Further, IRAdvocates "need not show that a favorable decision will relieve [its] every injury." *Larson v. Valente*, 456 U.S. 228, 244 (1982). For example, in *Massachusetts,* the Court granted States acting as plaintiffs standing in their suit against the EPA for failing to regulate greenhouses gases as required by the Clean Air Act. The Supreme Court acknowledged the near impossibility of solving the human-caused climate crises, while still acknowledging incremental steps as a valid remedy. *Massachusetts*, 549 U.S. at 525. The Court found that because the climate crisis is so enormous, it is irrelevant whether the results of an effective remedy might not be effective on their own to address the problem. *See id*. ("Because of the enormity of the potential consequences associated with manmade climate change, the fact that the effectiveness of a remedy might be delayed during the . . . time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant."). Nor did the Court excuse the EPA's responsibilities due to other, foreign actors: even though China and India were poised to increase greenhouses gases, "[a] reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Id*.

    Here, similarly, CBP has a duty to use its power under Section 307 to do whatever it can to prevent the importation of cocoa harvested by forced child labor

in violation of the law. As the *Massachusetts* Court ruled, IRAdvocates need not establish that a WRO by CBP would immediately or eventually -- by itself -- end all forced child labor in the Ivory Coast, as the CIT required. Appx. at 171 (Decision at 19). However, there can be no question that Section 307 would work as designed and at least reduce imports of cocoa harvested by forced child labor and accordingly reduce the number of child slaves harvesting cocoa. The loss of access to the U.S. market will incentivize cocoa producers in the Ivory Coast as well as the U.S. importers of such cocoa products to work together to end the use of forced child labor.

Finally, in response to the CIT's observation that "even if the Court compelled CBP to act, the agency might conclude that the Petition is without merit and refuse to impose Section 1307 exclusions on cocoa from the Ivory Coast," Appx. at 171 (Decision at 19), as IRAdvocates began this section, the stated objective of this case was to make clear that CBP must act on any Petition that meets its criteria. *See* Appx. at 68-69 (Complaint ¶¶ 132-34; Requests for Relief A and B). Even if CBP, when ordered by the CIT to act on the Petition, finds it lacks merit and declines to issue a WRO (a very unlikely result), this would still be an important victory for IRAdvocates on the key issue of whether CBP has complete discretion to ignore Section 307 Petitions. It would establish CBP is accountable and ***must act*** under Section 307 when a Petition is filed.

CBP's position that it has no accountability and need not act at all on a Petition unlawfully evades the APA's requirement in 5 U.S.C. § 555 (e) that CBP must provide "[p]rompt notice" "of the denial in whole or in part of a written . . . petition . . ." IRAdvocates has never received such notice, and this has left it in legal limbo. If CBP is ordered by the CIT to act, and CBP issues a decision denying the merits, this would presumably require CBP to articulate standards for a meritorious Petition that IRAdvocates, and others, could then endeavor to meet. It would also allow IRAdvocates to appeal that decision under 5 U.S.C. § 706(2)(A) as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Given the strong evidence of forced child labor in cocoa harvesting and CBP's bad faith in sitting on this evidence for years and then declaring it dated, such an appeal should be successful.

Under CBP's current interpretation of Section 307, it claims to have complete discretion to simply file away and never act upon even meritorious petitions. That CBP *must* act under Section 307 is the first step that needs to change to allow Section 307 to be used as Congress intended. This would be accomplished, and CBP accountability established, even if CBP were to initially decide that the Petition lacked merit.

## VIII.   CONCLUSION

Applying the proper pleading rules in assessing standing in the context of a motion to dismiss, IRAdvocates has standing to sue CBP and DHS for failing to act under Section 307 on IRAdvocates' well-documented and timely Petition demonstrating that cocoa imported from Ivory Coast was produced "in whole or in part" with forced child labor. The CIT's erroneous denial of standing must be reversed.

Respectfully submitted on this 12th day of November 2024,

_____
Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE FOR
## APPELLANTS' OPENING BRIEF

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(B)(i), I certify that Plaintiffs-Appellants' Opening Brief complies with applicable page and word limits in that it has a text typeface of 14 points and contains 12,994 words, less than the 13,000 words permitted.

Dated: November 12, 2024

Respectfully submitted:

/s/ Terrence Collingsworth
Terrence Collingsworth
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Phone: (202) 543-5811
Email: tc@iradvocates.org

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the

foregoing with the United States Court of Appeals for the Federal Circuit by using

the CM/ECF system, which will send a notice of filing to all registered users,

including counsel for all parties.


Date: November 12, 2024        /s/ Terrence P. Collingsworth
                                        Terrence P. Collingsworth
                                        (D.C. Bar No. 471830)
                                        INTERNATIONAL RIGHTS ADVOCATES
                                        621 Maryland Avenue, NE
                                        Washington, D.C. 20002
                                        Telephone: (202) 543-5811
                                        tc@iradvocates.org

                                        *Counsel for Plaintiff-Appellant*