**Case No.: 24-2316**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**INTERNATIONAL RIGHTS ADVOCATES,**
*Plaintiff-Appellant*

v.

**ALEJANDRO MAYORKAS, Secretary of U.S. Department of Homeland Security,**
**TROY MILLER, Acting Commissioner for U.S. Customs and Border Protection,**
*Defendants-Appellees*

---

On Appeal from the United States Court of International Trade, Case No. 23-00165
Honorable Claire R. Kelly

---

# CORRECTED OPENING BRIEF FOR PLAINTIFF-APPELLANT

---

Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, DC 20002
Phone: 202-543-5811
Email: tc@iradvocates.org

***Counsel for Plaintiff-Appellant***
***International Rights Advocates***

Dated: November 12, 2024
(Corrected 11/26/2024)

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

# CERTIFICATE OF INTEREST

**Case Number:** 24-2316

**Short Case Caption:** INTERNATIONAL RIGHTS ADVOCATES v. MAYORKAS, *et al.*,

**Filing Party/Entity:** INTERNATIONAL RIGHTS ADVOCATES

I certify the following information is accurate and complete to the best of my knowledge.

Date: November 12, 2024

Signature:

Name: Terrence P. Collingsworth

1. **Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case: Plaintiff-Appellant International Rights Advocates.

2. **Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities: None/Not Applicable.

3. **Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities: None/Not Applicable.

4. **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who

have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4): None/Not Applicable.

5. **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? No.

6. **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6). None/Not Applicable.

TABLE OF CONTENTS

I. INTRODUCTION .......... I

II. STATEMENT OF JURISDICTION .......... 3

III. STATEMENT OF THE ISSUE PRESENTED FOR REVIEW .......... 4

IV. STATEMENT OF THE CASE .......... 4

A. Procedural History .......... 4

B. Factual Background .......... 5

1. Child Labor is Pervasive in Cocoa Harvesting in the Ivory Coast and the Major Importing Companies Continue Their Reliance on Forced Child Labor .......... 5

2. Since at Least 2001, CBP Has Known About and Failed to Take Required Action to Enforce Section 307 to Ban Cocoa from the ivory Coast Harvested by Forced Child Labor .......... 8

V. STANDARD OF REVIEW .......... 13

VI. SUMMARY OF ARGUMENT .......... 13

VII. ARGUMENT

The CIT Erred in Finding IRAdvocates Lacked Article III Standing to Sue CBP for Failing to Enforce Section 307 of the Tariff Act .......... 16

A. IRAdvocates Suffered an "Injury-In-Fact." .......... 18

1. CBP's Failure to Enforce Section 307 Caused Injury to IRAdvocates by Depriving it of an Important Tool to Achieve its Core Mission of Ending Forced Child Labor in Cocoa Harvesting .......... 19

2. IRAdvocates Suffered a Concrete Injury When It Was Required to Drain its Resources in an Effort to Convince CBP to Enforce Section 307 .......... 29

B. IRAdvocates' Injury Was Caused by CBP's Failure to Act on the Petition as Required by Section 307 .......... 43

C. IRAdvocates' Injury Would Be Redressed by CIT's Order to CBP to Enforce Section 307 .....45

VIII. CONCLUSION .....54

TABLE OF AUTHORITIES

**CASES**

*A&D Auto Sales, Inc. v. United States*
748 F.3d 1142 (Fed. Cir. 2014)....................17

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*
469 F.3d 129 (D.C. Cir. 2006)....................24-25

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*
946 F.3d 615 (D.C. Cir. 2020)....................26

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)....................13, 17

*Attias v. CareFirst, Inc.*
865 F.3d 620 (D.C. Cir. 2017)....................17

*Digitalis Educ. Sols., Inc. v. United States*
664 F.3d 1380 (Fed. Cir. 2012)....................13

*Doe v. Apple, Inc.*
96 F.4th 403 (D.C. Cir. Mar. 5, 2024)....................17, 22

*Elliot v. Michael James Inc.*
507 F.2d 1179 (D.C. Cir. 1974)....................45

*Food and Drug Administration v. Alliance of Hippocratic Medicine*
602 U.S. 367 (2024)....................4, 19, 34, 37-39, 42

*Havens Realty Corp. v. Coleman*
455 U.S. 363 (1982)....................14, 19, 23-24, 30, 37, 43-44

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*
572 U.S. 559 (2014)....................13

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*
681 F.3d 1323 (Fed. Cir. 2012)....................34-35

*Int'l Labor Rights Fund v. United States*
391 F. Supp. 2d 1370 (C.I.T. 2005)............................................................9

*Larson v. Valente*
456 U.S. 228 (1982)........................................................................52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
572 U.S. 118 (2014)........................................................................43

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992)..................................................................16, 43-44

*Massachusetts v. E.P.A.*
549 U.S. 497 (2007)..................................................................46, 51-52

*Matsushita Elec. Indus. Co. v. United States*
750 F.2d 927 (Fed. Cir. 1984)..........................................................51

*McKinney v. U.S. Dep't of Treasury*
799 F.2d 1544 (Fed. Cir. 1986)........................................................45

*Military-Veterans Advocacy v. Sec'y of Vet. Affs.*
7 F.4th 1110 (Fed. Cir. 2021).....................................................19, 28

*Nalco Co. v. Chem-Mod, LLC*
883 F.3d 1337 (Fed. Cir. 2018).......................................................34

*Nat'l Treasury Empl.Union v. United States*
101 F.2d 1423 (D.C. Cir. 1996)..................................................24-25

*Neitzke v. Williams*
490 U.S. 319 (1989)...............................................................34, 44

*Norton v. Southern Utah Wilderness Alliance*
524 U.S. 55 (2004)..........................................................................47

*Nucor Corp. v. United States*
33 C.I.T. 157 (2009)...................................................................50-51

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*
797 F.3d 1087 (D.C. Cir. 2015)....................26

*Wanxiang Am. Corp. v. United States*
12 F.4th 1369 (Fed. Cir. 2021)....................13, 17

*Warth v. Seldin*
422 U.S. 490 (1975)....................14, 17, 19

**RULES**

Fed. R. Civ. P. 12(b)(1)....................4

Fed. R. Civ. P. 12(b)(6)....................34, 44

**STATUTES**

5 U.S.C. § 555 (e)....................53

5 U.S.C. § 702....................46

5 U.S.C. § 706(1)....................2, 47

5 U.S.C. § 706(2)(A)....................54

18 U.S.C. § 1595....................20

19 U.S.C. § 1307....................2, 3

28 U.S.C. § 1295(a)(5)....................3

28 U.S.C. § 1350....................20

28 U.S.C. § 1581(i)(1)(c)....................3

Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016)....................10

**REGULATIONS**

19 C.F.R. § 12.42(c)....................12, 40

19 C.F.R. § 12.42(e)....................................................................................10

19 C.F.R. § 12.42(f)....................................................................................50

19 C.F.R. § 12.42(g)................................................................................11, 50

**OTHER AUTHORITIES**

161 Cong. Rec. E1817-03...........................................................................49

161 Cong. Rec. E1817-03, E1817...............................................................49

*Administrative Procedure Act: Legislative History*, S. Doc. No. 79-248, at 1 (1946)..........................................................................................46

CBS News, *Children as Young as 5 Found Harvesting Cocoa Used by Major Corporations in Ghana*, CBS NEWS, https://www.cbsnews.com/news/children-harvesting-cocoa-used-by-major-corporations-ghana/ (last visited Nov. 7, 2024)................................8

*Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor (last visited Oct. 16, 2024)...28, 48

Matthew M. Higgins, *Closed Loophole, Open Ports: Section 307 of the Tariff Act and the Ongoing Importation of Goods Made Using Forced Labor*, 75 STAN. L. REV. 917, 958-67 (April 2023)........................................26-27

Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)..................................46

Shanni Alon, *Enforcing the Forced Labor Prohibition: Increasing Transparency and Mandating Supply Chain Due Diligence*, 31 Fed. Circuit B.J. 377 (2023)..........................................................................................49

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, undersigned counsel for Plaintiff-Appellant International Rights Advocates states that he is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. In addition, counsel is not aware of any cases before the United States Court of International Trade that may be affected by this Court's decision in the pending appeal.

Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, DC 20002
Phone: 202-543-5811
Email: tc@iradvocates.org

***Counsel for Plaintiff-Appellant***
***International Rights Advocates***

# I. INTRODUCTION

Plaintiff-Appellant International Rights Advocates ("IRAdvocates") is a non-profit corporation that "advocates for and with working people around the world . . . and is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy." Appx85 (Complaint ¶ 117). IRAdvocates "promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." *Id*.

One of IRAdvocates' major priorities is to stop the major chocolate companies, such as Nestlé, Cargill, Mars, Mondelez, and Hershey, from using forced child labor to harvest cocoa in the Ivory Coast (a/k/a Côte d'Ivoire) and Ghana. Appx75-81 (Complaint ¶¶ 93-104). As the United States Court of International Trade ("CIT") acknowledged:

> Forced child labor in the Ivory Coast's cocoa production is well documented and recognized not only by humanitarian organizations and nonprofits, but also by the courts and the U.S. chocolate companies themselves. *See, e.g.*, Compl. at ¶¶ 10–92 (citing sources). Despite this recognition, leading chocolate producers continue to use and profit from forced child labor in the Ivory Coast. *Id*. at ¶ 29.

Appx3 (Decision at 3).

One of the major tools to fight forced child labor is Section 307 of the Tariff Act, 19 U.S.C. § 1307 ("Section 307"). It provides products made "***wholly or in***

***part*** in any foreign country by . . . forced labor . . . "***shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited***." *Id.* (emphasis added). In this case, IRAdvocates filed a detailed Petition[1] under Section 307 requesting that U.S. Customs and Border Protection ("CBP") issue a Withhold Release Order ("WRO") blocking the importation to the U.S. of cocoa from the Ivory Coast produced with forced child labor. There is universal agreement that cocoa ***is*** harvested in the Ivory Coast with forced child labor. *See* Appx3-4 (Decision at 3-4).

When CBP took no action on the Petition ***after three years and five months***, IRAdvocates filed its Complaint against the U.S. Department of Homeland Security ("DHS"), DHS Secretary Alejandro Mayorkas, CBP, and CBP Acting Commissioner Troy A. Miller, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), asking the CIT to "compel agency action unlawfully withheld or unreasonably delayed." The CIT ultimately dismissed the case, erroneously finding that IRAdvocates had failed to show the requisite "injury-in-fact" required for Article III standing, and that even if there was an injury, it was not caused by CBP's inaction and would not be redressed by a decision of the CIT. Appx14-20 (Decision at 14-20).

[1] The Petition is Exhibit A to the Complaint. See Appx91.

As IRAdvocates demonstrates below, it suffered an injury-in-fact that can be linked to CBP's unlawful inaction and could be redressed by the CIT's decision. The CIT's decision finding IRAdvocates lacked standing must be reversed.

## II. STATEMENT OF JURISDICTION

The CIT had exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1581(i)(1)(c). IRAdvocates' claim arose out of Section 307, which is a law of the United States that provides for "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(1)(c), *see* 19 U.S.C. § 1307.

The CIT dismissed the case on August 8, 2024 (Appx1, Appx14-20), giving this Court appellate jurisdiction under 28 U.S.C. § 1295 (a)(5) as this is a final judgment of the CIT.

IRAdvocates filed a timely Notice of Appeal on September 9, 2024 (ECF No. 36).

## III. STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The sole issue on appeal is whether the CIT erred in finding that IRAdvocates lacked Article III standing to sue for its claim against CBP and DHS under the APA and dismissing the case based on Fed. R. Civ. P. 12(b)(1).

## IV. STATEMENT OF THE CASE

### A. Procedural History

IRAdvocates filed the Complaint in this case on August 15, 2023. Appx21. On December 15, 2023, CBP and DHS filed their Joint Motion and Memorandum in Support of Motion to Dismiss (ECF No. 16). On February 23, 2024, IRAdvocates filed its Opposition to the Motion to Dismiss (ECF No. 17) ("Opp. MTD"), and on May 3, 2024, CBP and DHS replied (ECF No. 21).

On June 17, 2024, the CIT requested supplemental briefing from the parties to discuss the application of the Supreme Court's decision in *Food and Drug Administration v. Alliance of Hippocratic Medicine* ("Alliance"), 602 U.S. 367 (2024). The parties filed supplemental briefs. *See* ECF No. 27 (Defendants' brief) and ECF No. 29-1 (Plaintiff's brief).

On July 16, 2024, the Court heard oral argument on the Motion to Dismiss. *See* ECF No. 33.

The CIT issued a decision dismissing IRAdvocates' claim on August 8, 2024 (Appx1). IRAdvocates filed a timely Notice of Appeal on September 9, 2024 (ECF No. 36).

### B. Factual Background

#### 1. Child Labor is Pervasive in Cocoa Harvesting in the Ivory Coast and the Major Importing Companies Continue Their Reliance on Forced Child Labor.

U.S. imports of cocoa products from the Ivory Coast are produced wholly or in part by forced labor, which the CIT explicitly acknowledged. Appx3 (CIT Decision at 3). Further, the record is clear that CBP and DHS have long been aware that the cocoa sector in the Ivory Coast is dependent on forced child labor and other child labor performed in violation of ILO Convention No. 182's "Worst Forms of Child Labor." Over 23 years ago, in 2001, the major chocolate companies, including those named in the Petition (Nestlé, Mars, Hershey, Barry Callebaut, Blommer Chocolate Co., Cargill, Mondelēz, and Olam),[2] to preclude mandatory legislation, signed the Harkin-Engel Protocol ("Protocol") and gave their explicit promise to "phase out" by 2005 their use of the "Worst Forms of

[2] These are the major chocolate producers that control the industry and lead efforts to avoid compliance with their promise in the Protocol to end their system of reliance on illegal child labor to harvest cocoa in West Africa. *See* Appx34-74 (Complaint ¶¶ 29-92).

Child Labor," including forced child labor. Appx40, Appx123 (Complaint ¶ 29 and Exhibit C).

The language of the Protocol is a specific admission by the industry that there **is** forced child labor in their cocoa harvesting operations in the Ivory Coast. The leading chocolate companies pledged that by 2005, they would have in place "industry-wide standards of public certification . . . that cocoa beans and their derivative products have been grown and/or processed without any of the worst forms of child labor." Appx124 (Protocol at p. 3).

Rather than keep their pledge, the major companies, acting through their trade association, the World Cocoa Foundation ("WCF"), have merely given themselves a series of unilateral extensions of time. In 2005, the WCF admitted the Protocol goals would not be "fully met" by the 2005 deadline, but assured consumers and regulators they were "committed to achieving a certification system . . . within three years." Appx35 (Complaint ¶ 22). Three years later, in 2008, the WCF again unilaterally extended their self-imposed deadline by another two years. *Id*. When that unmet deadline passed in 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by 70% the use of child labor in the cocoa industry. At the 8th Annual WCF Meeting in July 2018, the industry effectively abandoned any hard deadline and admitted it was not likely it would meet its "aspiration for 2020" nor

other targets "for the eradication of child labor by 2025." *Id*. ***Each major extension of time by the industry condemned another group of hundreds of thousands of children to a life of poverty, malnutrition, and lack of education in a system of child slavery imposed by the major companies to enhance their profits***.

IRAdvocates and others have utilized all available tools to compel the major cocoa companies to honor their commitment to the Protocol, as well as their own internal "policies," *see* Appx40-74 (Complaint ¶¶ 29-92), in order to end their reliance on illegal child labor. IRAdvocates has brought direct litigation against the responsible companies and has collaborated with filmmakers and media to launch a public campaign to pressure the companies to keep their promise to end their reliance on forced child labor to harvest cocoa. *See* Appx75-81, Appx101-103 (Complaint ¶¶ 93-104 and Petition [Exhibit A] at 11-13).

Nothing has changed in the cocoa sector in the Ivory Coast since the major companies signed the voluntary Protocol. Indeed, the companies' use of illegal ***child labor has increased*** in the ***23 years*** since the companies signed the Protocol. A 2020 study funded by the U.S. Department of Labor concluded that ***1.56 million*** child laborers were harvesting cocoa in the Ivory Coast and Ghana, an increase of 14 percent since their 2015 study, and 1.48 million child laborers engaged in hazardous work during this period. Appx82 (Complaint ¶ 107). As recent as

November 29, 2023, a CBS News crew accompanied IRAdvocates to Ghana and produced a story graphically showing that children as young as five years old are harvesting cocoa for the U.S. market and performing the "worst forms of child labor:" ECF No. 17 (Opp MTD), at 7, n.10.[3]

**2. Since at Least 2001, CBP Has Known About and Failed to Take Required Action to Enforce Section 307 to Ban Cocoa from the Ivory Coast Harvested by Forced Child Labor.**

Since the 1990s, IRAdvocates' predecessor organization, the International Labor Rights Forum ("ILRF"), has been fighting to end forced child labor and other worst forms of child labor in cocoa harvesting in West Africa. When IRAdvocates formed in 2007, its number one priority was to continue the fight to end child slavery in cocoa harvesting because generations of West African children have been, and continue to be, forced into child slavery to harvest cocoa for some of the most wealthy and powerful corporations on the planet. This is a preventable crime that continues only because the major companies have not yet been held accountable, something CBP could remedy by simply doing its job and enforcing

[3] The link to the referenced CBS news story is: https://www.cbsnews.com/news/children-harvesting-cocoa-used-by-major-corporations-ghana/.

the mandatory provisions of Section 307. CBP, housed within DHS,[4] is the sole agency responsible for investigating and enforcing Section 307.

In an early effort to harness the power of the CBP to address child slavery in cocoa harvesting, in 2002, the ILRF filed a petition seeking a WRO on all cocoa imported from the Ivory Coast because it was produced "in whole or in part" by forced child labor in violation of Section 307.[5] That 2002 Petition was well-documented with extensive evidence that forced child labor was pervasive in cocoa harvesting in the Ivory Coast, and certainly put CBP on notice of the extent of the problem. In response to that first Petition, ***just as in this case***, CBP unreasonably delayed taking any action to enforce Section 307, and when no action was taken in over two years and CBP failed to respond to ILRF's inquiries, ILRF filed suit under the APA seeking an order requiring CBP to enforce the law. *See Int'l Labor Rights Fund v. United States*, 391 F. Supp. 2d 1370, 1372-1373 (C.I.T. 2005).

At the time of the ILRF lawsuit, Section 307 had a "domestic consumptive demand" exemption, which required that there be sufficient domestic production of

---

[4] DHS is named as a party solely due to its control over CBP. The conduct complained of in this case is failure of CBP to perform its statutory duty to enforce Section 307.

[5] IRAdvocates' legal staff was part of the team at ILRF that did the field research and filed the 2002 Petition with CBP. In 2007, the legal department of ILRF formed IRAdvocates to focus on using the rule of law to address international human rights violations.

cocoa to replace the domestic demand for cocoa that would be needed if CBP issued a WRO banning the importation of cocoa from Ivory Coast. As there was little or no domestic production of cocoa at that time, the CIT dismissed the case based on the exemption. *Id*. at 1374-76.

In 2015, Congress removed the "domestic consumptive demand" exemption from Section 307, leaving CBP free to take action to prevent cocoa harvested with forced child labor from entering any U.S. ports. *See* Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016).

When five years passed and CBP still failed to take action on its own initiative to revisit the cocoa issue, as it has always had the power to do, *see* 19 C.F.R. § 12.42(e), IRAdvocates and its co-Petitioners filed a new Petition on February 14, 2020. See Appx91 (Exhibit A to Complaint). The Petition provided detailed evidence that forced child labor remains endemic to cocoa harvesting in the Ivory Coast. IRAdvocates filed the Petition because it was clear that, for some inexplicable reason, ***CBP was giving the large multinational chocolate companies like Nestlé, Cargill, Mars, and Hershey, a free pass, allowing them to import cocoa to the U.S. market that, without doubt, was harvested "in whole or in part" by forced child labor in violation of Section 307***.

A CBP Petition seeking an import ban under Section 307 is a powerful tool that, rather than targeting a specific company for using forced child labor, targets the tainted product, in this case cocoa from the Ivory Coast. IRAdvocates expected CBP to comply with its statutory duty under Section 307 and issue a WRO. This would have prohibited the cocoa companies from importing cocoa from the Ivory Coast "***unless the importer establishes by satisfactory evidence that the merchandise was not . . . manufactured in any part with the use of a class of labor specified in the finding.***" 19 C.F.R. § 12.42(g) (emphasis added). Such a result would have accomplished the objectives of IRAdvocates' efforts to impose accountability on the major cocoa companies. Companies would be prohibited from importing cocoa to the U.S. market unless they created a verifiable system to establish their cocoa was not harvested by forced child labor, exactly what they all promised to do in 2001 when they signed the Protocol. This outcome would also be consistent with Congress's intention when it removed the "domestic consumptive demand" exemption and cleared the way for Section 307 to be used as tool for ending forced child labor.

However, CBP did nothing in response to the Petition. Rather than merely accept CBP's unlawful failure to utilize the powerful tool Congress provided in enacting Section 307, IRAdvocates was forced to divert significant time and

resources in attempting to get CBP to comply with the law. Among other things,[6] IRAdvocates and its co-Petitioners submitted two supplemental filings (Appx142, Appx166 [Exhibits E and H]) with additional and updated evidence that cocoa from the Ivory Coast was harvested with forced child labor. This required multiple research trips to the Ivory Coast. IRAdvocates and its co-Petitioners also met with CBP several times, but never received any feedback or updates on CBP's planned action on the Petition. Appx4-6 (Decision at 4-6).

On December 13, 2022, CBP responded for the first time with a letter claiming that, despite the Petition being timely when it was submitted, the information IRAdvocates had provided was dated. Appx6-7 (Decision at 6-7). After years doing nothing with the Petition, this was the first time CBP raised such concerns, and it came well beyond the "prompt[]" response period required by 19 C.F.R. § 12.42(c). Appx6-7 (Decision at 6-7). Further, this late response was in violation of the APA, 5 U.S.C. § 555 (e), which required that CBP must provide "[p]rompt notice" "of the denial in whole or in part of a written . . . petition . . ."

Due to CBP's inexplicable and unreasonable delay in acting on the Petition, and apparent lack of good faith in labeling timely-submitted information as "dated," IRAdvocates was forced to file this case to require CBP to meet its

[6] See section VII.A.2, *infra*, for a detailed listing of the costly actions IRAdvocates undertook to encourage CBP to fulfill its statutory mandate.

statutory duty under Section 307. CBP's steadfast refusal to take any action in response to the Petition leaves hundreds of thousands of child slaves harvesting cocoa that is exported to the U.S. in clear violation of the mandatory prohibition of Section 307.

## V. STANDARD OF REVIEW

The sole legal issue raised in this appeal, whether IRAdvocates satisfies the requirement for Article III standing to sue, raises an error of law by the CIT in interpreting and applying the standing doctrine and thus is reviewed by this Court *de novo*. *See Highmark Inc. v. Allcare Health Mgmt. Sys.*, Inc., 572 U.S. 559 (2014); *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("We review determinations of standing *de novo.*") (citation omitted).

## VI. SUMMARY OF ARGUMENT

The CIT held that IRAdvocates lacked standing to sue CBP to compel Section 307 enforcement because IRAdvocates lacked the Article III requirements for standing: injury-in-fact, causation, and redressability. Appx14-20 (Decision at 14-20). In so holding, the CIT erred in failing to take IRAdvocates' allegations as true and provide IRAdvocates all reasonable inferences to be drawn from the allegations as is clearly required in assessing a motion to dismiss. *See, e.g.,*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Wanxiang Am. Corp. v. United States*, 12 F.4th 1369, 1373 (Fed. Cir. 2021). Here, not only did the CIT fail to take IRAdvocates' allegations as true, in significant ways, the CIT disagreed with the allegations. Further, in assessing standing, the CIT was required to assume the merits of the underlying legal claim. *See, e.g. Warth v. Seldin,* 422 U.S. 490, 501-02 (1975). The CIT clearly failed to do this.

If the CIT had complied with the legal requirements for assessing standing in the context of a motion to dismiss, IRAdvocates would have satisfied the three elements of standing. IRAdvocates suffered an injury-in-fact in that CBP's failure to enforce Section 307 in response to IRAdvocates' Petition deprived IRAdvocates of a major tool in its foundational purpose of ending forced child labor in cocoa harvesting. Violating pleading rules, the CIT factually sided with CBP, rather than IRAdvocates, when speculating that IRAdvocates' mission was not compromised by CBP's failure to enforce Section 307. The Complaint makes clear that CBP's effective denial of the Section 307 remedy to IRAdvocates was a major setback. Further, IRAdvocates was forced to expend significant time and resources to encourage CBP to comply with its statutory duty to enforce Section 307. These injuries meet the Supreme Court's standard for injury-in-fact, which is established when a defendant's actions impair an organization's activities, resulting in a drain on its resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Additionally, there is no question that IRAdvocates' injury is fairly traceable to or caused by CBP's failure to act. CBP is the sole agency charged with enforcing Section 307, and when it failed to do so, IRAdvocates expended resources specifically directed to requiring CBP to comply with its statutory duty to enforce the law. The CIT erroneously disagreed with the allegations and concluded that IRAdvocates' expenses were made in routine operations, rather than in direct response to CBP's inaction. The CIT's finding against IRAdvocates' allegations on a factual issue is reversible error.

Finally, if the CIT had ordered CBP to act to enforce Section 307, IRAdvocates' injury would have been redressed. The CIT incorrectly concluded that compelling CBP to act would not "guarantee" an end to forced child labor in the Ivory Coast, grossly overstating the relief IRAdvocates' actually requested, which was simply an order to CBP to enforce Section 307 and act of the Petition. Establishing CBP's duty to act on a viable Petition would have revived Section 307 as a major tool in addressing forced labor in the global economy, as opposed to a mere discretionary option for CBP to use at its whim. IRAdvocates maintains that it is likely that, if ordered to act on IRAdvocates' Petition, CBP would have had to issue a WRO to ban the importation of cocoa from the Ivory Coast, forcing the big chocolate companies to keep their 2001 promise to end their use of child slaves to harvest cocoa. Furthermore, even if in response to the CIT's order to promptly act

on IRAdvocates' Petition, CBP found the Petition lacked merit, this would still fulfill the primary objective of IRAdvocates' case: establishing that Section 307 requires CBP to act on any legitimate Petition and does not allow it the discretion to simply ignore a Petition.

The CIT fundamentally erred in finding that IRAdvocates lacked standing by assuming facts against IRAdvocates and failing to assume the merits of its claim. Had the CIT complied with fundamental rules in assessing standing on a motion to dismiss, it would have found that IRAdvocates has standing to compel CBP to enforce Section 307.

## VII. ARGUMENT – The CIT Erred in Finding IRAdvocates Lacked Article III Standing to Sue CBP for Failing to Enforce Section 307.[7]

Article III Constitutional standing requires that (1) the plaintiff has suffered an injury-in-fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which may be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The CIT erroneously concluded that IRAdvocates failed to demonstrate any of the three elements required for Article III standing. *See* Appx14-20 (Decision at 14-20). In reaching this erroneous conclusion, the CIT failed to apply established law in this Court and the Supreme

[7] To the extent that it requires a distinct analysis, IRAdvocates also established it has prudential standing. *See* ECF No. 17 (Opp MTD), at 18-23. The CIT did not reach this issue in its decision.

Court that IRAdvocates' allegations must be taken as true and all reasonable inferences must be drawn in favor of the allegations.[8] *See Ashcroft*, 556 U.S. at 678; *Wanxiang Am. Corp,* 12 F.4th at 1373.

Further, in assessing the standing issue, the CIT improperly failed to assume the merits of IRAdvocates' core claim that Section 307 created a mandatory duty for CBP to act on IRAdvocates' legitimate Petition. *See, e.g. Warth,* 422 U.S. at 501-02 (assuming validity of legal theory for purposes of standing analysis). "When assessing standing at the pleading stage, we assume that the plaintiffs' view of the statute is correct and that they will be successful on the merits of their claim." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *Doe v. Apple*, *Inc.*, 96 F.4th 403, 409-10, 416 (D.C. Cir. 2024).

Assuming the merits, CBP's failure to act on its mandatory duty under Section 307 to act on the Petition for over three and a half years was "unreasonable delay" under section 706(1) of the APA. CBP's failure to act on the Petition injured IRAdvocates by depriving it of a powerful tool to fight child slavery and

---

[8] Additionally, this Court has confirmed that the inquiry focuses primarily on the allegations in the complaint, but also includes documents "incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotations omitted). This would include IRAdvocates' initial Petition to CBP (Exhibit A) and the additional Exhibits B-H attached to the Complaint. See Appx91-166.

caused it to expend time and resources to pressure CBP to comply with its statutory duty. Further, an order to CBP to enforce Section 307 would have obtained for IRAdvocates the precise relief it sought.

If the law is properly applied to IRAdvocates' allegations, as is demonstrated below, IRAdvocates has standing to sue CBP for ignoring IRAdvocates' Petition and failing to enforce the mandatory requirements of Section 307.

### A. IRAdvocates Suffered an "Injury-In-Fact."

IRAdvocates suffered concrete injuries that satisfy the injury-in-fact requirement. First, in failing to act upon IRAdvocates' Petition and claiming that Section 307 is completely discretionary, requiring CBP to do nothing at all, CBP deprived IRAdvocates of a major tool in its fight against forced child labor in cocoa harvesting in the Ivory Coast and impaired its institutional mission. Second, once IRAdvocates filed its Petition under Section 307 and CBP did nothing to enforce the law, IRAdvocates suffered concrete injuries in attempting to get CBP to fulfill its statutory duty to enforce Section 307, including the diversion of time and resources to return to the Ivory Coast multiple times to gather new information to supplement the Petition.

These injuries meet the Supreme Court's standard in *Havens*, where the Court held that injury-in-fact for an organization is established when the

defendant's actions or inaction have "perceptibly impaired" the organization's activities, causing a "concrete and demonstrable injury" resulting in a "consequent drain on the organization's resources." *Havens*, 455 U.S. at 379. Recently, in *Alliance*, 602 U.S. at 369-70, the Supreme Court confirmed the ongoing viability of the *Havens* standard for organizational injury.

The allegations in IRAdvocates' Complaint demonstrate that it satisfies the *Havens* test for organizational injury-in-fact. Based on its loss of a critical tool due to CBP's failure to act on its Section 307 Petition and the consequent drain on its resources in attempting to convince CBP to take the required statutory action, IRAdvocates has demonstrated it has suffered the requisite "injury-in-fact" and therefore has a "'personal stake in the outcome of the controversy.'" *Military-Veterans Advocacy v. Sec'y of Veteran Affs.*, 7 F.4th 1110, 1121 (Fed. Cir. 2021) (quoting *Warth*, 422 U.S. at 498)).

1. **CBP's Failure to Enforce Section 307 Caused Injury to IRAdvocates by Depriving it of an Important Tool to Achieve its Core Mission of Ending Forced Child Labor in Cocoa Harvesting**.

Taking the allegations in IRAdvocates' Complaint as true, there is no question that IRAdvocates was founded as a legal advocacy organization dedicated to achieving just and humane treatment for workers worldwide. Appx85 (Complaint ¶ 117). IRAdvocates represents and advocates for working people around the world, including in the Ivory Coast, and is committed to overcoming

the problems of child labor, forced labor, and other abusive labor practices in the global economy. *Id.* IRAdvocates promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government, and business groups. *Id.* Moreover, IRAdvocates has for years made part of its core mission using Section 307 to end the importation into the United States of cocoa products that are made using forced child labor. *See* Appx75-81 (Complaint ¶¶ 93-104).

Improperly disputing facts in the context of their motion to dismiss, Defendant CBP mischaracterized IRAdvocates' mission as being limited to acting as an "advocacy organization." ECF No. 16, at 16. As the Complaint makes clear, IRAdvocates does much more than "advocate" to end forced child labor in cocoa harvesting. Appx75-81 (Complaint ¶¶ 93-104). One of the key tools IRAdvocates has used in its effort to stop forced child labor in cocoa harvesting is litigation. For example, IRAdvocates filed a claim under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, against Nestlé and Cargill, two major companies that intentionally profit from child slavery in the Ivory Coast. Appx75-76 (Complaint ¶ 94). IRAdvocates also filed a claim under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595 *et. seq.*, against all the major chocolate companies for using trafficked and forced child labor to harvest cocoa in the Ivory Coast. Appx80 (Complaint ¶ 103). And, IRAdvocates filed a Petition under Section 307 seeking to

ban the importation of cocoa produced by the major companies that IRAdvocates established with substantial evidence were using forced child labor to harvest in the Ivory Coast. Appx81-82 (Complaint ¶ 105).

CBP's failure to act on the Petition denied IRAdvocates a major tool in its limited arsenal to use litigation to force the major companies to keep the pledge they made in 2001 in signing the Harkin-Engel Protocol to stop using forced child labor in cocoa harvesting. *See* Appx33-34 (Complaint ¶ 19). According to CBP, its total failure to enforce Section 307 does not prevent IRAdvocates from continuing to "promote the enforcement of labor rights." ECF No. 16, at 16. The CIT agreed, stating "IRAdvocates has not shown that its mission has been inhibited." Appx15 (Decision at 15, n.3). Since the major companies are ***still*** profiting from child slavery after promising in 2001 to stop the horrific practice, it is clear that every possible tool must be employed to end the seemingly intractable problem of major chocolate companies profiting from child slavery in cocoa harvesting.

More fundamentally, the CIT's position factually siding with CBP that IRAdvocates mission was not compromised by CBP's failure to enforce Section 307 violated fundamental pleading rules in assessing a motion to dismiss based on lack of standing. When standing is challenged on a motion to dismiss, the underlying claim must be assumed to be meritorious. *See, e.g.*, *Apple,* 96 F.4th at

416. Here, the key merits issue, not reached by the CIT due to its erroneous conclusion that IRAdvocates lacked standing, was IRAdvocates' claim under section 706(1) of the APA that CBP's failure to act on the Petition for three years and five months after submission was "unreasonable delay" because CBP was ***required*** to take prompt action under Section 307 to ban the importation of cocoa harvested with forced child labor. Section 307 is made mandatory by, among other things, the language that cocoa harvested by forced child labor "***shall not*** be entitled to entry at any of the ports of the United States." *See* ECF No. 17 (Opp MTD), at 24-32 (detailing CBP's statutory and regulatory violations in failing to act on IRAdvocates' Petition). *See also*, Appx87-89 (Complaint ¶¶ 123-34). IRAdvocates thus asserted that CBP had no discretion to decline to act on their Petition and the CIT's Order confirming this would have revitalized Section 307 as a major tool to fight forced labor.

CBP took the contrary position on the merits and asserted it had complete discretion as to whether to take any action at all on any Petition filed. CBP further argued there is no mandatory action or time frame required by Section 307 and the implementing regulations. *See* ECF No. 16, at 3-4, 18, 22-29. According to CBP, Section 307 is merely optional and does not bind CBP to take any action at all.

Certainly, if CBP's position controlled, then IRAdvocates would not have suffered a concrete injury by CBP's refusal to act under Section 307 because no action would have been required. However, because the ***CIT was required to assume the merits of IRAdvocates' position***, for purposes of assessing standing, CBP's failure to act was unlawful and deprived IRAdvocates of the remedy it sought – CBP's mandatory review of its Petition on the merits. As is established in section VII.C below in the discussion of redressability, CBP's mandatory review of the Petition should have resulted in a WRO that banned the importation of cocoa harvested by child slaves. CBP's failure to act thus did more than impair or impede IRAdvocates' institutional objective; it unlawfully blocked the possibility of a mandatory ban that would have achieved IRAdvocates' mission.

It utterly defies the allegations of the Complaint to conclude that denying IRAdvocates an important tool designed to prevent forced child labor, thus meeting a key objective of IRAdvocates' foundational mission, does not cause injury to IRAdvocates. In *Havens*, HOME, an organization dedicated "to make equal opportunity in housing a reality in the Richmond Metropolitan Area," sued Havens Realty for racial steering in violation of the Section 804 of the Fair Housing Act of 1968 ("FHA"). 455 U.S. at 363, 368. The Court found that HOME had standing because Havens Realty's racial steering practices impaired HOME's core mission. *Id.* at 379 ("If . . . petitioners' steering practices have perceptibly impaired

HOME's ability to provide counseling and referral services . . . there can be no question that the organization has suffered injury in fact.”).

Here, CBP’s effective nullification of Section 307 by claiming it has absolute discretion to ignore the law directly blocked a key tool for IRAdvocates to accomplish its core mission of ending forced child labor in cocoa production. CBP’s unlawful failure to act on a statutory mandate was much more harmful to IRAdvocates than a single violator of the FHA, Havens Realty, was to HOME’s mission. The equivalent to this case would have been if the Office of Fair Housing and Equal Opportunity (“FHEO”) refused to enforce the FHA, thereby allowing Havens Realty, and all others who so chose to implement discriminatory racial steering practices, depriving HOME’s clients of their statutory protection against racial discrimination and causing HOME to expend resources to require FHEO to perform its statutory duty.

CBP’s failure to take mandatory action to stop the importation of cocoa harvested by child slaves in response to IRAdvocates’ Petition creates “a direct conflict between the defendant’s conduct and the organization’s mission.” *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citing *Nat’l Treasury Empl.Union v. United States*, 101 F.2d 1423, 1429-30 (D.C. Cir. 1996)). In *Abigail Alliance*, the court found institutional

injury where the organization's activities – providing "counseling, referral, advocacy, and educational services" to assist terminally ill patients in "accessing potentially life-saving drugs" – were impeded by Food and Drug Administration ("FDA") regulations that forced the organization "to divert significant time and resources from these activities towards helping its members and public address the unduly burdensome requirements that the FDA impose[d] on experimental treatments." *Id.* at 132-133. The D.C. Circuit found an injury based on the FDA's imposition of barriers to the statutory remedy *Abigail Alliance* sought to obtain to forward its institutional objectives. Here, CBP's failure to enforce Section 307 is akin to the FDA in *Abigail Alliance* negating the FDA regulations by refusing to approve ***any*** experimental treatments rather than by merely imposing new burdensome regulations that still allowed the treatments.

In another example of agency inaction causing injury by depriving an organization of a statutory tool to accomplish its mission, the D.C. Circuit found that an organization's mission – "to protect and raise awareness about the plight of captive birds, and to serve as an educational resource for the humane community, law-makers, and the general public" and to "respond to complaints [of] cruelty of birds" – was impaired by the failure of the U.S. Department of Agriculture ("USDA") to promulgate federal standards for the humane treatment of birds under the Animal Welfare Act ("AWA"). *Am. Anti-Vivisection Soc'y v. U.S. Dep't of*

*Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020). Specifically, the USDA had "repeatedly reiterated its intention to issue such standards," but its "decision-making process . . . remain[ed] unconsummated" for "many years." *Id.* at 620. In the absence of USDA standards, the organization was "compelled to fill the void" by developing and promoting its own guidance on bird welfare, which was "not part of [the organization's] normal annual expenditure until the efforts became necessary due to USDA's clear inaction" and "caused a consequent drain on the organization's resources." *Id.* at 619 (internal quotation and citation omitted).

The *Am. Anti-Vivisection Soc'y* Court relied strongly on *People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015). In both cases, the USDA deprived the concerned organizations of a tool to achieve their organizational goals when it failed to draft regulations to activate the AWA. Here, CBP deprived IRAdvocates of an important statutory tool by failing to enforce its existing regulations, claiming nonexistent discretion to decline to act.

Section 307 was intended by Congress to be, and if CBP actually does its job, could be one of the most effective tools to fight forced labor in the global economy. *See, e.g.*, Matthew M. Higgins, *Closed Loophole, Open Ports: Section 307 of the Tariff Act and the Ongoing Importation of Goods Made Using Forced Labor*, 75 STAN. L. REV. 917, 958-67 (April 2023). Depriving IRAdvocates of

this tool, when other legal avenues have been largely foreclosed, is a major injury to IRAdvocates' institutional mission of using litigation to stop forced child labor.

As noted, the CIT and CBP both took the position that because there were other avenues to battle child slavery, CBP's failure to enforce Section 307 did not impair IRAdvocates' organizational mission. *See* Appx15 (Decision at 15, n.3); ECF No. 16, at 16. While it is IRAdvocates' organizational and strategic decision as to how best to procced in using litigation to end child slavery, as alleged in the Complaint, the other potential avenues have been legally foreclosed or limited. IRAdvocates' ATS case was ultimately dismissed by the Supreme Court and the ATS was largely denuded by the Court's decision. Appx75-76 (Complaint ¶ 94). IRAdvocates' TVPRA case was initially dismissed by the District Court and is on appeal to the D.C. Circuit Court. *Id*. ¶ 103.

These negative court decisions left Section 307 as the most significant remaining legal tool available to IRAdvocates to end child slavery. CBP's utter failure to act in response to the Petition severely restricts IRAdvocates' mission of putting an end to forced labor. CBP's refusal to act also sends a message to the major chocolate companies that the highest mountain of evidence regarding forced child labor will not stop their imports of cocoa from entering the United States, even despite the explicit statutory prohibition of such conduct. This gave the companies a green light to continue to profit from harvesting cocoa with child

slaves, and, since illegal child labor in cocoa harvesting has increased in recent years, CBP's inaction has signaled to the industry that it need not take steps to end its reliance on child labor.

In ignoring that the merits of IRAdvocates' claim must be assumed in assessing standing and arguing that IRAdvocates could not show a concrete injury, CBP relied heavily on *Military-Veterans Advocacy,* 7 F.4th at 1129. There, the relevant organization's mission was to guide veterans through the benefits process. This Court concluded that the agency's action "[fell] short of a 'perceptibl[e] impair[ment]'" to the organization's operations and missions when the agency did not "foreclose claimants from obtaining benefits" or "impair or unwind" the organization's other efforts. *Id.* at 1130.

In the present case, IRAdvocates' ***only*** path towards enforcement of the legal prohibition on imports produced with forced child labor is through CBP taking the mandatory action required by law. As the CBP states on its website, under Section 307, "CBP is responsible for preventing the entry of products made with forced labor into the U.S. market by investigating and acting upon allegations of forced labor in supply chains." *Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor (last visited Oct. 16, 2024). "CBP's forced labor enforcement mission supports ethical and humane trade . . . CBP is the only U.S. government agency, and one of the few in the world, with the legal authority

to take enforcement action against goods produced with forced labor to prevent entry into domestic commerce." *Id.*

Unlike the agency action in *Military-Veterans Advocacy* that merely created ***surmountable hurdles***, assuming the merits of IRAdvocates' claim, CBP's unlawful failure to enforce Section 307 in response to the Petition absolutely blocked the remedy that IRAdvocates sought – a ban on imports of cocoa harvested by forced child labor. CBP's assertion of absolute discretion as to whether to enforce Section 307 in response to IRAdvocates' Petition, despite what the CIT agreed was strong evidence of forced child labor in cocoa harvesting, *see* Appx4 (Decision at 4), conflicts with the requirements of Section 307, as alleged in IRAdvocates' Complaint. CBP's total denial of the remedy of Section 307 by its discretionary and unlawful refusal to enforce the law can only be upheld if IRAdvocates' claim is ***not*** assumed to be meritorious, in violation of indisputable precedent.

**2. IRAdvocates Suffered a Concrete Injury When it Was Required to Drain its Resources in an Effort to Convince CBP to Enforce Section 307.**

In addition to suffering the concrete injury of being denied access to a major tool to end forced child labor by CBP's unlawful failure to enforce Section 307, IRAdvocates suffered the additional concrete injury of being required to divert

substantial resources to persuade CBP to take the action it was required to take by law. Again, assuming the merits of IRAdvocates' legal claim as is required, CBP had a mandatory obligation to enforce Section 307 following IRAdvocates' filing of the Petition. When CBP unreasonably delayed taking action to enforce the law, IRAdvocates was forced to expend additional resources to vindicate the law and obtain the relief it sought in the Petition.

The Supreme Court has found the requisite injury-in-fact exists when an organization is forced to divert resources to counteract an illicit harm. *See Havens,* 455 U.S. at 379 (finding that HOME's consequent drain on resources in response to the defendant's racially discriminatory steering practices constituted an injury-in-fact). There, the Court wrote "there can be no question" that the drain and diversion of HOME's resources, because of Havens Realty's violation, constituted a "concrete and demonstrable injury to the organization's activities." *Id*.

Here, the harm that IRAdvocates suffered is even more direct: IRAdvocates expended time and resources in an attempt to remedy CBP's unlawful failure to enforce Section 307 in response to IRAdvocates' Petition. The equivalent analogy to *Havens* would be if the Office of Fair Housing and Equal Opportunity (FHEO) refused to enforce the FHA, allowing Havens Realty to implement discriminatory racial steering practices, and HOME was required to expend resources to require FHEO to perform its statutory duty. "[T]here can be no question" that if the

Supreme Court found concrete injury when HOME expended resources to try to force a single violator of the FHA, Havens Realty, to comply with the law the Court would also find a concrete injury if HOME was forced to more broadly counteract FHEO's unlawful failure to enforce the FHA, as was the situation with CBP in this case.

IRAdvocates filed its lawful Petition on February 14, 2020. The CIT acknowledged the "Petition detailed both statistical and first-hand evidence of forced and trafficked child labor collected by IRAdvocates, as exhibited in direct accounts from IRAdvocates investigators and victims of forced child labor in the Ivory Coast." Appx4 (Decision at 4). The filing of the Petition was a strategic choice by IRAdvocates to enlist the powerful tool established by Section 307 to use the threat of lack of access to the attractive U.S. market to require private companies' compliance with the prohibition on using forced child labor.

When CBP failed to act on the Petition, IRAdvocates was then forced to expend time and resources to encourage CBP to perform its statutory duty. Among the costly steps IRAdvocates took to attempt to obtain CBP compliance with the law are:

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP's Office of Trade on March 23, 2021. Compl. ¶ 106.

- IRAdvocates diverted additional resources towards collecting additional evidence of trafficking and forced labor in the Ivorian cocoa industry to include in a supplemental petition that was filed on June 25, 2021. *Id.* ¶ 107 and Exhibit E. The resources included three trips to Western Africa in August, November, and December of 2020, which uncovered evidence that the impact of COVID-19 had worsened the situation of forced and child labor due to a loss of farmer income and the consequent increased in farmer indebtedness, which led to more children being trafficked into Côte d'Ivoire. *Id.* The investigators visited five regions in Côte d'Ivoire – Aboisso, Abengourou, Daloa, Duékoué, and Soubré – and uncovered evidence of forced labor in each of these regions. *Id.* This included numerous interviews and observations of children who discussed their work in the cocoa industry. *Id.*

- IRAdvocates also diverted substantial resources preparing reports, summaries of interviews, affidavits, description of photos, and transcripts of video and audio recording to document the new evidence of forced labor in its June 25, 2021 supplemental petition. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on September 10, 2021. *Id.* ¶ 108.

- IRAdvocates diverted additional resources towards organizing a February 14, 2020 letter that was joined by many important civil society stakeholders and that urged CBP to take statutorily required action on the Section 307 Petition. *Id.* ¶ 109 and Exhibit B. IRAdvocates' senior staff spent significant time interacting with the leadership of the 36 major civil society organizations that signed the letter, including the AFL-CIO, the National Consumers League, and the Child Labor Coalition, as well as the 16 ethical cocoa companies and 41 individual signatories. These concerned entities and individuals joined to stress to CBP the key role it had in enforcing Section 307 to protect children from forced labor in cocoa harvesting. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on August 15, 2022. *Id.* ¶ 110.

- IRAdvocates diverted additional resources towards preparing a January 17, 2023 letter responding to a December 13, 2020 letter from CBP in which IRAdvocates once again urged CBP to act on the Section 307 Petition. *Id.* ¶ 112 and Exhibit G.

- Finally, IRAdvocates diverted additional resources working with Corporate Accountability Lab to conduct additional research and obtain new evidence to submit on February 14, 2023 yet another supplemental petition regarding ongoing forced child labor in Côte d'Ivoire cocoa harvesting. *Id.* ¶ 113 and Exhibit H.

As IRAdvocates alleged, and which must be taken as true, there is no question IRAdvocates would not have had to expend any of these additional resources if CBP had not unreasonably withheld and delayed action based on IRAdvocates' original Petition. *See* Appx82-84 (Complaint ¶¶ 106-114).

The CIT improperly disputed IRAdvocates' allegations and rejected the factual allegations that IRAdvocates' expenditures in response to CBP's unlawful failure to act on IRAdvocates' Petition were a concrete injury. The CIT stated: "IRAdvocates' post-Petition expenditures fall squarely within the category of resources used for advocacy, litigation, or educational purposes—the types of expenses that have been consistently rejected as a basis for Article III injury in fact." Appx18 (Decision at 18). The CIT reasoned:

> Rather than relating to a business activity independent from its issue-advocacy functions, the expenditures appear to directly further IRAdvocates' claimed goal of "public education and mobilization, research, litigation,

> legislation, and collaboration with labor, government and business groups." See Compl. at ¶ 117. IRAdvocates cannot "spend its way into standing" by expending resources to gather information and advocate against forced-child labor in the Ivory Coast, be that at the outset of advocacy activities or in the middle. *See Alliance*, 602 U.S. at 394. Accordingly, IRAdvocates fails to demonstrate that it suffered any injury in fact as required to assume organizational standing under Article III.

*Id*. The CIT went on to speculate and dispute factually whether IRAdvocates' travel and other expenditures it alleged were required to encourage CBP to fulfill its statutory duty and enforce section 307 could have possibly been for different purposes. *Id*. n.16.

As a matter of fundamental law, the CIT must take IRAdvocates' allegations as true when evaluating a motion to dismiss and certainly cannot dispute those facts and make findings contrary to the factual allegations, as the CIT did in this case. *See, e.g.*, *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) ("Nalco's pleading clearly exceeds the minimum requirements under Rule 12(b)(6), especially as 'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.' The district court's failure to credit these allegations as true is reversible error.") (quoting *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012)).

Taken as true, the detailed allegations above of expenditures made by IRAdvocates indicate that they were directly caused by CBP's failure to act and were made solely and explicitly to prompt CBP to comply with its legal duty to enforce section 307. For example, on June 25, 2021, more than 16 months after the original Petition was filed, IRAdvocates invested resources to prepare and submit a detailed Supplemental Petition to CBP with additional and updated evidence of forced child labor in cocoa harvesting. Appx82, Appx142 (Complaint ¶ 107 and Exhibit E).

As Exhibit E makes clear, the information was compiled during ***three*** research trips to the Ivory Coast, and that information was gathered to file Exhibit E with CBP in an effort to get CBP to enforce Section 307 and issue a WRO on cocoa from the Ivory Coast. *See* Appx142-46 (Exhibit E at 1-4). The CIT was required by law to take it as true that the significant time and expense required for the three research trips and the preparation of Exhibit E were directed at getting CBP to enforce Section 307.[9] It was reversible error for the CIT to dispute these allegations in the context of a motion to dismiss based on its own speculation as to

[9] In another example showing the expenditures were exclusively to force CBP to properly enforce Section 307, IRAdvocates expended significant time and resources to draft a letter to CBP and obtain the signatures from numerous organizations and individuals with a shared interest in ending child slavery. The letter was directed to Defendant Miller and had no purpose other than encouraging CBP's compliance with Section 307. *See* Appx83, Appx115 (Complaint ¶ 109 and Exhibit B).

what caused IRAdvocates to make these expenditures. *See* Appx18 (Decision at 18, n.16).

The allegations of the Complaint make clear IRAdvocates ***was*** spending significant time and resources to force CBP to comply with the law and to protect the integrity of Section 307 as an important tool to end forced child labor in cocoa harvesting, a major institutional objective for IRAdvocates. This was specifically summed up in IRAdvocates' Complaint ¶ 114 (Appx84):

> CBP has continuously shirked its duties to answer widely-substantiated claims that cocoa producers are importing cocoa into the United States that has been produced by forced child labor. IRAdvocates, CAL, and UCI have suffered financial harm [due] to the inaction of CBP, requiring ongoing and expensive investigations to provide updated information. This prolonged indecision and failure to act by CBP has left vulnerable and endangered children at risk for exploitation.

Distinct from the CIT's fundamental error in disregarding or disputing IRAdvocates' factual allegations, the CIT also erred in finding that IRAdvocates lacked standing based on the reasoning in *Alliance*. By disputing and ignoring IRAdvocates' allegations of injury, the CIT diminished the injuries and compared them to the mere advocacy injuries alleged in *Alliance*: "IRAdvocates has devoted resources to persuading [CBP] to act in accordance with its wishes." Appx15 (Decision at 15). The Supreme Court distinguished *Alliance* from *Havens* by contrasting the abstract advocacy in *Alliance* with the interference with counseling

services resulting in increased costs caused by the false information Havens Realty provided to HOME's clients. 602 U.S. at 395. This distinction is operative here.

In *Alliance*, medical associations asserted standing based on the costs they incurred to oppose the FDA's actions, which "caused" them "to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks." *Id*. at 393. The Supreme Court denied standing and opined that neither policy interests nor public advocacy is enough for standing purposes: "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. at 394.

In contrast, in *Havens*, HOME successfully established standing because racial steering practices "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Havens*, 455 U.S. at 369. The harm was concrete because HOME's counseling had directed its clients to Havens Realty, which lied about available housing to those clients and to an employee of HOME. *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 366, 368).

Consequently, HOME had to "devote significant resources to identify and counteract" the "racially discriminatory steering practices" of the defendant. *Id.* at 379. The Court stressed that this injury was "more than simply a setback to the

organization's abstract social interests” because HOME was not only an advocacy organization, but also operated a counseling service as a core business. *Id*. at 379. The Court wrote “there can be no question” that the drain and diversion of HOME’s resources, because of Havens Realty’s violation, constituted a “concrete and demonstrable injury to the organization's activities.” *Id*. The *Alliance* Court characterized the core injury that gave HOME standing as the fact that Havens Realty intentionally provided HOME with false information – which the Supreme Court analogized to “defective goods” – that “perceptibly impaired HOME’s ability to provide counseling and referral services for low- and moderate-income homeseekers.” *Id*. at 395.

IRAdvocates’ injury is analogous to the injury suffered by HOME. First, contrary to the CIT’s erroneous conclusion, and unlike the medical associations in *Alliance*, IRAdvocates did not expend money and time to oppose, challenge, or spread awareness of a mere policy interest. *See* Appx15 (Decision at 15). Rather, as is catalogued at pages 31-33, *supra*, IRAdvocates expended significant time and resources to specifically target CBP’s unlawful failure to take the action required by Section 307 and act upon IRAdvocates’ meritorious Petition. Again, assuming the merits of IRAdvocates’ legal claim against CBP, the agency was required to act on the Petition and unlawfully failed to do so. IRAdvocates then was forced to spend time and resources to force CBP to perform its legal duty under Section 307,

funds and time IRAdvocates would not have spent had CBP not violated the law.[10] Like HOME, IRAdvocates was forced to divert resources to address a serious violation of law that blocked its efforts to accomplish its core mission.

Similarly, CBP's failure to act and the bad faith explanation that CBP in Exhibit F (Appx162) provided to justify that delay – that IRAdvocates' evidence of child labor had become too dated ***after three years of unreasonable delay by CBP*** – is like the "defective goods" analogy the *Alliance* Court made to distinguish *Havens*. *See* 602 U.S. at 395.

Here, CBP failed to provide accurate information about its now-clear position that it viewed Section 307 as a discretionary option and that it did not view Section 307 as requiring ***any*** action in response to IRAdvocates' Petition. Many of IRAdvocates' actions were taken because it was led to believe by CBP that CBP would act after IRAdvocates devoted additional resources to developing and providing additional information. As the CIT acknowledged, CBP did not indicate to IRAdvocates in the early phases that there was any issue with the

---

[10] IRAdvocates agrees *Alliance* prevents an organization that is outraged by child labor in the cocoa industry in West Africa – and appalled enough at CBP's failure to take any action against imports of cocoa harvested by forced child labor to spend money to engage in general advocacy against CBP– from establishing standing to challenge CBP's failure to enforce the law. Only organizations like IRAdvocates that have filed a lawful Section 307 petition ***and then*** expended funds in an effort to get CBP to take statutorily required action to enforce the law have standing to challenge CBP's inaction.

timeliness or quality of evidence in the Petition. Appx5 (Decision at 5). Indeed, 19 C.F.R. § 12.42(c) of the regulations implementing Section 307 required CBP to either notify IRAdvocates of any defects in the Petition or forward it to the CBP Commissioner "***within 10 days***" (emphasis added). Since CBP did not notify IRAdvocates of any defects in its Petition within 10 days, IRAdvocates reasonably assumed CBP was proceeding in good faith.

As is detailed at pages 31-33, *supra*, IRAdvocates continued to engage with CBP and, with CBP's encouragement, IRAdvocates and its partners provided two Supplemental Petitions, believing that the Petition was still pending and that the CBP-encouraged supplemental materials would result in action taken on the Petition. *See* Appx80-85 (Complaint ¶¶ 103-116)

After nearly ***three years*** of official silence, CBP, through its Acting Commissioner and Defendant, Troy Miller, then asserted in a letter ***for the first time*** that the information in the Petition was not timely. *See* Appx83, Appx162 (Complaint ¶ 111 and Exhibit F). Defendant Miller's letter ended with the assertion that "if evidence reasonably indicates that merchandise is produced by forced labor . . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." *Id*. This assertion has proven to be unequivocally false as CBP never acted on the Petition, which the CIT found to provide

substantial evidence of forced child labor in cocoa harvesting. Appx4 (Decision at 4).

CBP's official silence for three years before Defendant Miller then declared the evidence untimely demonstrates unreasonable delay. As IRAdvocates pointed out in response to Defendant Miller's letter, the information in the original and supplemental petitions was timely when submitted, and CBP's failure to act on the information until CBP unilaterally declared it untimely is irrefutable evidence of "unreasonable delay" under section 706(1) of the APA section. *See* Appx163 (Exhibit G).

If CBP had communicated the truth – that it (unlawfully) viewed Section 307 as optional, and CBP's position was that it had complete discretion to act or not act and was not going to act in the cocoa sector regardless of evidence of forced child labor, then IRAdvocates would not have spent enormous time and resources gathering new evidence and taking other actions to encourage CBP to perform its statutory duty. A truthful admission by CBP that, for whatever reason, it was not going to comply with its statutory duty to enforce Section 307 would have provided IRAdvocates with a clear basis to file its claim under the APA alleging CBP was refusing to perform its statutory duty without the need to spend three years and vast resources to get CBP additional information to encourage CBP to perform its statutory duty. IRAdvocates was ultimately forced to spend the time

and resources, but, regardless of the strong evidence of forced child labor in cocoa harvesting, CBP ***then*** asserted its unlawful position that Section 307 is merely an optional course of action for CBP, subject to CBP's complete discretion. IRAdvocates had no choice but to then file this case to use the APA to obtain CBP's compliance with its mandatory obligations under Section 307.

CBP's defective (and unlawful) failure to timely act upon the Petition directly affected and interfered with IRAdvocates' core mission of using an extremely important tool, Section 307, to fight the exploitation of forced child labor in cocoa harvesting. As a small public advocacy organization, IRAdvocates does not have unlimited resources to spend its way into standing based on any ideological mission. Instead, its clients and constituents, who rely upon IRAdvocates to achieve just results through advocacy, litigation, research, and other means, are denied the same levels of representation while IRAdvocates must dedicate its limited resources to compel CBP to do its statutory duty. Thus, like HOME in *Havens*, IRAdvocates suffered an injury to its core business.[11]

---

[11] The CIT again disregarded the factual allegations of the Complaint in asserting that IRAdvocates had a "mere ideological objection to the [CBP's] choices." Appx16 (Decision at 16) (quoting *Alliance*, 602 U.S. at 396–97). IRAdvocates' clear position is that CBP did not have a "choice" to disregard Section 307, which established a mandatory obligation for CBP to enforce the law. IRAdvocates is properly opposing CBP's unlawful failure to enforce the law and is not expressing any ideology other than that government agencies such as CBP must comply with their statutory duties.

Forcing IRAdvocates to expend substantial time and money to combat CBP's unlawful failure to enforce Section 307 "perceptibly impaired" its ability to protect and assist current and former child slaves. *See Havens*, 455 U.S. at 379. CBP's unlawful failure to act required IRAdvocates to divert resources that could have been devoted to finding other potentially effective ways to end forced child labor in cocoa harvesting and end other serious human rights violations in the global economy. *See* Appx32-33, Appx40, Appx75-81, Appx85-86 (Complaint ¶¶ 17-18, 29, 93-104, 117, 119).

### B. **IRAdvocates' Injury Was Caused By CBP's Failure to Act on the Petition as Required by Section 307**.

To satisfy causation, the plaintiff need only show that the injury is "fairly traceable" to the defendant's conduct. *Lujan*, 504 U.S. at 560-561. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct").

Turning to the CIT's specific reasoning in erroneously finding that IRAdvocates had not demonstrated causation, the CIT relied solely on its conclusion that "IRAdvocates' expenses resulted from CBP's inaction related to

those made in the routine operations of an organization seeking 'to achiev[e] just and humane treatment for workers worldwide.'" Appx19 (Decision at 19). As was discussed in relation to injury-in-fact in section VIII.A.2, *supra*, the allegations of IRAdvocates' Complaint make clear that the time and resources expended following CBP's failure to act on the Petition, including multiple trips to the Ivory Coast to develop supplemental evidence, were all done in an effort to encourage CBP to take the action it was required to take under Section 307. For the CIT to find against IRAdvocates because it merely disagreed with factual allegations is reversible error. As the Supreme Court has made clear, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke,* 490 U.S. at 327.

The time and resources IRAdvocates expended when CBP unlawfully failed to take required action under Section 307 were solely for the specific purpose of attempting to get CBP to act, not for a more general purpose. Taking IRAdvocates' allegations as true, causation is clearly established under the traditional *Lujan* test. *See Lujan*, 504 U.S. at 560-561.

Further, the *Havens* test for organizational standing, discussed in section VII.A above, also contains a causation requirement: whether the defendant's conduct "perceptibly impaired" the plaintiff organization's activities. *Havens*, 455 U.S. at 379. By satisfying the more stringent causation requirement in the *Havens*

test, *supra*, IRAdvocates naturally satisfies this basic requirement to show causation for Article III standing.

### C. IRAdvocates' Injury Would Be Redressed by CIT's Order to CBP to Enforce Section 307.

With a perfunctory analysis of just a few lines, the CIT concluded that IRAdvocates' claim was not redressable, reasoning "[t]here is no ***guarantee*** that action from CBP will immediately, or even eventually, put an end to forced child labor in the Ivory Coast." Appx19 (Decision at 19) (emphasis added). This was clear error as the relief requested in the Complaint was to require CBP to enforce Section 307 and act on IRAdvocates' Petition, not to "end to forced child labor in the Ivory Coast." *See* Appx89 (Complaint ¶¶ 132-34; Requests for Relief A and B).

As an initial matter, to satisfy redressability, a plaintiff need only show that the injury is "likely to be redressed should the court grant the relief requested." *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1549–50 (Fed. Cir. 1986). IRAdvocates' injury can "likely"[12] be redressed by a favorable court decision.

[12] The closest analogy to a standard for "likely" is the more probable than not standard for civil litigation. *See, e.g.*, *Elliot v. Michael James Inc.*, 507 F.2d 1179, 1184 (D.C. Cir. 1974) ("'it is enough that [plaintiff] introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not'") (*quoting* Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)).

Here, IRAdvocates is asserting a procedural right under the APA, which is a law designed "to improve the administration of justice by prescribing fair administrative procedure," which it does by "creat[ing] a foundation for protecting the rights of individuals and enterprises against the abuse of power by unelected officials." *Administrative Procedure Act: Legislative History*, S. Doc. No. 79-248, at 1 (1946). The APA provides legal protection by granting the right of judicial review to any person suffering from a legal wrong due to agency (in)action. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof"). Because IRAdvocates is seeking a procedural right under the APA, it can pursue its right of judicial review without "meeting all the normal standards for redressability and immediacy." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007).

The CIT's conclusory decision quoted above is legal error. First, as noted, IRAdvocates' Complaint was ***not*** seeking an Order from the CIT to end child labor in the Ivory Coast cocoa harvesting, but very specifically sought the limited ***procedural*** remedy established by the APA that the CIT order CBP to act under Section 307 in response to IRAdvocates' Petition. There is no question this requested relief could have been redressed by a favorable decision in this action because the CIT has the authority to compel agency action under the APA to

redress the harms of unlawfully withheld or unreasonably delayed agency action. 5 U.S.C. § 706(1); *see also, Norton v. Southern Utah Wilderness Alliance*, 524 U.S. 55, 61 (2004) ("The APA provides relief for a failure to act in § 706(1): 'The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed'").

Whether any action taken by CBP after the limited relief sought by IRAdvocates ultimately has an impact on ending forced child labor is pure speculation and is essentially irrelevant to whether the CIT could redress IRAdvocates' core complaint – that CBP did nothing in response to the Petition and could be ordered by CIT to enforce Section 307 and act upon the Petition.

However, even if the redressability assessment also includes the question of whether CBP's action on the Petition would lead to a reduction of forced child labor in cocoa harvesting in the Ivory Coast, based on the allegations of the Complaint and other documents in the record, it is very "likely" it would. As the CIT acknowledged, the Petition meets all the requirements of CBP's regulations and "detailed both statistical and first-hand evidence of forced and trafficked child labor collected by IRAdvocates, as exhibited in direct accounts from IRAdvocates investigators and victims of forced child labor in the Ivory Coast." Appx4 (Decision at 4). Further, there is no question that on two occasions, IRAdvocates

supplemented the Petition with updated and detailed additional evidence of forced child labor in cocoa harvesting. See Appx82, Appx84 (Complaint ¶¶ 107, 113).

According to CBP's Acting Commissioner, Defendant Miller, if a Petition is submitted with evidence that "reasonably indicates that merchandise is produced by forced labor . . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." *See* Appx162 (Exhibit F). CBP's website confirms its obligation to act on a meritorious Petition and ban goods made with forced labor: "CBP is the only U.S. government agency, and one of the few in the world, with the legal authority to take enforcement action against goods produced with forced labor to prevent entry into domestic commerce." *Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor. Thus, based on CBP's own admission, if it reviews a Petition that includes evidence of forced child labor, it will issue a WRO and ban the importation of the concerned products.

It is not clear why CBP failed to timely review and act on IRAdvocates' Petition, but if the CIT had granted the relief requested and ordered CBP to review the meritorious Petition, it is "likely" that CBP would have issued a WRO based on its own requirements. As noted in discussing injury-in-fact, the key merits issue in this case is CBP's position that it has total discretion as to whether to act in

response to any petition. An order from CIT that CBP ***must*** act in response to a Petition would likely have triggered a WRO.

In addition, there is every reason to conclude it is "likely" that CBP's issuance of a WRO banning cocoa from the Ivory Coast would have had a dramatic impact on reducing forced child labor. The very premise of Section 307 is that access to the massive U.S. market provides a strong incentive for companies to comply with the law and avoid losing access. Thus, the law is precisely designed to reduce, and ultimately eliminate, forced labor. *See* Shanni Alon, *Enforcing the Forced Labor Prohibition: Increasing Transparency and Mandating Supply Chain Due Diligence*, 31 Fed. Circuit B.J. 377, 381 (2023).

Further, to improve Section 307's ability to prevent forced labor, Congress closed the consumptive demand loophole in 2016 which eliminated "a provision that previously allowed some imports into the United States made, in whole or in part, with forced labor, including child labor." Signing Statement for H.R. 644, 2016 WL 737735, at *1. Members of Congress lauded the "strong provisions to put an end to importation of products made by child and forced labor" describing it as "a bipartisan compromise." 161 Cong. Rec. E1817-03, 161 Cong. Rec. E1817-03, E1817.

Congress established Section 307 as a tool to keep products made with forced labor out of U.S. markets. Once a WRO is issued, the implementing

regulations allow any specific importer to restore access to the U.S. market if "the ***importer*** establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42(f) and (g) (emphasis added). It is very likely that rather than lose access to the U.S. market, the major cocoa companies named in the Petition as using forced child labor to harvest cocoa would finally opt to keep the promise they made in signing the 2001 Protocol and, at long last, stop profiting from child slavery and establish transparent, independent monitoring to demonstrate their cocoa was not harvested in violation of Section 307.

In improperly disagreeing with the premise of the Complaint by speculating that a WRO would not have an impact on ending forced child labor in cocoa harvesting, the CIT also erred in ignoring numerous statutory provisions within U.S. trade law as well as court cases that recognize that withholding access to the U.S. market is a powerful tool in obtaining compliance with legal obligations. Indeed, the Federal Circuit has frequently noted that the United States is one of the largest and most attractive markets in the world due to its being relatively open and commanding higher prices than other markets. *See, e.g., Nucor Corp. v. United States*, 33 C.I.T. 157, 182 (2009) (recognizing the "fact that the U.S. market is particularly attractive to foreign producers due to the relatively open U.S. market

and its higher prices”); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 931 (Fed. Cir. 1984) (discussing the attractiveness of the U.S. market).

CBP has not disputed that a WRO denying access to the U.S. market is an effective tool established by Section 307 to obtain the elimination of forced labor in foreign countries. CBP disputes whether Section 307 mandates that CBP act on a viable Petition, an issue that must be assumed in IRAdvocates’ favor in assessing standing on a motion to dismiss.

Even if the CIT was correct in requiring IRAdvocates to show an order from the CIT must further IRAdvocates’ broader mission of ending forced child labor, instead of showing the CIT could issue the order to CBP that IRAdvocates requested, CBP clearly erred in demanding a “guarantee” that such action would “put an end to forced child labor in the Ivory Coast.” Appx19 (Decision at 19).

First, immediacy is **not** a requirement when plaintiffs are accorded procedural rights, such as in this case where IRAdvocates is asserting the right of agency review under the APA. *See Massachusetts,* 549 U.S. at 517-18 (holding a plaintiff can challenge unlawfully withheld agency inaction without meeting the normal standard of immediacy). Further, IRAdvocates “need not show that a favorable decision will relieve [its] every injury.” *Larson v. Valente*, 456 U.S. 228, 244 (1982). For example, in *Massachusetts,* the Court granted States acting as plaintiffs standing in their suit against the EPA for failing to regulate greenhouses

gases as required by the Clean Air Act. The Supreme Court acknowledged the near impossibility of solving the human-caused climate crises, while still acknowledging incremental steps as a valid remedy. *Massachusetts*, 549 U.S. at 525. The Court found that because the climate crisis is so enormous, it is irrelevant whether the results of an effective remedy might not be effective on their own to address the problem. *See id*. ("Because of the enormity of the potential consequences associated with manmade climate change, the fact that the effectiveness of a remedy might be delayed during the . . . time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant."). Nor did the Court excuse the EPA's responsibilities due to other, foreign actors: even though China and India were poised to increase greenhouses gases, "[a] reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Id*.

Here, similarly, CBP has a duty to use its power under Section 307 to do whatever it can to prevent the importation of cocoa harvested by forced child labor in violation of the law. As the *Massachusetts* Court ruled, IRAdvocates need not establish that a WRO by CBP would immediately or eventually -- by itself -- end all forced child labor in the Ivory Coast, as the CIT required. Appx19 (Decision at 19). However, there can be no question that Section 307 would work as designed and at least reduce imports of cocoa harvested by forced child labor and

accordingly reduce the number of child slaves harvesting cocoa. The loss of access to the U.S. market will incentivize cocoa producers in the Ivory Coast as well as the U.S. importers of such cocoa products to work together to end the use of forced child labor.

Finally, in response to the CIT's observation that "even if the Court compelled CBP to act, the agency might conclude that the Petition is without merit and refuse to impose Section 1307 exclusions on cocoa from the Ivory Coast," Appx19 (Decision at 19), as IRAdvocates began this section, the stated objective of this case was to make clear that CBP must act on any Petition that meets its criteria. *See* Appx89 (Complaint ¶¶ 132-34; Requests for Relief A and B). Even if CBP, when ordered by the CIT to act on the Petition, finds it lacks merit and declines to issue a WRO (a very unlikely result), this would still be an important victory for IRAdvocates on the key issue of whether CBP has complete discretion to ignore Section 307 Petitions. It would establish CBP is accountable and ***must act*** under Section 307 when a Petition is filed.

CBP's position that it has no accountability and need not act at all on a Petition unlawfully evades the APA's requirement in 5 U.S.C. § 555 (e) that CBP must provide "[p]rompt notice" "of the denial in whole or in part of a written . . . petition . . ." IRAdvocates has never received such notice, and this has left it in legal limbo. If CBP is ordered by the CIT to act, and CBP issues a decision

denying the merits, this would presumably require CBP to articulate standards for a meritorious Petition that IRAdvocates, and others, could then endeavor to meet. It would also allow IRAdvocates to appeal that decision under 5 U.S.C. § 706(2)(A) as “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Given the strong evidence of forced child labor in cocoa harvesting and CBP’s bad faith in sitting on this evidence for years and then declaring it dated, such an appeal should be successful.

Under CBP’s current interpretation of Section 307, it claims to have complete discretion to simply file away and never act upon even meritorious petitions. That CBP ***must*** act under Section 307 is the first step that needs to change to allow Section 307 to be used as Congress intended. This would be accomplished, and CBP accountability established, even if CBP were to initially decide that the Petition lacked merit.

## VIII. CONCLUSION

Applying the proper pleading rules in assessing standing in the context of a motion to dismiss, IRAdvocates has standing to sue CBP and DHS for failing to act under Section 307 on IRAdvocates’ well-documented and timely Petition demonstrating that cocoa imported from Ivory Coast was produced “in whole or in

part" with forced child labor. The CIT's erroneous denial of standing must be reversed.

Respectfully submitted on this 12th day of November 2024,

______________________________
Terrence P. Collingsworth
(DC Bar # 471830)
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
***Counsel for Appellants***

**CERTIFICATE OF COMPLIANCE FOR APPELLANTS' OPENING BRIEF**

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(B)(i), I certify that Plaintiffs-Appellants' Opening Brief complies with applicable page and word limits in that it has a text typeface of 14 points and contains 12,864 words, less than the 13,000 words permitted.

Dated: November 12, 2024

Respectfully submitted:

/s/ Terrence Collingsworth
Terrence Collingsworth
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Phone: (202) 543-5811
Email: tc@iradvocates.org

# Addenda

# TABLE OF CONTENTS

I. FINAL OPINION AND ORDER....................1

II. COMPLAINT (ECF No. 25)....................21

III. EXHIBITS TO THE COMPLAINT

EXHIBIT A (Petition to CBP)....................91

EXHIBIT B (2.14.22 Letter to CBP)....................115

EXHIBIT C (Harkin-Engel Protocol)....................123

EXHIBIT D (CBP Questionnaire to Cocoa Companies)....................139

EXHIBIT E (6.25.21 Supplemental Petition)....................142

EXHIBIT F (12.13.22 Letter to IRAdvocates from Acting CBP Commissioner Miller)....................162

EXHIBIT G (1.17.23 IRAdvocates Letter to Acting CBP Commissioner Miller)....................163

EXHIBIT H (2.14.23 Supplemental Petition)....................166

IV. STATUTORY AND REGULATORY TEXTS

19 U.S.C. § 1307....................172

5 U.S.C. § 706....................173

19 C.F.R. § 12.42....................175

V. DOCKET SHEET....................178

VI. CERTIFICATE OF SERVICE....................180

Slip Op. 24-91

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **INTERNATIONAL RIGHTS ADVOCATES,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ALEJANDRO MAYORKAS, Secretary U.S. Department of Homeland Security,**<br><br>**TROY A. MILLER, Acting Commissioner U.S. Customs and Border Protection,**<br><br>**Defendants.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 23-00165** |

**OPINION AND ORDER**

[Dismissing for lack of jurisdiction plaintiff's action to compel defendants to issue decision on allegations of cocoa imported through forced child labor from the Ivory Coast in violation of 19 U.S.C. § 1307.]

Dated: August 8, 2024

Terrence P. Collingsworth, International Rights Advocates, of Washington, D.C., for plaintiff International Rights Advocates.

Aimee Lee, Assistant Director, Marcella Powell, Senior Trial Counsel, and Christopher A Berridge, Trial Attorney, U.S. Department of Justice, of New York, N.Y. and Washington D.C., for defendants Alejandro Mayorkas, Secretary U.S. Department of Homeland Security, and Troy A. Miller, Acting Commissioner U.S. Customs and Border Protection. Also on the briefs were Justin R. Miller, Attorney-In-Charge, International Trade Field Office, Patricia M. McCarthy, Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General. Of counsel were Sabahat Chaudhary and Chelsea A. Reyes, Office of the Chief Counsel, U.S. Customs and Border Protection.

Kelly, Judge: Before the Court is the motion filed by Defendants Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security, and Troy A. Miller, Acting Commissioner, U.S. Customs and Border Protection ("CBP") (collectively "Defendants") seeking to dismiss the action filed by Plaintiff International Rights Advocates ("IRAdvocates") for lack of jurisdiction and failure to state a claim upon which relief can be granted. See generally Defs.' Mot. Dismiss, Dec. 15, 2023, ECF No. 16 ("Defs. Mot."); Defs.' Reply Memo. To Pl.'s Opp'n [Def. Mot.], May 3, 2024, ECF No. 21 ("Defs. Reply"). IRAdvocates opposes Defendants' motion. See generally [IRAdvocates] Opp'n [Def. Mot.], Feb. 23, 2024, ECF No. 17 ("Pl. Resp."). For the reasons that follow, Defendants' motion is granted for lack of jurisdiction.

## BACKGROUND[1]

Most of the world's cocoa comes from West African countries. Côte d'Ivoire (the "Ivory Coast") is one of, if not, the largest producing countries of cocoa in the world, responsible for a bulk share of the cocoa exported from the region that makes up seventy percent of the world's cocoa supply. See Compl. at ¶ 9, Aug. 15, 2023, ECF No. 2 (citing Elian Peltier, Ivory Coast Supplies the World With Cocoa. Now It Wants Some for Itself, N.Y. Times (Aug. 13,

[1] The background is drawn from the allegations contained in IRAdvocates' complaint, which are accepted as true for the purposes of evaluating Defendants' motion to dismiss. See Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); Warth v. Seldin, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party").

2022), https://www.nytimes.com/2022/08/13/world/africa/ivory-coast-chocolate.html (last visited July 29, 2024)). The United States receives a substantial portion of the total cocoa produced by the Ivory Coast. See id. (first citing Marius Wessel & P.M. Foluke Quist-Wessel, Cocoa Production in West Africa, a Review and Analysis of Recent Developments, 74–75 NJAS: Wageningen J. Life Sci. 1, 1–7 (2015), https://www.tandfonline.com/doi/epdf/10.1016/j.njas.2015.09.001?needAccess=true (last visited July 29, 2024); and then citing Vivek Voora et al., Global Market Report: Cocoa, Int'l Inst. For Sustainable Dev. 1 (2019) https://www.iisd.org/system/files/publications/ssi-global-market-report-cocoa.pdf (last visited July 29, 2024)).

Forced child labor in the Ivory Coast's cocoa production is well documented and recognized not only by humanitarian organizations and nonprofits, but also by the courts and the U.S. chocolate companies themselves. See, e.g., Compl. at ¶¶ 10–92 (citing sources). Despite this recognition, leading chocolate producers continue to use and profit from forced child labor in the Ivory Coast. Id. at ¶ 29.

On February 14, 2020, IRAdvocates, along with the Corporate Accountability Lab ("CAL") and the Civil Rights Litigation Clinic of University of California Irvine School of Law ("CRLC-UCI"), submitted a joint petition (the "Petition") to CBP seeking exclusion of cocoa produced in the Ivory Coast by means of forced or trafficked child labor pursuant to 19 U.S.C. § 1307 and 19 C.F.R. § 12.42(b). Id. at ¶¶ 105, 112;

Exh. A: Petition at 1–24, Feb. 14, 2020, ECF No. 2-1 ("Petition").[2] Specifically, the Petition alleged that certain cocoa imports from the Ivory Coast by certain chocolate companies[3] were produced by forced child labor and requested CBP investigate and issue a withhold release order ("WRO") on the merchandise.[4] Petition at 1–4. The Petition detailed both statistical and first-hand evidence of forced and trafficked child labor collected by IRAdvocates, as exhibited in direct accounts from IRAdvocates investigators and victims of forced child labor in the Ivory Coast. Id. In March of

---

[2] CBP's regulations include a mechanism for which a third-party may submit allegations of products made by forced labor to CBP. Particularly, 19 C.F.R. § 12.42(b) allows for:

> Any person outside CBP who has reason to believe that merchandise produced [in violation of 19 U.S.C. § 1307] is being, or is likely to be, imported into the United States may communicate his belief to any port director or the Commissioner of CBP. Every such communication shall contain, or be accompanied by:
>
> (1) A full statement of the reasons for the belief;
> (2) A detailed description or sample of the merchandise;
> (3) All pertinent facts obtainable as to the production of the merchandise abroad.

In this case, the communication came in the form of the Petition sent directly to CBP. See Compl. at ¶ 105; Petition at 1–24.

[3] The chocolate companies include Nestlé, S.A. and Nestlé, U.S.A.; Cargill, Incorporated; Barry Callebaut AG, Barry Callebaut USA LLC; Mars, Incorporated and Mars Wrigley Confectionary; Olam International and Olam Americas, Inc.; the Hershey Company; World's Finest Chocolate, Inc.; and Blommer Chocolate Co. Petition at 1.

[4] Merchandise subject to a WRO is detained by CBP, and the importer of the detained merchandise can either re-export the detained shipments at any time or provide information to CBP showing that the merchandise was not produced in violation of 19 U.S.C. § 1307. See Forced Labor Frequently Asked Questions, U.S. Customs and Border Prot. (May 1, 2024), https://www.cbp.gov/trade/programs-administration/forced-labor/frequently-asked-questions (last visited July 29, 2024).

2020, IRAdvocates and CAL met with CBP to discuss the Petition. Compl. at ¶ 105. At that meeting, CBP indicated that an investigation was underway, and that it had sent requests for information to "all of the major cocoa suppliers" regarding their supply chains. Id.

On March 23, 2021, CBP again met with CAL to discuss the Petition. Id. at ¶ 106. CBP claimed that an investigation into the underlying facts of the Petition was ongoing. Id. At that time, CBP did not identify any insufficiency or untimeliness with respect to the evidentiary support within the Petition. Id. On June 25, 2021, IRAdvocates and CAL submitted a joint supplemental allegation to CBP concerning the exclusion of cocoa produced in the Ivory Coast. Id. at ¶ 107; Exh. E: Supp. 307 Petition, Jun 25, 2021, ECF No. 2-5 ("Supp. Petition").[5] CBP met with IRAdvocates and CAL on September 10, 2021, to discuss the supplemental petition. Id. at ¶ 108. Again, CBP failed to discuss the timeline or status of the pending investigation. Id. CBP failed to convey any new information regarding the investigation and gave no indication as to whether it had received the requested information from cocoa manufacturers. Id.

[5] The Supplemental Petition urged that CBP require the chocolate companies to provide, within 180 days, a "transparent map of [each] companies' supply chains down to the farm level," "pay the full Living Income Differential [] immediately, and move toward the Living Income price over the next 18 months" for the cocoa-producing farmers and their families, and "require that companies establish long-term contracts with cooperatives and farmers in [the Ivory Coast] over the next 18 months to ensure economic stability." Supp. Petition at 2–3.

Two years after filing the initial Petition, on February 14, 2022, IRAdvocates, CAL, and CRLC-UCI authored another letter to CBP, signed by various organizations, companies, and individuals, calling on CBP to initiate a Section 1307 enforcement action on cocoa imported from the Ivory Coast based on the Petition. See id. at ¶ 109; Exh. B: Letter to CBP at 1–8, Feb. 14, 2022, ECF No. 2-2 ("Letter of Support"). CBP failed to directly respond to or otherwise answer the letter. Compl. at ¶ 111. Months later, another meeting between CAL and CBP took place on August 15, 2022, and IRAdvocates sent a follow-up email to CBP in October of 2022, requesting an update on the investigation. Id. at ¶¶ 110–111.

On December 13, 2022, CBP responded to inquiries from IRAdvocates and the co-petitioners. Id. at ¶ 111; Exh. F: Letter From Acting Comm'r Miller at 1, Dec. 13, 2022, ECF No. 2-6 ("Dec. 13, 2022, Letter"). CBP indicated that "the information submitted with the [Petition] was dated and did not provide a sufficient basis for CBP to move forward with enforcement action under 19 U.S.C. § 1307"—the first time any concern as to the quality of the information submitted by the petitioners was raised. Dec. 13, 2022, Letter at 1. CBP provided no further clarity on the status of the investigation and did not discuss when, or if, any action would be taken. See generally id. IRAdvocates and CAL were also encouraged by CBP to submit "any additional information" concerning the allegations in the Petition "should it become available." Id.

IRAdvocates responded to CBP's letter on January 17, 2023, contesting CBP's determination that the information contained in the Petition and related submissions were dated. Compl. at ¶ 112; Exh. G: Letter To Acting Comm'r Miller at 1–3, Jan. 17, 2023, ECF No. 2-7. On February 14, 2023, CAL submitted an additional supplemental petition of ongoing forced child labor practices in cocoa production in the Ivory Coast, which remains unaddressed by CBP. See Compl. at ¶ 113; Exh. H: 2023 307 Petition at 1–7, Jan. 14, 2023, ECF No. 2-8. At no point in the "ongoing investigation" did CBP indicate a time frame to resolve the Petition, address the merits of the allegations, or indicate whether it was going to issue a ruling of any sort. See Compl. at ¶¶ 105–113; Exh. G: Letter To Acting Comm'r Miller at 1–3, Jan. 17, 2023, ECF No. 2-7.

After three and a half years of unsuccessfully petitioning CBP and with no indication that CBP intended to act, IRAdvocates filed the instant action against Defendants on August 15, 2023, asserting jurisdiction under 28 U.S.C. § 1581(i) and alleging the failure to enforce the terms of Section 1307 in violation of 5 U.S.C. § 706(1). See Compl. at ¶¶ 115–34. Specifically, IRAdvocates asks the Court to compel CBP to act on its Petition by issuing a WRO on the cocoa products imported from the Ivory Coast, determining that the Petition lacks merit, or making "some other appropriate decision in response to the Petition." Id. at ¶ 134, Request for Relief at ¶¶ A–B. On December 15, 2023, Defendants moved the Court to dismiss IRAdvocates suit for lack of subject-matter jurisdiction and for failure to state a claim

upon which relief can be granted. See generally Defs. Mot. IRAdvocates opposed Defendants' motion on February 23, 2024, to which Defendants replied on May 3, 2024. See generally Pl. Resp.; Defs. Reply.

On June 6, 2024, the Court granted IRAdvocates' untimely request for oral argument based on its counsel's excusable neglect. See Order at 1–2, June 10, 2024, ECF No. 24. On June 17, 2024, the Court requested supplemental briefing from the parties in light of the Supreme Court's decision in Food and Drug Administration v. Alliance of Hippocratic Medicine. See 602 U.S. 367, 393–96 (2024) ("Alliance"); see also Letter of the Court, June 17, 2024, ECF No. 25. On July 9 and 11, 2024, the parties submitted their supplemental briefs addressing the Court's request. See generally Defs.' Supp. Br., July 9, 2024, ECF No. 27 ("Defs. Supp. Br."); [Pl.'s] Corrected Supp. Br. Addressing [Letter of the Court], July 11, 2024, ECF No. 29-1 ("Pl. Supp. Br."). On July 16, 2024, the Court heard oral argument on the issues raised by the parties in response to Defendants' motion. See generally Oral Arg., July 16, 2024, ECF No. 33.

## STANDARD OF REVIEW

The Court reviews an action brought under 28 U.S.C. § 1581(i) under the standards provided under Section 706 of the Administrative Procedure Act ("APA"), as amended. See 28 U.S.C. § 2640(e). Under the Section 706 of the APA, the reviewing court shall

(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

5 U.S.C. § 706(1)–(2)(A).

Whether the Court has subject-matter jurisdiction to hear an action is a "threshold" inquiry, Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998),[6] of which standing is a part. Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60 (1992). Further, a plaintiff fails to state a claim unless, when taking the facts in the complaint as true, its claim is "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## DISCUSSION

Defendants argue this action should be dismissed for lack of subject-matter jurisdiction because IRAdvocates lacks standing to bring its claim. Defs. Mot. at 14–20. Specifically, Defendants contend that IRAdvocates fails to satisfy Article III of the U.S. Constitution because: it cannot demonstrate a concrete, particularized injury in fact, there is no causal connection between the injury alleged and CBP's conduct, and the alleged injury is not likely to be redressed by a decision in IRAdvocates' favor.

[6] Subject-matter jurisdiction confers the Court with the power to hear a case and cannot be waived or forfeited. United States v. Cotton, 535 U.S. 625, 630 (2002). A party, or the Court on its own initiative, can object to the existence of subject-matter jurisdiction at any stage in the litigation, including after trial and entry of judgment. Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006).

Id.; Defs. Reply at 2–11.[7] IRAdvocates disputes Defendants' characterization of the suit, arguing that it has organizational standing under Article III to bring the action because it suffered an injury in fact that was fairly traceable to CBP's failure to act that can be redressed by a favorable decision.[8] Pl. Resp. at 9–24. Defendants' motion is granted because IRAdvocates lacks standing and therefore this Court lacks subject matter jurisdiction.[9]

Article III of the U.S. Constitution requires plaintiffs to demonstrate standing. U.S. Const. art. III, § 2; see Lujan, 504 U.S. at 560–61. In satisfying "[t]he irreducible constitutional minimum of standing," a plaintiff must demonstrate the three elements of injury in fact, causation, and redressability. Military-Veterans Advoc. v. Sec'y of Veterans Affs., 7 F.4th 1110, 1121 (Fed. Cir. 2021); Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1331 (Fed. Cir. 2008) (citing Lujan, 504 U.S. at 560). First, the plaintiff must show that it suffered an injury in fact: a concrete and

---

[7] Concerning standing, Defendants additionally assert that the action should be dismissed because IRAdvocates lacks statutory standing, as its claims are not within the "zone of interests" of the statute that IRAdvocates seeks to enforce. Defs. Mot. at 20–22; Defs. Reply at 11–15. Defendants further argue that the action should be dismissed for failure to state a claim because Section 1307 does not mandate any agency action that can be compelled under the APA, and thus the Court cannot provide declaratory relief. Defs. Mot. at 22–35.

[8] IRAdvocates also contends its interests are protected by 19 U.S.C. § 1307 and thus satisfy the criteria for statutory standing, and further that CBP has unreasonably delayed discrete and mandatory agency action on the Petition. Pl. Resp. at 18–40.

[9] IRAdvocates asserts that the Court has jurisdiction under 28 U.S.C. § 1581(i)(1)(c), providing the Court with exclusive jurisdiction over civil actions commenced against the United States concerning "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." Compl. at ¶ 115.

particularized "invasion of a legally protected interest" that is actual or imminent rather than conjectural or hypothetical. Lujan, 504 U.S. at 560; Military-Veterans Advoc., 7 F.4th at 1121 ("[the injury in fact requirement] ensures that the plaintiff has a 'personal stake in the outcome of the controversy'" (quoting Warth, 422 U.S. at 498)). Second, the plaintiff must demonstrate that the injury and conduct complained of are causally connected; that is, the injury is "fairly traceable to the defendant's actions or omissions," rather than those of a third party. Lujan, 504 U.S. at 560. Lastly, the plaintiff must show it is likely, rather than "merely speculative," that the injury will be redressed by a decision in the plaintiff's favor. Id. An organization establishes standing by demonstrating the same three components of constitutional standing required by an individual.[10] Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) ("Havens"); Alliance, 602 U.S. at 393–94. To satisfy the injury in fact requirement, the organization must establish "a concrete and demonstrable injury to the organization's activities." Havens, 455 U.S. at 379.

In Havens, the Court explained that an organization sufficiently pleads an injury in fact when it identifies a concrete harm to the organization. See 455 U.S. at 378–79. In that case, Housing Opportunity Made Equal ("HOME") alleged that the defendant, Havens Realty Corporation ("Havens Realty") engaged in "racial

[10] An organization can establish standing in one of two ways: through organizational standing; or on behalf of its members through associational standing. See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 552–53 (1996). Here, only the former is implicated.

steering"—a practice preserving and encouraging racial segregation by steering members of racial and ethnic groups to buildings primarily occupied by those of similar racial and ethnic groups—in violation of Section 804 of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. Id. at 368–69. HOME provided counselling services for low- and moderate-income homeseekers, as well as investigations and referral of complaints involving discriminatory housing practices. Id. HOME claimed that Havens Realty's actions frustrated HOME's "efforts to assist equal access to housing through counseling and other referral services," and that as a result, HOME "had to devote significant resources to identify and counteract [Havens Realty's] racially discriminatory steering practices." Id. at 379.

The Supreme Court, in finding that HOME had Article III organizational standing, emphasized that Havens Realty's racial steering practices "perceptibly impaired HOME's ability to provide counselling and referral services for low- and moderate-income homeseekers" and constituted a concrete harm. Id. HOME's counseling had directed its clients to Havens Realty, and Havens Realty lied about available housing to those clients and sabotaged the work HOME had accomplished. Id. at 368–69.[11] The Court stressed that the organization in Havens was not only an advocacy organization, but also operated a counseling service as a core business. Id.

[11] In Havens, the injury to HOME also caused a "consequent drain on the organization's resources" to remedy the harm caused by the defendant. 455 U.S. at 379. However, an organization cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Alliance, 602 U.S. at 394.

at 368. Thus, HOME's core business extended beyond advocacy. See id. at 368, 378–79. At issue was an asset with value—stemming from HOME's core business—rather than an abstract societal interest; Havens Realty's actions damaged that asset.[12] See id. at 379. In sum, Havens found injury in fact because the defendant's action harmed the plaintiff's asset. See id. (finding a perceptible injury to HOME's ability to "provide counseling and referral services").

Recently, in Alliance the Supreme Court applied Havens' rationale in the context of regulatory action. See Alliance, 602 U.S. 367. The plaintiff-organizations in Alliance challenged the Food and Drug Administration's ("FDA") approval of the drug mifepristone, used to terminate pregnancies up to ten weeks. Id. at 375–377. The organizations argued that the FDA's approval of mifepristone had "forced" them to "expend considerable time, energy and resources," engaging in public advocacy, conducting independent studies, and drafting civil actions, all of which constituted a concrete and particularized injury in fact. Id. at 394. The Court rejected the organizations' proposition that their claimed injury amounted to the same type of injury suffered by HOME in Havens. To the contrary, the FDA's approval of

[12] Indeed, an injury that is "merely ideological" fails to satisfy first element of standing. Alliance, 602 U.S. at 381. Allowing alleged damages to the "special interests" of an organization to suffice would result in "no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived." Military-Veterans Advoc., 7 F.4th at 1129 (quoting Sierra Club, 405 U.S. at 739); see also Alliance, 602 U.S. at 382 ("The injury in fact requirement prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders" (internal quotations and citations omitted)).

mifepristone did not obstruct a core business or "impose[] any similar impediment" to the organizations' mission. Id. at 395.

Inquiries into the second and third constitutional standing requirements—causation or traceability and redressability, respectively—often overlap. Alliance, 602 U.S. at 380–81 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin" (internal quotations and citations omitted)). The causation prong "examines the causal connection between the assertedly unlawful conduct and the alleged injury." Allen, 468 U.S. at 754 n.19. When government regulation of a third-party individual or business is purported to be the cause of injury to an unregulated plaintiff, that plaintiff must demonstrate a "predictable chain of events" stemming from the government action (or inaction) to the claimed injury. Alliance, 602 U.S. at 385 ("in other words, [the plaintiff must show] that the government action has caused or likely will cause injury in fact to the plaintiff"). The redressability prong "examines the causal connection between the alleged injury and the judicial relief requested." Allen, 468 U.S. at 754 n.19; see also McKinney v. U.S. Dep't of Treasury, 799 F.2d 1544, 1549–50 (Fed. Cir. 1986) (explaining that the injury caused by the defendant's actions must be "likely to be redressed should the court grant the relief requested").

Here, IRAdvocates has not met the requirements of organizational standing under Article III. The organization "advocates for and with working people around the world"—including those in the Ivory Coast—and is "committed to overcoming the

problems of child labor, forced labor, and other abusive practices in the global economy." Pl. Resp. at 10; Compl. at ¶ 117. It seeks to achieve its mission by promoting the enforcement of international labor rights through "public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." Pl. Resp. at 10; Compl. at ¶ 117. But unlike the plaintiff in Havens, IRAdvocates does not identify how CBP's failure to act has harmed a core business or diminished any asset. See 455 U.S. at 368–69.

In contrast to Havens, IRAdvocates' claimed injury rests not on harm to a core business, but solely on CBP's failure to issue a WRO for cocoa imported from the Ivory Coast or to otherwise take action in response to the Petition. See Pl. Resp. at 11. Similar to Alliance, IRAdvocates would prefer specific action by CBP. Like the organizations in Alliance, IRAdvocates has devoted resources to persuading the agency to act in accordance with its wishes. See Compl. at ¶¶ 105–114; Pl. Mot. at 10–17; Pl. Supp. Br. at 3–5. Such expenses do not constitute injury in fact.[13] See

[13] Moreover, IRAdvocates has not shown that its mission has been inhibited. See Vilsack, 808 F.3d at 919. Nothing in the filings indicate that IRAdvocates cannot continue its pursuit of achieving "just and humane treatment for workers worldwide," or that it now must spend resources in a capacity independent from its issue-advocacy functions to counteract harm that CBP has caused. To the contrary, the complaint highlights that IRAdvocates remains active in advocating for and litigating cases relating to its mission statement after submitting the Petition, such as in the Courts of Appeals for the Ninth Circuit and the D.C. Circuit, and the Supreme Court of the United States. See, e.g., Compl. at ¶ 96 (describing a film highlighting IRAdvocates' work in the Ivory Coast that was released in 2022); Nestle USA, Inc. v. Doe, 593 U.S. 628 (2021) (issuing decision on June 17, 2021); Coubaly v. Cargill, Inc., 610 F. Supp. 3d 173 (D.D.C. 2022) (issuing decision June 28, 2022, appeal filed July 25, 2022).

Alliance, 602 U.S. at 394 ("an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action").[14] IRAdvocates' frustration with the regulatory process fails, without more, to satisfy the injury in fact requirement because regulatory frustration is not injury in fact. See Alliance, 602 U.S. at 396 (noting plaintiffs must show "regulatory requirements likely would cause them to suffer an injury in fact"). Indeed, the federal courts are inappropriate forums for an organization to challenge a federal agency's actions based on that organization's mere ideological objection to the agency's choices. Id. at 396–97.

IRAdvocates' claim that it was injured by CBP's failure to act on the Petition after it was filed is also unavailing. See Pl. Resp. at 13; Pl. Supp. Br. at 3–5. IRAdvocates argues that the expenses it incurred as a result of CBP's delay caused

---

[14] IRAdvocates claims that CBP's failure to take action on the Petition poses "a direct conflict between [CBP's] conduct and [IRAdvocates'] mission." Pl. Resp. at 10–11. In support of its position, IRAdvocates cites Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006). However, that case is distinguishable. Similar to Havens, the plaintiff-organization in Abigail Alliance offered counseling and educational services to assist terminally ill patients in "accessing potentially life-saving drugs." Id. at 132–33. The FDA's challenged regulations, which barred the organization's clients from accessing clinical trials for experimental drugs, were found to perceptibly impair and be in direct conflict with the organization's counseling services, thus conferring constitutional standing. Id. at 133. The court specifically found that the organization's injury was "directly attributable to FDA policies." Id. Here, CBP's inaction is not of the same nature as the FDA's in that case, as IRAdvocates does not challenge any regulations that CBP promulgated. Moreover, and discussed below, IRAdvocates' cannot establish that the alleged injury is "directly attributable" to CBP's inaction.

the organization to "divert substantial additional resources to convince CBP to take enforcement action." Pl. Mot. at 13–14; see also Pl. Supp. Br. at 4–5. Specifically, IRAdvocates claims diversions of resources towards: additional resources to prepare for and participate in the March 23, 2021, September 10, 2021, and August 15, 2022, meetings at CBP's office; collecting additional evidence of trafficking and forced labor in the Ivorian cocoa industry included in the supplemental petition filed on June 25, 2021, consisting of three trips to Western Africa visiting five regions in the Ivory Coast in 2020 to interview and observe children subject to forced labor; preparing reports, summaries of interview, affidavits, descriptions of photos, and transcripts of video and audio recording for use in information submitted in the supplemental petition; organizing and filing the February 14, 2022, letter of support to CBP; preparing the January 17, 2023, response letter to CBP's December 13, 2022, letter; and conducting additional research and obtaining new evidence to assist the creation of CAL's unanswered supplemental petition filed on February 14, 2023. See id.; Compl. at ¶¶ 106–110, 112–13; Letter of Support; Dec. 13, 2022, Letter.[15]

[15] In further support of its claimed injury in fact, IRAdvocates argues that "[o]nly organizations like IRAdvocates that have filed a lawful [Section 1307] petition and then expended funds in an effort to get CBP to take statutorily required action to enforce the law have standing to challenge CBP's inaction." Pl. Supp. Br. at 3 (emphasis omitted). However, the act of filing a petition does not legally bind CBP to take a particular enforcement pathway. Rather, enforcement action is warranted only after CBP has evaluated and determined the merits of the allegations in the Petition. See 19 C.F.R. § 12.42(e), (f).

IRAdvocates' post-Petition expenditures fall squarely within the category of resources used for advocacy, litigation, or educational purposes—the types of expenses that have been consistently rejected as a basis for Article III injury in fact. See, e.g., Alliance, 602 U.S. at 394 ("But an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action"). Rather than relating to a business activity independent from its issue-advocacy functions, the expenditures appear to directly further IRAdvocates' claimed goal of "public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." See Compl. at ¶ 117. IRAdvocates cannot "spend its way into standing" by expending resources to gather information and advocate against forced-child labor in the Ivory Coast, be that at the outset of advocacy activities or in the middle. See Alliance, 602 U.S. at 394. Accordingly, IRAdvocates fails to demonstrate that it suffered any injury in fact as required to assume organizational standing under Article III.[16]

[16] Concerning the three trips to Western Africa, it would appear that these expenses similarly occurred within IRAdvocates' normally expended operational costs and insufficient to constitute injury in fact. See Vilsack, 808 F.3d at 920. The complaint details IRAdvocates' past travels to and work in the region, listing trips to the Ivory Coast in 2018 and 2019. Compl. at ¶¶ 99–100. In light of these excursions in the previous two years, attributing the 2020 trips solely to CBP's inaction is tenuous, at best, given the release of the 2022 film documenting IRAdvocates' work in the Ivory Coast and the filing of the Coubaly lawsuit in the U.S. District Court for the District of Columbia in 2021. See Compl. at ¶¶ 96, 103; see also Coubaly, 610 F. Supp. 3d 173.

Even if IRAdvocates had suffered an injury in fact, the injury is not traceable to CBP's inaction, and a decision in IRAdvocates' favor would not likely redress the injury. See Lujan, 504 U.S. at 560. As discussed, IRAdvocates' expenses resulted from CBP's inaction relate to those made in the routine operations of an organization seeking "to achiev[e] just and humane treatment for workers worldwide." Pl. Resp. at 10; see also Compl. at ¶ 117. Moreover, even if the Court compelled CBP to act, the agency might conclude that the Petition is without merit and refuse to impose Section 1307 exclusions on cocoa from the Ivory Coast—a possibility recognized in both IRAdvocates' complaint and brief. Compl. at ¶ 134; Pl. Resp. at 26–27.

Alternatively, a judgment in IRAdvocates' favor that compels CBP to issue a WRO would merely halt import of cocoa coming from the Ivory Coast—an outcome that fails to pass constitutional muster. See Alliance, 602 U.S. at 385 (clarifying that the causation element requires the plaintiff to "show a predictable chain of events leading from the government action to the asserted injury"); Lujan, 504 U.S. at 560–61 ("it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision" (internal quotations and citations omitted)). There is no guarantee that action from CBP will immediately, or even eventually, put an end to forced child labor in the Ivory Coast. CBP's interference with IRAdvocates' mission "to fight to prevent the exploitation of forced child labor in cocoa harvesting" using all available avenues, including Section 1307, see Pl. Supp. Br. at 5, is therefore an impermissibly attenuated and speculative basis to confer constitutional standing

under both the causation and redressability prongs of the analysis. See Alliance, 602 U.S. at 385; Lujan, 504 U.S. at 560–61. Thus, IRAdvocates has failed to show the causation and redressability elements of Article III standing.

Given that IRAdvocates does not have constitutional standing to bring its claim, the Court need not reach the remaining arguments made by the parties. CBP's motion to dismiss for lack of subject-matter jurisdiction is therefore granted.

## CONCLUSION

IRAdvocates lacks standing to bring action against CBP to compel 19 U.S.C. § 1307 enforcement on cocoa imported from the Ivory Coast. Therefore, Defendants' motion to dismiss is granted, and IRAdvocates complaint is dismissed for lack of subject-matter jurisdiction. Judgment will enter accordingly.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: August 8, 2024
New York, New York

TERRENCE P. COLLINGSWORTH
(DC Bar # 471830)
International Rights Advocates
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
E-mail: tc@iradvocates.org
*Counsel for Plaintiff*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES,<br>621 Maryland Ave NE,<br>Washington, D.C. 20002<br><br>Plaintiff,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary<br>U.S. Department of Homeland Security<br>2707 Martin Luther King Jr Ave SE, MS 0525<br>Washington, DC 20528-052<br><br>TROY A. MILLER, Acting Commissioner<br>U.S. Customs and Border Protection,<br>c/o Office of Chief Counsel,<br>1300 Pennsylvania Ave, Suite 4.4-B<br>Washington, DC 20229<br><br>Defendants. | **Case No.** 1:23-cv-00165 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I. INTRODUCTION AND FACTUAL BACKGROUND

1. Plaintiff International Rights Advocates (IRAdvocates) brings this action under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq*. Plaintiff seeks declaratory and injunctive relief against Alejandro Mayorkas, in his capacity as Secretary of the Department of Homeland Security (DHS), and Troy A. Miller, in his capacity as Acting Commissioner of Customs and Border Protection (CBP), for their failure to take any of the actions required by the Tariff Act of 1930, 19 U.S.C. § 1307, and the applicable implementing regulations, 19 CFR § 12.42 *et seq*, following the February 14, 2020 filing of a credible and well-documented Petition (attached hereto as **Exhibit A**) by IRAdvocates, Corporate Accountability Lab (CAL), and University of California Irvine Law School Human Rights Clinic (UCI). These organizations filed their Petition ***over three years and five months ago*** seeking to ban the importation of cocoa from Côte d'Ivoire by seven major chocolate companies that is harvested in whole or in part by forced child labor. The CBP has not only failed to make a decision but has also failed to respond to an inquiry made two years after the Petition was filed by IRAdvocates, CAL, UCI, and a large number of interested parties and organizations requesting enforcement of the law (letter attached as **Exhibit B**). Because the responsible agencies, DHS and CBP, have failed to take any action at all in response to the Petition, Plaintiff seeks an order from this Court requiring these entities to comply with the law and fulfil their statutory obligations.

### A. STATUTORY AND REGULATORY FRAMEWORK

2. Section 307 of the Tariff Act prohibits the importation of goods that are the fruits of forced labor, declaring, *inter alia,* that "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured ***wholly or in part*** in any foreign country by convict labor or/and

forced labor or/and indentured labor under penal sanctions *shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited*, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision." 19 U.S.C. § 1307 (1997) (emphasis added).

3. The Tariff Act was amended in 1997 to clarify the definition of forced labor so as to specifically and explicitly prohibit the importation of goods produced by forced *child* labor for the purposes of the Act. "'Forced labor,' as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term 'forced labor or/and indentured labor' includes forced or indentured *child* labor." 19 U.S.C. § 1307 (1997) (emphasis added).

4. The U.S. Customs regulations that implement the Tariff Act, 19 C.F.R. § 12.42, *et seq.*, entitle "[a]ny person outside the Customs Service who has reason to believe that merchandise produced [by convict, forced, or indentured labor] is being, or is likely to be, imported into the United States" to "communicate his belief to any port director or the Commissioner of Customs." 19 CFR § 12.42(b). IRAdvocates, CAL, and UCI acted in good faith under this provision and filed the Petition with CBP on February 14, 2020. There is no question that the Petition was received by CBP as IRAdvocates and CAL have had several discussions about the Petition with staff at CBP and have also supplemented their filing with additional evidence on two occasions.

5. The Commissioner of Customs, upon receipt of any such communication, "will cause such investigation to be made as appears to be warranted by the circumstances of the case . . ." 19 CFR § 12.42(d).

6. If the Commissioner of Customs finds at any time "that information available *reasonably but not conclusively* indicates that merchandise within the purview of section 307 [of the Tariff Act] is being, or is likely to be, imported, he will promptly advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise pending instructions from the Commissioner as to whether the merchandise may be released otherwise than for exportation." 19 CFR § 12.42(e) (emphasis added).

7. If it is determined that the merchandise is indeed subject to the provisions of Section 307, such merchandise ***must*** be denied entry into the United States, "unless the *importer* establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 CFR § 12.42(f),(g) (emphasis added).

8. Section 1307 was further amended in 2016 when Pub. L. 114-125 struck out the "consumptive demand exception" that originally followed after "enforcement of this provision." Prior to this change, the statute read: "[t]he provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall such provisions be applicable to goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demands of the United States." Prior to the 2016 amendment, the "consumptive demand exception" was very difficult to satisfy, and cases which failed to satisfy the exception were ruled to lack standing. This was demonstrated in the International Labor Rights Fund's prior case filed in 2005 seeking to ban the importation of cocoa harvested with forced child labor. This legal obstacle, now removed, is no longer relevant. 19 U.S.C. § 1307 (1997).

**B. FORCED CHILD LABOR ON COCOA PLANTATIONS IN CÔTE D'IVOIRE IS WELL-DOCUMENTED AND NOT DISPUTABLE**

9. Côte d'Ivoire is the largest producer of cocoa in the world. While seventy percent of the world's cocoa comes from West African countries, primarily Côte d'Ivoire and Ghana,[1] roughly forty-five percent is produced in Côte d'Ivoire alone.[2] The United States, being the third largest importer of chocolate (following Netherlands and Germany), is a major customer of Côte d'Ivoire's cocoa.[3] The United States accounts for forty-six percent of Côte d'Ivoire's direct exports. However, the quantity of Ivorian cocoa imported into United States is much higher than that percentage would indicate, as countries including Panama, Belgium, and Spain reexport Ivorian cocoa to the U.S. after processing it.

10. Child labor is rampant in Côte d'Ivoire. In 2013, a UNICEF report estimated that 1.4 million children aged five to seventeen were working in Côte d'Ivoire, with forty-nine percent working in the agricultural sector alone.[4] The incidence of child labor has only increased in recent years. In October 2020, the Department of Labor issued a report (NORC Report) in conjunction with the University of Chicago; the report estimated (based on 2018/2019 survey findings) approximately **1.56 million child laborers** worked in cocoa production in Côte

---

[1] Marius Wessel & P.M. Foluke Quist-Wessel, *Cocoa production in West Africa, a review and analysis of recent developments*, NJAS: WAGENINGEN J. LIFE SCI., Vol. 74-75 (December 2015), https://doi.org/10.1016/j.njas.2015.09.001.

[2] Elian Peltier, *Ivory Coast Supplies the World With Cocoa. Now It Wants Some for Itself*, NEW YORK TIMES (Aug. 13, 2022), https://www.nytimes.com/2022/08/13/world/africa/ivory-coast-chocolate.html.

[3] Vivek Voora, Steffany Bermúdez, & Cristina Larrea, *Global Market Report: Cocoa*, INT'L INST. FOR SUST. DEV. 1 (2019), https://www.iisd.org/system/files/publications/ssi-global-market-report-cocoa.pdf.

[4] *Promoting the Rights of children in the Cocoa Producing Areas in Côte d'Ivoire*, UNICEF 6 (March 2019), https://open.unicef.org/sites/transparency/files/2020-06/Cote-d-Ivoire-TP5-2018.pdf.

d'Ivoire and Ghana.[5] Of this number, 790,000 worked in Côte d'Ivoire alone.[6] According to the U.S. State Department, this number increased during the COVID-19 pandemic, but a follow-up study in November found that the rates had fallen to pre-COVID-19 levels.[7] It bears mentioning that while the Department of Labor abdicated its responsibility to investigate the presence of forced labor, its conclusion that ninety-five percent of child laborers (**1.48 million children**) engage in the **Worst Forms of Child Labor** certainly is a strong indicator that much of the child labor in Côte d'Ivoire and Ghana is forced.[8] Among those children living in agricultural households in Côte d'Ivoire, the rate of children engaged in hazardous work, including exposure to toxic chemicals, hazardous tools, and carrying heavy loads, increased by fourteen percent



[5] *NORC Final Report: Assessing Progress in Reducing Child Labor in Cocoa Production in Cocoa Growing Areas of Côte d'Ivoire and Ghana*, NORC AT THE UNIVERSITY OF CHICAGO 10 (Oct. 2020), https://www.norc.org/PDFs/Cocoa%20Report/NORC%202020%20Cocoa%20Report_English.pdf (hereinafter "NORC report").

[6] *Id.*

[7] Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, U.S. DEP'T OF STATE39 (2021), https://www.state.gov/wp-content/uploads/2022/02/313615_COTE-D_IVOIRE-2021-HUMAN-RIGHTS-REPORT.pdf.

[8] NORC Report*, supra* note 5 at 2, 47.

from 2008/2009 to 2018/2019.[9]

11. It is well-documented that **forced** child labor, and other "Worst Forms of Child Labor" that violate ILO Convention No. 182, is prevalent on cocoa plantations in Côte d'Ivoire that supply U.S. importers.[10] The U.S. State Department, the International Labor Organization (ILO), and UNICEF, among others, have documented the existence of child slavery in cocoa with reports and statistics dating back to the late 1990s. Since that time, Côte d'Ivoire's cocoa production has been controlled by major chocolate companies with the unilateral goal of finding the cheapest sources of cocoa. Various NGOs, including IRAdvocates, have independently confirmed that many of the children working on Ivorian cocoa plantations are forced to work as slaves without any remuneration. Further, many of the adult workers are themselves forced, bonded or indentured laborers. These levels of child labor and forced labor are a direct result of cocoa farmers being impoverished, as nearly seventy percent of cocoa is produced by farmers living on less than two dollars a day.[11]




12. Since 1997, UNICEF has reported that children from neighboring countries have been trafficked to Côte d'Ivoire to harvest cocoa beans.[12] In a 2019 report, UNICEF reported

[9] *Id.* at 70.
[10] The Washington Post published a major exposé on the continued and extensive use of children, many of them trafficked into forced labor, performing hazardous work harvesting cocoa for Defendants in Côte d'Ivoire. Peter Whoriskey & Rachel Siegel, *Cocoa's child laborers*, THE WASHINGTON POST (June 5, 2019), https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/?utm_term=.6cb753bcb6f8.
[11] Voora, Bermúdez, & Larrea, *supra* note 3 at 1.
[12] *See* Carol Bellamy, *The State of the World's Children 1997: Focus on Child Labour*, OXFORD UNIVERSITY PRESS FOR UNICEF (1997), https://www.unicef.org/media/84761/file/SOWC-1997.pdf.

that many children engaged in child labor in Côte d'Ivoire come from countries such as Burkina Faso, Mali, Togo, Benin, Niger, Guinea, and Ghana.[13] While many of the children migrate with their families, some migrate alone in search of financial stability, increasing the risk that they will be victimized and coerced into forced labor.[14] Human traffickers often prey on the most vulnerable members of society, recruiting financially insecure children from neighboring countries and tricking them into slavery through false promises of jobs and financial security.[15] The U.S. Department of Labor describes the conditions of forced child labor in chilling detail:

> [s]ome children are sold by their parents to traffickers, some are kidnapped, and others migrate willingly but fall victim to traffickers who sell them to recruiters or farmers, where they end up in conditions of bonded labor. Some farmers buy the children and refuse to let them leave the farm until the debt of their purchase has been worked off. The children are frequently not paid for their work; some of their wages are paid to the recruiter or trafficker. These children are held against their will on isolated farms, are locked in their living quarters at night, and are threatened and beaten if they attempt to escape. They are punished by their employers with physical abuse. They are forced to work long hours, including overtime, and are required to work even when they are sick. Some children are denied sufficient food by their traffickers and employers.[16]

13. The 2021 Country Report on Human Rights Practices, issued by the Department of State, recognizes Côte d'Ivoire as "a source, transit, and destination country for children subjected to trafficking in persons."[17] It further explains the state of forced labor in Côte d'Ivoire:

> The government did not effectively enforce the law [regarding trafficked and forced labor]. Penalties were criminal and commensurate with those for comparable crimes such as kidnapping but were seldom and inconsistently applied. The

---

[13] *Promoting the Rights of children in the Cocoa Producing Areas in Côte d'Ivoire*, *supra* note 4, at 6.
[14] *Id.*
[15] Trafficking in Persons Report, U.S. DEP'T OF STATE 27 (2011).
[16] Bureau of Int'l Labor Affairs, *List of Goods Produced by Child Labor or Forced Labor*, U.S. DEP'T OF LABOR (September 28, 2022), https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods-print.
[17] *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, *supra* note 7,at 31.

> government did not provide enough resources or conduct enough inspections to enforce compliance. Forced and compulsory labor, including for children, continued to occur in small-scale and commercial production of agricultural products, particularly on cocoa, coffee, pineapple, cashew, and rubber plantations.[18]

Ultimately, the Ivorian government repeatedly fails to enforce its anti-trafficking laws, and the worst forms of child labor in agriculture are most prevalent in the cocoa and coffee sectors.[19] The State Department's report also found that "[i]nspections carried out during the year did not result in fines for child labor crimes. Penalties were commensurate with penalties for comparable crimes but were seldom applied. The number of inspectors and resources for enforcement were insufficient to enforce the law."[20]

14. While Ivorian government officials outwardly condemn child labor trafficking, corruption exists at many levels, with "[s]ome observers alleg[ing] low-ranking police on the borders with Mali and Ghana facilitated smuggling, including potential trafficking cases, and organized a system to collect bribes at checkpoints and along bus routes."[21] This form of corruption is consistent with what a group of investigators, working with CAL, witnessed in November 2020. Further, in 2019, staff and agents of IRAdvocates were arrested in Sikasso, Mali, when they were photographing traffickers at the main bus station. The police ignored their demand to arrest the traffickers instead and the IRAdvocates' team was held at the police station for several hours when they refused to pay a bribe.

---

[18] *Id.* at 37 (2021).
[19] *Id.*
[20] *Id.* at 38-39.
[21] *Trafficking in Persons Report,* U.S. DEPT. OF STATE 189 (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.



15. The Department of State does note that, although the Côte d'Ivoire government fails to meet the minimum requirements for the elimination of trafficking, various significant improvements have occurred. While these numbers are likely extremely under-representative of the actual numbers of trafficking victims, the "Trafficking in Persons Report" (July 2022) states that during the reporting period, 1,190 trafficking victims were identified by the Ivorian government, the majority children; of these, 753 were trafficked for forced labor.[22] Some of these children were foreign nationals, coming from Nigeria, Mali, Guinea, Burkina Faso, Niger, Togo, and Benin.[23] The "Trafficking in Persons Report" cites one case investigated by the Sub-Directorate in the Fight against Trafficking and Child Labor (SDLTEDJ), where "law enforcement arrested 24 alleged traffickers and identified 68 child victims, most of whom were from Burkina Faso, exploited in forced labor in cocoa; courts convicted and sentenced five traffickers under Law No. 2016-111 and 17 traffickers under penal code provisions on child

[22] *Id.*
[23] *Id.*

labor."[24] Further, in February 2021, four alleged traffickers were arrested along with nineteen rescued children, all from Burkina Faso, who were being transported across the border to work on cocoa plantations.[25]

16. News sources have also publicized a number of raids conducted by the Ivorian government. In January 2020, *Bloomberg* reported that a raid in Côte d'Ivoire had rescued 137 children from Ghana, Nigeria, and Benin from human traffickers.[26] In a separate raid in October 2020, police arrested three farmers "on suspicion of people trafficking" and rescued eleven children and two teenagers from cocoa farms in the southwestern part of Côte d'Ivoire. According to a *Reuters* article, those children were rescued while shelling cocoa pods.[27] In early February 2021, the Ivorian government arrested a total of seven traffickers and rescued twenty-two children in two separate sting operations.[28] The Ivorian government again conducted a raid in May of the same year, rescuing sixty-eight children from forced labor conditions on cocoa farms and arresting twenty-five suspected traffickers. *Reuters* reported that most of these children had been trafficked into Côte d'Ivoire from Burkina Faso.[29] Despite these major actions, the role of the government appears to vary by region and is undermined by ongoing corruption. In fact,

---

[24] *Id.*

[25] *Country Reports on Human Rights Practices, 2021: Côte d'Ivoire*, *supra* note 7, at 38.

[26] Leanne de Bassompierre, *Ivory Coast Rescues 137 Children in Raid on Traffickers*, BLOOMBERG, (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/top-cocoa-grower-rescues-137-children-in-raid-on-traffickers#xj4y7vzkg.

[27] Ange Aboa, *Ivory Coast police rescue 11 children working on cocoa farms*, REUTERS (Oct. 7, 2020), https://www.reuters.com/article/us-ivorycoast-cocoa/ivory-coast-police-rescue-11-children-working-on-cocoa-farms-idUSKBN26S3C4.

[28] Ange Aboa, *Ivory Coast arrests three suspected child traffickers in cocoa belt*, REUTERS (Feb. 12, 2021), https://www.reuters.com/article/cocoa-childlabour-ivorycoast/ivory-coast-arrests-three-suspected-child-traffickers-in-cocoa-belt-idUSL8N2KI3GR.

[29] Ange Aboa, *Ivory Coast police rescue 68 children working on cocoa farms*, REUTERS (May 10, 2021), https://www.reuters.com/world/africa/ivory-coast-police-rescue-68-children-working-cocoa-farms-2021-05-10/.

the recent increased attention to forced labor trafficking, including a new anti-trafficking center,[30] has forced child labor further underground as the traffickers are now acting more discreetly.

17. Beginning in 1999, Plaintiff IRAdvocates (and its predecessor organization, International Labor Rights Forum) conducted several investigative trips to Côte d'Ivoire and Mali to document forced and trafficked child labor in cocoa harvesting, as well as children working under hazardous conditions that violate ILO Convention No. 182. Most recently, in December 2020, IRAdvocates investigators visited five different regions in Côte d'Ivoire. While in those areas, the investigators spoke with children they encountered and asked them questions about their work, school, and parents. Many of the children the investigators spoke with were young, did not appear to be attending school, and were using sharp objects, such as machetes. Such work would be considered as fitting within the "worst forms of child labor" and is therefore prohibited under ILO Convention No. 182. The investigators found indicators of abuse of vulnerable children, abusive working and living conditions, and isolation, all well-established criteria for "forced labor." Many of the children had been trafficked from Mali and Burkina Faso. In some cases, the trafficked child workers initially said they were from Côte d'Ivoire and were working for their "uncle," but upon further questioning they admitted they had been trafficked.

18. As part of the investigation, IRAdvocates spoke to leaders of various cocoa cooperatives. All of them either admitted that child labor was common or claimed not to know the conditions on the plantations from which they sourced their cocoa beans. While the major

---

[30] The anti-trafficking center referred to here is one of the centers that the First Lady's Office has established. Abou Traoré, *Travail des enfants dans les plantations de cacao: Le traffic a la peau dure*, CENOZO (Jan. 8, 2019), https://cenozo.org/travail-des-enfants-dans-les-plantations-de-cacao-le-trafic-a-la-peau-dure/.

chocolate companies claim they are moving towards "transparency" and "sustainability," whatever those terms mean, it is clear that very little has changed on the ground in Côte d'Ivoire.

**C. CHOCOLATE COMPANIES HAVE KNOWINGLY BENEFITTED FROM FORCED CHILD LABOR FOR DECADES DESPITE THEIR PLEDGES TO END THE ABUSE OF CHILD WORKERS IN THEIR COCOA SUPPLY CHAINS.**

19. In 1999, various labor rights and consumer groups, including the International Labor Rights Forum and the Child Labor Coalition, urged Congress to pressure the major chocolate companies to stop using trafficked and forced child labor and to pay the adult workers a living wage. They worked with then-Congressman Bernie Sanders and Congressman Elliot Engel to introduce legislation to ban the importation of cocoa (and other products) harvested by forced child labor. In 2001, that bill passed the House by a 291-115 vote and went to the Senate, where Senator Tom Harkin sponsored it. However, the pending legislation, known as the Harkin-Engel bill, was halted before a Senate vote due to intense industry lobbying against a mandatory program with real consequences. Once the lobbyists were done with the bill, it was transformed to the 2001 Harkin-Engel Protocol (the "Protocol"), a "voluntary" initiative that gave participating companies until 2005 to "phase out" the use of child labor. The Protocol, attached hereto as **Exhibit C**, was personally signed by the Chief Executive Officers of the major chocolate companies, including Nestlé, Hershey, and Mars, as well as the overall industry group, the Chocolate Manufacturers Association. They explicitly acknowledged that forced child labor and other "worst forms of child labor" prohibited by ILO Convention No. 182 were endemic in cocoa harvesting in Côte d'Ivoire and Ghana. The Protocol was therefore an explicit admission by the major companies in 2001 that their cocoa was harvested by exploited children. The Protocol is also not a bygone example of the recent history of such admissions; as discussed

below, the major companies flouted the Protocol's timeline and extended the deadline to eradicate child labor to 2008, then 2010, then 2020, then 2025—and then abandoned a set date.[31]

20. The World Cocoa Foundation (WCF) is a non-profit member organization whose members represent more than eighty percent of the cocoa sector.[32] Among the WCF's almost 100 members are leading chocolate manufacturers, suppliers, and producers such as Nestlé, the Hershey Company, Mars Wrigley, Barry Callebaut, Olam International, and Cargill. The foundation's stated purpose is to "convene the private sector, governments, civil society and cocoa-growing communities to focus on three goals: increasing farmer income, combating child and forced labor, and ending deforestation in cocoa."[33] In actuality, the WCF has become a home base for cocoa companies to coordinate public relations positions and strategize about how to avoid making major changes in their child labor-dependent system of cocoa harvesting.

21. The International Cocoa Initiative (ICI) is a Geneva-based non-profit organization established pursuant to Article 5 of the Harkin-Engel Protocol. The group is a multi-stakeholder partnership between cocoa and chocolate producers, farming communities,

---

[31] *See Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate/Cocoa Industry on Efforts to Address the Worst Forms of Child Labor in Cocoa Growing Protocol Work Continues* (July 1, 2005), http://www.cacao.gouv.ci/commun/documents/jointstatementSenateurTomHarkin.pdf.; *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol* (June 16, 2008), http://www.csrwire.com/press_releases/14132-Joint-Statement-from-U-S-Senator-Tom-Harkin-Representative-Eliot-Engel-and-the-Chocolate-and-Cocoa-Industry-on-the-Implementation-of-the-Harkin-Engel-Protocol-#,; Tim McCoy, *2018 Child Labor Cocoa Coordinating Group 8th Annual Meeting Remarks*, World Cocoa Foundation (Aug, 21, 2018), https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8th-annual-meeting-remarks/.

[32] WORLD COCOA FOUNDATION, https://www.worldcocoafoundation.org/.

[33] *Id.*

international organizations, governments, and civil society members. Members include Nestlé, Hershey, Barry Callebaut, Mars Wrigley, Mondelēz International, Olam International, and Cargill. The landing page of the initiative's website opens with "[p]reventing and addressing child labour and forced labour in cocoa," and "[w]e are a non-profit foundation that works to protect the rights of children and adults in cocoa-growing areas in West Africa."[34] The ICI is, in fact, industry-dominated and serves mainly to create the false impression that the industry is making progress on ending child labor in cocoa harvesting.

22. In 2005, cocoa industry leaders representing the world's largest chocolate companies that source products from Côte d'Ivoire admitted the goals of the Protocol would not be "fully met" by the 2005 deadline, but assured Sen. Harkin and Rep. Engel they were "committed to achieving a certification system . . . within three years."[35] Then, in 2008, the industry leaders again unilaterally extended their self-imposed deadline by two years.[36] In 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by seventy percent the use of child labor in the cocoa industry. At the Eighth Annual World Cocoa Foundation (WCF) meeting in July 2018, the industry admitted it could not make its 2020 or even 2025 goal of eradicating child labor in the cocoa supply chain. Effectively abandoning any set date, the WCF admitted it was not likely it would meet its "aspiration for 2020" or other targets "for the eradication of child labor by 2025."[37]

---

[34] INTERNATIONAL COCOA INITIATIVE, https://www.cocoainitiative.org/.
[35] *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate/Cocoa Industry on Efforts to Address the Worst Forms of Child Labor in Cocoa Growing Protocol Work Continues*, *supra* note 31.
[36] *Joint Statement from U.S. Sen. Tom Harkin, Rep. Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol*, *supra* note 31.
[37] *2018 Child Labor Cocoa Coordinating Group 8th Annual Meeting Remarks* (2018), https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8th-annual-meeting-remarks/.

Thus, the major companies acknowledged that two decades after they promised to stop profiting from forced child labor, they still were and would continue to do so.

23. After a study conducted in 2015 by Tulane University concluded that the number of Ivorian children engaged in the worst forms of child labor on cocoa plantations substantially increased between 2009 and 2014, with 1,203,472 child laborers working on farms in the 2013-2014 harvest season,[38] cocoa companies renewed their false assurances to consumers and regulators, stating they would initiate programs to reduce child labor in their supply chains. These promises remain unfulfilled.

24. Many WCF leaders are the creators and founding members of the WCF's "CocoaAction Plan." Among other things, the CocoaAction Plan purports to include a monitoring system, the Child Labor Monitoring and Remediation System (CLMRS), to ensure there are no children working on cocoa plantations. Like the Harkin-Engel Protocol, the CocoaAction Plan and the CLMRS are ineffective in ending forced child labor and instead serve as public relations ploys. Chocolate companies know them to be so and purposefully set them up to be narrow, uncomprehensive, and lacking in transparency. The CLMRS "monitoring," like the CocoaAction Plan, extends only to a small percentage of chocolate companies' supply chains. Further, CLMRS does not have any form of independent monitoring, and provides no consequences for a farmer using child slaves. Finally, there is no effective remediation when CLMRS does find children working as slaves, and/or performing hazardous work with dangerous tools and spraying pesticides and herbicides without protective equipment.

[38] Tulane University Payson Center for International Development, *Survey Research on Child Labor in West African Cocoa Growing Areas*, Department of Labor (July 30, 2015) https://www.dol.gov/sites/dolgov/files/ilab/research_file_attachment/tulane%20university%20-%20survey%20research%20cocoa%20sector%20-%2030%20july%202015.pdf.

25. One graphic example of the CocoaAction Plan's willful and ongoing acceptance of the use of child labor is apparent in the 2015 Fair Labor Association (FLA) audit on Nestlé (a developer and promoter of the CocoaAction Plan), which occurred at Nestlé's request. The FLA's audit report explained that "[f]or Nestlé in Ivory Coast, the FLA has been monitoring since 2013 a growing portion of its cocoa supply served by the Nestlé Cocoa Plan (NCP). As of mid-2015, the NCP represented around twenty-five percent of Nestlé's total cocoa supply chain."[39] The NCP areas were what the FLA audited; in other words, Nestlé had the FLA audit the small subset of its supplying cocoa farms where it had engaged in the most efforts to eradicate child and slave labor, excluding the majority of its supply. The FLA assessors visited a sample of 260 farms, less than one percent of the 30,000 that supply Nestlé in the Ivory Coast.[40] Despite this small sample limited to areas most favorable to Nestlé, the FLA report found that "[c]hildren younger than 15 continue to work at cocoa farms connected to Nestlé, more than a decade after the food company promised to end the use of child labour in its supply chain."[41] These children "were expected to work in hazardous conditions and carry out dangerous tasks, including using machetes and transporting heavy loads." Additionally, the Fair Labor Association "found evidence of forced labour, with a young worker not receiving any salary for a year's work at a farm."[42] Ultimately, and remarkably, even Nestlé's paid agent, when focusing on the small subset of farms carefully selected to reduce the chances of unfair labor practices,

---

[39] *2014 Executive Summary, Nestlé Cocoa Supply Chain, Ivory Coast*, FAIR LABOR ASSOCIATION 1 (Sept. 2, 2015), https://www.fairlabor.org/reports/2014-executive-summary-nestle-cocoa-supply-chain-ivory-coast/.
[40] *Id.*
[41] Joe Sandler Clarke, *Child labour on Nestlé farms: chocolate giant's problems continue*, THE GUARDIAN (September 2, 2015), https://www.theguardian.com/global-development-professionals-network/2015/sep/02/child-labour-on-nestle-farms-chocolate-giants-problems-continue.
[42] *Id.*

immediately discovered many serious instances of exploitative practices harming child workers. If this is what the FLA found in Nestlé suppliers' *monitored* farms, a survey of Nestlé's entire supply chain—or that of other chocolate companies— would almost certainly yield even more devastating findings of child slavery.

26. Further, in March 2019 interviews with the WCF, the ICI, and the Fair Labor Association (FLA), IRAdvocates learned that, at most, twenty to thirty percent of any producer's cocoa comes from plantations that are in cooperatives and that are participants in the CocoaAction Plan. The remaining seventy to eighty percent comes from "free zones," where there is no monitoring whatsoever and where there is an extremely high incidence of trafficked and forced child labor. Though these percentages may have changed since 2019, it remains clear that unmonitored cocoa still constitutes well over half of the overall cocoa supply (and for many companies, often much more than half).[43]

27. Meanwhile, the so-called "monitored" cocoa, though an improvement over "free zones" because there is at least the possibility of traceability to the identified cocoa plantations, relies on company-designed and -implemented systems that cannot remotely be considered legitimate, independent monitoring. These systems are not transparent and they do not in actuality prevent unfair labor practices; as with Nestlé's monitoring system, this type of "monitoring" remains inaccurate and misleading. The current company-sponsored "monitoring"

---

[43] *See* Cécile Renier et al, *Transparency, traceability and deforestation in the Ivorian cocoa supply chain*, ENVIRONMENTAL RESEARCH LETTERS Vol. 18, No. 2, DOI 10.1088/1748-9326/acad8e. This number is generous, as many chocolate companies monitor much less than 50% of their cocoa supply; Mars, for instance, traced only 24% as of 2019. Peter Whoriskey and Rachel Siegel, *With its 2005 deadline to end child labour missed, the cocoa industry is bitterly behind – especially in Africa,* THE INDEPENDENT (June 11, 2019), https://www.independent.co.uk/news/world/africa/cocoa-child-labour-africa-hershey-nestle-mars-cadbury-toblerone-a8948316.html.

systems are prime examples of the fox guarding the chicken coop. Chocolate companies, as well as the WCF and ICI, are misleading the public and consumers by creating the false impression that the CocoaAction Plan extends past a small minority of farmers in companies' supply chains. In doing so, the organizations willfully fail to disclose the scale of child labor in cocoa harvesting. In addition, there is still pervasive use of child labor even in the subset of plantations in the CocoaAction Plan; the companies explain this away by claiming, without a factual basis, that the child laborers are the children of the plantation owners. Regardless of whether some child workers are family members of the farmers using them, these children are performing hazardous work that no children are permitted to do under ILO Convention No. 182. As noted, the company-implemented monitoring systems cover only a minority of the relevant cocoa supply. And even for the farms they supposedly cover—the supposedly monitored, sustainable, and slave-free farms—the systems, in actuality, do not prevent forced child labor or other violations of ILO Convention No. 182.

28. Chocolate companies' repeated delays in stopping their use of child slaves, after twenty-two years of falsely promising to do so under the Harkin-Engel Protocol while continuing to claim to be "committed" and "concerned" about the welfare of children, demonstrates they knowingly benefit from forced child labor without interference. Their "voluntary" initiatives have proven to be shams, and they are getting away with and profiting from an international human rights crime while claiming they are making progress.[44] These companies maintain an ongoing, cheap supply of cocoa through exclusive supplier/buyer

---

[44] *See* Peter Woriskey, *Chocolate companies sell 'certified cocoa.' But some of those farms use child labor, harm forests,* WASHINGTON POST (Oct. 23, 2019), https://www.washingtonpost.com/business/2019/10/23/chocolate-companies-say-their-cocoa-is-certified-some-farms-use-child-labor-thousands-are-protected-forests/.

relationships with local farms and/or farmer cooperatives in Côte d'Ivoire. Despite this control and their specific knowledge of the pervasive use of child labor by the farmers harvesting cocoa for them, chocolate companies have failed to stop the illegal use of forced child labor in cocoa harvesting. This history and methodology of exploitation is well documented, as was irrefutably demonstrated by the 2020 NORC Report showing that illegal child labor has increased since 2015 and there are now 1.56 million children harvesting cocoa.[45] This lawless environment allows chocolate companies to continue to benefit from the forced child labor.

29. The Petition filed with CBP by IRAdvocates, CAL, and UCI specifically names the major chocolate companies that signed the Protocol in 2001 but remain the worst offenders of their failed promise to stop profiting from forced child labor and other worst forms of child labor; the Petition asks that the cocoa harvested by these companies be banned from importation to the U.S. The named companies are: Nestlé, Mars, Hershey, Barry Callebaut, Blommer Chocolate Co., Cargill, Mondelēz, and Olam**.** Each of these companies continues to violate the Protocol while engaging in deceptive practices to mislead consumers and regulators into believing they no longer profit from forced child labor. Each of them is knowingly profiting from trafficked and forced child labor and other examples of the "worst forms of child labor" prohibited by ILO Convention No. 182. All of these companies pledged to stop this abuse of West African children when they signed the Protocol in 2001 and have been misleading the public about their efforts to do so since then.

---

[45] NORC Report, *supra* note 5, at 146.

**a. Nestlé**

30. Nestlé, U.S.A. (Nestlé) is a U.S. corporation that is a subsidiary of Nestlé, S.A. Headquartered in Virginia, Nestlé is one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, forty-two manufacturing facilities, six distribution centers, and fifty-eight sales offices. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America. The company acknowledges child labor exists in its supply chain.[46] Nestlé bombards the public with nice-sounding policies that are merely false assurances of its compliance with its own standards and universally recognized prohibitions on trafficking and using children to perform hazardous work.

31. As one example of consumer-facing messaging, Nestlé's Responsible Sourcing Standard provides in section 2.2.5:

> Minimum Age for Employment. In accordance with international labour standards, no person shall be employed under the age of 15 or under the age for completion of compulsory education, whichever is higher, except in the strict frame of the Family Farm Work described in 4.2.1: If the Supplier employs young workers, defined as between the ages of 15 and 18, it shall demonstrate that the employment of young people contributes to their personal education and does not expose them to undue physical risks that can harm physical, mental or emotional development.[47]

32. Despite this assertion, Nestlé's known suppliers systematically violate this standard. Meanwhile, Nestlé profits from cocoa it obtains from the "free zones" in Côte d'Ivoire, where Nestlé knows the cocoa is produced by young children forced to perform

---

[46] Nestlé Cocoa Plan, *Tackling Child Labor 2017 Report*, NESTLÉ 9, https://www.nestlecocoaplan.com/themes/custom/cocoa/dist/assets/nestle-cocoa-plan-child-labour-2017-report.pdf.

[47] *Nestlé Responsible Sourcing Standard*, NESTLÉ 9, https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf.

hazardous work, and where Nestlé knows many of those child laborers were trafficked from Mali and Burkina Faso.

33. The Nestlé Cocoa Plan provides additional insight into its own "efforts to tackle child labor." In the "Tackling Child Labour 2017 Report," the company lauds its own efforts, which involve the monitoring of **40,728** five-to-seventeen-year-olds and the identification of **7,002** child laborers currently working on farms covered by the Cocoa Plan. The report is self-congratulatory, despite its more quiet acknowledgement that monitoring efforts only covered **one-third** of Nestlé's supply chain.[48] As previously discussed, in meetings with a team from IRAdvocates, officials at the WCF, the ICI, and FLA in 2019 admitted that this estimate is high and, at most, twenty to thirty percent of any member's cocoa supply chain is within any of their programs. Even if Nestlé's one-third figure is accepted as true, Nestlé is still implicitly admitting that two thirds of its cocoa supply chain is not within its program—and officials at the WCF, ICI and FLA acknowledge that child labor is rampant in the "free zones" of cocoa production and that trafficked children also work in those areas. Thus, like other leading chocolate companies, the majority of Nestlé's cocoa is sourced through untraceable channels, where no monitoring takes place and forced child labor and trafficking occur on a widespread basis.

34. Even within the small percentage of plantations actually covered by the Cocoa Plan, there exists no effective system of monitoring or remediation. Nestlé admits that within the seventy co-operatives in Côte d'Ivoire that supply the small amount of traceable cocoa bought by Nestlé, only tenty-two have implemented Nestlé's Child Labor Monitoring and

[48] Nestlé Cocoa Plan, *Tackling Child Labor 2017 Report*, NESTLÉ, ICI 11, https://www.nestle.com/sites/default/files/asset-library/documents/creating-shared-value/responsible-sourcing/nestle-cocoa-plan-child-labour-2017-report.pdf.

Remediation System (CLMRS). In other words, even in the small number of cooperatives where the cocoa is traceable to known farmers, monitoring activities through the Nestlé Cocoa Plan CLMRS take place in only a fraction. There is no secondary system for child labor monitoring and remediation.

35. Further, Nestlé's CLMRS system is ineffective. It purports to be a community-based monitoring system to identify and remediate child labor. Nestlé's plan relies on either Community Liaison People (community auditors) to spot children engaged in labor activities, or on the children themselves to self-declare that they are engaging in a hazardous activity. There are no trained independent monitors and no consequences for farmers who use child slaves to harvest Nestlé's cocoa. This is evidenced by Nestlé's finding that

> Cases of forced labor are rare in Nestlé's cocoa supply chain. Since 2012, we have uncovered three violations of forced labor guidelines and immediately took action to report and remedy them. The cases were identified in 2013, 2014 and 2015. Since the publication of the 2017 Tackling Child Labor Report, no further instances of forced labor have been identified. This does not mean that forced labor does not exist - **it may be that we are not good enough at identifying it**.[49]

36. The Nestlé Cocoa Plan reports flagrantly attempt to justify the company's failure to stop the use of child labor in its supply chain. The 2017 report cites as a "challenge" to tackling child labor: "[r]esistance to change: If children have been practicing certain hazardous activities for years they and their families are often resistant to change. This is especially true when they have few alternatives, and when working like an adult brings them status amongst their peers."[50] This unapologetic blame-shifting continues in Nestlé's 2019 report, which states

---

[49] Nestlé Cocoa Plan, *Tackling Child Labour 2019 Report*, NESTLÉ 24 (2019), https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf (emphasis added).
[50] *Tackling Child Labor 2017 Report*, *supra* note 48, at 42.

that "[c]ertain aspects of the laws surrounding child labor can be confusing for farmers and can directly conflict with their beliefs and traditions."[51]

37. Nestlé makes false assurances that it is determined to "tackle" the problem and that its Nestlé Cocoa Plan is helping to "eliminate the use of child labour" and "stamp out forced labour practices" in the Ivorian cocoa industry. Nestlé also claims that it is "improv[ing] the lives of farmers" through the Plan.[52] However, Nestlé's profiteering from child labor does not help the lives of farmers. Child labor has only increased in Côte d'Ivoire since Nestlé instituted its Cocoa Plan. And Nestlé has yet to commit to even paying farmers a fair price for their cocoa and does not currently have any long-term plans to support farmers achieving a living income.

38. In the face of its empty promises, Nestlé still had the chutzpah to oppose a proposed law in Australia that would require companies to report on child slaves in their supply chain. In late April 2019, Nestlé issued a warning against the proposed legislation that would mandate that Nestlé report on its efforts to weed out slavery within their company. The company claimed the cost of checking whether its suppliers were forced to work against their will would end up being passed on to the consumer. There is no way for Nestlé to tell if it is on the verge of ending the use of child slaves, as it claims, if it deliberately refuses to count or survey its operations. This refusal amounts to willful blindness—and willful obfuscation of its practices.

39. The Nestlé Cocoa Plan is a clear attempt to vindicate the company to the public without requiring it to take tangible actions to eradicate this widespread scourge. The plan thus

---

[51] *Tackling Child Labor 2019 Report*, *supra* note 49, at 60.
[52] *Id.* at 6.

deceives consumers into believing that buying Nestlé's products will actually benefit farmers in Côte d'Ivoire and misleads them into thinking the products are reliably child labor- and slave labor-free.

**b. Cargill**

40. Cargill Cocoa is a major cocoa bean originator and processor incorporated in Pennsylvania. It is a subsidiary of Cargill, Incorporated Company (Cargill), one of the largest privately-held corporate providers of food and agricultural products and services worldwide. Cargill is headquartered in Minnesota and incorporated in Delaware. Cargill Cocoa offers a wide range of high-quality cocoa powder, butter, and liquor products under the Gerkens and Wilbur brands to leading manufacturers of food, chocolate, and confectionery products worldwide. Products are sold through an international network of offices, agents, and distributors. However, evidence in the public record indicates Cargill has a long history of profiting from child slavery in cocoa production.

41. Cargill Cocoa & Chocolate North America is responsible for Cargill's partnerships with farmers in Côte d'Ivoire. Cargill's facilities include a production facility in Côte d'Ivoire that produces cocoa liquor, butter, powder, and origination of cocoa beans. As Carol Off, author of *Bitter Chocolate*, notes, Cargill is possibly the largest privately-owned corporation in the world; its influence over the food we eat, in terms of where it comes from and how it is produced, is staggering.[53] Cargill has a more visible presence in Côte d'Ivoire than any other cocoa importer. There are numerous cocoa cooperatives large and small that have exclusive relationships with Cargill. At one large cooperative in Duekoue that produces for

[53] Carol Off, *Bitter Chocolate: Investigating the Dark Side of the World's Most Seductive Sweet*, VINTAGE CANADA (2006).

Cargill, the owner told counsel for Plaintiff that a local representative from Cargill visited his cooperative on a *weekly basis* and that a Cargill representative from the company headquarters visited about once a year.

42. As part of their ongoing and continued presence on the cocoa farms in Côte d'Ivoire—for purposes of quality control, pesticide eradication, cultivation assistance, harvesting, and packing and shipping, among other activities and assistance to the farmers—Cargill has first-hand knowledge of the widespread use of child slave labor in harvesting cocoa on the farms they work with and purchase from. This direct knowledge of child labor is supplemented by well-documented and prevalent information provided by many public news articles and reports of child labor by both international and U.S. organizations.

43. After signing on to the Harkin-Engel Protocol in 2001, Cargill posted a series of promises and pledges about its intention to stop using child slaves in its supply chain. These promises and pledges were largely misleading, as none of the stated objectives for solving the child labor problem or reducing its incidence in Cargill's supply chain were met. Cargill's claims from 2005 to 2015 are detailed in the Second Amended Complaint in *Doe v. Nestle*, Case No. CV 05-5133-SVW-MRW (C.D. CA 2016) at ¶¶ 40 and 59. They indicate Cargill's supposed intentions were false, or at best, that Cargill was not as serious about these intentions as it pretended to be.

44. Cargill has recently rolled out a new set of promises and pledges to stop using child slaves that are likewise misleading and empty. On Cargill's "Ethics and Compliance" webpage, it lists as its number one guiding principle, "[w]e obey the law . . . [a]s a global organization privileged to do business all over the world, we have the responsibility to comply

with all of the laws that apply to our businesses."[54] Cargill's ongoing and admitted profiting from child slaves harvesting cocoa in its supply chain violates universally recognized law prohibiting the use of young children to perform any work, and certainly hazardous work.

45. Cargill introduced a new gimmick in 2017 called the Cargill Cocoa Promise, which states on its "Cocoa Promise in Action" page:

> At Cargill Cocoa & Chocolate, we believe that improving the lives of cocoa farmers goes hand-in-hand with our business success – and the success of the sector as a whole. While we are proud of the progress we are making, there is still much to do. To achieve a fully sustainable cocoa sector, we're going to have to learn faster, try harder, and go further – together.[55]

Goal Two of the "Cargill Cocoa Promise" is "Community Wellbeing," with the specific goal of "[z]ero incidents of child labor in our supply chain by 2025."[56] Within these statements, the conglomerate is tacitly admitting to the existence of child labor in its supply chain.

46. On Cargill's website, the company describes its efforts to address the known child labor in its supply chain in Côte d'Ivoire that it and the other large cocoa companies promised to end back in 2001 when the Harkin-Engel Protocol was signed:

> Since 2016, Cargill has used a Child Labor Monitoring and Remediation System (CLMRS), which we co-designed with the International Cocoa Initiative (ICI), to address child labor in the cocoa supply chain. CLMRS brings networks of local coaches and monitoring agents to visit farms year-round, working with families to raise awareness about the impact of child labor, identify incidents, and implement prevention and remediation programs. Cargill also works together with our partners to address the root causes of child labor by improving access to education, helping farmers to increase their incomes; expanding economic opportunities for women; and delivering programs that improve health, nutrition, and food security in cocoa communities. Our goal, by 2025, is to have a CLMRS in place to identify and address child labor throughout our direct cocoa supply chain, along with monitoring, prevention, and remediation approaches tailored for local needs.[57]

---

[54] *Cargill Code of Conduct*, CARGILL, https://www.cargill.com/about/code-of-conduct.
[55] *Our Stories*, CARGILL, https://www.cargill.com/sustainability/cocoa/our-stories.
[56] *Committed to More: 2016/2017 Cargill Cocoa Promise Global Summary Report*, CARGILL 7, https://www.cargill.com/doc/1432099950824/cargill-cocoa-promise-report-2016-17.pdf.
[57] *Human Rights*, CARGILL, https://www.cargill.com/sustainability/human-rights.

Case 1:23-cv-00165-N/A Document 2 Filed 08/15/23 Page 28 of 70

47. As stated in paragraph 24-27, *supra*, the CLMRS does not even purport to be a complete monitoring and certification system. There are no independent monitors, there are no surprise inspections, and there are no consequences to farmers or Cargill when child slaves are found to be working in Cargill's supply chain. These are the most basic foundations of a credible monitoring system. The deficiencies of the CLMRS system is evidenced by Cargill's own report of its methodology, which states that "Cargill trains farm extension workers" and these "farmer coaches visit households throughout the year" to report if any child labor was identified.[58] Relying on farmers who have been using child slaves to now become "farmer coaches" is an incredibly cynical example of hiring the fox to guard the chicken coop.

48. The Cargill Cocoa Promise assured consumers in its 2017/2018 report that "more than 21,000 members of farm families including 5,400 farmers and nearly 8,400 children were reached with information about child labor prevention and monitoring services. In 2018, an additional 25,000 members of farming families were reached, and the program is expanding further in 2019 and beyond."[59] In its 2021 report, Cargill claims that "51,708 farming households" were included in CLMRS; however, this number includes households in "Côte d'Ivoire, Ghana, Cameroon, and Indonesia."[60] Of this number, 32,220 were located in Côte d'Ivoire.[61] After twenty-three years of inaction, Cargill covering this number of farming households with its faulty monitoring system is shockingly inadequate. Cargill is clearly hoping

---

[58] *Committed to More Infographic*, CARGILL, https://www.cargill.com/doc/1432121706389/ccc-committed-to-more-ending-child-labor-infographic.pdf.
[59] *Id.*
[60] *Cocoa and Chocolate Sustainability Progress Report 2021*, CARGILL 12, https://www.cargill.com/doc/1432213708736/cargill-cocoa-sustainability-progress-report-2021.pdf.
[61] *Id.* at 24.

that consumers and regulators without knowledge of the cocoa industry will be impressed that Cargill is reaching out in any way to 32,000 farms. But as Cargill well knows, that number represents a miniscule proportion of the farms producing cocoa. The WCF admits that: "[t]he organized supply chains of a handful of companies reach only a fraction of the entire cocoa-growing population of Côte d'Ivoire and Ghana, and efforts to date have only reached a fraction of the farmers in those supply-chains."[62] And, as stated above, these supposed CLMRS efforts include contacting farmers with mere "information about child labor prevention," which is absolutely ineffective even if Cargill had done this for every cocoa producing person in the world.

49. Cargill also claims it has implemented an innovative "bar code" system to track bags of cocoa produced within the CLMRS system. Again, even if this digital tracing system worked perfectly, CLMRS is only operating in a small portion of Cargill's supply chain, and the rest of their cocoa comes from the unregulated free zone. Cargill claims in its 2021 report that "100% of our direct supply chain is traceable up to the first point of purchase"; however, of its indirect supply chain, only "10% of the cocoa is traceable to the first point of purchase," and "78% is traceable to sourcing region."[63] This vague language is intended to obscure the fact that seventy to eighty percent of Cargill cocoa comes from the completely unregulated free zone, as aforementioned interviews by Plaintiff's counsel uncovered. Further, based on an investigation by Plaintiff's counsel in March 2019, the owner of one major Cargill cooperative—controlling

[62] *2018 Child Labor Cocoa Coordinating Group 8th Annual Meeting Remarks*, *supra* note 37.
[63] *Cocoa and Chocolate Sustainability Progress Report 2021*, CARGILL16, https://www.cargill.com/doc/1432213708736/cargill-cocoa-sustainability-progress-report-2021.pdf.

over 1,000 member farms—admitted he had not yet even received training for the bar code system. He showed the bar code electronic device, brand new in the box, to Plaintiff's counsel.

50. The Cargill cooperative owner also admitted that there is no way that Cargill could know if farmers put cocoa beans that were produced outside of the CLMRS system into the Cargill bags. Without effective monitoring, farmers are free to purchase beans from the free zone, pass them off as CLMRS beans, and receive whatever premium Cargill offers for CLMRS beans.

51. Cargill clearly has a long way to go to meet its stated goal of "[z]ero incidents of child labor in our supply chain by 2025."[64] But based on the long history of Cargill and the other cocoa retailers and chocolate companies doing virtually nothing since signing the Harkin-Engel Protocol twenty-two years ago, the goal is not to stop profiting from child slavery. The goal is to deceive regulators and the public and create the false impression that the Cargill Cocoa Promise is not yet another empty promise. Meanwhile, the alarming results of the NORC Report conclusively demonstrate that child labor is increasing while Cargill is touting its broken "Cocoa Promise."

**c. Barry Callebaut**

52. Barry Callebaut USA LLC (Barry Callebaut) is a U.S. company headquartered in Chicago and is a subsidiary of Barry Callebaut AG. The company markets and sells cocoa produced in Côte d'Ivoire in the United States with brands such as Barry Callebaut, Bensdrop, and Cacao Barry.

---

[64] *Committed to More: 2016/2017 Cargill Cocoa Promise Global Summary Report*, *supra* note 56 at 7.

53. Barry Callebaut claims that it is now working to make sustainable chocolate the norm. When it launched its "Forever Chocolate" plan in 2016, Barry Callebaut pledged to eradicate child labor and lift 500,000 farmers out of poverty by 2025.[65] In May 2023, however, Barry Callebaut delayed its goals further—as it and the cocoa industry have repeatedly done over the previous two decades—and backed off its promise to eradicate child labor altogether. Instead, the company's new "sharpened goals" are for its supply chain to be covered by Human Rights Due Diligence by 2025 and for farming communities to be "empowered to protect child rights" by 2030.[66] Barry Callebaut has once again failed to implement effective policies, and instead has rolled out new vague goals to keep up its public appearance.

54. The most recent Forever Chocolate progress report admits that "Barry Callebaut sources cocoa from regions where child labor, defined as work that deprives children of their childhood, their potential and their dignity, and that is harmful to their physical and mental development, occurs."[67] This acknowledgment is repeated by Barry Callebaut's internal "Human Rights Committee," which states "Barry Callebaut sources cocoa and other commodities from regions where child labor . . . is widespread."[68] Again, this is a cocoa company that brings incredible amounts of cocoa product into the United States each year, admitting in its own reports that child labor is prevalent in its supply chain. Given the broken

---

[65] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor,* BARRY CALLEBAUT1, https://www.barry-callebaut.com/system/files/2022-11/Forever%20Chocolate%20Progress%20Report%202021-22%20Barry%20Callebaut_2.pdf.
[66] *Forever Chocolate: Impact Beyond 2025*, Barry Callebaut 4 (2023), https://www.barry-callebaut.com/system/files/2023-05/Our%20impact%20beyond%202025%20brochure_0.pdf.
[67] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor, supra* note 65, at 7.
[68] *Safeguarding Human Rights Update 2021/22*, BARRY CALLEBAUT, https://www.barry-callebaut.com/en/group/forever-chocolate/ethical-sourcing-and-business/safeguarding-human-rights-our-supply-chain#:~:text=We%20expect%20our%20suppliers%20and,of%20our%20products%20by%202025.

promises of chocolate companies since 2001 to end the exploitation of child labor in their supply chains, these new promises by Barry Callebaut and others to end exploitation by 2025 are very likely going to be broken as well. Barry Callebaut even references the 2025 goals, highlighted in public relations material and supposedly mandated by Barry Callebaut's membership in WCF and other organizations, as merely a "springboard."[69]

55. Further, Barry Callebaut's internal Human Rights Committee acknowledges that the October 2020 NORC report, and a June 2021 report published by the European Commission on ending child labor in Côte d'Ivoire and Ghana, concluded that "current efforts to eliminate child labor are not sufficiently and structurally embedded with a functioning institutional support system."[70]

56. Barry Callebaut claims that its use of the Child Labor Monitoring and Remediation Systems (CLMRS) and awareness training in collaboration with the International Cocoa Initiative (ICI) and the World Cocoa Foundation (WCF) will provide the necessary monitoring to back up their supply chain transparency. However, as previously stated, CLMRS appears to be a scam to merely create the appearance of meaningful monitoring and remediation. CLMRS does not provide for independent monitoring or remediation, and there are no consequences for farmers using child slaves. Most fundamentally, CLMRS is being applied to a very small percentage of Defendants' supply chains. Monitoring and remediation is in place in only eight-one percent of Barry Callebaut's direct supply chain.[71] However, as the ICI and WCF admit, chocolate company's direct supply chains only account for about twenty to thirty percent of their total supply chain. The company admits that only twenty-three percent of its

[69] *Forever Chocolate Progress Report 2021/22*, *Eradicating Child Labor*, *supra* note 65, at 1.
[70] *Id.* at 7.
[71] *Id.* at 10.

indirect supply chain is sourced from third party suppliers covered by "equivalent child labor monitoring systems."[72]

57. Still, in the minority of farms covered by Barry Callebaut's monitoring scheme, the company identified 25,235 cases of child labor.[73] Barry Callebaut claims to tackle the issue of child labor through awareness training in farmers' communities. According to the company, systematic change must happen from within farming communities who need to be aware "of the consequences of the worst forms of child labor for a child's development, education, and quality access to primary, secondary and vocational education."[74] Its 2017/18 report sheds light on Barry Callebaut's plan to "creat[e] a movement" by signing letters of intent with the Ivorian and Ghanaian governments to "spell out a commitment to increase cooperation on the eradication of the worst forms of child labor."[75] These self-policing measures have been failing miserably for years.

58. Barry Callebaut's Supplier Code confirms that it knows the legal requirements that prohibit child labor in cocoa harvesting. This Code states suppliers are prohibited from using child labor in their operations and must respect and realize the principles set forth in the ILO convention Nos. 138 and 182, respectively, on the minimum age for employment and on the worst forms of child labor.[76] Barry Callebaut claims to reserve the right to terminate its business relationship with the supplier if it does not act to remediate non-compliance issues.

[72] *Id.*
[73] *Id.*
[74] *Forever Chocolate Progress Report 2017/18,* BARRY CALLEBAUT 5, https://www.barry-callebaut.com/sites/default/files/2019-01/barry-callebaut-forever-chocolate-progress-report-2017-18.pdf.
[75] *Id.*
[76] *Supplier Code*, BARRY CALLEBAUT 6 (May 2020), https://www.barry-callebaut.com/sites/default/files/2020-05/Barry%20Callebaut%20Supplier%20Code_EN_2020.pdf.

Barry Callebaut's Code of Conduct accordingly condemns forced labor, child slavery and other practices that exploit children or expose them to harmful conditions.[77] However, there is no record of enforcement of these clear objectives, and given that Barry Callebaut's supply chain is still riddled with child slavery, its Code of Conduct serves only as a clear admission that the company is knowingly violating fundamental laws and principles as it continues to profit from child slavery. The NORC Report confirms that, rather than contributing to overall progress on reducing child labor (let alone eliminating the practice), child labor has increased since Barry Callebaut rolled out its unenforced Code of Conduct.

**d. Mars**

59. Mars, Incorporated (Mars), by far the largest manufacturer of chocolate in the world, is a privately held corporation with its U.S. headquarters in McLean, Virginia. It operates its cocoa business and sales in the U.S. through Mars Wrigley Confectionary, which is headquartered in Chicago, Illinois. Mars sells and markets cocoa products all over the United States, with much of its supply hailing from Côte d'Ivoire. Like other chocolate manufacturers, Mars admits the ongoing existence of child labor and forced child labor in its supply chain. After years of knowingly benefiting from child slavery, it claims it is trying to fix the problem with its "Five Principle Plan."[78] These five principles are "Quality, Responsibility, Mutuality, Efficiency and Freedom to life every day."[79] Mars has developed a "global human rights approach" to focus its principles on issues of human rights violations. Specifically, Mars states that its "Supplier Code of Conduct outlines our global human rights expectations of all first-tier

---

[77] *Code of Conduct*, Barry Callebaut 9 (2023), https://www.barry-callebaut.com/system/files/2023-04/Barry%20Callebaut_Code%20of%20Conduct.pdf.
[78] *The Five Principles*, Mars, https://www.mars.com/about/the-five-principles.
[79] *See Id.*; *California Transparency in Supply Chains Act*, Mars, https://fin.mars.com/en/ca-supply-chain-act?language_content_entity=fi.

suppliers, including workplace standards and guidelines aligned with the International Labour Organization's Fundamental Principles and Rights at Work. It prohibits the use of prison, slave, bonded, forced and indentured labor and human trafficking."[80] This includes "Child labor, forced labor, including slavery and human trafficking, and migrant labor."[81] As with the other Defendants, these high-minded words and standards merely serve to prove that Mars' ongoing use of child slavery violates its own standards.

60. Mars continuing to profit from child slavery violates the fundamental principles to which Mars purports to adhere. Such principles can be found in its Human Rights Policy statement:

> Significant, complex and systemic human rights issues persist in the global economy and affect people in a number of extended supply chains that we ultimately rely on as a business. These challenges are often linked with poverty, weak rule of law or the vulnerability of migrant workers. For example, the International Labour Organization (ILO) estimates that more than 85 million children are working under hazardous conditions, most in the agriculture sector, and that more than 21 million people are victims of forced labor around the world. Mars does not control and has very limited influence over operations in our extended supply chains. Nevertheless, we believe these practices are unacceptable and that we must renew our individual and collective efforts to take action, boldly test new approaches and form new collaborations to drive sustained progress. [82]
>
> In consultation with human rights experts and through thorough review of publicly-available data we have identified forced labor and child labor as the human rights issues that may pose the most severe risk to people in our extended supply chains.[83]

---

[80] *Id.*
[81] *Id.*
[82] *Human Rights Position Statement*, MARS, https://www.mars.com/about/policies-and-practices/human-rights.
[83] *Id.*

> At Mars, we seek to promote and respect human rights across our entire value chain. From factory workers in Chicago to farmers in Côte d'Ivoire, we believe everyone touched by our business should be treated with dignity, fairness and respect.[84]

61. Mars claims to have a plan to address its ongoing use of child slavery in five steps.[85] First, Mars will work on verifying the supply chain, not through traceability, but by giving the third-party cocoa suppliers Mars' Supplier Code of Conduct and encouraging suppliers to implement relevant systems. Additionally, Mars "periodically engage[s] suppliers in training and awareness raising to drive continuous improvements."[86] This is just as ineffective as Cargill's mere provision to farmers of information about child labor's harms, discussed in para. 48, *supra*. Second, Mars aims to fix human rights abuses by auditing suppliers: "[i]f a supplier repeatedly fails to meet our Code and other verification standards and does not credibly commit to meeting them in a given time period, we *may* terminate our relationship."[87] Third, Mars promotes the certification of suppliers, but only requires that "suppliers . . . maintain transparent records to demonstrate compliance with applicable law and regulations."[88] Fourth, Mars aims to build international accountability, which is done through "purchasing teams and buyers . . . tak[ing] a course in responsible sourcing and hav[ing] related criteria embedded in their personal development plans."[89] Finally, Mars aims to increase training for Mars associates—namely, training people who have knowingly profited from child slavery, and continue to do so. Mars's entire plan is centered around self-monitoring, which clearly has not

---

[84] *Our Approach to Respecting and Promoting Human Rights*, MARS, https://mex.mars.com/en/news-and-stories/articles/our-approach-respecting-and-promoting-human-rights?language_content_entity=en.
[85] *California Transparency in Supply Chain Act*, *supra* note 79.
[86] *Id.*
[87] *Id.* (emphasis added).
[88] *Id.*
[89] *Id.*

worked based on the massive amounts of cocoa still sourced with child slavery; it is nothing more than a public relations ploy to hide Mars' ongoing use of child slavery. As noted, under no circumstances is self-monitoring considered a legitimate and reliable process for addressing serious supply chain issues. While WCF lists Mars as one of the nine companies committed to "CocoaAction," Mars does not discuss this sham program in its own materials.

62. Mars, while admitting it still has child slaves in its supply chain, doubles down on emphasizing that the use of child slavery violates international law, U.S. law, California law, and Mars' own standards:

> In accordance with the UN Guiding Principles, we will advance respect for human rights in our value chain by implementing a due diligence process to identify relevant adverse impacts on human rights and establish or support appropriate and effective mechanisms for prevention and remediation. No matter where we operate, Mars strives to comply with the spirit and the letter of the law. Where local laws are less stringent than our Policy, we will operate in accordance with this Policy and our Five Principles.[90]
>
> We are seeking to advance respect for human rights in our extended agricultural supply chains, which reach past our first-tier suppliers all the way to the farm or fishery level. Some of the most serious human rights issues in our value chain may be at the farthest ends of our agricultural supply chains, where our influence and visibility are typically low.[91]
>
> We expect our first tier suppliers to align with our Code of Conduct, including its provisions on forced labor, by affirming their commitment to uphold our Code or demonstrating an equivalent policy of their own. Suppliers are expected to maintain transparent records to demonstrate compliance with applicable law and regulations.[92]

63. In emphasizing new promises to improve compliance in its supply chain, Mars fails to inform the public and regulators what it knows: according to WCF and ICI, Mars, like

---

[90] *Our Human Rights Policy*, MARS, https://www.mars.com/about/policies-and-practices/human-rights-policy/.
[91] *Our Approach to Respecting and Promoting Human Rights*, *supra* note 84.
[92] *California Transparency in Supply Chain Act*, *supra* note 79.

the other Defendants, gets seventy to eighty percent of its cocoa from the "free zone," and while progress in the monitored zones is failing, there is absolutely *nothing* in Mars' sham plan to address the child slavery and trafficking in the "free zone." And as the NORC Report makes clear, child labor has dramatically increased in the years since Mars launched its failed program.

**e. Hershey**

64. According to the International Cocoa Organization, Hershey, an international chocolate producer headquartered in Hershey, Pennsylvania, is the fifth largest manufacturer of chocolate products in the world. The company's own materials admit to the existence of child labor in its supply chain. Hershey states, "[w]e are on track to meet our commitment of 100 percent [CLMRS] coverage of farmers producing Hershey's cocoa volume in Côte d'Ivoire and Ghana by 2025, achieving 6 percent since we began implementing CLMRS in 2018."[93] Within this sixty-two percent of monitored farms, "7,408 children in total were identified via CLMRS in Côte d'Ivoire and Ghana in 2022 as doing inappropriate work and are in process of remediation."[94] Since 2018, the company has identified 18,927 such children, and reports that 6,167 are no longer part of that group, either due to remediation, or because they aged out.[95] Hershey applauds itself for rehabilitating a small percentage of the child laborers it identified, while flagrantly admitting that many of the rehabilitated simply no longer qualify for monitoring because they "aged out" of the program. For the few former child laborers Hershey claims to have remediated, there is no transparent reporting or programmatic descriptions

---

[93] *Child Labor Monitoring and Remediation*, HERSHEY, https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-areas/cocoa/child-labor-monitoring-and-remediation-system.html.
[94] *Id.*
[95] *The Goodness Inside, 2022 ESG Report*, HERSHEY 32, 40, https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/pdf/hershey-2022-esg-report.pdf#page=24.

regarding what remediation actually entails. There are serious reasons to doubt that Hershey and the other companies do anything more than simply remove child workers from the plantations, or provide information to farmers on the harms of child labor without further follow-up.

65. Like the other companies, Hershey attempts to exonerate its use of child labor by shifting blame to the impoverished communities it exploits for cheap labor. On its 2021 ESG Report, it states:

> In cocoa-growing communities, child labor is a complex issue resulting from a mix of poverty, cultural norms, and misunderstandings about what constitutes appropriate child work. In many communities, child-appropriate work on the family farm or in the household is an important part of young people's learning and cultural development. However, a lack of stable income and educational opportunities in rural areas can lead families to depend on children putting in long hours at home and on the farms, which are often the families' sole source of income.[96]

This paternalistic and condescending attitude towards the communities that enrich Hershey through their chocolate production is reprehensible. Hershey resigns itself to the sad reality that child labor is necessary in these communities, where poverty is rampant, without addressing how these issues could easily be rectified by paying farmers living wages.

66. Hershey claims that it knows profiting from child slavery violates international law, U.S. law, and its own code of conduct and supplier standards. In its Statement Against Slavery and Human Trafficking, Defendant Hershey states it is "committed to operating responsibly and sustainably throughout the world."[97] This document also states that:

---

[96] *Powered by Shared Goodness, 2021 ESG Report*, HERSHEY 24, https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/pdf/hershey_2021_esg_report.pdf.
[97] *Hershey Company Statement Against Slavery and Human Trafficking*, HERSHEY 1, https://www.thehersheycompany.com/content/dam/corporate-us/documents/pdf/HSY_Statement_Against_Human_Trafficking_and_Slavery.pdf

> Hershey is purchasing 100% independently verified cocoa and each program prohibits the use of forced and child labor.[98]
>
> Onsite Audits: Hershey facilities undergo the 4-Pillar Sedex Member Ethical Trade Audit ("SMETA") on a three-year cadence, and more frequently as needed based on issue remediation or per customer requests.[99]
>
> Responsible Sourcing Supplier Program: Our Responsible Sourcing Supplier Program ("Supplier Program") verifies our Tier 1 suppliers' compliance with our Supplier Code. The program is aligned with our saliency assessment of our most significant human rights issues and leverages third-party verification tools, including self-assessment questionnaires (SAQ) and independent third-party audits. The high-risk and priority suppliers in Hershey's program are required to complete or update their facility's Sedex SAQ or equivalent on an annual basis and undergo the SMETA 4-Pillar social compliance audit or equivalent on a cadence determined by risk and historic performance. The Supplier Program also promotes ongoing training and capability-building and works to drive suppliers' continuous improvement.
>
> When a Supplier Code violation is identified, the Hershey Global Responsible Sourcing team reviews the findings and suppliers are required to develop a corrective action plan that includes addressing the root cause of the issues. A follow-up audit is then required to verify that the non-conformity has been addressed. In instances where a supplier is unwilling or unable to remediate violations in the appropriate timeframe, Hershey reserves the right to suspend or remove the supplier.[100]

67. In its Code of Conduct, Hershey states:

> Our business is built on a long, interdependent supply chain, and we want every link to be solid and strong. We have zero tolerance for the worst forms of child labor as defined by International Labor Organization Conventions 138 and 182 and expect suppliers to support and participate in industry efforts aimed at eliminating these kinds of practices wherever they exist. We respect the rights of every individual and believe that anyone employed by Hershey or Hershey suppliers should be treated with dignity and respect, paid a fair wage based on applicable law and assured of safe working conditions.[101]

[98] *Id.* at 7.
[99] *Id.* at 5.
[100] *Id.* at 6.
[101] *In Good Company, Code of Conduct*, HERSHEY 11, https://www.thehersheycompany.com/content/dam/hershey-corporate/documents/investors/code-of-conduct-english.pdf.

> As a company, we respect the rights of every individual and abide by the employment laws in the markets where we operate. We support the principles established under the United Nations Universal Declaration of Human Rights and do not knowingly conduct business with any individual or company that participates in the exploitation of children (including child labor), physical punishment, forced or prison labor or human trafficking.[102]
>
> [Encourage employees to] [f]ollow the employment laws where you work, be alert to abuses and speak up if you see or suspect possible labor law or human rights violations.[103]

68. Hershey also has available on its website its Supplier Code of Conduct, which it describes as the "backbone of Hershey's commitment to a responsible and sustainable supply chain."[104] The Supplier Code of Conduct lays out Hershey's policies with regard to, among other things, child labor:

> Hershey does not tolerate child labor in our supply chain. We are committed to the elimination of the "worst forms of child labor," as defined by ILO Convention 182. Hershey requires our Suppliers, including their labor agents/agencies, to prevent child labor in their operations and in their supply chain and encourages our Suppliers to participate in industry efforts aimed at the elimination of such practices wherever they exist in the supply chain.
>
> • No individuals are hired under 15 years of age, or 14 years of age where local law allows, consistent with ILO Convention No. 138, or under the legal minimum age for employment in the country, whichever is greatest.
>
> • Any employment or utilization of Workers under the age of 18 must not interfere with schooling or vocational education and/or expose children and young workers (between 15 and 18 years) to work that is mentally, physically, socially or morally dangerous.[105]

69. The Supplier Code of Conduct also lays out Hershey's policy regarding forced labor and human trafficking:

---

[102] *Id.*
[103] *Id.*
[104] *Hershey Company Statement Against Slavery and Human Trafficking*, *supra* note 97, at 2.
[105] *Hershey Company Supplier Code of Conduct*, HERSHEY 4 (2023), https://www.thehersheycompany.com/content/dam/corporate-us/documents/partners-and-suppliers/supplier-code-of-conduct.pdf.

Hershey does not tolerate forced labor or human trafficking in our supply chains. Hershey requires that all labor in its supply chain be voluntary and that workers are allowed freedom of movement. All forms of forced labor and human trafficking are prohibited including but not limited to any form of prison, slave, bonded or forced indentured labor.

> • The recruitment, transportation, transfer, harboring or receipt of persons, by means of threat or use of force, coercion or other means, for the purpose of exploiting them is prohibited.
>
> • In advance of employment, Suppliers, including their labor agents/agencies, provide Workers with written, accurate and understandable information in a language understood and acknowledged by the Worker regarding the basic terms and conditions of their employment clearly stating their rights and responsibilities as well as information on wages, working hours, overtime, benefits, leave and disciplinary procedures.
>
> • Workers are free to leave work and terminate their employment upon reasonable or legally required notice without penalty.[106]

70. The Code further states:

Suppliers must establish adequate and effective management systems, policies, procedures, financial documentation non-compliance and grievance procedure, and training programs to uphold and ensure ongoing compliance with all applicable laws and standards, including this Supplier Code within their own business operations and supply chain.

We reserve the right to verify compliance with this Supplier Code , at the Supplier's own expense, through internal and external assessment mechanisms, such as self-assessment questionnaires, announced and unannounced on-site independent third-party audits, and worker well-being surveys. Such audits may inspect Suppliers' facilities, operations, books and records, and supplier-provided housing, and confidential worker interviews. If non-compliances are observed, the supplier will be required to take corrective actions.[107]

---

[106] *Id.* at 4-5.
[107] *Id.* at 14.

71. Hershey's website further states, on its Responsible Sourcing page, that its Global Sourcing Policies include dedication to "a transparent supply chain."[108] Hershey promises that "[w]e are committed to complying with the California Transparency in Supply Chains Act of 2010, as well as the United Kingdom Modern Slavery Act. As part of our commitment to Good Business practices, we constantly strive to ensure our supply chains are responsibly managed."[109]

72. Hershey knows it has been profiting from child slavery for years, and since 2001, when it endorsed the Harkin-Engel Protocol through the Chocolate Manufacturers Association and later through the WCF, it has failed to take effective action to stop profiting from child slavery. The NORC Report dramatically establishes that Hershey has continued to benefit from increased numbers of child workers in its cocoa supply chain.

**f. Mondelēz**

73. Mondelēz International Inc. is a U.S.-based international chocolate producer headquartered in Deerfield, Illinois. Its major cocoa products containing cocoa produced in Côte d'Ivoire include Cadbury Chocolates and Dairy Milk. It manufactures, distributes, and sells its cocoa products all over the United States. On its website, it states:

> We believe that in order to drive long-lasting positive change for children in cocoa-growing regions, all actors along the cocoa supply chain should play their part to help combat the systemic issues underlying child labor. This is why, as founding members, we support the work of the World Cocoa Foundation (WCF) and the International Cocoa Initiative (ICI), aiming to help combat the root causes of child labor and drive efforts to strengthen public-private partnership with governments, development partners and civil society organizations.[110]

[108] *Responsible Sourcing,* HERSHEY, https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-areas/responsible-sourcing.html.
[109] *Corporate Polices and Global Sourcing*, HERSHEY, https://www.hersheytrading.ch/en_us/sustainability.html.
[110] MONDELĒZ, https://www.cocoalife.org/the-program/child-protection/.

74. Mondelēz International thus admits that there is still child slavery in its supply chain. Like most of the other chocolate companies, it is doing little to stop profiting from child slavery. It instead chooses to refer the public and regulators to its "Cocoa Life" program, which relies upon the "monitoring" and "remediation" of the CLMRS system, which, as established above, is a sham. There is no independent monitoring, no remediation, and no consequences for using child slaves, and the CLMRS applies, at most, to twenty to thirty percent of Mondelēz International's supply chain. Hoping to deceive or distract the consuming public and regulators, Mondelēz International goes on at length to describe its sham programs.

75. Mondelēz's Cocoa Life website dedicates an entire section to child labor. This Child Labor page states:

> Our approach to eliminating child labor is three-pronged: it focuses on prevention, monitoring and remediation, with a heavy emphasis on addressing the root causes of child labor. Cocoa Life – our company program for sustainable cocoa – addresses the root causes of child labor around poverty and lack of rural development with holistic approach.[111]

The company continues by describing its action plan, which includes:

- Increase income from cocoa farming as well as additional sources
- Empower communities to advocate for their own development
- Empower women at household and community level
- Prosperous cocoa farms mean farmers are less likely to rely on their children to support in their work. Empowered women and communities, who understand their development needs, will push for their children to remain in school.[112]

76. Mondelēz also goes to great lengths to demonstrate that it knows that child slavery and profiting from child labor are abhorrent, illegal, and unethical. Mondelēz features on its website a 2016 study commissioned from Embode that confirms "[t]he issue of child labour,

---

[111] *Child Labor in Cocoa*, MONDELĒZ, https://www.mondelezinternational.com/Snacking-Made-Right/ESG-Topics/Child-Labour-in-Cocoa.
[112] *Id.*

including the worst forms of child labour, such as child slavery, has been of significant concern to the cocoa industry, particularly in West Africa, over the last two decades . . . Despite efforts, child labour is still largely prevalent in Côte d'Ivoire."[113] The Report continues, outlining how forced labor is still present in Côte d'Ivoire:

> most evidence highlights the reality that children's work and child labour are prevalent, in different forms, throughout the country.[114]
>
> Relatively little evidence is available relating to child slavery, or practices similar to child slavery in the sector. Stakeholder consultations also revealed a general lack of prioritisation of and sufficient attention to these more egregious forms of child exploitation. Police recently identified and recovered 48 alleged 'child slaves' aged 5 to 16 from cocoa farms, and arrested 22 alleged traffickers. This calls urgent attention to the significant concern of child trafficking and slavery in the sector.[115]

The commissioned report itself highlights the persistent failures of Mondēlez and similar companies, stating that "[c]hild labour, in all its forms, including child slavery, is a tenacious problem in Côte d'Ivoire. Even after 15 years of dedicated efforts and millions of dollars of investment, the problem continues, and arguably grows."[116]

77. The company states on its Snacking Made Right page that it is "on a mission to lead the future of snacking by creating snacks the right way for both people and planet to love . . . We have specific goals to which we hold ourselves accountable, and we're continuing to make progress and scale our efforts to deliver meaningful change."[117]

---

[113] Aarti Kapoor, *Children at the Heart*: *Assessment of child labour and child slavery in Côte d'Ivoire's cocoa sector and recommendations to Mondelēz International*, EMBODE 6 (2016), https://assets.ctfassets.net/qggsjlmpzfmx/7bqOrCJcDmr04upBCF6SnM/b8560d71bbb5596d18d062ce56e64124/FULL_REPORT_Cote_Ivoire_Mondelez_Embode_ChildrenattheHeart.pdf.
[114] *Id.* at 16.
[115] *Id.* at 6.
[116] *Id.* at 46.
[117] *Snacking Made Right,* MONDELĒZ, https://www.mondelezinternational.com/Snacking-Made-Right.

78. Mondelēz International acknowledges that "[a]s the world's largest chocolate company" it is vital to "create a sustainable cocoa supply."[118] In support of this proclamation, it references Cocoa Life, one of its "signature programs," which it states "is a holistic, verified program that aims to create a sustainable cocoa supply. . . . We are on a journey towards our goal of empowering at least 200,000 cocoa farmers and reaching over one million community members."[119] The company also promises it is committed to "doing business the right way" in its Code of Conduct.[120] In support of this, it states that it does "not tolerate discrimination, harassment, bullying, intimidation, or any disrespect to human rights, including child and forced labor."[121]

79. Mondelēz International further cites its published supplier contract provisions, which states, "[w]e expect our suppliers and partners to . . . Never use or tolerate the use of human trafficking, forced labor, or child labor as defined by the International Labor Organization (ILO)"[122] The company also states:

> Our purchasing contracts require suppliers to comply with all laws and support Mondelēz International's policies on child and forced labor. We have various tools to address non-compliance, which may include, but are not limited to, a corrective action plan. If the supplier does not resolve the issues of concern in a timely and

[118] *Cocoa Life: Empowering Cocoa Farmers and Communities: 2015 Progress Report,* MONDELĒZ 1, https://assets.ctfassets.net/qggsjlmpzfmx/1CCoDMBtJos4Zs8iC4g78q/1d3085e27e75c207902647f7d9aacaf9/Cocoa_Life_Executive_Summary.pdf.
[119] *Id.*
[120] *Our Way of Doing Business: The Mondelēz International Code of Conduct*, MONDELĒZ 13, https://www.mondelezinternational.com/-/media/Mondelez/PDFs/employeecodeofconduct.pdf.

[121] *Id.* at 6.
[122] *Supplier & Partner Code of Conduct,* MONDELĒZ 1-2, https://www.mondelezinternational.com/-/media/Mondelez/PDFs/MDLZ-Supplier-and-Partner-Code-of-Conduct.pdf.

satisfactory manner, Mondelēz International reserves the right to take more drastic action, such as termination of the business arrangement.[123]

Meanwhile, in its Modern Slavery Statement for 2017, Mondelēz writes:

- **Forced Labor.** Supplier will not use any forced labor, which means any work or service performed involuntarily under threat of physical or other penalty. Supplier shall respect the freedom of movement of its workers and not restrict their movement by controlling identity papers, holding money deposits, or taking any other action to prevent workers from terminating their employment. If workers enter into employment agreements with Supplier, workers should do so voluntarily.
- **Child Labor.** Supplier will not directly (or indirectly through the use of its subcontractors) employ any children under the age of 18 years unless legal, necessary, and appropriate and the following are met:
    - Supplier will comply with the minimum employment age limit defined by national law or by International Labor Organization ("ILO") Convention 138, whichever is higher. The ILO Convention 138 minimum employment age is the local mandatory schooling age, but not less than 15 years of age (14 in certain developing countries), subject to exceptions allowed by the ILO and national law.
    - Supplier will ensure that employees working in facilities that are manufacturing or packaging Mondelēz International finished products, serving as temporary employees to Mondelēz International, or present at Mondelēz International facilities, are at least 15 years of age (and no exceptions allowed by the ILO or national law will apply).
    - Supplier must demonstrate that their employment does not expose them to undue physical risks that can harm physical, mental, or emotional development
- **Safety and Health.** Supplier will (i) endeavor to provide safe working conditions, (ii) provide its employees with appropriate protection from exposure to hazardous materials, and (iii) provide its employees with access to potable water and clean sanitation facilities.
- **Business Integrity**. Supplier will promote honesty and integrity in its business conduct by raising ethical awareness among its employees and providing direction and education on ethical issues. Further, Supplier will not: pay or

[123] *Supply Chain Expectations*, MONDELĒZ, https://www.mondelezinternational.com/About-Us/Our-Way-of-Doing-Business/Supply-Chain-Expectations.

> accept bribes, arrange or accept kickbacks, or participate in illegal inducements in business or government relationships.[124]

80. Mondelēz's website contains numerous other sections with similar representations about its policies with regard to respecting and promoting human rights, ethical and sustainable sourcing, and child welfare. There is no question that Mondelēz knowingly benefits from child labor and is extremely aware that its own failure to stop this practice is universally condemned in the world. The NORC Report confirms its failure to even manage to reduce child labor in its supply chain.

**g. Olam**

81. Olam International America, Inc. (Olam) does business and sells and promotes its cocoa products from Côte d'Ivoire all over the United States.[125] It holds itself out as "one of the world's leading suppliers of sustainable cocoa."[126] On its website, Olam claims to be "against all forms of child exploitation" and actively working to "prevent it" through "a number of programmes" such as its Child Labor Monitoring and Remediation Systems.[127]

82. Despite these empty assurances, there is no disputing the evidence of extreme abuses of child workers in Côte d'Ivoire. Further, Olam's willingness to make empty promises while profiting from forced child labor extends to its cocoa supply chain around the world. In

---

[124] *Modern Slavery Statement*, MONDELĒZ, at 3-4, https://www.mondelezinternational.com/~/media/mondelezcorporate/uploads/downloads/mdlz_modern_slavery_statement_2017.pdf?la=en.

[125] *See* Olam Food Ingredients, *Unicao Cocoa*, OLAM, https://www.olamgroup.com/content/dam/olamgroup/products-and-services/ofi/cocoa/cocoa-ingredient-brands/unicao/unicao-pdfs/Unicao-BM2001.pdf as one example of Côte d'Ivoire-sourced cocoa sold in the U.S.

[126] *Olam Cocoa Sustainability*, OLAM 1, https://www.olamgroup.com/content/dam/olamgroup/files/uploads/2017/09/Olam-Cocoa-Sustainability-Overview-2017.pdf.

[127] *Id.* at 18, 20.

2021, Brazilian prosecutors sued Olam for $58 million after a report by Brazil's Federal Labor Prosecution Office found widespread child labor in the country's cocoa industry.[128] In a hearing, the company admitted that cocoa beans obtained through third party producers were "not liable to tracking."[129] Further, a group of sixty Ghanaian children aged five to seventeen years old have initiated an action against Olam, claiming the hazardous work to which they are subjected violates international and Ghanaian law. They allege that "they have no choice but to help their families by working on the cocoa farms because the insufficient money paid by Olam to the cocoa farmers does not allow for them to hire adult workers. This results in absences from school, food insecurity, and poor living conditions."[130]

83. Olam identified 11,194 children in child labor supplying its cocoa, in its "Cocoa Compass 2020/21 Impact Report."[131] Again ignoring the effect that paying living wages would have on these communities, Olam highlights how it supposedly remediates identified cases of child labor, stating, "[f]or most cases of child labor, raising awareness on what children are and are not permitted to do on the farm and under what conditions . . . is the first step of remediation."[132] It is unclear whether, or how often, Olam actually takes that first step to remediate—let alone whether Olam takes any second or third steps.

---

[128] Fabio Teixeira, *Exclusive-Cocoa giant in Brazil slave labour probe says it can't trace supplies*, REUTERS (August 12, 2021) https://www.reuters.com/article/us-brazil-labor-cocoa-exclusive/exclusive-cocoa-giant-in-brazil-slave-labour-probe-says-it-cant-trace-supplies-idUSKBN2FD1DO.
[129] *Id.*
[130] *Ghanaian children accuse cocoa supplier Olam of breaching child labour laws*, LEIGH DAY (14 August 2022), https://www.leighday.co.uk/news/news/2022-news/ghanaian-children-accuse-cocoa-supplier-olam-of-breaching-child-labour-laws/.
[131] *Cocoa Compass 2020/21 Impact Report*, OLAM 9 (2021), https://publuu.com/flip-book/24916/132171/page/1.
[132] *Id.* at 11.

84. Olam outlines its efforts to stop child labor in its supply chain, stating in 2020:[133]

> Olam Cocoa has committed to set up dedicated child labour monitoring and remediation systems (CLMRS) across 100 percent of our direct sourcing areas. Earlier this month, we announced a partnership with the Fair Labor Association (FLA) and local cocoa farming cooperatives to digitally register nearly 7,000 farmer suppliers in Cameroon and their households – the first time these measures have been introduced professionally and at scale in Cameroon.
>
> This digital approach to mapping the child labour issue in the supply chain is the first step to resolving the problem. It is essential to allow Olam Cocoa to understand where it can best focus resources and efforts to tackle child labour, and to share data with partners and cooperatives on the ground so that we can co-create together.
>
> We'd like to share with you new details and examples from Côte d'Ivoire for the period 2018-2019 where CLMRS has been scaled up to cover 185 cooperatives from a standing start in 2015. It's a snapshot of the range of measures necessary to make a difference:
>
> - … We are establishing 1,638 birth certificates for children who run the risk of not being admitted to secondary school as a result of lacking such documents.
>
> - …Using the premiums received for the sustainable cocoa that we purchase, our cooperatives have constructed 84 classrooms, built four teachers' residences, constructed 2 canteens and refurbished another four schools and a youth hostel, as well as equipping schools with school benches, school kits and school books. These interventions have improved the quality of education for more than 22,000 children.
>
> - … We have set up over 111 Village Savings and Loans Associations that have managed to save nearly $155,000 in total and granted loans of a total value of $63,482. Given their success in promoting women's economic empowerment and pooling funds for education expenses for children, we are planning to set up another 165 in 2020.
>
> All of this needs to be embedded in the community and local authority level – to that end we have established Child Protection Committees in 33 areas that promote awareness of children's needs.

---

[133] *One intervention is not enough in the fight against child labour*, OLAM (April 3, 2020), https://www.olamgroup.com/news/all-news/blog/one-intervention-is-not-enough-in-the-fight-against-child-labour.html.

85. Olam professed a goal to "achieve 100% traceable and sustainable cocoa volumes from [its] direct origination supply chain by 2020."[134] In September 2020, Olam claimed it achieved that goal, though in actuality its supposedly 100 percent-accurate tracing of cocoa beans only applies to the small percentage of directly sourced cocoa beans, as is the aforementioned pattern among cocoa company self-reporting.[135] In 2020, when Olam claimed 100 percent traceable and sustainable cocoa, even a very company-friendly report that relies on data supplied by the companies reported that direct supply chains only constituted about half of cocoa purchased by companies.[136] This is itself a highly suspect number that contradicts information provided to IRAdvocates by WCF and ICI that at most twenty to thirty percent of cocoa harvested in Côte d'Ivoire is within a company-sponsored monitoring system. Thus, it is likely that much more of Olam's supply chain remains unmonitored.

86. The NORC Report confirms that not only did Olam and the other companies fail to stop using child labor by 2020 as they promised, but that the incidence of child labor has actually increased.[137] Olam is thus still profiting from child slavery and has no viable plan to stop the practice. It is hoping to deceive the public and regulators so that it can continue to profit from child slavery and avoid the costs of actual compliance with the promise it made, along with other chocolate companies, years ago to stop profiting from child slavery.

---

[134] *Olam Cocoa hits 100% traceability target across its direct global supply chain*, OLAM (Sept. 21, 2020), https://www.olamgroup.com/news/all-news/press-release/olam-cocoa-hits-100-percent-traceability-target-across-its-direct-global-supply-chain.html.
[135] *Id*.
[136] Antonie C. Fountain and Friedel Huetz-Adams, *2020 Cocoa Barometer*, VOICE NETWORK 30 (2020), https://voicenetwork.cc/wp-content/uploads/2020/12/2020-Cocoa-Barometer.pdf.
[137] NORC Report, *supra* note 5, at 146.

**h. Blommer Chocolate Company**

87. Blommer Chocolate Company (Blommer) is a chocolate manufacturer based in Chicago, Illinois, and is the largest supplier of chocolate ingredients in North America, accounting for around forty-five percent of the cocoa beans processed in the United States.[138] Around seventy percent of Blommer's business consists of supplying processed chocolate ingredients to branded chocolate companies. Fuji Oil Holdings, Inc. (Fuji Oil) acquired the company in 2018. On the company's landing page, it writes "[w]e pride ourselves on being a leader in advancing **sustainable cocoa farming**, playing an active role in the World Cocoa Foundation and promoting sustainable farming practices through our privately managed programs in Cote d'Ivoire, Indonesia and Ecuador."[139] Côte d'Ivoire farms are Blommer's primary suppliers of cocoa beans.

88. Blommer is a founding member of the WCF, and is a participant in a number of initiatives such as the African Cocoa Initiative (2011-2016), CocoaAction (2018-2020), Cocoa and Forestry Initiative (2018-Present), and Sustainable Origins (2007-Present).[140] In 2016, Blommer promised to only purchase certified cocoa by 2020[141]; now, the company itself admits that "we have not yet fully achieved what we were set out to do."[142] In Fuji Oil Holding's Sustainability Report, the company lists the results of its first and second human rights impact

---

[138] Phil Rosenthal, *Inside Blommer Chocolate: family and cocoa at 75*, CHICAGO TRIBUNE (May 18, 2014), https://www.chicagotribune.com/business/ct-xpm-2014-05-18-ct-chocolate-smell-chicago-blommer-biz-0518-20140518-story.html.
[139] BLOMMER, https://www.blommer.com.
[140] *Blommer's Global Presence in Sustainability*, BLOMMER, https://www.blommer.com/sustainability/global-presence.php#map.
[141] Reuters Staff, *Blommer Chocolate to buy only certified cocoa by 2020*, REUTERS (Oct. 27, 2016), https://www.reuters.com/article/cocoa-blommer-idAFL8N1CX53R.
[142] *Blommers Sustainability Vision*, BLOMMER, https://www.blommer.com/sustainable-origins.php#CocoaCoopMap.

assessments; both assessments (conducted in 2016 and 2020) identified "forced and child labor" as a present risk.[143]

89. In the Fuji Oil's "Responsible Cacao Sourcing Policy," one of the company's "Key Commitments" reads:

> **Eliminating child labor from our supply chain**
>
> We will seek to eliminate child labor from our supply chain through monitoring and the provision of remedies; raising awareness in cacao farming communities; creating an environment that ensures access to education; and other measures that may be appropriate.[144]

90. Like the corporations above, Blommer lists CLMRS monitoring as its method to redress child labor and forced child labor within its supply chain. It states:

> The Fuji Oil Group is working to end child labor–a significant human rights issue in the cocoa industry. In major cocoa-producing countries, farms face several challenges that can lead to child labor, including poverty, lack of community infrastructure such as schools and health centers, and lack of farm workers, each of which has to be addressed appropriately. The Group focuses on creating an environment to prevent child labor and on developing a mechanism to remediate any violations of children's rights along the supply chain. To identify the causal factors of child labor and be informed of potential violations, we set up the [CLMRS] on a cooperate level at all villages where [Blommer] procures cocoa beans. Community agents who monitor and carry out remediation measures are trained on child protection and household surveys. They identify endangered children and reveal high-risk communities, as well as suggest action plans to remediate issues at the family level or throughout the community. Initiatives on traceability, supporting cocoa farmers, women's empowerment, and environmental conservation also help significantly in preventing and remediating child labor.[145]

---

[143] *Sustainability Report 2022,* Fuji Oil Holdings 50, https://www.fujioilholdings.com/en/sustainability/download/.
[144] *Fuji Oil Holdings Inc., Responsible Cacao Sourcing Policy*, Fuji Oil Holdings 2, https://www.fujioilholdings.com/en/news/2018/__icsFiles/afieldfile/2018/08/07/180808_2.pdf.
[145] *Sustainability Report 2022*, supra note 144 at 73.

As this complaint notes above, these CLMRS monitoring systems are ineffective. They mandate no independent monitoring, are community-led, and cover only small portions of chocolate companies' actual suppliers.

91. Blommer's Labor Compliance Statement notes:

> Blommer does not use any forced labor, allow any work or service performed involuntarily under threat of physical or other penalty, nor does Blommer employ child labor, specifically anyone under the age of sixteen. Our ingredients are sourced from companies that conduct themselves in the same manner and Blommer requires that these suppliers confirm that their organizations understand International Labor standards and comply with those laws. If we believe that a supplier is not in compliance with our standards, we will provide that supplier with the opportunity to address and remedy any potential non-compliance through a comprehensive corrective action plan. Should noncompliance continue to be an issue we will remove the supplier from our supply chain. [146]

However, after asserting that neither Blommer nor its suppliers permit the use of child labor, and even seeming to guarantee that Blommer *does not* use forced or child labor, the statement continues to acknowledge the presence of child labor in cocoa production.

> Blommer is committed to continuing this work to improve labor conditions within the cocoa community including the elimination of the worst forms of child labor. We work closely with the leading certification agencies and our West African programs are annually audited by the Rainforest Alliance, Fair Trade USA, FLO, UTZ, and Intertek as well as international worker's rights group the Fair Labor Association. [147]

92. If Blommer alleges that it does not use nor purchase from suppliers who used forced child labor, it is unclear where its efforts towards the "elimination of the worst forms of child labor" are being executed.

---

[146] *Labor Compliance Statement,* BLOMMER, https://www.blommer.com/_documents/Blommer_Labor-Compliance-Statement-2020.pdf
[147] *Id.*

## D. EFFORTS BY IRADVOCATES AND OTHERS TO ADDRESS CHILD LABOR IN CÔTE D'IVOIRE

93. On May 30, 2002, the International Labor Rights Forum (ILRF)[148] filed a Section 307 Petition seeking a Withhold Release Order (WRO) on all cocoa imported to the U.S. from Côte d'Ivoire. The ILRF Petition detailed the extensive evidence of forced and trafficked child labor in the harvesting and processing of Côte d'Ivoire cocoa and documented that U.S. importers were knowingly importing cocoa produced by illegal child labor. There was little dispute about the facts. The cocoa importers, acting through the Chocolate Manufacturers Association (CMA), one of the entities that signed the Protocol in 2001 pledging to end child labor in the cocoa supply chain, did not dispute that child labor was pervasive in their supply chains. Rather, they argued that the "domestic consumptive demand" exemption allowed them to continue to import cocoa from Côte d'Ivoire even though it was produced by child labor. The domestic consumptive demand exemption was removed in 2015 and thus no longer provides immunity for the cocoa importers' ongoing and admitted use of illegal child labor in their supply chains.

94. When the cocoa companies that signed the 2001 Protocol had still done little or nothing to implement the pledge to end child labor by 2005, IRAdvocates filed a federal lawsuit under the Alien Tort Statute (ATS), 28 U.S.C. § 1350 against Nestlé and Cargill on behalf of six individuals who, as children, had been trafficked from Mali to Côte d'Ivoire and had been forced to work harvesting cocoa. The case, *John Doe I et al. v. Nestle et al.*, was heard by the Supreme Court on December 1, 2020. On June 17th, 2021, sixteen years after the case was filed,

---

[148] IRAdvocates' legal staff was part of the team at ILRF that did the field research and filed the 2002 Petition with CBP. In 2007, the legal department of ILRF formed IRAdvocates to focus exclusively on using the rule of law to address international human rights violations.

the Supreme Court issued a heavily divided opinion which determined that the operative complaint did not satisfy the standard for the extraterritorial application of ATS created by *Kiobel v. Royal Dutch Petroleum Co.* in 2013. This decision deprived the plaintiffs, six formerly enslaved children, of their day in court. Even though the case eventually failed due a technicality within the Alien Tort Statute, the Ninth Circuit acknowledged the existence of child slavery within Côte d'Ivoire, stating:

> The use of child slave labor in the Ivory Coast is a humanitarian tragedy. Studies by International Labour Organization, UNICEF, the Department of State, and numerous other organizations have confirmed that thousands of children are forced to work without pay in the Ivorian economy. Besides the obvious moral implications, this widespread use of child slavery contributes to poverty in the Ivory Coast, degrades its victims by treating them as commodities, and causes long-term mental and physical trauma. *Doe I v. Nestle*, 766 F.3d 1013, 1017 (9th Cir. 2014).

95. In another section of the *Doe I v. Nestle* opinion, the Ninth Circuit identified as credible the plaintiffs' claims that defendants, major cocoa companies, knowingly benefit from the use of forced child labor, writing:

> [T]he Ivory Coast remains a critical part of the international chocolate industry, producing seventy percent of the world's supply of cocoa. The defendants in this case dominate the Ivorian cocoa market. Although the defendants do not own cocoa farms themselves, they maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms. The defendants are largely in charge of the work of buying and selling cocoa and import most of the Ivory Coast's cocoa harvest into the United States. The defendants' involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa.
>
> To maintain their relationships with Ivorian farms, the defendants offer both financial assistance and technical farming assistance designed to support cocoa agriculture. The financial assistance includes advanced payment for cocoa and spending money for the farmers' personal use. The technical support includes equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices. The technical support is meant to expand the farms' capacity and act as a quality control mechanism, and either the defendants or their agents visit farms several times per year as part of the defendants' training and quality control efforts.

> The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.
>
> Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast "with the unilateral goal of finding the cheapest sources of cocoa." The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor. The defendants have also lobbied against congressional efforts to curb the use of child slave labor. In 2001, the House of Representatives passed a bill that would have required United States importers and manufacturers to certify and label their products "slave free." The defendants and others in the chocolate industry rallied against the bill, urging instead the adoption of a private, voluntary enforcement mechanism. A voluntary enforcement system was eventually adopted, a result that, according to the plaintiffs, "in effect guarantee[d] the continued use of the cheapest labor available to produce [cocoa]—that of child slaves." 766 F.3d at 1017-18.

96. In 2010, Filmmaker Miki Mistrati released *The Dark Side of Chocolate*, the first of three documentaries that reveal in shocking detail the realities of child slavery in the cocoa sector. *The Shady Chocolate Business*, released in 2012, further exposed the horrors of chocolate production in Côte d'Ivoire. *The Chocolate War*, Mistrati's most recent film, released in 2022, highlights IRAdvocates' fight to expose Nestlé and Cargill's ongoing use of child labor while these companies deny their responsibility for injuries to forced child laborers.[149]

97. In 2018, an IRAdvocates team, including the undersigned Executive Director Terry Collingsworth, visited cocoa farms around Côte d'Ivoire. In Duekoue, they observed and interviewed a group of about seven male child workers harvesting cocoa. The following are photos taken by Terry Collingsworth or a member of the team:

[149] *The Chocolate War* is available on amazon.com and other streaming services.

Case: 24-2306 Document: 11 Page: 146 Filed: 11/26/2024





98. The two children in the photos above were both about fourteen years old. They were using machetes to clear brush around the cocoa trees and to cut cocoa pods from the trees and then open the pods and clean the cocoa beans. Both children said they were brought by a "man" from Burkina Faso, where they were from. They did not know the man's name, but they were promised jobs working on a cocoa farm. When IRAdvocates met them, they had been working on the farm for over a year and were on their second season. They had not yet been paid anything and were working for food. They slept in a lean-to made of sticks and covered with a tarp. The boy in the photo immediately above in the white shirt expressed that he was very hungry and asked for food. He was visibly afraid of the adult male who was the overseer of the farm. These children can also be seen in the first sixty seconds of this video, https://vimeo.com/388589094, captured by Miki Mistrati's film crew as a part of *The Dark Side of Chocolate* documentary.

99. In March 2019, IRAdvocates returned to Côte d'Ivoire and again visited several farms. In Daloa, IRAdvocates visited a farm that had about eight boys working with machetes cutting down cocoa pods, opening the pods, and cleaning the beans. The following photos were taken by IRAdvocates' Executive Director Terry Collingsworth or a member of the team:







100. In December 2019, Corporate Accountability Lab and IRAdvocates, with local support, obtained evidence of child labor on cocoa farms in Côte d'Ivoire. Investigators visited four different regions within the country, and spoke with farmers, farmworkers (adult and children), cooperative managers, and others living and working in the area. Many individuals recited prepared answers, and many children simply dropped their work and walked away when they would see the investigators.

101. In August 2020, investigators working with Corporate Accountability Lab visited Soubré, Daloa, Duékoué, Abengouro, and Aboisso during the mid-crop harvest to investigate the impact of COVID-19 on cocoa farmers. The investigatory team visited the same regions in December of 2020, during the main cocoa growing season, to investigate trafficking routes and identify specific instances of forced and child labor. The team also traveled to the northern border regions in November 2020 to investigate trafficking patterns from Mali and Burkina Faso. On these trips, the investigatory team found evidence of illegal trafficking across closed borders. Local police officials were aware of these trafficking patterns, and in some instances facilitated and profited from it, soliciting bribes from known traffickers.

102. Although forced child labor is difficult to document in the West African cocoa industry, as many locals are hesitant to speak about such issues, investigators spoke to many young children who presented several of the International Labour Organization's (ILO) forced labor indicators. Investigators found the indicators of abuse of vulnerability, abusive working and living conditions, and isolation were applicable in many of these children's cases.

103. On February 12, 2021, IRAdvocates filed its most recent complaint against the world's most prominent chocolate companies, including Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz. The case, *Coubaly v. Nestlé*, was filed on behalf of eight former child slaves. It alleges that these companies violate the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595 *et. seq.* by knowingly benefitting from a venture that utilized trafficked or forced labor. The plaintiffs also seek relief based on common law claims of negligent supervision, intentional infliction of emotional distress, and unjust enrichment. That case is currently pending in the D.C. Circuit Court of Appeals.

104. Despite chocolate companies' repeated assurances that child labor in West Africa is only due to children working on family farms, the *Coubaly* case highlights that there is no question that pervasive forced and trafficked child labor is used for harvesting cocoa. The eight plaintiffs were trafficked from Mali and subjected to forced labor. Their stories share many tragic traits. Often beginning with false promises of a better life, these children were identified by a locateur, who surreptitiously sneaked them across the border. Upon arrival at cocoa plantations in Côte d'Ivoire, oftentimes having no knowledge of where they were located, the children were forced to live in horrible conditions and given very little food. They performed dangerous work, clearing brush with machetes, applying harsh chemicals without any safety gear, and carrying heavy loads. Several of the children are scarred with injuries sustained while engaging in forced labor, from machetes cuts to untreated snake bites. Many were additionally subjected to beatings by their bosses on the plantations. As they had no money and could not understand the local language, the child slaves had no way to advocate for themselves when year after year passed without any payment for their labor.

**E. THE FAILURE OF CBP TO TAKE ACTION AS REQUIRED BY LAW**

105. As the "consumptive demand" exception was removed from Section 307 of the Tariff Act of 1930, and as the use of forced child labor in cocoa harvesting by the major companies had actually gotten worse in the intervening years, IRAdvocates, CAL, and UCI attempted to reengage CBP by filing a petition under Section 307 of the Tariff Act on February 14, 2020. The Petition, attached as **Exhibit A**, requested that CBP take action, as provided for in its legislation, to ban the importation of cocoa by nine specific companies with clear records of harvesting cocoa with forced child labor in Côte d'Ivoire. It featured evidence collected during the 2019 and 2020 investigatory trips in Côte d'Ivoire. Additionally, the Petition referenced

official, undisputed reports confirming massive numbers of child laborers in cocoa harvesting and supplemental evidence that many of these children are trafficked and forced to work on cocoa plantations. Shortly after filing the Petition, in March 2020, IRAdvocates and CAL met with staff from CBP to discuss the Petition. CBP confirmed that they had sent all of the major cocoa suppliers a detailed questionnaire regarding their supply chains (attached as **Exhibit D**). In subsequent discussions, CBP declined to discuss how or even whether the cocoa companies subject to the Petition responded to the questionnaire.

106. After a year without response from Customs and Border Protection, CAL met with CBP's Office of Trade on March 23, 2021. CBP claimed to be investigating the facts and gave no indication that there was any issue with the quality or timeliness of the information provided in the Petition.

107. On June 25, 2021, CAL and IRAdvocates filed a supplemental petition providing further current evidence of trafficking and forced child labor in the Ivorian cocoa industry (attached as **Exhibit E**). This supplemental petition looked not just at specific instances of forced labor, but also documented new information about the manner in which child trafficking occurs, including through specific border crossings, and identified specific actors involved in the trade. The information in the supplemental petition was consistent with the NORC report released by the Department of Labor in October 2020, which found that 1.56 million children are engaged in harvesting cocoa in Côte d'Ivoire and Ghana and ninety-five percent are engaged in the ILO's definition of the worst forms of child labor.

108. On September 10, 2021, CBP representatives Edward Thurmond, Maria Navarro, and possibly others, met with CAL and IRAdvocates to discuss the status of the investigation and the new information provided in the supplemental petition. CBP gave no useful information

about the status of the case but expressed appreciation for the new information and acknowledged CAL and IRAdvocates' frustration at the lack of action.

109. On February 14, 2022, after another prolonged period of silence and inaction by CBP, IRAdvocates and co-petitioners wrote Commissioner Magnus to request that he take long overdue action to address the ongoing forced labor in Côte d'Ivoire's cocoa industry. The letter, attached as **Exhibit B**, was signed by many important civil society stakeholders, including the AFL-CIO. These organizations expressed great frustration at CBP's two years of inaction despite the overwhelming evidence that cocoa imported from Côte d'Ivoire is certainly produced "in whole or in part" by forced child labor.

110. On August 15, 2022, CAL met with CBP representatives Ann Marie Highsmith and Eric Choy and discussed cocoa briefly, among other topics.

111. Unfortunately, the February 2022 letter, followed up by an email in October 2022 from IRAdvocates to Acting Commissioner Miller, went unanswered until December 13, 2022. On that day, Acting Commissioner Troy Miller made the first written communication from CBP concerning the nearly three-year-old pending Petition and sent a letter to IRAdvocates (attached as **Exhibit F**). Rather than address the merits or explain CBP's incredible delay in addressing the Petition, Acting Commissioner and Defendant herein Miller made the incredible assertion that, after nearly three years of unanswered pleas, the information provided by petitioners is dated. This was the first time any person at CBP had raised the issue of timeliness. Defendant Miller's letter ended with a bureaucratic flair. He claimed that "if evidence reasonably indicates that merchandise is produced by forced labor . . . and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO)." This assertion has proven to be unequivocally false.

112. IRAdvocates responded to Defendant and Acting Commissioner Miller in a letter dated January 17, 2023 (attached as **Exhibit G**). Responding to the baseless assertion that the information provided by IRAdvocates, CAL, and UCI was untimely, IRAdvocates stated, "[o]ur original Petition submitted on February 14, 2020 was explicitly based on evidence of trafficked and forced child labor that we gathered across 2019 and also referred to official government reports from 2019. Our June 25, 2021 Supplemental Petition was explicitly based on interviews, observations, and photos from December 2020 and current government reports. It is hard to imagine given processing and verification time that these submissions could have been more current." IRAdvocates also asked for clarification as to whether Defendant Miller's letter, which did not address the merits of the Petition in any way, was a ruling of some sort on the Petition.

113. There has been no further response from CBP. On February 14, 2023, CAL submitted an additional Supplemental Petition of ongoing forced child labor in Côte d'Ivoire cocoa harvesting (attached as **Exhibit H**). This was the third anniversary of the original Petition, which CBP has yet to address on the merits. CBP has not responded to the Supplemental Petitions either.

114. CBP has continuously shirked its duties to answer widely-substantiated claims that cocoa producers are importing cocoa into the United States that has been produced by forced child labor. IRAdvocates, CAL, and UCI have suffered financial harm to the inaction of CBP, requiring ongoing and expensive investigations to provide updated information. This prolonged indecision and failure to act by CBP has left vulnerable and endangered children at risk for exploitation.

## II. JURISDICTION AND VENUE

115. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C.S. § 1581(i)(1)(c). Plaintiff's claims arise out of Section 307 of the Tariff Act of 1930, 19 U.S.C.A. § 1307, which is a law of the United States that provides for "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C.S. § 1581(i)(1)(c), *see* 19 U.S.C.A. § 1307. Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

116. Venue in the U.S. Court of International Trade is proper by virtue of 28 U.S.C. § 1391(b) and (e) because defendants are officers of the United States, acting in their official capacity, and agencies of the United States.

## III. PARTIES

### Plaintiff

117. Plaintiff IRAdvocates was founded in 2007 as an advocacy organization dedicated to achieving just and humane treatment for workers worldwide. IRAdvocates advocates for and with working people around the world, including in Côte d'Ivoire, and is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy. IRAdvocates promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups.

118. IRAdvocates is within the category of persons entitled to submit a petition under 19 CFR § 12.42.

119. Due to the failure/refusal of the Defendants to properly enforce the law, Plaintiff IRAdvocates has expended its own resources to investigate allegations of forced child labor in

Côte d'Ivoire, and to initiate its own campaign to prevent the importation of this illegal merchandise. Further, IRAdvocates has expended resources in an ongoing, multi-year effort to obtain enforcement of the Tariff Act by Defendants. This expenditure of resources constitutes a judicable, concrete and specific injury on the part of IRAdvocates.

**Defendants**

120. Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security (DHS) and is sued in his official capacity. Secretary Mayorkas is authorized and obligated to properly enforce Section 307 of the Tariff Act and the regulations promulgated thereunder. He is required to direct his subordinate officers to properly implement the law.

121. Defendant Troy A. Miller is the Acting Commissioner of the Bureau of Customs and Border Protection at DHS. He is sued in his official capacity. Defendant Miller is obligated to comply with and enforce the Customs regulation 19 CFR § 12.42 and the enabling statute, the Tariff Act of 1930, 19 U.S.C. § 1307. He is further required to direct his subordinate officers to properly implement the law.

122. Defendant DHS is an agency of the United States that houses the Bureau of Customs and Border Protection. As of March 1st, 2003, DHS is responsible for implementing and enforcing the Tariff Act's prohibition on the importation of goods that are the fruits of forced child labor. 19 U.S.C. § 1307; 19 CFR § 12.42.

## IV. CAUSE OF ACTION

**Violation of Administrative Procedure Act - 5 U.S.C. § 706(1)**

123. The Tariff Act of 1930, 19 U.S.C. § 1307 (1997), prohibits the importation of goods that are produced wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanction. The Act declares that such goods "shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited."

124. In 1997, the Sanders Amendment was passed, clarifying the definition of "forced labor" for the purposes of the Act so as to explicitly include forced or indentured *child* labor: "'Forced labor' as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term 'forced labor or/and indentured labor' includes forced or indentured *child* labor." 19 U.S.C. § 1307 (1997) (emphasis added).

125. The regulations promulgated pursuant to this statute entitle "[a]ny person outside the Customs Service who has reason to believe that merchandise produced [by convict, forced, or indentured labor] is being, or is likely to be, imported into the United States" to "communicate his belief to any port director or the Commissioner of Customs." 19 CFR § 12.42(b).

126. The regulations further require that any such communication be accompanied by: "(1) a full statement of the reasons for the belief; (2) a detailed description or sample of the merchandise; and (3) all pertinent facts obtainable as to the production of the merchandise abroad." *Id.*

127. If the communication does not conform to these requirements, the regulations require that "the communication shall be returned promptly to the person who submitted it with

detailed written advice as to the respects in which it does not conform." 19 CFR § 12.42(c).

128. Upon receipt of a communication that conforms to the requirements of 19 CFR § 12.42(b), the regulations require that "the Commissioner *will* cause such investigation to be made as appears to be warranted by the circumstances of the case." 19 CFR § 12.42(d) (emphasis added).

129. If the Commissioner "finds at any time that information available reasonably *but not conclusively* indicates that merchandise within the purview of Section 307 is being, or is likely to be, imported, he *will promptly* advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise." 19 CFR § 12.42(e) (emphasis added).

130. If it is determined that the merchandise in question was produced, wholly or in part, by convict, forced, or indentured labor, such merchandise *must* be denied entry into the United States, "unless the *importer* establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42(f) and (g) (emphasis added).

131. As previously alleged in paragraphs 1-114, *supra*, IRAdvocates, CAL, and UCI filed a comprehensive Section 307 Petition in compliance with the operative regulations on February 14, 2020, and have supplemented it twice with additional timely information. CBP has failed to take any action with respect to the Petition as is required by law. In taking no action for more than three years, CBP has allowed hundreds of millions of dollars' worth of tainted cocoa produced by forced child labor to *illegally* enter the United States. As such, Defendants have violated their own regulations and the laws of the United States. 19 CFR § 12.42, 19 U.S.C. § 1307 (1997).

132. Pursuant to Section 706(1) of the Administrative Procedure Act, this Court may "compel agency action unlawfully withheld or unreasonably delayed."

133. Defendants Secretary of Homeland Security Mayorkas and CBP Acting Commissioner Troy Miller have unlawfully withheld and/or unreasonably delayed an investigation into cocoa imports from Côte d'Ivoire, as required by 19 CFR § 12.42, and, further, to deny entry into the United States the products of forced child labor, as required by the Tariff Act of 1930, as amended. 19 U.S.C. § 1307. More fundamentally, they have failed to take any action whatsoever, including issuing a decision regarding the merits of the Petition.

134. Plaintiff IRAdvocates has complied fully with the requirements of 19 CFR § 12.42(b), and thus Customs is obligated to act on the Petition and issue a WRO as requested by the Petition, or make a determination that the Petition lacks merit, or make some other appropriate decision in response to the Petition.

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Declare that the February 14, 2020 Petition and supplemental materials submitted by IRAdvocates, CAL, and UCI constitute a sufficient basis to require CBP to take appropriate action under the Tariff Act of 1930, 19 U.S.C. § 1307 and the applicable implementing regulations, 19 CFR § 12.42 *et seq*.;

B. Declare that the failure and refusal of the defendants Secretary of Homeland Security and Acting Commissioner of CBP to issue a decision in response to the February 14, 2020 Petition violates Section 706(1) of the Administrative Procedure Act. These agencies have a statutory duty to make a decision within the scope of their statutory authority. They do not have the power to simply ignore a federal law passed by Congress;

C. Award Plaintiff their costs and attorneys' fees pursuant to 28 U.S.C. § 2412; and

D. Grant such other relief as the Court deems just and equitable.

Respectfully submitted this 15th day of August, 2023,

s/ *Terrence P. Collingsworth*
Terrence P. Collingsworth
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, D.C. 20002
202-543-5811
tc@iradvocates.org

*Counsel for Plaintiff*

CORPORATE ACCOUNTABILITY LAB

INTERNATIONAL RIGHTS ADVOCATES

**VIA CBP PORTAL**

Mr. Mark A. Morgan
Acting Commissioner
U.S. Custom and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

**Re: Petition to exclude cocoa produced in Cote D'Ivoire and imported to the U.S. by Nestle, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., Blommer Chocolate Co., Cargill, Mondelēz, and Olam unless and until within 180 days any specific "importer establishes by satisfactory evidence that [its] merchandise was not ... manufactured in any part with" forced or trafficked child labor. 19 C.F.R. § 12.42 (g)(emphasis added).**

Dear Commissioner Morgan,

International Rights Advocates (IRAdvocates) and Corporate Accountability Lab (CAL) hereby submit this Petition under section 307 of the Trade Act of 1930, 19 U.S.C. § 1307, regarding the importation of cocoa from Cote D'Ivoire (CDI) by Nestlé, S.A. and Nestlé, U.S.A. (together referred to as "Nestlé"), Cargill, Incorporated ("Cargill"), Barry Callebaut AG, Barry Callebaut USA LLC (together as "Barry Callebaut "), Mars, Incorporated and Mars Wrigley Confectionary (together as "Mars"), Olam International and Olam Americas, Inc. (together as "Olam"), the Hershey Company ("Hershey"), World's Finest Chocolate, Inc., and Blommer Chocolate Co.[1]

## I. Introduction and Summary of Position

IRAdvocates and CAL hereby jointly request that, based on 19 C.F.R., Chpt. 1, § 12.42 (b) (1997), U.S. Customs and Border Protection (CBP) initiate an enforcement action under section 307 of the Trade Act of 1930, 19 U.S.C. § 1307, regarding the importation of cocoa from CDI by the

1. The rationale for the selection of these specific Cocoa Importers is that the cocoa companies that signed the Harkin-Engel Protocol in 2001, discussed below, made a much-publicized commitment to end their use of child labor with respect to cocoa brought into the U.S. Those companies, Nestle, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., and Blommer Chocolate Co., expressly admitted in 2001 that they were importing CDI cocoa into the U.S. and that there was "forced child labor" in their cocoa supply chains. Since then, they have repeatedly admitted that there is still such forced child labor in their supply chains. In addition, Cargill, Mondelēz, and Olam all import significant amounts of CDI cocoa to the U.S. and have joined the Protocol signers within the WCF in leading the efforts to delay any meaningful measures to stop utilizing child labor in cocoa harvesting and production. Petitioners also believe that these companies form an overwhelming critical mass of cocoa producers and importers operating in CDI such that requiring them to finally comply with their 2001 commitment to end child labor will force the entire industry to change.

Cocoa Importers. Our understanding is that CBP has an open investigation of the cocoa sector in CDI. This Petition provides additional information on the extent of forced and trafficked child labor harvesting cocoa in CDI and, we believe, constitutes overwhelming evidence that now requires a concrete enforcement action. Under the controlling regulations, "[a]ny person ... who has **reason to believe**" that imported products are made with prohibited forced or indentured child labor shall provide to the Commissioner of Customs "(1) a full statement of the reasons for the belief, (2) a detailed description or sample of the merchandise, and (3) all pertinent facts obtainable as to the production of the merchandise abroad." 19 C.F.R. § 12.42 (b).

We submit that information we and others have already provided to CBP and that CBP itself has gathered constitutes an overwhelming basis for any person to have a "reason to believe"[2] that cocoa imported from CDI is produced "wholly or in part"[3] with forced or trafficked child labor. The additional evidence provided herein compels the finding that there is a strong "reason [for CBP] to believe" that all cocoa imported to the U.S. that is produced in CDI is produced "wholly or in part" with forced or trafficked child labor.

Under normal procedures, following our *prima facie* showing that CDI cocoa is produced with illegal child labor, the Commissioner is required to conduct an investigation as per 19 C.F.R. § 12.42(d). However, as there is an ongoing investigation, we urge that there is now, with the additional information in this Petition, more than sufficient evidence for the Commissioner to take the next step required by 19 C.F.R. § 12.42 (e), which provides in pertinent part:

> If the Commissioner of CBP finds **at any time** that information available **reasonably but not conclusively** indicates that merchandise within the purview of section 307 is being, or is likely to be, imported, he will promptly advise all port directors accordingly and the port directors shall thereupon withhold the release of any such merchandise...[4]

Once the Commissioner makes a finding as per 19 C.F.R. § 12.42 (f), then all merchandise in the class is an "importation prohibited by section 307 ... **unless the importer establishes by satisfactory evidence that the merchandise was not ... manufactured in any part with the use of a class of labor specified in the finding.**"[5]

We demonstrate below that the Cocoa Importers have been knowingly benefiting from the use of forced or trafficked child labor for ***at least*** 20 years, and during this time have repeatedly made empty and false promises to stop relying on child labor. Their failure to take real steps requires action to ban the importation of their cocoa from CDI. However, we caution that an abrupt and immediate exclusion of this scale would cause collateral harm to farmers, farmworkers, and the CDI economy. We do not want that. Thus, in the interests of avoiding economic upheaval in CDI, we urge that the regulations are sufficiently flexible on timing and would permit CBP to issue the following order under 19 C.F.R. § 12.42 (g):

> Based on the overwhelming evidence of ongoing and pervasive forced and trafficked child labor in the production of cocoa in CDI, CBP hereby orders that Cocoa Importers from CDI

[2] 19 C.F.R. § 12.42 (b).
[3] § 307 of the Tariff Act of 1930, 19 U.S.C. § 1307 ("Section 307").
[4] 19 C.F.R. § 12.42 (e)(emphasis added).
[5] *Id.*

Nestle, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., Blommer Chocolate Co., Cargill, Mondelēz, and Olam will have **180 days**[6] from the date of this Order to produce "**satisfactory evidence that [any shipment of cocoa from CDI to the US] was not ... manufactured in any part with the use of a class of labor specified in the finding.**" 19 C.F.R. § 12.42 (g)(emphasis added). This evidence shall include a transparent map of companies' supply chains down to the farm level, public reports on how each company is utilizing an acceptable independent third-party monitoring and certification system to implement its own Code of Conduct banning illegal child labor and overseeing its Supplier Codes of Conduct related to the issue of child and forced labor, and an externally-run grievance mechanism related to the company's commitments on cocoa that is in line with the UN Guiding Principles on Business and Human Rights and is in place as of the date produced. Any shipment of cocoa from CDI that does not meet this standard will be subject to a Withhold Release Order (WRO) and held at the port of entry.

This is a reasonable and feasible starting point to identify and stop the use of forced and trafficked child labor by the Cocoa Importers. A transparent supply chain will enable independent and external audits, and will not allow companies to continue using child labor while claiming to be working to stop themselves from this abhorrent conduct.

A grievance mechanism should allow independent third parties to have access to the cocoa farms, provide a safe space for victims to report cases of forced labor, and provide a process to manage complaints related to the companies' adherence to their commitments on child and forced labor. This grievance mechanism must be created specifically for the cocoa sector, in collaboration with potential users. It must be easily accessible and safe for potential users and must meet, at the very minimum, the Effectiveness Criteria outlined in UNGP 31.[7]

180 days is a more than reasonable timeframe to implement these changes. Most major cocoa and chocolate companies have committed to investing millions of dollars this year to expand sustainability and traceability in CDI. There are ample resources for companies on how to conduct proper due diligence in supply chains,[8] and many of these companies have taken steps towards this in other industries.[9] There is a significant civil society presence with the knowledge and expertise to

---

[6] Petitioners suggest 180 days as a reasonable time given that the companies concerned have been on notice for decades that they must stop their illegal use of child labor in their cocoa production. Given the long history of non-compliance with their various "voluntary" programs, the importers must be given a firm deadline to comply.

[7] Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework, United Nations Human Rights Office of the High Commissioner, 2011, https://www.ohchr.org/documents/publications/guidingprinciplesbusinesshr_en.pdf.

[8] *See, e.g.,* OECD, OECD Due Diligence Guidance for Responsible Business Conduct (2018); Working Group on Business and Human Rights, Companion note II to the Working Group's 2018 report to the General Assembly (A/73/163), https://www.ohchr.org/Documents/Issues/Business/Session18/CompanionNote2DiligenceReport.pdf; United Nations Human Rights Office of the High Commissioner, The Corporate Responsibility to Respect Human Rights: AN Interpretive Guide (2012), https://www.ohchr.org/Documents/Publications/HR.PUB.12.2_En.pdf; International Cocoa Initiative, *Human Rights Due Diligence in Supply Chains: A review of legislation and guidelines through the lens of the UN Guiding Principles on Business and Human Rights*, ICI REVIEW (October 2019), https://cocoainitiative.org/wp-content/uploads/2019/10/HRDD_report_ICI_Final_w_image.pdf.

[9] *See* Cargill, Managing Grievances, https://www.cargill.com/sustainability/palm-oil/managing-grievances; Cargill, Grievance Process for Cargill's Policy on Sustainable Palm Oil ("Palm Grievance Process"), updated June 2019, https://www.cargill.com/doc/1432135747848/cargill-palm-grievance-procedure.pdf. *See also* Nestlé, Grievance mechanisms and Remediation, https://www.nestle.com/csv/impact/respecting-human-rights/grievance-mechanisms;

ensure that these programs are implemented properly.[10] Cocoa Importers have the resources and the access to expertise. They simply need to have the will to actually take these steps.

## II. Background of U.S. Cocoa Importers' Failure to Stop Benefitting from Child Labor in Harvesting Cocoa from CDI.

### A. The Cocoa Industry in CDI

CDI is the world's top cocoa producer, producing approximately 32% of the world's cocoa.[11] Cocoa is vital to CDI's economy and accounts for roughly half of its export economy.[12] The industry generates annual exports worth approximately US $5B, with cocoa beans ($3.79B), and cocoa paste ($1.04B) in the country's top three biggest export items.[13] Globally, between five and six million farmers depend on cocoa farming. Two million of those farmers are located in Ghana and Coˆte d'Ivoire.

Although CDI is the largest global producer of cocoa, Ivorian cocoa farmers are the lowest paid. The average daily income for a cocoa farmer in CDI is less than what a consumer pays for a single chocolate bar. This creates labor-related risks to children, hired labor (especially migrant labor), and women. These many human rights risks endemic to the cocoa sector are driven in large part by the low price farmers receive for their cocoa, and the severe imbalances in the value chain. By far the most documented abuse in the cocoa industry is the use of child labor, both through local family and social networks and through national and international child trafficking. Recent research estimates that about 2.1 million children work in the cocoa fields of CDI and Ghana.[14] According to a 2018 study, about 891,5000 children between the ages of 10 and 17 worked in the cocoa industry between October 2016 and November 2017.[15]

It has been estimated that at least 16,000 children in West Africa are being forced to work on cocoa farms by people who are not their parents,[16] and that is probably a very low estimate.[17] Many

---

Nestlé, Tackling labor rights issues: Our palm oil action plan, https://www.nestle.com/stories/nestle-launched-action-plan-palm-oil.

[10] We would be happy to provide recommendations.

[11] Miklos Mattyasovsky, *Top 10 Cocoa Producing Countries*, WORLD ATLAS, Apr. 25, 2017, https://www.worldatlas.com/articles/top-10-cocoa-producing-countries.html.

[12] Alexander Simones, *Cote d'Ivoire*, THE OBSERVATORY OF ECONOMIC COMPLEXITY, Apr. 11, 2018, https://atlas.media.mit.edu/en/profile/country/civ/.

[13] *Id.*

[14] Antonie Fountain and Friedel Hütz-Adams, COCOA BAROMETER (2018), at 3, https://www.voicenetwork.eu/wp-content/uploads/2019/07/2018-Cocoa-Barometer.pdf.

[15] BITTER SWEETS: PREVALENCE OF FORCED LABOUR & CHILD LABOUR IN THE COCOA SECTORS OF COTE D'IVOIRE & GHANA, Tulane University and the Walk Free Foundation, https://cocoainitiative.org/wp-content/uploads/2018/10/Cocoa-Report_181004_V15-FNL_digital.pdf.

[16] Peter Whoriskey and Rachel Siegel, *Cocoa's child laborers*, WASH. POST, June 5, 2019, https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/; BITTER SWEETS, *supra* note 15, at 28, https://cocoainitiative.org/wp-content/uploads/2018/10/Cocoa-Report_181004_V15-FNL_digital.pdf.

[17] ASSESSMENT OF FORCED LABOR RISK IN THE COCOA SECTOR OF COTE D'IVOIRE, Verite, Feb. 2019, https://www.verite.org/wp-content/uploads/2019/02/Verite-Report-Forced-Labor-in-Cocoa-in-CDI.pdf ("Given the

of the children who are trafficked come from Mali and Burkina Faso. Children between the ages of 10 and 18 are often offered money or tangible goods to take the bus to work on cocoa farms in CDI. [18] They may also have been promised education or were misled about the conditions of work they were heading to.[19] Children are also internally trafficked within Cote d'Ivoire, including from the north of the country to the south.[20] These documented conditions in CDI are well within the International Labor Organization ("ILO")'s indicators of "forced labor."[21]

It can be difficult to learn if individual children have been trafficked. The issue of child labor in general is extremely sensitive in CDI, and people are hesitant to speak about it. They will often deny that child labor exists, or will claim that all of the children working on a farm are family. CAL heard this through multiple confidential conversations with various sources, and it was noted by the investigators, who stated that in every place visited, it appeared that people had prepared answers. This has been identified by many others as well.[22] Children themselves may be scared to speak, or prohibited from doing so. A 2016 report by Ebode and Mondolez noted: "It was felt that children were well aware of the sensitivities around talking about working on cocoa farms. In one community, the focus group discussion was observed (and intervened upon) by a group of adults, potentially making it difficult for children to express themselves openly."[23] The 2017 FLA audit report for Olam stated that, "monitors observed a foreign worker visibly below the minimum age of employment. He was forced by his employer (farmer) not to answer the monitor's questions."[24]

And yet, the Cocoa Importers systematically avoid discussions of trafficking or forced labor in their superficial analysis of "root causes" and they rarely appear in the companies' claimed due diligence efforts. The Mondolez report found "a general lack of prioritisation of and sufficient attention to these more egregious forms of child exploitation" in their stakeholder consultations.[25] Despite almost 20 years of commitments, Nestle admits as recently as 2019 that the low number of

---

hidden nature of much human trafficking and forced labor, it is also possible that levels may be significantly higher within isolated pockets in the sector.")

[18] Whoriskey & Siegel, *supra* note 16.

[19] Abou Traoré, *Child labor on cocoa plantations: Trafficking*, CENOZO, January 8, 2019, https://cenozo.org/en/articles/120-travail-des-enfants-dans-les-plantations-de-cacao-le-trafic-a-la-peau-dure.

[20] On file with CAL.

[21] The ILO has identified eleven indicators of forced labor: abuse of vulnerability, deception, restriction of movement, isolation, violence, intimidation and threats, retention of identity documents, withholding of wages, debt bondage, abusive living and working conditions, and excessive overtime. *ILO Indicators of Forced Labour*, Int'l. Labor Office (2012).

[22] *See, e.g.*, Aarti Kapoor, *Children at the Heart: Assessment of Child Labour and Child Slavery in Côte d'Ivoire's Cocoa Sector and Recommendations to Mondelēz International*, Embode, 2016, at 15 ("If community members felt there were community-wide negative consequences to reporting or sharing information about child labour, this inevitably pushes incidences further underground."); Oliver Neiburg, *Fair Game: How Effective is Cocoa Certification?*, CONFECTIONARY NEWS, Dec. 20, 2017, https://www.confectionerynews.com/Article/2017/12/20/Fair-trade-How-effective-is-cocoa-certification (Nick Weatherill, Executive Director of the International Cocoa Initiative, highlighted that regarding sporadic audits of certified farms, "[i]t's a model where, if child labor is found, then farmers risk to lose their certificates then of course that threat of punishment drives the issue underground."); ASSESSMENT OF FORCED LABOR RISK IN THE COCOA SECTOR OF COTE D'IVOIRE, *supra* note 17, at 46 ("Producers and cooperative officials interviewed during field research were highly sensitized to the question of child labor and – likely in anticipated response to our perceived interest in the topic – were quick to note that children did not work on their farms and that they knew buyers did not want children involved.")

[23] Kapoor, *Children at the Heart*, at 10.

[24] Fair Labor Association, Independent External Monitoring of Olam's Cocoa Supply Chain in Cote d'Ivoire: 2017, at 5, https://www.fairlabor.org/sites/default/files/documents/reports/2017_olam_executive_summary_181203.pdf.

[25] Kapoor, *Children at the Heart*, at 16.

forced labor cases that it has identified "does not mean that forced labor does not exist - it may be that we are not good enough at identifying it."[26]

Despite the challenges, there has been clear documentation of trafficked and forced child labor in CDI's cocoa sector for years. There are numerous, highly credible public reports documenting the pervasive and ongoing use of forced and trafficked child labor in harvesting and processing cocoa in CDI.[27] The U.S. Department of Labor and U.S. State Department have both clearly documented the trafficking of children and forced child labor in the CDI cocoa sector.[28] The Child Labor Cocoa Coordinating Group Annual Report also provides ample evidence of forced child labor in the cocoa industry.[29] Additionally, reports from the Fair Labor Association on Nestlé's supply chain and reports on Olam's supply chains also found evidence of forced child labor.[30] Lastly, civil society groups, academics,[31] and news reports have also reported and documented such abuses for years.[32]

The Cocoa Importers' programs and ploys to avoid legal compliance is a master class in public relations. We outline below how despite being on notice for two decades of this risk and its continued prevalence, these companies refuse to take the necessary steps to address the forced labor and trafficking that continues in their supply chains. This history demonstrates that voluntary nature of past and current measures has given companies little incentive to take the necessary steps to address this issue.

---

[26] *Tackling Child Labor, 2019 Report*, Nestle Cocoa Plan, https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf.

[27] For a list of reports documenting the ongoing use of illegal child labor in the cocoa sector industry in CDI, see Exhibit 6.

[28] *See, e.g.*, U.S. DEP'T OF LABOR, BUREAU OF INTERNATIONAL LABOR AFFAIRS, CHILD LABOR AND FORCED LABOR REPORTS: COTE D'IVOIRE, https://www.dol.gov/agencies/ilab/resources/reports/child-labor/cote-divoire [hereinafter CHILD LABOR AND FORCED LABOR REPORTS]; U.S. DEP'T OF LABOR, FINDINGS ON THE WORST FORMS OF CHILD LABOR: CÔTE D'IVOIRE (2018), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2018/Cote%20d%27lvoire.pdf; U.S. EMBASSY IN COTE D'IVOIRE, COTE D'IVOIRE 2018 HUMAN RIGHTS REPORT (2018), https://ci.usembassy.gov/wp-content/uploads/sites/29/Cote-dIvoire-HRR-2018-English.pdf.

[29] *See, e.g.*, U.S. DEP'T. LABOR, BUREAU OF INTERNATIONAL LABOR AFFAIRS, CHILD LABOR IN THE PRODUCTION OF COCOA, https://www.dol.gov/agencies/ilab/our-work/child-forced-labor-trafficking/child-labor-cocoa; U.S. DEP'T. LABOR, CHILD LABOR COCOA COORDINATING GROUP ANNUAL REPORT (2018), https://www.dol.gov/sites/dolgov/files/ILAB/legacy/files/CLCCG2018AnnualReport.pdf.

[30] *See e.g.*, FAIR LABOR ASSOCIATION, INDEPENDENT EXTERNAL MONITORING OF NESTLE'S COCOA SUPPLY CHAIN IN IVORY COAST: 2016 (2017), https://www.fairlabor.org/sites/default/files/documents/reports/october_2017_nestle_executive_summary.pdf; FAIR LABOR ASSOCIATION, INDEPENDENT EXTERNAL MONITORING OF OLAM'S COCOA SUPPLY CHAIN IN IVORY COAST: 2016 (2016), https://www.fairlabor.org/sites/default/files/documents/reports/november_2017_olam_executive_summary.pdf [hereinafter INDEPENDENT EXTERNAL MONITORING OF OLAM'S COCOA SUPPLY CHAIN].

[31] *See, e.g.*, BITTER SWEETS, *supra* note 15; THE TRUE PRICE OF COCOA IVORY COAST, IDH & True Price (2016), https://cocoainitiative.org/wp-content/uploads/2016/10/The-True-Price-of-Cocoa.pdf; COCOA BAROMETER (2018), *supra* note 14.

[32] *See, e.g.*, Tim Adams, *From bean to bar in Ivory Coast, a country built on cocoa*, THE GUARDIAN, Feb. 24, 2019, https://www.theguardian.com/global-development/2019/feb/24/ivory-coast-cocoa-farmers-fairtrade-fortnight-women-farmers-trade-justice; Whoriskey & Siegel, *supra* note 16.

### A. The First Measures Taken in the U.S. to Tackle the Issue: The Harkin-Engels Protocol

Child labor in West African cocoa production, particularly CDI, is a long-standing issue. Yet it was not until the late 1990s that NGOs and news media were able to gain access to cocoa farms and begin to educate the public on the systematic use of child labor in cocoa harvesting by the world's major cocoa producers. In 1999, various labor rights and consumer groups, most of them members of the Washington-based Child Labor Coalition, began a campaign in the U.S. to pressure the companies to stop using child labor and to pay adult workers a living wage. They worked with (then) Congressman Bernie Sanders and Rep. Elliot Engel to introduce legislation to ban the importation of cocoa (and other products) harvested by child labor. In 2001, that bill passed by a 291-115 vote in the House and went to the Senate, where Senator Tom Harkin sponsored it. However, the pending legislation, known as the Harkin-Engel bill, was halted before a Senate vote due to intense industry lobbying against a mandatory program with real consequences. Once the cocoa lobbyists were done with the bill, it had been transformed into the 2001 Harkin-Engel Protocol (the Protocol), a "voluntary" initiative that gave the participating companies until 2005 to "phase out" the use of child labor. The Protocol, executed on September 19, 2001, is attached hereto as Exhibit 1.

The CEO's of the major cocoa importers, Nestle, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., Blommer Chocolate Co., and Archer Daniels Midland (ADM)[33] personally signed the Protocol and made a commitment to achieve its goals. Section 1 of the agreed Key Action Plan provided that

> Industry has publicly acknowledged the problem of forced child labor in West Africa and will continue to commit significant resources to address it. West African nations also have acknowledged the problem and have taken steps under their own laws to stop the practice. More is needed because, while the scope of the problem is uncertain, the occurrence of the worst forms of child labor in the growing and processing of cocoa beans and their derivative products is simply unacceptable. Industry will reiterate its acknowledgement of the problem and in a highly-public way will commit itself to this protocol.[34]

The major cocoa companies, knowing that child labor was rampant in their supply chains, acted to prevent effective measures to end their profiting from forced child labor and enacted a voluntary program that was under the complete control of the companies. However, in doing so, the companies expressly acknowledged that there was "forced child labor" and the "worst forms of child labor" in their supply chains.

This history of the cocoa companies' actual "commitments" to ending child labor on a voluntary basis is a shocking series of self-approved extensions coupled with repeated admissions that the companies continued to use forced child labor in their cocoa supply chains. In 2005, the Protocol's initial deadline, cocoa industry leaders admitted that the goals would not be "fully met" by the 2005 deadline, but assured Sen. Harkin and Rep. Engel they were "committed to achieving a certification

---

[33] ADM later sold its cocoa business to Cargill. *See Cargill buying ADM's chocolate unit in North American expansion*, REUTERS, Sept. 2, 2014, https://www.reuters.com/article/us-archer-daniels-m-a-cargill/cargill-buying-adms-chocolate-unit-in-north-american-expansion-idUSKBN0GX22M20140902.

[34] Protocol, Exhibit 1, at 2.

system…within three years."[35] Then in 2008, cocoa industry leaders again unilaterally extended their self-imposed deadline by two years.[36] In 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by 70% the use of child labor in the cocoa industry. At the 8th Annual World Cocoa Foundation (WCF) Meeting in July 2018, the industry admitted it could not make its 2020, or even 2025, goal of eradicating child labor in the cocoa supply chain. Effectively abandoning any set date, the WCF admitted it was not likely to meet its "aspiration for 2020" or its other targets "for the eradication of child labor by 2025."[37]

The major cocoa importers, acting through WCF, have given themselves a free pass for ***19 years*** to continue using child labor, all the while falsely promising to comply with the Harkin-Engel Protocol and claiming to be "committed" and "concerned" about the welfare of children performing hazardous work on their cocoa farms. These companies knowingly benefit from child labor while ***failing to stop themselves*** from using child labor.

### B. The Failures of the CocoaAction Plan

Around 2015, the major cocoa companies, all members of the WCF, implicitly admitted that the public was not likely to continue to believe that the companies would end child labor under the Harkin-Engel Protocol when they announced that they were implementing the WCF's "CocoaAction Plan."[38] However, this Plan has limited reach, no independent oversight, and does not address the issue of forced labor specifically. Like the Harkin-Engel Protocol, the CocoaAction Plan is more public relations than an effective program.

Among other things, the CocoaAction Plan purports to include a monitoring system to ensure that there are no children working on participating companies' cocoa farms, the Child Labor Monitoring and Remediation System (CLMRS). In the fine print of the companies' websites, they acknowledge that CLMRS "monitoring" and the CocoaAction Plan extend only to a small percentage of the companies' supply chains, at most 20-30%. For example, Nestle claims only that "around one third of Nestlé's total global cocoa supply" is covered by this system.[39] The Cocoa Importers appear to be intentionally vague as to the limited scope of these programs. To the extent there is information, it confirms that these are in essence pilot programs applicable to a small portion of their cocoa production.

---

[35] *Joint Statement from U.S. Senator Tom Harkin, Representative Eliot Engel and the Chocolate/Cocoa Industry on Efforts to Address the Worst Forms of Child Labor in Cocoa Growing*, July 2, 2005, http://www.cacao.gouv.ci/commun/documents/jointstatementSenateurTomHarkin.pdf.
[36] *Joint Statement from U.S. Senator Tom Harkin, Representative Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol*, June 16, 2008, http://www.csrwire.com/press_releases/14132-Joint-Statement-from-U-S-Senator-Tom-Harkin-Representative-Eliot-Engel-and-the-Chocolate-and-Cocoa-Industry-on-the-Implementation-of-the-Harkin-Engel-Protocol-#.
[37] *Remarks: Child Labor Cocoa Coordinating Group (CLCCG) Annual meeting Opening Ceremonies Sofitel Abidjan Hotel Ivoire*, Tuesday, July 17, 2018, https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8th-annual-meeting-remarks/.
[38] World Cocoa Foundation, CocoaAction, https://www.worldcocoafoundation.org/about-wcf/cocoaaction/.
[39] Nestle Cocoa Plan, https://www.nestlecocoaplanreport.com/.

In March 2019 interviews with the WCF, the ICI, and the Fair Labor Association (FLA), IRAdvocates' Executive Director, Terry Collingsworth, confirmed with each of these organizations that, at most, 20-30% of any producer's cocoa production comes from farms that are in cooperatives and that are participants in the CocoaAction Plan. The remaining 70-80% comes from the "free zones" where there is no monitoring and a high incidence of child labor, including trafficked child labor.

In addition to applying to a limited number of the companies' supply chain farms, CLMRS does not have independent monitoring, a key aspect of any credible system of compliance. These systems largely rely on "self-reporting" by "trusted" communities of farmers. Given the long history of exploitation of children by farmers squeezed by the low payments by the cocoa companies, this is a situation that absolutely requires a "trust but verify" approach. Further, to the extent there are reported violations, the companies collect this information and may or may not disclose it to the public. More fundamentally, there are no consequences for a farmer using forced child laborers. Even if a child labor violation is reported to the company, the cocoa produced by child labor is simply processed with all the other cocoa and prepared for export. Finally, there is no transparent system of effective remediation for children found to be working as forced laborers – the companies are largely silent about what happens to this small percentage of children harvesting cocoa who are identified by the CocoaAction Plan. Helping these at-risk kids who have already been through the tremendous trauma of being trafficked and/or forced to perform hazardous work should be the highest priority of any system, not a hidden data point. Presumably, the companies are fully aware of the double-edged sword of reporting their own ongoing use of illegal child labor, thus showing their monitoring can produce results but also proving that they have failed to stop benefiting from child labor. At most, CLMRS identifies child labor on a small number of farms and allows the Cocoa Importers to purchase and export to the U.S. cocoa that included child labor.

As a clear example of the willful and ongoing use of child labor within the CocoaAction Plan, on September 2, 2015, the FLA released the results of its audit performed for Nestlé. The FLA explained that "[f]or Nestlé in Ivory Coast, the FLA has been monitoring since 2013 a growing portion of its cocoa supply served by the Nestlé Cocoa Plan (NCP). As of mid-2015, the NCP represented around 25 percent of Nestlé's total cocoa supply chain."[40] Nestlé had the FLA audit the subset of its supplying cocoa farms where it had engaged in the most efforts to eradicate child and forced labor. The FLA assessors visited a sample of 260 farms,[41] less than 1% of the 30,000 that supply Nestlé in the Ivory Coast.

The 2015 FLA report found children under the age of 15 working on cocoa farms from which Nestle sourced.[42] This came "more than a decade after the food company promised to end

---

[40] FAIR LABOR ASSOCIATION, 2014 ASSESSMENTS OF NESTLÉ COCOA SUPPLY CHAIN IN IVORY COAST, Sept. 2, 2015, https://www.fairlabor.org/report/2014-assessments-nestlé-cocoa-supply-chain-ivory-coast.

[41] *Id.*

[42] FAIR LABOR ASSOCIATION, INDEPENDENT EXTERNAL MONITORING OF NESTLÉ'S COCOA SUPPLY CHAIN IN IVORY COAST: 2015, at 5, https://www.fairlabor.org/sites/default/files/documents/reports/september_2016_nestle_executive_summary.pdf.

the use of child labour in its supply chain."[43] These children "were involved in various farm activities … Some of these tasks are considered as hazardous since they involve the use of machete and transportation of heavy loads."[44] The Fair Labor Association also "found evidence of forced labour,"[45] including a young worker who had not received his salary for an entire year that he worked at a farm.[46] In its own report from 2019, Nestle admitted that 23% of the children it was monitoring were performing child labor, amounting to 18,283 of the 78,580 children in Nestlee's monitoring system.[47] (13)

In a 2017 FLA audit of cooperatives in Olam's supply chain, "monitors identified a contract worker who was presented by his employer as 18 years old. However, based on his physical appearance, the monitors believe that his age might be 14 years."[48] They also identified a young worker who was prohibited from speaking to them.[49] These cases were in addition to numerous other farms where the FLA found children engaged in labor, including hazardous work.

To further deceive the consumers and government regulators, the major U.S. cocoa importers that are members of the WCF hire and pay Fair Trade, UTZ, and Rainforest Alliance to label their cocoa as meeting their standards when these groups also know that at most only 20-30% of the companies' cocoa production is even partially monitored. Further, these so-called "fair trade" initiatives mislead the public by creating the false impression that they are certifying cocoa as child-labor-free when they do not in fact assess the extent of child labor in their member companies' production. In addition, they are forced to admit that in CDI they mix "certified" beans with uncertified beans to maintain supply. The *Washington Post* recently exposed the reality of these sham programs that do little more than mislead consumers into thinking that "fair trade" means child labor free.[50]

Each time the WCF or another industry group makes a comment on the child labor issue they implicitly admit that the industry continues to use and benefit from child labor. For instance, a January 15, 2020 article in confectionery news reported that the Government of Cote D'Ivoire conducted raids on cocoa farms and freed 137 trafficked children and arrested 12 traffickers. In response the WCF could only offer the repeated empty refrain that they have "zero tolerance" for child labor.[51] As

[43] Joe Sandler Clarke, *Child labour on Nestlé farms: chocolate giant's problems continue*, THE GUARDIAN, Sept. 2, 2015, https://www.theguardian.com/global-development-professionals-network/2015/sep/02/child-labour-on-nestle-farms-chocolate-giants-problems-continue.
[44] FAIR LABOR ASSOCIATION, INDEPENDENT EXTERNAL MONITORING OF NESTLÉ'S COCOA SUPPLY CHAIN IN IVORY COAST: 2015, *supra* note 42, at 5.
[45] Clarke, *supra* note 43.
[46] FAIR LABOR ASSOCIATION, INDEPENDENT EXTERNAL MONITORING OF NESTLÉ'S COCOA SUPPLY CHAIN IN IVORY COAST: 2014–2015, at 3–4, https://www.fairlabor.org/sites/default/files/documents/reports/september_2015_nestle_executive_summary.pdf.
[47] *Tackling Child Labor: 2019 Report*, Nestlé Cocoa Plan, at 13, https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf.
[48] INDEPENDENT EXTERNAL MONITORING OF OLAM'S COCOA SUPPLY CHAIN, *supra* note 30, at 6.
[49] *Id.* at 5.
[50] Peter Whoriskey, *Chocolate companies sell 'certified cocoa.' But some of those farms use child labor, harm forests*, WASH. POST, Oct. 23, 2019, https://www.washingtonpost.com/business/2019/10/23/chocolate-companies-say-their-cocoa-is-certified-some-farms-use-child-labor-thousands-are-protected-forests/.
[51] Anthony Myers, *Ivorian police raid cocoa farms and villages in child trafficking crackdown*, CONFECTIONERYNEWS.COM, Jan. 15, 2020, https://www.confectionerynews.com/Article/2020/01/15/Ivorian-police-raid-cocoa-farms-and-villages-in-child-trafficking-crackdown.

support for this, the WCF referenced a recent report that found that 829,400 children in CDI were working in the cocoa sector and 768,800 were performing hazardous work.[52] The report further found that 667,800 children were working in the cocoa sector in Ghana and 632,100 of those children were performing hazardous labor.[53] There is no question that the companies are admitting, once again, that they have failed to stop using child labor and thus are knowingly benefiting from the ongoing abuse of children on cocoa farms.

### C. History of Efforts Seeking Accountability

With this long history of admissions by U.S. cocoa importers that there was and continues to be child labor in their supply chains, it is remarkable that they continue to import cocoa produced with illegal child labor undeterred. On May 30, 2002, the International Labor Rights Forum (ILRF) filed a section 307 Petition seeking a Withhold Release Order (WRO) on all cocoa imported to the U.S. from CDI, attached hereto as Exhibit 2. The ILRF Petition detailed the extensive evidence of forced and trafficked child labor in the harvesting and processing of CDI cocoa and documented that U.S. importers were knowingly importing cocoa produced by illegal child labor. There was little dispute about the facts. The cocoa importers, acting through the Chocolate Manufacturers Association (CMA), one of the entities that signed the Protocol and pledged in 2001 to end child labor in the cocoa supply chain, did not dispute that child labor was pervasive in their supply chains; rather, they argued that the "domestic consumptive demand" exemption allowed them to continue to import cocoa from CDI even though it was produced by child labor.[54] The domestic consumptive demand exemption was removed in 2015[55] and thus no longer provides immunity for the Cocoa Importers' ongoing and admitted use of illegal child labor in their supply chains.

When the cocoa companies that signed the 2001 Protocol had still done little or nothing to implement the pledge to end child labor by 2005, IRAdvocates filed a federal lawsuit under the Alien Tort Statute, 28 U.S.C. 1350 against Nestle and Cargill on behalf of six individuals who, as children, had been trafficked from Mali to CDI and had been forced to work harvesting cocoa. The case, *John Doe I et al. v. Nestle et al.*, is still pending. The Second Amended Complaint, which includes detailed factual allegations that Nestle and Cargill knowingly aided and abetted ongoing forced child labor in CDI, is attached hereto as Exhibit 4. The case has been in the courts for 15 years. Nestle and Cargill, once again, do not and cannot deny that they are knowingly benefiting from child labor in their CDI supply chains. The companies continue to raise highly technical legal arguments in an attempt to avoid liability for their admitted use of child labor. The Ninth Circuit Court of Appeals has consistently credited the allegations of the former forced child laborers and has overruled the companies' specious legal arguments.[56]

[52] BITTER SWEETS, *supra* note 15, at 24.
[53] *Id.*
[54] *See ILRF et al., v. United States and Chocolate Manufacturers' Association*, Slip Op. 05-110 (U.S. CIT, 8-29-05), at 9-13, attached hereto as Exhibit 3.
[55] Trade Facilitation and Trade Enforcement Act of 2015, current version at 19 U.S.C. § 1307 (2012 & Supp III 2015).
[56] *See Doe I. v. Nestlé USA, Inc.* (*Doe I*), 766 F.3d 1013 (9th Cir. 2014); *Doe v. Nestle, S.A.*, 929 F.3d 623 (9th Cir. 2018).

Reviewing the facts alleged by the six former forced child laborers trafficked from Mali to work on cocoa farms in CDI, the Ninth Circuit observed: "The defendants' involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa."[57] The Ninth Circuit also found that the defendants in the case "are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations."[58] The Ninth Circuit further stated:

> ***Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast "with the unilateral goal of finding the cheapest sources of cocoa." The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor***.[59]

The Ninth Circuit further commented:

> ***The defendants' control over the Ivory Coast cocoa market further supports the allegation that the defendants acted with the purpose to facilitate slavery***. … ***The defendants had the means to stop or limit the use of child slavery, and had they wanted the slave labor to end, they could have used their leverage in the cocoa market to stop it. Their alleged failure to do so, coupled with the cost-cutting benefit they allegedly receive from the use of child slaves, strongly supports the inference that the defendants acted with purpose.***[60]
>
> ***
>
> ***Thus, the allegations suggest that a myopic focus on profit over human welfare drove the defendants to act with the purpose of obtaining the cheapest cocoa possible, even if it meant facilitating child slavery. These allegations are sufficient to satisfy the*** **mens rea** ***required of an aiding and abetting claim under either a knowledge or purpose standard.***[61]

Nestle and Cargill are now seeking review in the U.S. Supreme Court arguing that corporations cannot be sued under international law.[62] Once again, the companies are not denying that there is forced and trafficked child labor harvesting their cocoa. They are seeking immunity based on an arcane point of law.

Members of Congress who first sought to regulate imported products produced by child labor and settled for the Protocol are now expressing great frustration that after nearly 20 years of promises and pledges made by the companies, child labor remains a serious problem. There are several new

---

[57] *Doe I,* 766 F. 3d at 1017–19 (quotations to Plaintiffs' First Amended Complaint).
[58] *Doe I,* 766 F. 3d at 1017–19 (quotations to Plaintiffs' First Amended Complaint).
[59] *Doe I,* 766 F. 3d at 1017–19.
[60] *Id.* at 1024–25 (emphasis added).
[61] *Id.* at 1026 (emphasis added).
[62] Edvard Pettersson, *Child Slavery Claims Against Nestle, Cargill Get One More Chance*, BLOOMBERG, Jan. 8, 2017, https://www.bloomberg.com/news/articles/2017-01-09/child-slavery-claims-against-nestle-cargill-get-one-more-chance.

bills being developed to try to effectively stop the U.S. cocoa importers from continuing to benefit from illegal child labor. In the Senate, Senators Brown and Wyden sent a strong letter to CBP asking for enforcement action for cocoa under section 307 of the Trade Act 19 years after the importing companies promised Congress they would phase out child labor by 2005. A copy of the Brown-Wyden Letter is attached hereto as Exhibit 5.

## III. Full Statement of the Reasons for the Belief that Cocoa Imported from CDI is Produced With Forced or Trafficked Child labor.

The repeated admissions by the U.S. cocoa companies, going back to the 2001 Harkin-Engel Protocol, that they are allowing illegal child labor to continue in their supply chains while they make empty promises to take effective action to phase out child labor, should be enough, in itself, to allow the Commissioner of Customs to find the "information available reasonably but not conclusively indicates that" cocoa harvested and processed with illegal child labor "is being, or is likely to be, imported"[63] and shift the burden of proof to the importers by issuing a WRO, effective 180 days from the time of the Order, "unless the importer establishes by satisfactory evidence that the merchandise was not ... manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42 (g)(emphasis added). Evidence should include a transparent supply chain mapped to the farm level, a public report on how the importers are implementing their own Codes of Conduct and supervising their Supplier Codes, and a grievance mechanism in place that is in line with the UNGPs.

The cocoa companies are not hapless consumers of cocoa harvested by children in CDI. The companies are acting together in the WCF to knowingly perpetuate a system of forced and trafficked child labor that they will continue to benefit from until they are forced to stop. They have proven without question that they cannot be trusted to monitor themselves. This demonstrates, once again, the old adage that the fox cannot be trusted to guard the chicken coop.

To ensure a complete record that removes all doubt that the relief requested by Petitioners should be granted, Petitioners provide the following additional evidence of pervasive and ongoing use of forced or trafficked child labor by the U.S. importers.

### A. Evidence of Forced and Trafficked Child Labor Gathered by CAL and IRAdvocates in Partnership with Local Organizations.

CAL and IRAdvocates, with local support, obtained evidence of child labor on cocoa farms throughout CDI in December 2019. Here we provide evidence of both trafficking of children and child labor throughout the cocoa industry. In order to protect the identities of investigators, witnesses, and victims, simultaneous to this petition, CAL and IRAdvocates are privately submitting evidence to CBP, including affidavits, photos, videos and audio recordings.

[63] 19 C.F.R. § 19.42 (e)(emphasis added).

Determining that any person, adult or child, is engaged in forced labor, is highly fact-intensive and often speculative. While we cannot determine with certainty whether any particular individual was engaged in forced labor at the time the evidence was gathered in December 2019, we tried to identify where particular indicia relevant to the analysis were present, including other forms of illegal labor (primarily hazardous child labor), evidence that the person was from a different country or region, language differences, and evidence that a child was not accompanied by members of the child's immediate family.

Further, as described above, the extremely sensitive nature of this sector made it difficult to get access to farms and to have people speak freely. The investigators explained to us that it seemed like a system set up for hiding. People would stop working and children would walk away when a stranger such as the investigators approached. Many people who did speak sounded like they had prepared answers.

The investigators went to four different regions of the country and spoke with farmers and farmworkers, both adult and children, as well as cooperative managers and others living and working in the areas they visited. They documented children engaged in hazardous activities, some of whom had dropped out of school, and one youth who had been sent over from Mali to work with his uncle on a cocoa farm. Children as young as five were carrying or using machetes, children as young as ten were carrying extremely heavy loads of cocoa beans, and teenagers were selling agricultural chemicals. Many were hesitant to talk to the investigators, especially to share their ages, and near one farm, the investigators saw "[t]wo underage girls visibly emerging from the cocoa plantation, holding machetes. When they saw that they were being filmed, they fled."[64]

The investigators interviewed two teenagers who had been lured from the north of CDI and had made it part way to a cocoa farm further south before their families intervened and brought them back home. The teenagers described how they met their initial contact at night, and talked about the network of point people and various stops between the border town and Issia, where they would depart from to go to an undisclosed farm. They made it as far as Bouaké, a common transit town for migrant workers, when a family member brought them back to their town. They explained that by then, another group of youth, younger than them, had departed.

The investigators spoke with cooperatives, and saw posters stating that child labor is not allowed close to farms where they saw child labor happening. One cooperative manager openly admitted that the farms used child labor. This manager told the investigators that after children pile up the cocoa and break the pods up to put them in the sun, the cocoa is sent to "big industrial groups." He explained that after the children brought the cocoa pods to the camp, they dry the pods on tarps and racks. Then the coops give the cocoa to "the financiers," including Cargill. In response to a question from the investigator as to whether the coop has to meet quotas set by companies and therefore "take[s] children to supplement those who have to make the 2400 tonnes," the manager responded "yes."

---

[64] Source on file with CAL.

**B. Evidence of Forced and Trafficked Child Labor Gathered by IRAdvocates' Research from 2017–19**

IRAdvocates renewed its evidence-gathering on forced and trafficked child labor in CDI cocoa harvesting and production in 2017 in order to assess whether the companies had finally made significant improvements in their supply chains and had made measurable progress on phasing child labor out of their cocoa production. Unfortunately, the situation remains unchanged and child labor remains a major problem in CDI cocoa production. IRAdvocates is now finalizing a new legal complaint based on this newly-gathered evidence and will soon be filing a federal complaint against Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, Mondelēz, and perhaps others, under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 *et. seq*.

In 2018, the IRAdvocates team, including the undersigned Executive Director Terry Collingsworth, visited cocoa farms around CDI. In Duekoue, they observed and interviewed a group of about 7 male child workers harvesting cocoa. The following are photos taken by Terry Collingsworth or a member of the team:[65]





The two children in the photos above were both about 14 years old. They were using machetes to clear brush around the cocoa trees and to cut cocoa pods from the trees and then open the pods and clean the cocoa beans. Both children said they were brought by a "man" from Burkina Faso, where they were from. They did not know the man's name, but they were promised jobs working on a cocoa farm. When IRAdvocates met them, they both had been working on the farm for over a year and were on their second season. They had not yet been paid anything and were working for food. They slept in a lean-to made of sticks and covered with a tarp. The boy in the photo immediately above in the white shirt expressed that he was very hungry and asked for food. He was visibly afraid of the adult male who was the overseer of the farm.

The first 60 seconds of this video https://vimeo.com/388589094 shows these same children and other children on this farm performing hazardous work. The video was filmed by Miki Mistrati's

[65] The children in these photographs were observed by IRAdvocates working on farms that were easily accessible to the public. None of these children are participants in any legal action brought by IRAdvocates.

film crew as part of a new documentary they are making focused on Nestle and Cargill's ongoing use of child labor while these companies deny their responsibility for injuries to forced child laborers in the *Doe v. Nestle* case.



The adult male on the right in the photo (left) was the overseer of the farm. He informed the IRAdvocates team that the cocoa from that farm was sent to a processing and sorting center just down the road.

IRAdvocates went to the processing center and photographed the Cargill bags that were being filled with cocoa beans (below):




In March 2019, IRAdvocates returned to CDI and again visited several farms. In Daloa, IRAdvocates visited a farm that had about 8 boys working with machetes cutting down cocoa pods, opening the pods, and cleaning the beans. The following photos were taken by IRAdvocates' Executive Director Terry Collingsworth or a member of the team:







The children in these photos were vague about their ages but were clearly quite young. IRAdvocates estimates they were no more than 14 or 15 years old. The children were also from Burkina Faso. The young boy with the grey shirt in the first two photos first said that his father brought him to the CDI cocoa farm, but he said his father was back in Burkina Faso. He appeared to be visibly afraid when IRAdvocates questioned him about how he came to the farm and appeared to be an example of a child being told by those who trafficked him not to provide details about his situation. The final 52 seconds of this video shows these same children performing hazardous work:

https://vimeo.com/388589094

The video was filmed by Miki Mistrati's film crew as part of a new documentary they are making focused on Nestle and Cargill's ongoing use of child labor while continuing to deny their responsibility for injuries to forced child laborers in the *Doe v. Nestle* case.

IRAdvocates left this farm and very close by was a large Cargill cooperative (below left):







The certification rules of Rainforest Alliance were posted on the wall of the processing center (above right).

IRAdvocates observed that cocoa beans were being brought in and dumped on the floor and mixed with other beans. The owner/manager of the cooperative admitted that the "certified" beans were mixed with non-certified beans as a routine matter. This is consistent with the results of the *Washington Post*'s investigation of the so-called certification schemes.[66]

[66] Whoriskey, *supra* note 50.

During both the 2018 and 2019 IRAdvocates research trips, the team also visited Mali, where many of the children working on CDI cocoa farms are trafficked from. IRAdvocates met with and interviewed numerous former child laborers who were trafficked from Mali to work in CDI on cocoa farms. IRAdvocates selected eight former trafficked child laborers to serve as Plaintiffs in the TVPRA case IRAdvocates will soon file against Nestle, Cargill, Mars, Hershey, Barry Callebaut, Mondelēz, and Olam. The following paragraphs which will be part of the forthcoming TVPRA case provide the facts of how these eight children were trafficked from Mali and what conditions they faced in CDI working on cocoa farms:[67]

### C. Factual Allegations of Eight Plaintiffs From IRAdvocates' Forthcoming TVPRA Case

1. John Doe 20 is from Djoumatene in the Department of Kadilio, Mali. He thinks he was born late in 1996. In 2012, when he was 15 years old, he was working in a field near his home in Mali when a man approached and offered him a job. The man promised a good paying job in Côte d'Ivoire and offered to pay his transport there. They went together to the bus terminal in Sakasso. The man bought his ticket and also boarded the bus. They arrived in Daloa, Côte d'Ivoire, a major cocoa production area where all Defendants obtain cocoa. There they were met by another man who bought him a bus ticket to another village. He did not know exactly where. The second man went with him. From there they went to a plantation and he met the man who apparently owned or managed the plantation. He came to know the man's name was Lassina Coubaly. He also came to know that the plantation was called the Guezouba plantation. This was a small plantation of 8 hectares. He was the only worker there.

2. John Doe 20 was told that he would be fed and would be paid his wages at the end of the season when the cocoa was harvested. He worked long days, from around 6 am until 4 or 5 pm. He cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He also applied pesticides and herbicides without any safety instruction or protective gear. He slept on the plantation under a ragged tarp. He was exposed to insects and snakes. At the end of the year he was not paid. He asked for money to leave and Lassina told him he had to stay and keep working. He had absolutely no money and did not know where he was. He kept working so that he could eat and not starve to death. He worked under these conditions for 5 years. At the end of the 5th season, in 2017, he was desperate and could not continue doing the difficult and hazardous work only to barely be fed enough to keep him alive. He confronted Lassina and said that he wanted to be paid all of the wages he was due and that he was going to leave. Lassina said he had no money, but finally gave him 20,000 CFA (about $33.00) for transport, and he left. It took some time to get back to Mali because 20,000 CFA was not enough money to even cover transport home. He did some odd jobs in Pogo, the border town in Côte d'Ivoire, to earn enough money to get a bus back to Mali. He arrived home in early March 2017.

[67] These are the actual paragraphs from the TVPRA complaint. The eight Plaintiffs are identified with pseudonyms for security reasons. With proper precautions, IRAdvocates can arrange for these individuals to be interviewed.

3. John Doe 21 is also from Djoumatene in the Department of Kadilio, Mali. He thinks he was 16 when, completely destitute, he was in Komogho, Mali looking for work. There, when he was wandering around, a man named Seydou told him he had a brother in Côte d'Ivoire who could give him a good job on a cocoa plantation. John Doe 21 accepted the offer and Seydou bought him a bus ticket to Abidjan, and then on to Aboisso, Côte d'Ivoire. When he got there, Madou Kone, Seydou's brother, met him and took him in the night to a plantation John Doe 21 later found out was called Karou. Madou said he had to work to pay off bus fare. Sidiki worked for a year, to the end of the season, and asked to be paid. Madou said he had to keep working and that he would pay him 12,500 CFA (about $21.00) per month going forward but would only pay at the end of the season when the cocoa was sold. He worked with 6 other children, and though he could not speak with them because they spoke some other dialect (Senoufo), he learned they were not being paid either.

4. John Doe 21cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He also applied pesticides and herbicides without any safety instruction or protective gear. At the end of the next year, Madou told him the same thing again. He worked one more season and was still not paid for almost 3 years of work. He complained and Madou beat him. Shortly thereafter, Madou gave him CFA 20,500 ($34.00) and told him how to get a bus to Abidjan. He could not leave the plantation before he finally got a small amount of money from Madou because he did not have a single CFA in his pocket and did not even know where he was. He had no identification and no idea how to get help. When he got there, he did not have enough money to get a ticket home, so he found a job at a construction site for CFA 1,500 ($2.50) per day. He worked about 15 days and then had enough to get his ticket home to Mali.

5. John Doe 22 is from Kouroussandougou, Mali. He was 11 years old and was approached near the bus station by a man named Brahima who promised him a job in Côte d'Ivoire. He went with Brahima, who bought him a bus ticket to the Mali/Côte d'Ivoire border town of Zegoa in Mali. There were 4 or 5 other children with him when he got on the bus. In Zegoa, they got off the bus and Brahima arranged for small motor bikes to take them across the border beyond the check point as they did not have identification papers. They crossed the border and went to Pogo, the Côte d'Ivoire border town. From there, they all went on a bus to Sinfra. There, Brahima handed him over to Madou Kone, who took him to a house to sleep. Then Madou's brother came and took him to a plantation called Yofla near Sinfra, which is a major cocoa-producing region in Côte d'Ivoire. He went alone, but 2 other small children came within a few days. He was promised CFA 25,000 per month and Friday (religious holiday) off, but he was then forced to work every day and was not paid.

6. John Doe 22 cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He also applied pesticides and herbicides without any safety instruction or protective gear. He worked for a year this way and was told he would be paid after the next year. He was given breakfast in the morning and then worked all day without food. He was once bitten by a snake and got sick because they did not give him medical care. He could not leave on his own because he had no money, did not speak the language where he was working, and had no idea where he was. After 2 years, Madou took him to the bus station in Sinfra and bought him a bus ticket back to Mali. He gave him some extra money for food, but the guards at the border took it when he did not have any identification.

7. John Roe 1 was 14 years old in early 2009 when he was approached near Sikasso, Mali, by Omar Traore who told him he could get him work on a cocoa plantation in Côte d'Ivoire. Omar then introduced him to a lorry driver in Sikasso, Mali, and the driver took him to Divo, Côte d'Ivoire. When they got to Divo after a 12-plus hour drive, he met the owner of the plantation, Madou Kone. Divo is a major cocoa-producing area from which all Defendants obtain cocoa. He was taken by motorbike to the plantation. The owner promised him 90,000 CFA (about $180) at the end of the harvest season. The owner showed him around and left him with the other workers, 3 kids and 1 older man, all from Mali. The owner lived in Divo and did not work the plantation himself. The 3 kids were from a different area of Mali and he could not understand their dialect. The older man was in charge and did not want him to speak with the other kids and kept everyone working separately. The kids were all afraid of him.

8. John Roe 1 slept in a small, open hut on the plantation. He ate bananas, pineapple, and cassava roots. He was always hungry. He did everything on the plantation. He cleared brush, cut down and opened cocoa pods, and applied pesticides. He has visible scars from cuts on his hands and arms from machete accidents. He was always bitten by bugs. The owner came once a week or so to check on things. At the end of the year, the owner was visiting and John Roe 1 asked for the 90,000 CFA he was promised. The owner said he did not have the money to pay anyone but would pay once he had it. John Roe 1 wanted to leave, but he had not one CFA in his pocket. He did not know where he was, but knew he was a very long distance from Mali, and there was no one he could ask for help. He was very afraid but saw no option other than continuing to work for food and hope he would get paid. He worked another year through the next harvest and was again told by the owner there was no money to pay the workers. The owner said he would get all his money soon. John Roe 1 worked another 3-4 months to avoid starvation, and then met Baba Bambara Dioula on the plantation, who was originally from Burkina Faso and owned a neighboring plantation. John Roe 1 told Baba his story and he took him to the lorry park and introduced him to a driver who was heading to Mali and the driver took him for no charge. He returned to Mali at the end of 2011.

9. Plaintiffs John Roe 2 and John Roe 3 were trafficked together from Mali to the cocoa plantations of Côte d'Ivoire. They were friends from childhood. John Roe 2 was born in 1998. John Roe 3 does not know his birthdate, but he does know he is one year younger than John Roe 2, so he was likely born in 1999. In 2013, when John Roe 2 was 14 and John Roe 3 was 13 they were approached by a labor broker known as Nou, who told them he could send them both to Cote D'Ivoire to get good jobs on a cocoa plantation. They said they had no money. Nou said that he would pay for everything and the plantation owner would pay him back out of their first pay. Nou then took them to a bus and he clearly knew the driver. He explained to the driver what was going on and paid the driver something. This first bus took them all the way to Yamoussoukro, which is the ancient capital of Cote D'Ivoire and about 150 km North of Abidjan. The trip took at least 12 hours. The bus driver fed them and also paid off the border guard at the Côte d'Ivoire/Mali border crossing. There, the bus driver took them over to a different bus and spoke to the driver. They got on the new bus and first stopped in San Pedro and then went on the Grabo, which is in the far Southwest of Côte d'Ivoire just a few miles from the border with Liberia. This area is known to the "wild west" of the cocoa production areas and there are lots of unregulated, free zone plantations in that area. All the Defendants purchase free zone cocoa for 70-80% of their cocoa, and much of it comes from this area.

10. The owner of the plantation they were destined for, Salif Djamoutene, met John Roes 2 and 3 in Grabo. Salif was on a bicycle and he rode beside them as they walked about 6-7 hours to the small village of Souroudouga. They were not given any food and they were able to drink water

out of a river. The planation was just outside of the village. It was a big one, maybe 12 hectares. Salif explained the entire process of harvesting cocoa and caring for the trees. He offered them 100,000 CFA each (about $200) to work for the year until the harvest, when they would be paid. He did say that he would pay for Nou and all the travel expenses out of the first pay, but did not say how much that would be. Salif came about once a week to check on them, and they were they only two workers. He yelled at them a lot and said they needed to do better if they wanted to be fed. He brought their food when he visited and they ate mainly yams, bananas, and cassava. They did everything on the plantation, including clearing brush, applying pesticides and fertilizer (without any protective gear), cutting down the pods, opening them, collecting the beans and drying them. Both have visible scars from machete accidents.

11. At the end of the season, John Roes 2 and 3 asked to be paid. They worked for about 7 months. They told Salif they wanted to be paid what they were owed and they wanted to go home. They were afraid of staying because the owner of a neighboring plantation had been killed due to a land conflict in the area and they wanted to get out of the area. Salif told them he had no money to pay them and that they owed a lot to Nou. They left Salif and decided to try to get home. They walked from the plantation back to Grabo. They remembered the way because they had walked it to get to the plantation. At the bus station they met a driver who agreed to take them to San Pedro. There they got another driver to take them to Abidjan because one of them had a relative there. In Abidjan, the relative who was from Mali took them to the bus station and introduced them to a driver also from Mali who was going to Sikasso. The bus driver took them and gave them food and paid to get them through the checkpoint at the Mali border.

12. Plaintiff John Roe 5 is still suffering from physical and mental trauma to this day attributable to his four years of working on a cocoa plantation in Côte d'Ivoire. He has never been to school. He was born in 1998. He went to work in 2012, when he was 14. He is from the village of Nionodjassa, Mali. A man came to his village and told John Roe 5 that he could get him a good job in Côte d'Ivoire. The man took John Roe 5 on a motorbike to the bus station in Sikasso. The guy paid for the bus and seemed to know the driver. The guy told John Roe 5 the costs would be taken out of his first pay. Like John Roes 2 and 3, he took the bus route to Grabo. When he got there, he met Sidibe the plantation owner who the guy who sent him arranged. They walked about two hours from the bus station to the plantation. Sidibe showed him how to do the work. He did everything on the plantation from clearing brush, trimming trees, harvesting and opening pods, and applying pesticides. He remembered a brand of pesticide called "72" that he used. He was not given any protective gear. He cut himself many times. Sidibe came once a week and brought food and gave him direction for the week. He worked alone. At the end of the first year Sidibe said he did not have any money but would eventually pay him.

13. John Roe 5 continued this arrangement for four years. He had no idea where he was or where he could go. He did not have any money and no identification. After 4 years, he got very sick and lost consciousness. He attributes this to exhaustion and hunger. He woke up in a local hospital. He thinks Sidibe brought him there. Somehow, he does not know, a relative Drissa Ballo was summoned to get him. Drissa took him by bus back to Mali and to a hospital there where he spent 1 night. The doctor said he was suffering from traumatic stress. He recalls that during the worst part of the trauma he endured while working on the plantation for 4 years without pay, he dreamed of getting a bicycle and a radio when he finally got paid.

14. Plaintiff John Roe 6 is a very observant Muslim and knows only the Koranic calendar. He went to work in 2006 when he was 13 and worked for 5 years. A man named Soumaila Kone

came to his village, Domogodjassa, and promised him 125,000 CFA ($250) per year to work on a cocoa plantation in Côte d'Ivoire. Soumaila was originally from Burkina Faso. He said he did not know the man but really needed to earn money so he went to the bus station in Sikasso with him. Soumaila spoke to and paid the bus driver. JR 6 was taken by bus to Divo, Côte d'Ivoire, a major cocoa producing area that all Defendants obtain cocoa from. Divo is at least 12 hours by bus from Sikasso. At Divo John Roe 6 was met by the owner of the plantation, Sekou Traore. From the bus station they went by a cocoa truck to the plantation near the village of Niama. It was about 10-11 hectares. Sekou showed him how to do the work. He did all tasks on the plantation and has terrible scars on his arms from the machete. There was one other Malian boy there and another boy from Burkina Faso. The owner separated John Roe 6 from the Malian boy so they could not talk. They worked in different parts of the plantation.

15. John Roe 6 fell victim of the same basic scheme as the other Plaintiffs – each year the owner said he had no money, but told John Roe 6 to keep working if he wanted to be fed, and he would eventually be paid. John Roe 6 had no money, did not know how to get home or even where he was as it was long drive from Mali. After five years, he got angry and demanded that he be paid so he could leave. The owner did pay him 125,000 CFA, so he finally had enough money to get home. He walked to the bus station and went back to Mali.

IRAdvocates has detailed notes from these and other interviews that are now protected by the Attorney-Client and work product privileges, but would be happy to provide additional information as requested.

### D. 2019 Report and Video by Investigative Journalist Group Cenozo

In January 2019, Abou Traoré from the investigative journalist group Cenozo published a report on Cenozo's website, after going undercover on a bus traveling from Burkina Faso to CDI to document the trafficking of children for work in the cocoa sector.[68] In February 2019, Cenozo uploaded a video discussing that investigation.[69]

### E. Two Documentary Films By Miki Mistrati

Filmmaker Miki Mistrati has produced two comprehensive documentary films documenting the horrors of forced child labor in cocoa production in CDI:

**The Dark Side of Chocolate**

https://www.youtube.com/watch?v=7Vfbv6hNeng

**Shady Chocolate**

[68] Abou Traoré, *Travail des enfants dans les plantations de cacao: Le traffic a la peau dure*, CENOZO, https://cenozo.org/en/articles/120-travail-des-enfants-dans-les-plantations-de-cacao-le-trafic-a-la-peau-dure.
[69] Cenozo, *Travail des enfants dans les plantations de cacao: Le trafic a la peau dure*, https://www.facebook.com/cenozo/videos/308465473203064/?q=abou%20traore%20cenozo&epa=SEARCH_BOX.

https://www.youtube.com/watch?v=Z5C7jmrycf0

### F. U.S. Department of Labor Reports

Since 2001, the U.S. Department of Labor (DOL) has published annual reports on countries in which children are subjected to the "Worst Forms of Child Labor." The 2001 Report specifically found that "children are sometimes forced to work for owners of commercial farms harvesting cocoa . . ."[70] Every year since 2001, the DOL has found there is forced child labor, including trafficked children, and children performing the Worst Forms of Child Labor, in harvesting cocoa in CDI. The latest report, which covers 2018, also found forced child labor, trafficked child labor, and children performing the Worst Forms of Child Labor in cocoa production, among other areas.[71] Not only are the DOL Reports highly credible, they should be conclusive. Petitioners urge that CBP should issue WROs in all cases in which DOL reports ongoing forced or trafficked child labor in the production of any specific product, like cocoa, coming from a specific country, like CDI.

## V. A Detailed Description or Sample of the Merchandise Subject to the Petition.

CDI remains the undisputed world leader in cocoa production and produces almost 40% of world production.[72] As detailed above, child labor, including forced or trafficked child labor, remains pervasive in CDI cocoa production. Much of this cocoa "is being, or is likely to be, imported," by the U.S. Cocoa Importers. 19 C.F.R. § 12.42 (e).

The Cocoa Importers have had nearly two decades to make good on their promise that their cocoa from CDI imported to the U.S. would be certified as child labor free. Their cocoa continues to be imported into the U.S. without impediment even though they admit that this cocoa was likely harvested with forced or trafficked child labor. Petitioners' evidence conclusively reinforces the companies admissions. There is no question that the evidence provided herein and the extensive public record "**reasonably but not conclusively** indicates that" cocoa harvested and processed by the cocoa importers in CDI[73] "is being, or is likely to be, imported"[74] to the U.S market and was made "wholly or in part"[75] with forced or trafficked child labor.

---

[70] DEPARTMENT OF LABOR, COTE D'IVOIRE: GOVERNMENT POLICIES AND PROGRAMS TO ELIMINATE THE WORST FORMS OF CHILD LABOR, at 104, https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2001/cotedivoire.pdf.

[71] CHILD LABOR AND FORCED LABOR REPORTS, *supra* note 28.

[72] *See, e.g.*, Esri, *Cocoa Industry in the Cote d'Ivoire*, https://www.arcgis.com/apps/Cascade/index.html?appid=dd19d4b6444e492da5b069d62d2c3ecb.

[73] There are certainly other companies that import CDI cocoa to the U.S. and a total ban on CDI cocoa would be warranted. However, Petitioners choose to focus on the large companies that import massive amounts of CDI cocoa to the U.S. and have been leaders in the industry campaign of nearly 20 years that has continued to make false assurances to consumers and government regulators regarding their ineffective programs to end child labor in their supply chains. Petitioners believe that if these large companies are, at long last, required to end their use of child labor, this critical mass of companies in compliance will force industry-wide compliance.

[74] 19 C.F.R. § 19.42 (e)(emphasis added).

[75] 19 U.S.C. § 1307.

These actors have demonstrated that they do not have the will to make the necessary changes of their own free will. They do, however, have the resources to implement significant changes within 180 days if they are required to do so.

## VI. Conclusion

Based on the ongoing investigation and the information provided herein, pursuant to C.F.R. § 12.42 (g), CBP should require the Cocoa Importers, within 180 days, to establish their cocoa imports from CDI were "Not ... Manufactured in any Part" with Forced or Trafficked Child Labor." Petitioners request that their suggested WRO provided, at pages 2–3 above, be entered immediately.

Respectfully submitted,

INTERNATIONAL RIGHTS ADVOCATES
By Terrence P. Collingsworth
Executive Director
621 Maryland Ave NE
Washington, DC 20002
202-543-5811
tc@iradvocates.org

CORPORATE ACCOUNTABILITY LAB
By Charity Ryerson
Co-Founder and Legal Director
6214 N. Glenwood Ave
Chicago, IL 60660
773-346-5545
charity.ryerson@corpaccountabilitylab.org

CIVIL RIGHTS LITIGATION CLINIC
UC Irvine School of Law
By Paul Hoffman
Director
400 East Peltason, Suite 1000
Irvine, California 92697-8000
310-717-7373

international rights advocates

Corporate Accountability Lab

**VIA CBP PORTAL**

February 14, 2022

Mr. Chris Magnus
Commissioner
U.S. Custom and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

Re: **Request that you enforce the law to stop forced child labor in cocoa harvesting**

Dear Commissioner Magnus,

Congratulations on your appointment and best wishes in addressing the many challenges you face.

We, the undersigned, are writing to ask you to take long overdue action to address an urgent problem of ongoing forced child labor in cocoa harvesting in Côte d'Ivoire. Two years ago, on February 14, 2020, International Rights Advocates and Corporate Accountability Lab filed a petition under Section 307 of the Tariff Act of 1930 ("the Petition") asking that U.S. Custom and Border Protection (CBP) take action, as provided for in its legislation, to ban the importation of cocoa by nine specific companies[1] with clear records of harvesting cocoa with forced child labor in Côte d'Ivoire . The Petition referenced official, undisputed reports confirming massive numbers of child laborers in cocoa harvesting and supplemental evidence that many of these children are trafficked and forced to work on cocoa plantations. This past summer, on June 25, 2021, the Petitioners submitted a supplemental petition to CBP providing further evidence of trafficking and forced child labor in the Ivorian cocoa industry. This petition looked not just at specific instances of forced labor, but also documented new information about the manner in which child trafficking occurs, including through which border crossings, and identified specific actors involved in the trade. In our view, the inaction on the Petition is allowing horrific forced child labor to continue in cocoa harvesting and sharply conflicts with stated U.S. government policy.

We draw to your attention the following undisputable facts:

- Clear evidence has been submitted to CBP documenting widespread, ongoing use of forced and trafficked child labor in harvesting and processing cocoa in Côte d'Ivoire.
- The U.S. Department of Labor and U.S. State Department have both clearly documented the trafficking of children and forced child labor in the Côte d'Ivoire cocoa sector.
- The Child Labor Cocoa Coordinating Group's Annual Report provides ample evidence of forced child labor in the cocoa industry.
- Reports from the Fair Labor Association, civil society groups, academics, as well as news reports, have documented evidence of forced child labor in the cocoa industry for years.
- The Department of Labor has since 2008 published an annual list of products made with forced and child labor. Cocoa from Côte d'Ivoire has been on the list every year.

---

[1] Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, Mondelēz, World's Finest Chocolate, Inc., and Blommer Chocolate Co.

- ILO Convention 182 regarding the Worst Forms of Child Labor, ratified by the U.S. in 1999, prohibits forced child labor. Young children are incapable of consenting to carry out hazardous labor. Child labor that requires children to work at the expense of their health, schooling, or well-being must be considered forced. The documented conditions of the children working in the cocoa industry in Côte d'Ivoire are well within the ILO's indicators of "forced labor." Child workers are inherently vulnerable and carry out hazardous work, including using machetes, carrying heavy loads, and spraying pesticides.
- In 2020, the U.S. Department of Labor released a study it commissioned by the University of Chicago's NORC Institute finding that there are ***1.56 million*** children harvesting cocoa in Côte d'Ivoire and Ghana, and 95% of these children, ***1.48 million***, are performing hazardous work that violates ILO Convention 182's definition of the Worst Forms of Child Labor and should also meet the ILO's indicators of forced labor.

Thus, the U.S. government has officially established and condemns that forced child labor is involved in harvesting cocoa in Côte d'Ivoire .

For over 20 years the chocolate industry has exerted its power and influence to prevent the U.S. government from taking action to end the industry's use of child labor. In 2001, to defeat a pending U.S. law to regulate the companies' supply chains, the chocolate industry signed the Harkin-Engel Protocol, a "voluntary" initiative that gave the participating companies until 2005 to "phase out" their use of child labor. Two decades later, the chocolate industry has failed to take the necessary action to achieve their "voluntary" target and has given itself endless, self-serving, unilateral extensions of time. The industry now claims that by 2025 it will merely "reduce by 70%" their reliance on child labor.

The chocolate industry's "voluntary" plan and public relations statements that it will end its use of child labor have zero credibility. The industry puts out contradictory messages, admitting on the one hand its use of child labor and pledging to end it. On the other hand, it argues in a pending federal case that it has no more responsibility for ending forced child labor in cocoa harvesting than a kid buying a candy bar at a store, the claims of eight former child slave laborers against the chocolate companies should be dismissed, and the chocolate companies granted impunity.[2]

Under CBP regulations, 19 C.F.R. § 12.42, if a Petition establishes that there is "**reason to believe**" cocoa from Côte d'Ivoire was produced by forced child labor, this allows CBP to "**reasonably but not conclusively"** find that cocoa from Côte d'Ivoire is produced by forced child labor and issue a Withhold and Release Order (WRO) stopping the importation of cocoa by the named companies from Côte d'Ivoire. This threshold has been clearly established by the Petition. The issuance of a WRO would require any of the named importing companies to establish "by satisfactory evidence that [its] merchandise was not ... manufactured ***in any part*** with" forced child labor.

The chocolate companies would then at long last be required to demonstrate whether they are profiting from forced child labor and to take real action to end it. Many of the responsible

---

[2] *See* Defendants' Joint Motion to Dismiss, ECF No. 27-1 at p. 11, *Issouf Coubaly, et. al.v. Cargill Inc., et. al.*, Civil Action No. 21-0386 (D.DC 2021), available at https://www.internationalrightsadvocates.org/cases/tevracoubaly.

companies loudly proclaim there is no forced child labor in their cocoa supply chains. If they can't, after 20 years of promising, prove this essential fact, they should not be extended the privilege of access to the U.S. market. The Petition suggested a flexible approach as to the timing of the requested WRO, and we are confident that giving the companies notice that a WRO is coming on a specific date will be the push needed to shift the cocoa industry from vague and empty promises to concrete action that it promised in signing the Harkin-Engel Protocol more than 20 years ago.

However, CBP has for the past two years taken no enforcement action based on the strong evidence presented in the Petition. It has taken no action to enforce the clear prohibition in the legislation on importing cocoa harvested by forced child labor. It has taken no action to implement the clear, strong policy of the U.S. government to prevent this continuing abuse of children. If CBP continues to decline to take action, this would send a message that the U.S. Government is turning a blind eye to the known use of forced child labor by powerful chocolate companies.

We recognize that the chocolate industry has enormous economic and political power and that the children being exploited and trafficked as child laborers do not. However, the law and policy of the United States is to protect children forced to work, and this should be especially true when they are being exploited by large multinationals that made a written promise over 20 years ago to stop this horrific practice. We are merely asking for the very relief that the chocolate industry itself promised to deliver over 20 years ago.

We call on you to put the lives of millions of children in West Africa ahead of the business interests of the chocolate industry. We call on you to enforce the law you are sworn to uphold to free these children from forced labor. We call on you to demonstrate that the U.S. Government's policy that it will not tolerate forced child labor is genuine and serious.

We await your response with strong hope. Please direct your response to the Petitioners, Terrence Collingsworth (tc@iradvocates.org) and Charity Ryerson (charity@corpaccountabilitylab.org).

**SIGNED**:

**CO-PETITIONERS**

Terrence P. Collingsworth, Founder and Executive Director, International Rights Advocates

Charity Ryerson, Founder and Executive Director, Corporate Accountability Lab

Paul L. Hoffman, Co-Director, UC Irvine Civil Rights Litigation Clinic

**ORGANIZATIONS**

Cathy Feingold, International Director, AFL-CIO

Sharan Burrow, General Secretary, International Trade Union Confederation (ITUC)

Willie Adams, President, International Longshore Warehouse Union

Ed Ferris, Secretary Treasurer, International Longshore Warehouse Union

Bobby Olvera Jr., Vice President – Mainland, International Longshore Warehouse Union

Reid Maki, Coordinator, Child Labor Coalition

Sally Greenberg, Executive Director, National Consumers League

Duncan Jepson, Managing Director, Liberty Shared

Dana Geffner, Executive Director, Fair World Project

Nina Smith, Executive Director, Goodweave

Ayn Riggs, Executive Director, Slavefreechocolate

Martina Vandenberg, Founder and President, Human Trafficking Legal Center

Patti Lynn, Executive Director, Corporate Accountability, USA

Georges C. Benjamin, MD, Executive Director, American Public Health Association, USA

Shahieda Adams, Director, Centre for Environmental and Occupational Health Research, Faculty of Health Sciences, University of Cape Town, South Africa

Devra Davis, President, Environmental Health Trust, USA and Fellow, Collegium Ramazzini

Lauren Ornelas, President, Food Empowerment Project

Prof. John Packer, Director, Human Rights Research and Education Centre, University of Ottawa, ON, Canada.

Diana Bohn, Co-coordinator, Nicaragua Center for Community Action

Perry Gottesfeld, Executive Director, Occupational Knowledge International

Peggy Mason, President, Rideau Institute on International Affairs, Ottawa, Canada.

Grahame Russell, Director, Rights Action. USA & Canada.

Tientcheu Kameni Maurice, Terre et Développement, France.

Gopal Krishna, LL.M., PhD, Director, ToxicsWatch Alliance, New Delhi, India.

Ayda Zugay, Principal and Co-Founder, Advancing Agency

Len Morris, Executive Director, Media Voices for Children

Dorianne Beyer, Esq., General Counsel, National Child Labor Committee

Andrew Dudley, President & CEO, Earth PBC

Fernando Morales-de la Cruz, Executive Director, Cacao for Change

Elana Berger, Executive Director, Bank Information Center

Ellen J. Kennedy, Ph.D., Executive Director, World Without Genocide at Mitchell Hamline School of Law

Catherine Sweetser, Director, UCLA Human Rights Litigation Clinic

Kate Mackintosh, Executive Director, Promise Institute for Human Rights at UCLA School of Law

Bahati Nepa, President and CEO, Africa Beyond Wars

Dr. Ruth Rosenbaum, CREA: Center for Reflection, Education and Action

Arnold Matlin, M.D., Founding Member, Genesee Valley Citizens for Peace, and in his individual capacity.

**SUSTAINABLE CHOCOLATE COMPANIES**

Shawn Askinosie, Founder/CEO, Askinosie Chocolate

Dahlia Graham, Co-Founder / CEO, Fruition Chocolate Works

Danny Sundell, Co-Owner, Dark Forest Chocolate

Ben Rasmussen, Owner, Chocolate Maker, Potomac Chocolate

Ariel Wolansky, Owner, Choquiero Chocolate

Paul Picton, President, Maverick Chocolate Co.

Aaron Cotler, Chief Operations Officer, Fine & Raw Chocolate

Kazemaru Yukawa, Owner, Aloha Feels

Shelley Wallace, President, Truffle Pig Chocolate

Mara Tcheunou, Co-founder, Bibamba Artisan Chocolate

Malena Lopez-Maggi, Owner, The Xocolate Bar

Jonas Ketterle, President, Ora Cacao

Chris McKellar, Owner, Love's Ice Cream & Chocolate

Barbara Wilson, Owner, Mindo Chocolate

Elaine Read, Owner, Xocolatl Small Batch Chocolate.

Art Pollard, President, Amano Artisan Chocolate

**INDIVIDUALS**
**NOTE: Institutions named for identification purposes only**

Kathleen Ruff, Partner, International Rights Advocates, Honorary Fellow, Collegium Ramazzini, Recipient, Medal of the Quebec National Assembly, Former Director, British Columbia Human Rights Commission, BC, Canada

David Michaels, PhD, MPH, Professor, Department of Environmental and Occupational Health, Milken Institute School of Public Health, The George Washington University, Washington, DC; former Assistant Secretary, US Occupational Safety and Health Administration (2009 – 2017), USA

Dr Peter F. Infante, D.D.S., Dr.P.H., Department of Environmental and Occupational Health, School of Public Health and Health Services, George Washington University, Washington; Former Director of Standards Review, U.S. Occupational Safety and Health Administration

Prof. Mohamed F. Jeebhay, MBChB, DOH MPhil (Epi), MPH (Occ Med), PhD FCPHM (Occ Med), Head of Occupational Medicine Division, School of Public Health and Family Medicine, Faculty of Health Sciences, University of Cape Town, South Africa

Penelope Simons, PhD (Cantab.), Associate Professor, Gordon F. Henderson Chair in Human Rights, Vice Dean Research, University of Ottawa, Faculty of Law, Ottawa, ON, Canada

Linda S. Birnbaum, Ph.D., D.A.B.T., A.T.S., Scientist Emeritus and Former Director, National Institute of Environmental Health Sciences and National Toxicology Program; Scholar in Residence, Nicholas School of the Environment, Duke University, Durham, NC, USA

Sheldon W. Samuels , Director of Health Safety and Environment [Retired]
Industrial Union Department, AFL-CIO, USA

Carl F. Cranor, Distinguished Professor of Philosophy, Faculty Member, Environmental Toxicology, University of California, Riverside, CA, USA

Prof. Laetitia Rispel, South African Research Chair on the Health Workforce; Professor of Public Health, University of the Witwatersrand School of Public Health, Johannesburg, South Africa

Paul Landsbergis, PhD, MPH, Associate Professor, SUNY-Downstate School of Public Health, Brooklyn, NY, USA

Joseph LaDou, MD, Emeritus Clinical Professor, Division of Occupational and Environmental Medicine, University of California School of Medicine, San Francisco, CA, USA

Thomas M. Horiagon, MD MoccH, ABPM Occupational Medicine, CDC/NIOSH Epidemic Intelligence Service Veteran, Mountain West Workers' Free Clinic, Denver, Colorado, USA

William Black, Professor Emeritus, Allard School of Law, University of British Columbia; Former Director of the Human Rights Research and Education Centre, University of Ottawa, Canada

Steven Markowitz MD, DrPH, Director and Professor, Barry Commoner Center for Health & the Environment, City University of New York, USA

Amanda Hawes, Occupational Safety and Health Attorney, Safe Jobs Healthy Families Project Founder, USA

Michael Quinlan B.Ec(hons), PhD, Emeritus Professor of Industrial Relations, University of New South Wales, Sydney, Australia

Lundy Braun, Departments of Africana Studies and Pathology and Laboratory Medicine and Science and Technology Program, Brown University, Providence, RI, USA

Roberto Calisti, Director of the Unit of Occupational Epidemiology, ASUR MARCHE - Civitanova Marche, Italy

Bruce Lanphear, MPH, MD, Professor, Faculty of Health Sciences, Simon Fraser University, Burnaby, BC, Canada. Member, National Children's Study Steering Committee

Prof. Saloshni Naidoo, Head of Discipline: Public Health Medicine, College of Health Sciences, School of Nursing & Public Health, University of KwaZulu-Natal, Durban, South Africa

Dr. John Calvert, Adjunct Professor, Faculty of Health Sciences, Simon Fraser University, Burnaby, B.C., Canada

Iman Nuwayhid, MD, DrPH, Professor and former Dean, Faculty of Health Sciences, American University of Beirut, Lebanon

Prof. Andrew Watterson, PhD, CFIOSH, Public Health Researcher, University of Stirling, Scotland

Domyung Paek, MD, MSc, ScD, Professor Emeritus, Seoul National University; Senior Scientist, Wonjin Institute for Occupational and Environmental Health, Green Hospital, Seoul, Korea

Arthur L.Frank, MD,PhD, Fellow, Collegium Ramazzini, Philadelphia, Pennsylvania, USA

Barry Castleman, ScD., Environmental Consultant & Author, Maryland, USA

Professor Phil Taylor, University of Strathclyde, Glasgow

Mohamed Aqiel Dalvie, PhD, Professor, South Africa/Swiss Bilateral SARChi Chair in Global Environmental Health, Deputy Director of Centre for Environmental & Occupational Health Research (CEOHR), School of Public Health & Family Medicine, Health Sciences Faculty, University of Cape Town, South Africa

Karen B. Mulloy, DO, MSCH, Occupational Medicine Physician, Past Chair Occupational Health and Safety Section, APHA, USA

Peter Eglin, PhD, Professor Emeritus of Sociology, Wilfrid Laurier University, Canada

Kathleen Fagan, MD, MPH, FACOEM, Cleveland, OH, USA

Rosemary K. Sokas, MD, MOH, Professor of Human Science and of Family Medicine, Georgetown University School of Nursing and Health Studies, Washington DC, USA

James Brophy, Occupational and environmental health researcher; Adjunct Professor, University of Windsor, Canada

Wolf E. Mehling, MD, Professor of Clinical Family and Community Medicine, University Of California, San Francisco, CA, USA

Jordan Rinker MD, MPH, Medical Consultant, Senior Medical Director, Premise Health, Clinical Professor of Medicine, Division of Occupational & Environmental Medicine, University of California San Francisco, USA

Margaret Keith, Occupational and environmental health researcher; Adjunct Professor, University of Windsor, Canada

Prof. Dr. Antonio Granda Ibarra, Former Director, Cuban Institute of Occupational Health, Cuban School of Public Health, Cuba

Peggy Mason, Former Canadian Ambassador for Disarmament to the UN, Ottawa, ON, Canada

Dr. Jeong-ok Kong, M.D., M.P.H., Occupational and environmental medicine specialist, Workers' Health Center in East Gyeonggi, South Korea

Seth Klein, adjunct professor, Simon Fraser University Urban Studies Program, Burnaby, BC, Canada

Thomas Oatis Sandborn, journalist & life-long social justice activist, Vancouver, BC, Canada

Chocolate Manufacturers Association

**PROTOCOL FOR THE GROWING AND PROCESSING OF COCOA BEANS AND THEIR DERIVATIVE PRODUCTS IN A MANNER THAT COMPLIES WITH ILO CONVENTION 182 CONCERNING THE PROHIBITION AND IMMEDIATE ACTION FOR THE ELIMINATION OF THE WORST FORMS OF CHILD LABOR**

**Guiding Principles:**

* *OBJECTIVE* – Cocoa beans and their derivative products should be grown and processed in a manner that complies with International Labor Organization (ILO) Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor. ILO Convention 182 is attached hereto and incorporated herein by reference.

* *RESPONSIBILITY* – Achieving this objective is possible only through partnership among the major stakeholders: governments, global industry (comprised of major manufacturers of cocoa and chocolate products as well as other, major cocoa users), cocoa producers, organized labor, non-governmental organizations, and consumers. Each partner has important responsibilities. This protocol evidences industry's commitment to carry out its responsibilities through continuation and expansion of ongoing programs in cocoa-producing countries and through the other steps described in this document.

* *CREDIBLE, EFFECTIVE PROBLEM SOLVING* – In fashioning a long-term solution, the problem-solving process should involve the major stakeholders in order to maximize both the credibility and effectiveness of the problem-solving action plan that is mutually-agreed upon.

* *SUSTAINABILITY* – A multi-sectoral infrastructure, including but independent of the industry, should be created to develop the action plan expeditiously.

* *ILO EXPERTISE* – Consistent with its support for ILO Convention 182, industry recognizes the ILO's unique expertise and welcomes its involvement in addressing this serious problem. The ILO must have a "seat at the table" and an active role in assessing, monitoring, reporting on, and remedying the worst forms of child labor in the growing and processing of cocoa beans and their derivative products.

**Key Action Plan and Steps to Eliminate the Worst Forms of Child Labor:**

*(1) Public Statement of Need for and Terms of an Action Plan* – Industry has publicly acknowledged the problem of forced child labor in West Africa and will continue to commit significant resources to address it. West African nations also have acknowledged the problem and have taken steps under their own laws to stop the practice. More is needed because, while the scope of the problem is uncertain, the occurrence of the worst forms of child labor in the growing and processing of cocoa beans and their derivative products is simply unacceptable. Industry will reiterate its acknowledgment of the problem and in a highly-public way will commit itself to this protocol.

*(2) Formation of Multi-Sectoral Advisory Groups* – By October 1, 2001, an advisory group will be constituted with particular responsibility for the on-going investigation of labor practices in West Africa. By December 1, 2001, industry will constitute a broad consultative group with representatives of major stakeholders to advise in the formulation of appropriate remedies for the elimination of the worst forms of child labor in the growing and processing of cocoa beans and their derivative products.

*(3) Signed Joint Statement on Child Labor to Be Witnessed at the ILO* – By December 1, 2001, a joint statement made by the major stakeholders will recognize, as a matter of urgency, the need to end the worst forms of child labor in connection with the growing and processing of West African cocoa beans and their derivative products and the need to identify positive developmental alternatives for the children removed from the worst forms of child labor in the growing and processing of cocoa beans and their derivative products.

*(4) Memorandum of Cooperation* – By May 1, 2002, there will be a binding memorandum of cooperation among the major stakeholders that establishes a joint action program of research, information exchange, and action to enforce the internationally-recognized and mutually-agreed upon standards to eliminate the worst forms of child labor in the growing and processing of cocoa beans and their derivative products and to establish independent means of monitoring and public reporting on compliance with those standards.

*(5) Establishment of Joint Foundation* – By July 1, 2002, industry will establish a joint international foundation to oversee and sustain efforts to eliminate the worst forms of child labor in the growing and processing of cocoa beans and their derivative products. This private, not-for-profit foundation will be governed by a Board comprised of industry and other, non-governmental stakeholders. Industry will provide initial and on-going, primary financial support for the foundation. The foundation's purposes will include field projects and a clearinghouse on best practices to eliminate the worst forms of child labor.

*(6) Building Toward Credible Standards* — In conjunction with governmental agencies and other parties, industry is currently conducting baseline-investigative surveys of child labor practices in West Africa to be completed by December 31, 2001. Taking into account those surveys and in accordance with the other deadlines prescribed in this action plan, by July 1, 2005, the industry in partnership with other major stakeholders will develop and implement credible, mutually-acceptable, voluntary, industry-wide standards of public certification, consistent with applicable federal law, that cocoa beans and their derivative products have been grown and/or processed without any of the worst forms of child labor.

We, the undersigned, as of September 19, 2001 and henceforth, commit the Chocolate Manufacturers Association, the World Cocoa Foundation, and all of our members wholeheartedly to work with the other major stakeholders, to fulfill the letter and spirit of this Protocol, and to do so in accordance with the deadlines prescribed herein.

Larry Graham

Mr. Larry Graham
President
Chocolate Manufacturers Association

Bill Guyton

Mr. William Guyton
President
World Cocoa Foundation

Chocolate Manufacturers Association

WITNESSETH

We hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Senator Tom Harkin
US Senate – Iowa

Senator Herbert Kohl
US Senate – Wisconsin

Congressman Eliot Engel
US Congress – New York

Ambassador Youssoufou Bamba
Embassy of the Ivory Coast

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

CMA
OF THE UNITED STATES OF AMERICA

**Chocolate Manufacturers Association**

**WITNESSETH**

I hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Mr. Frans Roselaers, Director
International Programme on the Elimination of Child Labour (IPEC)
International Labor Organization

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

CMA OF THE UNITED STATES OF AMERICA

Chocolate Manufacturers Association

**WITNESSETH**

I hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Mr. Ron Oswald
General Secretary
International Union of Food, Agricultural, Hotel, Restaurant, Catering, Tobacco and Allied Workers' Associations (IUF)

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

OF THE UNITED STATES OF AMERICA

# Chocolate Manufacturers Association

**WITNESSETH**

I hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Mr. Kevin Bales
Executive Director
Free The Slaves

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

CMA
OF THE UNITED STATES OF AMERICA

# Chocolate Manufacturers Association

**WITNESSETH**

I hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Ms. Linda Golodner
President
National Consumers League

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

OF THE UNITED STATES OF AMERICA

Chocolate Manufacturers Association

**WITNESSETH**

I hereby witness the commitment of leaders of the cocoa and chocolate industry evidenced on September 19, 2001 and henceforth to fulfill the letter and spirit of this Protocol to eliminate the worst forms of child labor from this sector as a matter of urgency and in accordance with the terms and deadlines prescribed herein.

Darlene Adkins

Ms. Darlene Adkins
National Coordinator
The Child Labor Coalition

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

# Chocolate Manufacturers Association

**ATTACHMENT TO
PROTOCOL FOR THE GROWING AND PROCESSING OF
COCOA BEANS AND THEIR DERIVATIVE PRODUCTS
IN A MANNER THAT COMPLIES WITH ILO CONVENTION 182
CONCERNING THE PROHIBITION AND IMMEDIATE ACTION FOR THE
ELIMINATION OF THE WORST FORMS OF CHILD LABOR**

Convention concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour.
Convention: C182
Place: Geneva
Session of the Conference: 87
Date of adoption: 17 June 1999

The General Conference of the International Labour Organization:

- Having been convened at Geneva by the Governing Body of the International Labour Office, and having met in its 87th Session on 1 June 1999.
- Considering the need to adopt new instruments for the prohibition and elimination of the worst forms of child labour, as the main priority for national and international action, including international cooperation and assistance, to complement the Convention and the Recommendation concerning Minimum Age for Admission to Employment, 1973, which remain fundamental instruments on child labour.
- Considering that the effective elimination of the worst forms of child labour requires immediate and comprehensive action, taking into account the importance of free basic education and the need to remove the children concerned from all such work and to provide for their rehabilitation and social integration while addressing the needs of their families.
- Recalling the resolution concerning the elimination of child labour adopted by the International Labour Conference at its 83rd Session in 1996.
- Recognizing that child labour is to a great extent caused by poverty and that the long-term solution lies in sustained economic growth leading to social progress, in particular poverty alleviation and universal education.
- Recalling the Convention on the Rights of the Child adopted by the United Nations General Assembly on 20 November 1989.
- Recalling the ILO Declaration on Fundamental Principles and Rights at Work and its Follow-up, adopted by the International Labour Conference at its 86th Session in 1998.
- Recalling that some of the worst forms of child labour are covered by other international instruments, in particular the Forced Labour Convention, 1930, and the United Nations Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, 1956.

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

- Having decided upon the adoption of certain proposals with regard to child labour, which is the fourth item on the agenda of the session.
- Having determined that these proposals shall take the form of an international Convention adopts this seventeenth day of June of the year one thousand nine hundred and ninety-nine the following Convention, which may be cited as the Worst Forms of Child Labour Convention.

**Article 1**

Each Member which ratifies this Convention shall take immediate and effective measures to secure the prohibition and elimination of the worst forms of child labour as a matter of urgency.

**Article 2**

For the purposes of this Convention, the term *child* shall apply to all persons under the age of 18.

**Article 3**

For the purposes of this Convention, the term *the worst forms of child labour* comprises:

(a) all forms of slavery or practices similar to slavery, such as the sale and trafficking of children, debt bondage and serfdom and forced or compulsory labour, including forced or compulsory recruitment of children for use in armed conflict;

(b) the use, procuring or offering of a child for prostitution, for the production of pornography or for pornographic performances;

(c) the use, procuring or offering of a child for illicit activities, in particular for the production and trafficking of drugs as defined in the relevant international treaties;

(d) work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children.

**Article 4**

1. The types of work referred to under Article 3(d) shall be determined by national laws or regulations or by the competent authority, after consultation with the organizations of employers and workers concerned, taking into consideration relevant international standards, in particular Paragraphs 3 and 4 of the Worst Forms of Child Labour Recommendation, 1999.

2. The competent authority, after consultation with the organizations of employers and workers concerned, shall identify where the types of work so determined exist.

3. The list of the types of work determined under paragraph 1 of this Article shall be periodically examined and revised as necessary, in consultation with the organizations of employers and workers concerned.

**Article 5**

Each Member shall, after consultation with employers' and workers' organizations, establish or designate appropriate mechanisms to monitor the implementation of the provisions giving effect to this Convention.

**Article 6**

1. Each Member shall design and implement programmes of action to eliminate as a priority the worst forms of child labour.

2. Such programmes of action shall be designed and implemented in consultation with relevant government institutions and employers' and workers' organizations, taking into consideration the views of other concerned groups as appropriate.

**Article 7**

1. Each Member shall take all necessary measures to ensure the effective implementation and enforcement of the provisions giving effect to this Convention including the provision and application of penal sanctions or, as appropriate, other sanctions.

2. Each Member shall, taking into account the importance of education in eliminating child labour, take effective and time-bound measures to:

(a) prevent the engagement of children in the worst forms of child labour;

(b) provide the necessary and appropriate direct assistance for the removal of children from the worst forms of child labour and for their rehabilitation and social integration;

(c) ensure access to free basic education, and, wherever possible and appropriate, vocational training, for all children removed from the worst forms of child labour;

(d) identify and reach out to children at special risk; and

(e) take account of the special situation of girls.

3. Each Member shall designate the competent authority responsible for the implementation of the provisions giving effect to this Convention.

**Article 8**

Members shall take appropriate steps to assist one another in giving effect to the provisions of this Convention through enhanced international cooperation and/or assistance including support for social and economic development, poverty eradication programmes and universal education.

**Article 9**

The formal ratifications of this Convention shall be communicated to the Director-General of the International Labour Office for registration.

**Article 10**

1. This Convention shall be binding only upon those Members of the International Labour Organization whose ratifications have been registered with the Director-General of the International Labour Office.

2. It shall come into force 12 months after the date on which the ratifications of two Members have been registered with the Director-General.

3. Thereafter, this Convention shall come into force for any Member 12 months after the date on which its ratification has been registered.

**Article 11**

1. A Member which has ratified this Convention may denounce it after the expiration of ten years from the date on which the Convention first comes into force, by an act communicated to the Director-General of the International Labour Office for registration. Such denunciation shall not take effect until one year after the date on which it is registered.

2. Each Member which has ratified this Convention and which does not, within the year following the expiration of the period of ten years mentioned in the preceding paragraph, exercise the right of denunciation provided for in this Article, will be bound for another period of ten years and, thereafter, may denounce this Convention at the expiration of each period of ten years under the terms provided for in this Article.

**Article 12**

1. The Director-General of the International Labour Office shall notify all Members of the International Labour Organization of the registration of all ratifications and acts of denunciation communicated by the Members of the Organization.

2. When notifying the Members of the Organization of the registration of the second ratification, the Director-General shall draw the attention of the Members of the Organization to the date upon which the Convention shall come into force.

**Article 13**

The Director-General of the International Labour Office shall communicate to the Secretary-General of the United Nations, for registration in accordance with article 102 of the Charter of the United Nations, full particulars of all ratifications and acts of denunciation registered by the Director-General in accordance with the provisions of the preceding Articles.

**Article 14**

At such times as it may consider necessary, the Governing Body of the International Labour Office shall present to the General Conference a report on the working of this Convention and shall examine the desirability of placing on the agenda of the Conference the question of its revision in whole or in part.

**Article 15**

1. Should the Conference adopt a new Convention revising this Convention in whole or in part, then, unless the new Convention otherwise provides --

(a) the ratification by a Member of the new revising Convention shall ipso jure involve the immediate denunciation of this Convention, notwithstanding the provisions of Article 11 above, if and when the new revising Convention shall have come into force;

(b) as from the date when the new revising Convention comes into force, this Convention shall cease to be open to ratification by the Members.

2. This Convention shall in any case remain in force in its actual form and content for those Members which have ratified it but have not ratified the revising Convention.

**Article 16**

The English and French versions of the text of this Convention are equally authoritative.

CMA
OF THE UNITED STATES OF AMERICA

# Chocolate Manufacturers Association

We personally support the protocol entered into by industry ***Protocol for the Growing and Processing of Cocoa Beans and their Derivative products In a Manner that Complies with ILO Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor*** and look forward to its successful execution which we support wholeheartedly.

**Gary Guittard**
*President*
*Guittard Chocolate Company*

**Paul Michaels**
*President*
*M&M / Mars, Inc.*

**Edmond Opler, Jr.**
*President*
*World's Finest Chocolate, Inc.*

**G. Allen Andreas**
*Chairman and Chief Executive*
*Archer Daniels Midland Company*

**Bradley Alford**
*President*
*Nestle Chocolate & Confections USA*

**Henry Blommer, Jr.**
*Chairman of the Board*
*Blommer Chocolate Company*

**Richard H. Lenny**
*President and CEO*
*Hershey Food Corporation*

**Andreas Schmid**
*Chairman & CEO*
*Barry Callebaut AG*

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

CMA OF THE UNITED STATES OF AMERICA

# Chocolate Manufacturers Association

We personally support the protocol entered into by industry ***Protocol for the Growing and Processing of Cocoa Beans and their Derivative products In a Manner that Complies with ILO Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor*** and look forward to its successful execution which we support wholeheartedly.

**Gary Guittard**
*President*
*Guittard Chocolate Company*

**Paul Michaels**
*President*
*M&M / Mars, Inc.*

**Edmond Opler, Jr.**
*President*
*World's Finest Chocolate, Inc.*

**G. Allen Andreas**
*Chairman and Chief Executive*
*Archer Daniels Midland Company*

**Bradley Alford**
*President*
*Nestle Chocolate & Confections USA*

**Henry Blommer, Jr.**
*Chairman of the Board*
*Blommer Chocolate Company*

**Richard H. Lenny**
*President and CEO*
*Hershey Food Corporation*

**Andreas Schmid**
*Chairman & CEO*
*Barry Callebaut AG*

8320 Old Courthouse Road • Suite 300 • Vienna, Virginia 22182 • Telephone: 703-790-5011 • FAX: 703-790-5752 • Toll free: 1-800-433-1200
Website: www.NCA-CMA.org • E-mail: info@CandyUSA.org

**Documents requested:**

- List of all suppliers that provided cocoa, in any from: raw, powder, or otherwise, imported into the United States in 2017, 2018, and 2019? The cocoa in these forms can be directly from Ivory Coast or via other countries; Ivory Coast must to be the origin point of the cocoa.
- List of all cooperatives, pisteurs, and traitants in the company's supply chain.
- Certification audit results. This is to include any third party certifiers such as Utz, Fair Trade, Rain Forest Alliance, or auditing firms such as KPMG, PriceWaterhouseCoopers, Guidehouse and/or Ernst and Young. Include the full results of any internal auditing. The auditing can fall in the categories of labor issues such as forced labor, child labor, and hazardous child labor.
- Corrective Action Plan(s) for when forced labor /forced child labor is found in your supply chain(s).
- Documentation related to the prices and premiums paid for cocoa acquired, specifically include the years 2017, 2018, 2019, and 2020.
- Maps with GPS coordinates of all the current farms and cooperatives in the company's supply chain.

**Questions:**

1. How does the cocoa bean get from the farm; the cooperative; supplier(s); shipper(s); your company? Who transports the cocoa from each part of the supply chain to the next in Cote d'Ivoire? List if any parts are either directly part of your company, or if they are contracted, or sub-contracted.

2. Who is the manufacturer listed on the customs documentation and how does it relate to the entities in your cocoa supply chain in Cote d'Ivoire?

3. For the cocoa that was imported into the United States in 2017, 2018, and 2019, when would you have purchased it? What does the contracting process look like when purchasing cocoa?

4. What percentage of Ivorian cocoa exported to the U.S. is purchased at the point of shipping or processing? For cocoa purchased at the point of shipping or processing from a third party, how much of it is traceable back to the farm level?

5. What percentage of your cocoa is traceable to the farm level? To the cooperative level? When do you expect it to be fully traceable? What system do you have in place to trace the cocoa?

6. How do you authorize your buyers to utilize the paid premium? Does the buyer work with the third party certifying organizations (Rain Forest Alliance/Utz – Fairtrade)? Does

your company follow up with the farmers to find out what they use the premiums for and if they are paid the proper amounts?

7. How do you ensure the premium goes to farmers? What programs or systems are used to disperse and monitor payment? Are the systems paper or digital? Who audits this system to ensure the payment? Are the auditors internal to your company, or do you pay a third party to conduct the audits?

8. Even if you are paying a premium, how do you ensure that the farmers get a reasonable amount if the price of cocoa falls?

9. How often do you change farmers and cooperatives? How long does it usually take to bring a farmer or cooperative on board; what is the process; how are the Rainforest Alliance/Utz and Fairtrade certifications applied and how long does it take to get those certifications for new farms or for farms that have been de-certified. How do you work with de-certified farms to remediate and achieve re-certification?

10. How are you using an independent third-party monitoring and certification system to implement your Code of Conduct and oversee your Supplier Codes of Conduct particularly as it relates to labor issues?

11. Have there been any farms or cooperatives in the Ivory Coast you stopped sourcing from because of concerns of forced labor/ forced child labor? If so, how was the issue remediated? Was the remediation successful? Why or why not?

12. What impact did the price slump of 2016-2017 have on your efforts to mitigate forced labor and forced child labor in your supply chain?

13. If you implement the Child Labor Monitoring and Remediation System (CLMRS), what percentage of farms in your supply chain does it cover? Who collects the information? Is that the individual(s) full-time job and how are they paid? If you do not implement CLMRS, why not?

14. How much money have you contributed to implementing CLMRS in 2017, 2018, and 2019 respectively? How much is earmarked for expenditure over the next 6 years for CLMRS?

15. How much of your cocoa products have you purchased from other importers in 2017, 2018, and 2019? Who are these importers?

16. What is the import percentage breakdown by importer? Where are these importers located?

17. How much cocoa did you purchase at an increased social premium rate in 2017 and 2018?

18. What is the breakdown of the different social premiums used in 2017, 2018, and 2019?

19. How much of the cocoa you source from Cote d'Ivoire gets exported to Europe? Where else if any other countries are you exporting cocoa to? To the United States? For any Ivorian cocoa that gets exported to countries besides the United States and then is transformed into another product only to be re-exported to the United States, what does it get processed into (please provide HTS codes)? Of all the products with those HTS codes that you import, what percentage of them does the product with the Ivorian cocoa represent?

20. What safeguards do you have in place to prevent the comingling of cocoa beans at the earliest stages of your supply chain (e.g. when the cocoa gets collected from the farm and at the cooperative)? How do you ensure that any anonymously purchased cocoa is monitored with the same level of safeguards that you use within your own supply chain?

21. What procedures/policies do pisteurs and traitants in your supply chain follow when they take in cocoa from farms and deliver them to cooperatives within your supply chain? How do you know they follow those policies and procedures to ensure your cocoa is traceable? Does your company have mechanisms to detect and or enforce these policies/procedures on cocoa that may have been sourced from outside of your supply chain?

22. How many cases of the worst forms of child labor and/or forced labor have you detected in your supply chain? When did you detect them? How many have been resolved? When do you expect to resolve the outstanding cases?

23. If you were to find forced labor or forced child labor in your supply chain, how would you remediate it? To whom would it be reported to internally in your company and externally, be it to the Ivorian government or NGO/CSOs?

24. What impediments would there be to establishing an externally-run grievance mechanism? Is this something you have explored? If so, why has it not been implemented?

25. Are there any impediments to making a map of farms in your Ivorian cocoa supply chain publicly available? If you had made this data available in the past but then removed it from your website, why was it removed?

CORPORATE ACCOUNTABILITY LAB

INTERNATIONAL RIGHTS ADVOCATES

Troy Miller, Senior Official Performing the Duties of the Commissioner
U.S. Custom and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

**Re: Supplemental petition to exclude cocoa produced in Côte D'Ivoire and imported to the U.S. by Nestlé, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., Blommer Chocolate Co., Cargill, Mondelēz, and Olam unless any specific "importer establishes by satisfactory evidence that [its] merchandise was not ... manufactured in any part with" forced or trafficked child labor. 19 C.F.R. § 12.42 (g)(emphasis added).**

Dear Troy Miller, Senior Official Performing the Duties of the Commissioner,

Corporate Accountability Lab (CAL) and International Rights Advocates (IRAdvocates) hereby submit this Supplemental Petition to the February 2020 Petition filed under Section 307 of the Tariff Act of 1930, 19 U.S.C. § 1307, regarding the importation of cocoa from Côte D'Ivoire by Nestlé, S.A. and Nestlé, U.S.A. (together referred to as "Nestlé"), Cargill, Incorporated ("Cargill"), Barry Callebaut AG, Barry Callebaut USA LLC (together as "Barry Callebaut"), Olam International and Olam Americas, Inc. (together as "Olam"), Mars, Incorporated and Mars Wrigley Confectionery (together as "Mars"), the Hershey Company ("Hershey"), World's Finest Chocolate, Inc., and Blommer Chocolate Co.

On February 14, 2020, CAL and IRAdvocates submitted a petition requesting that Customs and Border Protection (CBP) require the named importers to produce **"satisfactory evidence that [any shipment of cocoa from Côte d'Ivoire to the US] was not ... manufactured in any part with the use of a class of labor specified in the finding."**[1] The petition requested that this evidence include

> a transparent map of companies' supply chains down to the farm level, public reports on how each company is utilizing an acceptable independent third-party monitoring and certification system to implement its own Code of Conduct banning illegal child labor and overseeing its Supplier Codes of Conduct related to the issue of child and forced labor, and an externally-run grievance mechanism related to the company's commitments

[1] 19 C.F.R. § 12.42 (g)(emphasis added).

on cocoa that is in line with the UN Guiding Principles on Business and Human Rights and is in place as of the date produced.

Since CAL and IRAdvocates filed this petition, CBP has not issued a single Withhold Release Order (WRO) against cocoa or chocolate goods produced in Côte d'Ivoire. There is evidence that during this same period, these companies continued to import cocoa and chocolate products produced with forced child labor.

This petition contains new and recently-acquired information, including evidence of systemic trafficking of children, forced child labor on cocoa farms in Côte d'Ivoire, indebtedness of farmers, evidence of police corruption, and information on the complicated role of the First Lady's office. ***Based on this and previous information submitted to CBP, there is no question that there is sufficient evidence for CBP to issue a WRO against these companies, and we request that CBP properly apply the law and issue the WRO. However, in the interests of minimizing disruption to the industry, we request that the companies be provided the opportunity to take the following remedial steps toward the ultimate goal of ending forced child labor and building a sustainable cocoa industry:***

1. ***Grant cocoa and chocolate companies and importers 180 days to publicly release information on their cocoa supply chains down to the farm level.*** The lack of transparency in supply chains provides cover for companies that benefit from forced labor, and makes it difficult for the civil society organizations, journalists, and investigators to trace particular instances of forced labor to particular importers.

2. ***Require that companies pay the full Living Income Differential (LID) immediately, and move toward the Living Income price over the next 18 months.*** The Voice Network has calculated the current Living Income farmgate price to be $3,166 USD per metric ton of cocoa produced, a significant increase over the current farmgate price of approximately $1,224.70 per ton.[2] Extreme poverty forces farmers to rely on illegal forms of labor to survive, and sometimes just to pay off the prior season's debts. Chocolate companies have purchased cocoa at or below the cost of production for decades. Until farmers can afford to produce cocoa legally and support their families, there will be a market for trafficked children who work for free.

---

[2] *See* Voice Network, "Necessary Farmgate Prices for a Living Income," January 2020, https://www.voicenetwork.eu/wp-content/uploads/2020/01/200113-Necessary-Farm-Gate-Prices-for-a-Living-Income-Definitive.pdf; Reuters Staff, *Ivory Coast lowers 2020/21 mid-crop cocoa farmgate price by 9%*, REUTERS, March 31, 2021, https://www.reuters.com/article/cocoa-ivorycoast/ivory-coast-lowers-2020-21-mid-crop-cocoa-farmgate-price-by-9-idUSL8N2LT1OE [hereinafter *Ivory Coast lowers 2020/21 mid-crop cocoa farmgate price*]. In September, 2020 Cote d'Ivoire increased the farmgate price to 1,000 CFA Francs ($1.80) per kg, or $1,632.93 per ton. Then, in spring 2021, Cote d'Ivoire lowered the price to 750 CFA Francs ($1.35) per kg, or $1,224.70. *See* Ange Aboa, *Ivory Coast raises 2020/21 cocoa farmgate price by 21%*, REUTERS, OCT. 1, 2020, HTTPS://WWW.REUTERS.COM/ARTICLE/US-COCOA-IVORYCOAST/IVORY-COAST-RAISES-2020-21-COCOA-FARMGATE-PRICE-BY-21-IDUSKBN26M79F; *Ivory Coast lowers 2020/21 mid-crop cocoa farmgate price*.

3. ***Require that companies establish long-term contracts with cooperatives and farmers in Côte d'Ivoire over the next 18 months to ensure economic stability.*** Farmers bear the burden of market volatility, whether driven by commodity prices or by changes in demand. This generates economic precarity and indebtedness, which are both drivers of forced labor. Long-term contracts distribute risk to supply chain actors who are better situated to absorb it, resulting in greater stability across the supply chain.

We submit that information we and others have already provided to CBP and that CBP itself has gathered constitutes an overwhelming basis for any person to have a "reason to believe"[3] that much of the cocoa imported from Côte d'Ivoire is produced "wholly or in part"[4] with forced or trafficked child labor. The additional evidence provided herein compels the finding that there is a strong "reason to believe" that much of the cocoa imported to the U.S. produced in Côte d'Ivoire is produced "wholly or in part" with forced or trafficked child labor.[5]

## I. Background

For over twenty years, corporations have made and broken promises to clean up their cocoa supply chains and eradicate child labor and forced child labor. Since 2001, cocoa and chocolate companies have failed to live up to their promises under the Harkin-Engel Protocol, a voluntary protocol in which companies initially promised to eradicate child labor by 2005. Sixteen years after the first missed deadline, and despite years of promises, child labor in the West African cocoa industry remains prevalent and has even increased.[6]

According to the most recent Department of Labor report,[7] released in October 2020 and carried out prior to the COVID-19 pandemic, there are currently 1.56 million children engaged in child labor in the West African cocoa sector, including 790,000 in Côte d'Ivoire.[8] 770,000 of these children are engaged in at least one component of hazardous child labor in cocoa production.[9] Moreover, this same report found that the prevalence of child labor in agricultural households in

---

[3] 19 C.F.R. § 12.42 (b).
[4] § 307 of the Tariff Act of 1930, 19 U.S.C. § 1307 ("Section 307").
[5] 19 CFR § 12.42; 19 U.S.C. § 1307.
[6] For a more detailed discussion of the Harkin-Engel Protocol, see Corp. Accountability Lab and IRAdvocates, Petition to U.S. Custom & Border Protection to exclude cocoa produced in Cote D'Ivoire manufactured with forced or trafficked child labor under 19 C.F.R. § 12.42 (Feb. 14, 2020) available at https://tinyurl.com/rjxw6mk. See also NORC Final Report: Assessing Progress in Reducing Child Labor in Cocoa Production in Cocoa Growing Areas of Côte d'Ivoire and Ghana, NORC at the University of Chicago, Oct. 2020, at 16, https://www.norc.org/PDFs/Cocoa%20Report/NORC%202020%20Cocoa%20Report_English.pdf [hereinafter NORC Report].
[7] *See generally NORC Report*, *supra* note 6.
[8] *Id.* at 10.
[9] *Id.*

the Ivorian cocoa sectors actually rose by 14 percent over ten years (from 31 percent in 2008/09 to 45 percent in 2018/19).[10]

Child labor and forced child labor are direct results of the poverty wages that cocoa farmers earn.[11] These low prices leave the majority of cocoa farmers in poverty, often earning under the World Bank's poverty line of $1.90 per day.[12] These low wages make it difficult for farmers to pay for legal forms of labor. As a result, farmers often rely on their families, including their underage children, and in some cases, on forced labor, including children trafficked from neighboring Mali and Burkina Faso, to produce cocoa.

The following information was gathered by an investigatory team working with CAL during three trips in 2020. In August 2020, investigators visited Soubré, Daloa, Duékoué, Abengouro, and Aboisso during the mid-crop harvest to investigate the impact of COVID-19 on cocoa farmers. The investigatory team visited the same regions in December of 2020, during the main cocoa growing season, to investigate trafficking routes and identify specific instances of forced and child labor. The team also traveled to the northern border regions in November 2020 to investigate trafficking patterns from Mali and Burkina Faso.

## II. Poverty and Farmer Indebtedness

The COVID-19 pandemic has hurt farmer income and likely increased farmer indebtedness. The pandemic hit Côte d'Ivoire in mid-March 2020, as the smaller of the two cocoa growing seasons was beginning. With the borders closed, migrant workers who usually travel to Côte d'Ivoire for the season were unable to cross the border; farmers were often unable to transport their cocoa to the ports in Abidjan or San Pedro; and farmers were often unable to receive financing for inputs such as fertilizers. As a result, cocoa farmers generally did not produce as much cocoa during the 2020 small growing season as they had in the previous year. Because the price of cocoa

---

[10] *Id*. at 12.

[11] Peter Whoriskey & Rachel Siegel, *Cocoa's Child Laborers*, WASHINGTON POST, June 5, 2019, https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/ [hereinafter *Cocoa's Child Laborers*]; Antonie C. Fountain & Friedel Huetz-Adams, *Cocoa Barometer 2020*, 2020, at 12, https://www.voicenetwork.eu/wp-content/uploads/2020/12/2020-Cocoa-Barometer.pdf [hereinafter *Cocoa Barometer*]; *The True Price of Cocoa From Ivory Coast*, True Price and IDH, 2016, at 16, https://www.chocolatemakers.nl/wordpress/wp-content/uploads/2016/04/TP-Cocoa.pdf [hereinafter *The True Price of Cocoa*].

[12] *See, e.g.*, *Cocoa Barometer*, at 40, *supra* note 11 (showing a graph for farmer income in Ghana); Francisco Ferreira, et al, The international poverty line has just been raised to $1.90 a day, but global poverty is basically unchanged. How is that even possible?, *World Bank Blogs*, Oct. 5, 2015, https://blogs.worldbank.org/developmenttalk/international-poverty-line-has-just-been-raised-190-day-global-poverty-basically-unchanged-how-even (explaining why the World Bank increased the poverty rate to $1.90 per day).

remained the same -- at 825 FCFA[13] -- many cocoa farmers earned less income during 2020's small growing season than in previous years.

In August 2020, the investigators traveled to Soubré, Daloa, Duékoué, Abengourou, and Aboisso for a three-week investigation into the impact of COVID-19 on cocoa farmers. They spoke with farmers during the mid-crop harvest, which runs from April to September and during which farmers generally produce less cocoa than in the main harvest – about 30 percent of the total cocoa production each year.[14]

Cocoa farmers in various regions repeatedly told the investigators that they had produced significantly less cocoa during the 2020 mid-crop harvest than they had in the 2019 mid-crop harvest. The difference in production varied among farmers, ranging from a couple hundred kilograms less (700 kilograms during the 2019 harvest but only 530 kilograms in 2020)[15] to half as much (2 tonnes in 2019 compared to only 1 tonne in 2020)[16] to less than a third (259 kilograms of cocoa in 2020, as opposed to 1 tonne in 2019).[17] Because the price in 2020 had remained the same as in 2019, many farmers earned significantly less income overall.

Côte d'Ivoire's border closure has also hurt farmers who rely on foreign workers to work on cocoa farms (and, as discussed further below, impacted child trafficking patterns). With fewer migrant workers entering Côte d'Ivoire, farmers were often unable to hire anyone to work on their farms. This inability to find labor is likely, at least in part, a result of the very low wages farmers pay migrant workers, who generally come from Mali and Burkina Faso. A 2014 report found that migrant workers on cocoa farms are "the most marginalized actors in the cocoa supply chain."[18] While most farmers do not earn a living income, migrant workers earn much less.[19]

Farmers rely on cheap labor because cocoa farming is labor-intensive and farmers do not earn a living income. According to an article in the *Financial Times*, Nestor Yao, president of the

---

[13] *Ivory Coast holds cocoa mid-crop farmgate price at 825 CFA francs/kg*, REUTERS, March 31, 2020, https://www.reuters.com/article/ozabs-us-cocoa-ivorycoast-estimate-idAFKBN21I1V8-OZABS.
[14] *Id*.
[15] Summary Of Interview With Cocoa Producers, Aug. 2020 [hereinafter Summary Of Interview With Cocoa Producers].
[16] *Id*.
[17] *Id*.
[18] International Labor Rights Forum, *The Fairness Gap: Farmer Incomes and Root Cause Solutions to Ending Child Labor in the Cocoa Industry*, Dec. 2014, at 3, https://laborrights.org/sites/default/files/publications/Fairness%20gap_low_res.pdf ("[T]hese workers are even more impoverished than the producers that employ them. Since smallholder farmers make poverty incomes themselves, they have very little leftover to pay their hired laborers. Field research in Côte d'Ivoire revealed that hired workers receive poverty level wages. ILRF surveys revealed that hired workers receive between $209 and $1045 per year, which is far below the minimum wage set by the government (around $4 per day, or $1460 per year, although it is set lower for agricultural workers).").
[19] *See Id*.

CAPRESSA farmer cooperative in Abengourou,[20] explained to a journalist that with the borders closed, "We can't do farm work the way it should be done so production will be [affected]."[21] He further explained that the impact on farmers is "disastrous, as it makes it more difficult for them to pay school fees for their children, buy food, or pay for adequate housing for their families.[22]

Cocoa farmers also reported having difficulty transporting and selling their cocoa during the 2020 mid-crop harvest. One cooperative manager explained that it had become more expensive to transport the beans to the ports, which also decreased farmers' income.[23] Similarly, the director of the SCOOPAK-COOP-CA cooperative near Soubré explained that their expenses had increased because the cooperative must now transport the cocoa to the San-Pedro port themselves, while they usually sent the beans to Abidjan for sale.[24] The person further explained that Cargill and SACO (Barry Callebaut) have not provided adequate help to farmers,[25] even though the cooperative was having difficulty transporting its goods, there was a delay from buyers purchasing beans, and the cooperative faced security issues, including the risk of being robbed, while transporting the beans.[26] Other cocoa farmers reported that because Abidjan was closed off, they were forced to sell their beans at low prices to pisteurs.[27] Additionally, farmers in Abengourou explained that they usually sell cocoa from the mid-harvest season to pisteurs from Ghana.[28] However, with the borders closed, the pisteurs did not arrive, making it even harder for farmers to sell their cocoa.[29]

Farmers also reported that they could not afford inputs such as fertilizers during the 2020 mid-crop season. Prior to the pandemic, there is evidence that farmers often were unable to buy inputs, in part because they were unable to access credit.[30] As a result, farmers often go into debt to pay for inputs necessary to produce cocoa. Farmers reported that during the early months of the pandemic, inputs such as fertilizer had become more expensive. Companies and cooperatives generally do not appear to have assisted farmers during this period. One farmer, who works with the ECOGAK cooperative, explained that the cooperative facilitates the sale of cocoa and had promised maintenance products that the producers had not yet received.[31] Another cooperative employee explained that companies do not subsidize the mid-season harvest, which means that

---

[20] Emiko Terazono & Neil Munshi, *Choc Waves: How Coronavirus Shook the Cocoa Market*, FINANCIAL TIMES, July 30, 2020, https://www.ft.com/content/37aa0ac8-e879-4dc2-b751-3eb862b12276.
[21] *Id.*
[22] *Id.*
[23] Summary Of Interview With Cocoa Producers, *supra* note 15.
[24] *Id.*
[25] *Id.*
[26] *Id.* Security issues while transporting cocoa beans is a common problem in Côte d'Ivoire. According to the investigators, robbers, commonly called "coupeurs de route," are rampant in cocoa production areas.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Cocoa Barometer*, *supra* note 11, at 44.
[31] Summary Of Interview with Cocoa Producers, *supra* note 15.

the cooperative must pay for the cocoa beans it buys from farmers up front, before it receives payment for the beans.[32] As a result, cooperatives do not always have the funds to buy all the beans that the farmers produce to sell. This year, because there were delays in selling beans, the cooperative was unable to buy as many beans as farmers produced.[33]

The decreased production and difficulties in selling and transporting cocoa meant that many farmers reported being in debt. As a result, many reportedly took out loans to maintain their farms, feed their families, or pay other bills.[34] These loans were generally with someone in the village, the cooperative, or a pisteur. During a period in which farmers were already earning less than in other years, cocoa farmers also reported that even banks, which farmers would not typically borrow from, did not have enough liquidity to make loans, leaving farmers with even less access to loans. At the same time, the community-support system that traditionally stepped in to support community members in times of need was not functioning because people were scared of catching COVID-19.

The COVID-19 pandemic exacerbated many of the issues around farmer poverty that already existed. Prior to the pandemic, many farmers lived in precarious financial conditions, often going into debt to buy inputs. With reduced income during the mid-season harvest, farmers appear to have been forced to go into more debt. While the increased income from the LID during the main cocoa-growing season may have allowed farmers to pay off that debt, the price of cocoa has again decreased, making it likely that farmers will once again go into debt to buy inputs in the upcoming season. This is likely to have also impacted farmers who are not landowners, including sharecroppers, renters, and hired labor.

## III. Evidence of Forced Child Labor

### A. *Evidence of Child Trafficking*

Trafficking of vulnerable children from Mali and Burkina Faso into forced labor conditions in the Ivorian cocoa sector has been documented and known to local authorities for years.[35] In November 2020, the investigatory team visited the northern region of Côte d'Ivoire on the border of Mali and Burkina Faso. In December 2020 they traveled to several cocoa-growing communities across the country's cocoa belt. They found evidence of illegal trafficking across

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] Abou Traoré, *Travail des enfants dans les plantations de cacao: Le traffic a la peau dure*, CENOZO (Jan. 8, 2019), https://cenozo.org/travail-des-enfants-dans-les-plantations-de-cacao-le-trafic-a-la-peau-dure/ [hereinafter *Travail des enfants dans les plantations de cacao*]; Abou Traoré, *Travail des enfants dans les plantations de cacao: Le trafic a la peau dure*, CENOZO, Feb. 4, 2019, https://www.facebook.com/cenozo/videos/308465473203064/?q=abou%20traore%20cenozo&epa=SEARCH_BOX [hereinafter Facebook: *Travail des enfants dans les plantations de cacao*].

closed borders and of police knowledge and facilitation of illegal child travel suspected to constitute trafficking.

Despite the closed borders, a result of the COVID-19 pandemic, the investigators found evidence that people continue to be trafficked into Côte d'Ivoire through unofficial channels. B.B., a soldier stationed at the northern border with Maréchal des Logis (MDL), an Ivorian military unit, explained to the investigators that "[e]ven though the borders have closed [because of COVID-19], the movement of people has not stopped. Populations from neighboring countries (Mali and Burkina Faso) come into the country through non-official routes. They enter with motorcycles late at night or very early in the morning with the help of human traffickers."[36]

Once across the border, children continued to be trafficked to the cocoa-growing regions on regular bus routes. The investigators interviewed employees at the SAMA bus company in Pogo, a village on the border near Mali.[37] The bus company runs buses from the border region through some of the main cocoa-growing regions to Abidjan.[38] The employees reported that a known trafficker called "Mr. M." frequently purchased bus tickets for children to travel south to cocoa-growing regions.[39] The buses take the children to Pogo, Bouaké, Yamoussoukro, and Abidjan.[40] The investigators were told that at each stop, children get off the bus and head to other nearby cities or towns.[41]

---

[36] Affidavit 2: Border Conversation, Nov. 2020.
[37] Mission Report, Nov. 2020 [hereinafter Mission Report].
[38] Affidavit 1: Bus Route, Nov. 2020 [hereinafter Affidavit 1: Bus Route].
[39] Document on file with CAL.
[40] Affidavit 1: Bus Route, *supra* note 38; Mission Report, *supra* note 37.
[41] Document on file with CAL.




Diagram of bus routes used to traffic children.[42]

The investigators learned that Ivorian police are aware of ongoing child trafficking and, in some cases, even facilitate it and profit from it. As one example, they identified cases in which existing rules designed to address illegal immigration and trafficking were inconsistently applied or were used to solicit bribes. Foreign citizens traveling in Côte d'Ivoire are required to produce an identity card or birth certificate when requested by the police. Investigators were told that non-Ivorian passengers are required to pay an additional "fee" to the bus company to cover bribes at checkpoints along the bus route if they cannot produce the required documents.[43] Prior to reaching the checkpoints, the bus drivers collect non-Ivorian passengers' identity documents, if any, to present to police and gendarmerie officers.[44] Once on the bus, the police officer asks that all passengers whose money had been collected raise their hands. The police officer then compares the number of people raising their hands with the amount of money collected, takes the corresponding amount of money, and exits the bus without performing other identity checks.[45] This form of corruption allows the clandestine trafficking of children to cocoa-growing regions and cocoa farms in Côte d'Ivoire.

During the investigation, police boarded a bus and asked for identification.[46] A girl who appeared to be about 12-13 years old clearly did not have a birth certificate or any other form of

[42] Affidavit 1: Bus Route, *supra* note 38.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] Affidavit 3: Trafficked Children, Nov. 2020.

identification.[47] The police asked her to get off the bus and she was taken to the police station with an older woman.[48] After a short "negotiation," the girl and the woman came back and boarded the bus again.[49]

Additionally, while traveling on a bus south from the border, the investigators witnessed two situations in which children without birth certificates were allowed to remain on buses. At the Kanawolo checkpoint, a police officer boarded the bus to check passengers' identity documents.[50] The officer asked to see the birth certificates of two children who were about 6-7 years old.[51] The women who were traveling with the children claimed to be their mothers and indicated that the children's birth certificates were in their travel bags in the bus's luggage compartment.[52] The police appeared to accept that rationale and moved on, allowing the children to remain on the bus without checking their birth certificates.[53]

The evidence that the investigators gathered mirrors information published in a January 2019 report by the Ivorian journalist Abou Traoré, known as AT.[54] AT traveled undercover on a bus from Burkina Faso to Côte d'Ivoire to document the trafficking of children for work in the cocoa sector. His report, published by the investigative journalist group *Cenozo*, documents similar patterns of trafficking and issues of forced child labor. In February 2019, *Cenozo* uploaded a video to Facebook that discusses the investigation.[55]

AT reported that there is a trafficking network that uses the Sikasso-San Pedro road. The road runs through some of the main cocoa-growing regions, ending at San Pedro, Côte d'Ivoire's second largest port. While traffickers use several routes, the most frequented route goes from Sikasso (Mali) to Soubré or to San-Pedro in Côte d'Ivoire. Consistent with the information gathered for the present investigation in January 2021, AT reported that migrants travel to Yamoussoukro and from there depart for their final destinations in the forest, such as Soubré, San Pedro, the forests of Duekoué, Guiglo, Blolequin, etc.

AT also reported that since the campaign against child labor began, children have been required to show their birth certificates while traveling to prove that they are accompanied by their parents.[56] AT was told that traffickers sometimes bribe police officers who are suspicious.[57] At the

[47] *Id*.
[48] *Id*.
[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id*.
[53] *Id*.
[54] *Travail des enfants dans les plantations de*, *supra* note 35.
[55] Facebook: *Travail des enfants dans les plantations de cacao*, *supra* note 35.
[56] *Travail des enfants dans les plantations de*, *supra* note 35.
[57] *Id*.

same time, a policeman he spoke with at the border of Laleraba (Côte d'Ivoire-Burkina Faso), explained that every time they asked the children about their travels, they said they were going to a relative's house. He said that often the children are accompanied by adults whom they present as a relative who they are traveling with.[58]

While Côte d'Ivoire has implemented stronger laws and policies to fight trafficking, from our investigation it appears that trafficking remains a key issue in the country and that police and other government officials are complicit.

### *B. Evidence of Forced Child Labor*

#### *1. Background*

Forced child labor is notoriously difficult to document in the West African cocoa industry. People are often hesitant to speak about these issues, making it difficult to collect data on the prevalence of forced child labor. Both children and adults often deny that child labor exists in any form and often claim that the children working on a farm are all family members. Children are often scared to speak to people they do not know and in some cases are likely prohibited by their parents or relatives from doing so.[59]

Despite the difficulties in gathering data on forced laborers, it has been estimated that there are at least 28,900 forced laborers in Cote D'Ivoire and Ghana alone,[60] including 15,600 children who are being forced to work on cocoa farms by people who are not their parents—and the real number is probably much higher.[61] Moreover, as a result of increased attention to the issue, it appears that forced child labor has gone further underground, making it more difficult to document. According to an NGO worker, because of the existence of an anti-trafficking center, all traffickers are now discreet.[62] Our investigators have made similar observations.

---

[58] *Id.*

[59] *See, e.g.*, Aarti Kapoor, *Children at the Heart: Assessment of Child Labour and Child Slavery in Cote d'lvoire's Cocoa Sector and Recommendations to Mondelez International*, Embode, 10 (2016), https://www.cocoalife.org/~/media/CocoaLife/Files/pdf/Library/FULL_REPORT_Cote_Ivoire_Mondelez_Embode_ChildrenattheHeart.pdf.

[60] Elke de Buhr & Elise Gordon, *Bitter Sweets: Prevalence of forced labour & child labour in the cocoa sectors of Côte d'Ivoire & Ghana*, Sept. 2018, at 28–29, https://cocoainitiative.org/wp-content/uploads/2018/10/Cocoa-Report_181004_V15-FNL_digital.pdf.

[61] *Cocoa's child laborers*, *supra* note 11; Verité, *Assessment of Forced Labor Risk in the Cocoa Sector of Côte d'Ivoire* 2019, at 5, https://www.verite.org/wp-content/uploads/2019/02/Verite-Report-Forced-Labor-in-Cocoa-in-CDI.pdf ("Given the hidden nature of much human trafficking and forced labor, it is also possible that levels may be significantly higher within isolated pockets in the sector.").

[62] *Travail des enfants dans les plantations de*, *supra* note 35. The anti-trafficking center referred to here is one of the centers that the First Lady's Office has established. *See below* for more information.

In addition to the many reports that document forced labor in the Ivorian cocoa industry,[63] the Ivorian government has conducted a number of raids in the past 18 months, showing some progress in the government's enforcement efforts. In January 2020, *Bloomberg* reported that a raid in Côte d'Ivoire had rescued 137 children from human traffickers.[64] The children were from Ghana, Nigeria, and Benin.[65] In a separate raid in October 2020, police arrested three farmers "on suspicion of people trafficking"[66] and rescued eleven children and two teenagers from cocoa farms in the southwestern part of Côte d'Ivoire.[67] According to the *Reuters* article, the children were rescued while shelling cocoa pods.[68]

More recently, in early February 2021, the Ivorian government arrested "four suspected traffickers and rescued 19 children in the southeastern town of Aboisso." A few days later, the Ivorian police arrested three Burkinabe nationals suspected of trafficking, who were detained while traveling on a bus with three children from Burkina Faso.[69] In May 2021, the Ivorian government again conducted a raid, rescuing 68 children from forced labor conditions on cocoa farms and arresting 25 suspected traffickers.[70] *Reuters* reported that most of these children had been trafficked into Cote d'Ivoire from Burkina Faso.[71]

Despite these high-profile enforcement actions, the role of the government overall appears to vary greatly between regions and to be undermined by ongoing corruption, as discussed above. While there are reports that increased enforcement in the cocoa-growing regions has pushed

---

[63] The Department of Labor's 2020 List of Goods Produced by Child Labor or Forced Labor includes cocoa from Côte d'Ivoire, listing it as produced with both child labor and forced labor. Dep't of Labor, 2020 List of Goods Produced by Child Labor or Forced Labor 21, https://www. dol.gov/sites/dolgov/files/ILAB/child_labor_reports/ tda2019/2020_TVPRA_List_Online_Final.pdf. The U.S. Department of Labor and U.S. State Department have both reported on the trafficking of children and forced child labor in the Ivorian cocoa sector. *See, e.g.*, U.S. Dep't of Labor, Bureau of Int'l Labor Affairs, *2018 Findings on the Worst Forms of Child Labor: Côte d'Ivoire*, https://www. dol.gov/sites/dolgov/files/ILAB/child_labor_reports/ tda2018/Cote%20d%27lvoire.pdf; U.S. Dep't of State, Bureau of Democracy, Human Rights, & Labor, *Cote d'Ivoire 2018 Human Rights Report*, https://ci.usembassy.gov/wp-content/uploads/sites/29/ Cote-dIvoire-HRR-2018-English.pdf. The Child Labor Cocoa Coordinating Group Annual Report provides clear evidence of forced child labor in the cocoa industry, *2018 CLCCG Annual Report*, CLCCG, https://cocoainitiative.org/wp-content/ uploads/2019/10/CLCCG2018AnnualReport.pdf.

[64] Leanne de Bassompierre, *Ivory Coast Rescues 137 Children in Raid on Traffickers*, BLOOMBERG, Jan. 13, 2020, https://www.bloomberg.com/news/articles/2020-01-13/top-cocoa- grower-rescues-137-children-in-raid-on-traffickers.

[65] *Id.*

[66] *Ivory Coast police rescue 11 children working on cocoa farms*, CNN, Oct. 8, 2020, https://www.cnn.com/2020/10/08/africa/ivory-coast-police-rescue-children-cocoa-farm-intl/index.html.

[67] *Id.*

[68] *Id.*

[69] Ange Aboa, *Ivory Coast arrests three suspected child traffickers in cocoa belt*, REUTERS, Feb. 12, 2021, https://www.reuters.com/article/cocoa-childlabour-ivorycoast/ivory-coast-arrests-three-suspected-child-traffickers-in-cocoa-belt-idUSL8N2KI3GR.

[70] *Ivory Coast police rescue 68 children working on cocoa farms*, REUTERS, May 10, 2021, https://www.reuters.com/world/africa/ivory-coast-police-rescue-68-children-working-cocoa-farms-2021-05-10/.

[71] *Id.*

forced child labor further underground, trafficking continues, assisted by officials who can be bribed to look the other way.

2. *New Evidence*

In December 2020, the investigators visited five regions in Côte d'Ivoire: Aboisso, Abengourou, Daloa, Duékoué, and Soubré. The investigators spoke with children who they encountered and asked them questions about their work, school, and parents. Based on these conversations, some of which are video-taped or on audio, the investigators identified which ILO indicators of forced labor had been met. The ILO Indicators are:[72]

1. Abuse of vulnerability
2. Deception
3. Restriction of movement
4. Isolation
5. Physical and sexual violence
6. Intimidation and threats
7. Retention of identity documents
8. Withholding of wages
9. Debt bondage
10. Abusive working and living conditions
11. Excessive overtime

Many of the children the investigators spoke with were young, did not appear to be attending school, and were using sharp objects such as machetes or carrying loads that were much too heavy for them. The ILO defines hazardous work as work that a child does such as conducting land clearing; carrying heavy loads; using agrochemicals; using sharp tools; engaging in long working hours; or engaging in night work.[73] Many of these children appear to have been engaged in hazardous child labor.

The investigators found that the ILO indicators of abuse of vulnerability, abusive working and living conditions, and isolation were applicable in a number of cases.[74] Due to the underground nature of forced child labor, in many cases the investigators were unable to verify if other ILO indicators applied, including if a child was in debt bondage or if his identity documents had been retained. This section, organized by region, provides information about the children they spoke with and what ILO indicators the investigators found.

---

[72] International Labour Office, *ILO Indicators of Forced Labor*, Special Action Programme to Combat Forced Labour. https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.
[73] *NORC Report*, *supra* note 6, at 8–9 (stating the ILO definition).
[74] Affidavit 4: Pictures and Audio, Dec. 2020 [hereinafter Affidavit 4].

### *a. Abengourou*

At a farm near Abengourou, the investigators saw a group of people sitting and opening cocoa pods. Among this group, at least one was a child holding a machete.[75] They also saw a child distributing cocoa pods to the others to open.[76] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicator.

Near Abengourou, the investigators saw a small child, who was about 7-years-old, transporting cocoa beans to a gathering point.[77] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicators.

Near Abengourou, the investigators saw a 12-year-old child moving a heavy load of cocoa pods in a bag.[78] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicators. The child appears to be carrying a very heavy load, which under the ILO definition constitutes hazardous child labor.

### *b. Aboisso*

Near Aboisso, the investigators spoke with a 17-year-old who explained that he has worked with his father on the cocoa farm since he left school in CM2 (six grade).[79] He told the investigators that the work is "really hard" and that "[w]eeding is not easy."[80] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicators.

Near Aboisso, the investigators saw a 17-year-old on a cocoa farm who was harvesting cocoa pods and regrouping them in a pickup point.[81] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicators.

Near Aboisso, the investigators saw a family working and harvesting cocoa pods. They witnessed one of the children, who appeared to be about 8 years old, using a machete to open the cocoa pods.[82] The investigators observed abuse of vulnerability, abusive working conditions, and restriction of movement under the ILO's Forced Labor Indicators.

---

[75] *Id.*; Description of Photos, Transcripts of Video and Audio Recordings, Dec. 2020 [hereinafter Description of Photos, Transcripts of Video and Audio Recordings].
[76] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[77] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[78] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[79] Affidavit 4, *supra* note 74.
[80] Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[81] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[82] Affidavit 4, *supra* note 74.

Near Aboisso, the investigators saw the planter's two children, who were about 10 and 12 years old, carrying cocoa pods in containers.[83] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicator.

Near Aboisso, the investigators took a photo of a little girl, who appeared to be about 7 years old, carrying cocoa beans.[84] The investigators observed abuse of vulnerability and abusive working conditions under the ILO's Forced Labor Indicator.

*c. Daloa*

Near Daloa, the investigators spoke with a young boy, who was holding a machete, in the middle of the afternoon during school hours – at 1:45 pm. The boy told the investigators that he was twelve years old and in CM2 (fifth grade), and that he was heading to the cocoa fields to join his parents.[85] The investigators noted the ILO indicators of abuse of vulnerability and abusive working conditions. Moreover, under the ILO definition, the young boy's use of a machete constitutes hazardous child labor.

Near Daloa, the investigators spotted a young boy holding a machete in a cocoa field during school hours.[86] The boy told the investigators that he was "on vacation" and that [t]he union made us leave. So we are on vacation." He then avoided speaking with the investigators by running into the fields.[87] The investigators found the ILO indicators of abuse of vulnerability, abusive working conditions, and isolation. Under the ILO definition, the young boy's use of a machete constitutes hazardous child labor.

*d. Soubré*

Near Soubré, the investigators met a young boy who they witnessed lifting a large bag of cocoa beans at 3:03 pm on a weekday. The boy appeared to be between nine and eleven years old; he claimed that he attends school and is in CE2 (third grade).[88] The investigators noted the ILO indicators of abuse of vulnerability, abusive working conditions, and isolation. The young boy is carrying a heavy load, which constitutes hazardous child labor under the ILO definition.

Near Soubré, the investigators met another young boy who claimed to be fifteen years old. This child was coming from the fields during school hours and was lifting a heavy load and holding a machete. He explained to the investigators that he had been alone in the field, without his mother

[83] *Id.*; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[84] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[85] Affidavit 4, *supra* note 74; Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[86] Affidavit 4, *supra* note 74.
[87] Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[88] Affidavit 4, *supra* note 74.

or father.[89] He told them that his father was in Okrouyo and his mother was in Soubré.[90] The investigators found the ILO indicators of abuse of vulnerability and abusive working conditions. It also appears that the ILO indicator of isolation is also present here.

*C. Child Labor on Cocoa Farms: Evidence from a Cooperative Delegate*[91]

As part of the investigation, the investigators spoke with a number of cooperative managers and others who are in charge of or have knowledge of aspects of the cocoa supply chain. In December 2020, the investigators spoke with Mr. Y.Y.T., a delegate (intermediary between the farmers and the President of the Board of Directors) of the SOCOOPAK-COOP-CA cooperative in Soubré. Mr. Y.Y.T. was quite candid with them about child labor and explained that the campaign against child labor really began in 2015. He further told them that the ECATAMEA and the ECAM (MEAGUY) cooperatives ask the cocoa farmers to be careful and tells them not to provide any information to outsiders about child labor. Our investigators' experiences are in line with this, as they faced hostility when they visited these cooperatives.

Mr. Y.Y.T. told the investigators that at the ECATAMEA cooperative, children work on the cocoa farms. However, the children are sent away when companies come to visit or monitor the farms. The investigators asked him: "This is why, during our last visit to ECATAMEA the cooperative was hostile towards us." And Mr. Y.Y.T. responded: "Yes of course. They take children and they send them somewhere else in the cocoa plantations."

According to Mr. Y.Y.T., every month managers from cocoa companies come to monitor the farms. When the manager arrives, the children are told to leave and hide. "The boss of our cooperative tells us that every month westerners are in the camps. So, the boss of our cooperative makes patrols with his all-terrain vehicle and intimidates people and orders parents not to have their children work in the plantations and at the same time asks children who are in the plantations to leave the plantations otherwise the cooperative may stop all collaboration with their partner (big cocoa company)."

Some companies attempt to comply with their legal requirements by threatening to end business relationships with cooperatives that use child labor. One chocolate company, the Swiss company Chocolate Frey, apparently told one cooperative that the company works with this coop because they trust that the farmers do not use child labor to produce cocoa. The company further said that if this trust is broken and children do work on the farms, Chocolate Frey will end the partnership agreement and stop sourcing from the cooperative. As a result, the boss of the cooperative had meetings and asked the farmers to stop having their children work in the plantations. However,

---

[89] *Id.*
[90] Description of Photos, Transcripts of Video and Audio Recordings, *supra* note 75.
[91] *Id.*

such threats often simply drive forced and child labor underground rather than meaningfully addressing the problem. The threat to abandon farmers does little to address the reason that children work on the cocoa farms -- namely, that farmers often cannot afford to pay adult workers and thus rely on child labor.

*D. The First Lady's Office*

Dominique Ouattara is married to Côte d'Ivoire's current president, Alassane Ouattara. In 2011, the First Lady was named President of the National Monitoring Committee on Actions to Fight Trafficking, Exploitation and Child Labor.[92] The National Monitoring Committee has set up three facilities for trafficked children, in Soubré, Ferkessedougou, and Bouake.[93]

The First Lady's program has made some advances, as noted above, in spurring targeted enforcement actions. However, the program has also demonstrated a lack of good faith efforts, including through misleading public messaging and an outright disinterest in accountability for supply chain actors. Many of the steps taken by the program are viewed as performative by some local organizations, geared more toward the protection of Côte d'Ivoire's export market than the protection of children.

For example, in 2019, CAL staff visited the First Lady's center for trafficked children in Soubré. Not only were there no children staying in the center, and no evidence that any children had ever lived there, the Center's Director stated that child trafficking occurs rarely, if ever. The Center itself appeared to exist to demonstrate the lack of need for such a center, rather than to provide a safe environment for child victims.

In addition, CAL staff has seen evidence that the First Lady's office has influenced NGOs to claim there is no child labor in Côte d'Ivoire, despite abundant evidence to the contrary. During visits with local NGOs in Abidjan and Soubré in 2018 and 2019, CAL staff encountered multiple child rights and child protection NGOs that were collaborating closely with the First Lady's program, who stated unequivocally that child labor no longer existed in Côte d'Ivoire. One of these organizations accompanied CAL staff to a farmer village to speak with tribal leaders. When a group of small children emerged from a farm during school hours, covered in dirt and carrying machetes, unaccompanied by adults and not wearing the mandatory uniform for all school children, the NGO's staff reported that these children were not child laborers but were in "manual labor class." Several hours later, school let out and the same roads were filled with children wearing clean uniforms, clearly not having spent the day in the field. CAL staff found

---

[92] UNAIDS, *First Lady of Côte d'Ivoire Dominique Ouattara, UNAIDS Special Ambassador for the Elimination of Mother-to-Child Transmission and the Promotion of Pediatric Treatment for HIV*, https://www.unaids.org/en/aboutunaids/unaidsambassadors/dominiqueouattara.

[93] U.S. Department of State, *2019 Trafficking in Persons Report: Côte d'Ivoire*, Côte d'Ivoire: Tier 2, https://www.state.gov/reports/2019-trafficking-in-persons-report-2/cote-divoire/.

this intentional obfuscation concerning and likely to be a result of the influence exercised by the First Lady's Office and the local Member of Parliament, who required a meeting with our staff to obtain permission to visit the farms.

While it remains unclear what leverage the First Lady's office has over these organizations, her office has also nakedly intimidated independent investigators with whom CAL works. In December 2019, a contract between CAL and the investigators was leaked to the Office of the First Lady. As a result, the investigators were called into the First Lady's Office and questioned about their upcoming investigation. As a result of the intimidation, the investigators changed their work schedules, went into the office as little as possible, used code names in text messages, and changed their plans for an upcoming investigation, even changing members of the team and traveling to different regions than originally planned.

## III. Conclusion

Based on CBP's ongoing investigation and the information provided herein and in the original petition from February 14, 2020, pursuant to C.F.R. § 12.42 (g), CBP should grant cocoa and chocolate companies and importers 180 days to publicly release information on their cocoa supply chains down to the farm level; require that companies pay the full Living Income Differential (LID) immediately, and move toward the Living Income price over the next 18 months; and require that companies establish long-term contracts with cooperatives and farmers in Côte d'Ivoire to ensure economic stability.

Respectfully submitted,

Corporate Accountability Lab
By Charity Ryerson
Executive Director, Founder
By Allie Brudney
Staff Attorney
6214 N. Glenwood Ave.
Chicago, IL 60660
773-346-5545
charity@corpaccountabilitylab.org
allie@corpaccountabilitylab.org

International Rights Advocates
By Terrence P. Collingsworth
Executive Director

621 Maryland Ave. NE
Washington, DC 20002
202-543-5811
tc@iradvocates.org

**Appendices**

Appendix A: Mission Report Summer 2020, August 2020 (English)

Appendix B: Mission Report Summer 2020, August 2020 (French)

Appendix C: Summary of Interviews with Cocoa Producers, August 2020 (English)

Appendix D: Summary of Interviews with Cocoa Producers, August 2020 (French)

Appendix E: Affidavit 1: Bus Route, November 2020 (English)

Appendix F: Affidavit 1: Bus Route, November 2020 (French)

Appendix G: Affidavit 2: Border Conversation, November 2020 (French)

Appendix H: Affidavit 2: Border Conversation, November 2020 (English)

Appendix I: Affidavit 3: Trafficked Children, November 2020 (English)

Appendix J: Affidavit 3: Trafficked Children, November 2020 (French)

Appendix K: Affidavit 4: Pictures and Audio, December 2020 (English)

Appendix L: Affidavit 4: Pictures and Audio, December 2020 (French)

Appendix M: Description of Photos, Transcripts of Video and Audio Recordings, December 2020 (English)

Appendix N: Description of Photos, Transcripts of Video and Audio Recordings, December 2020 (French)

Appendix O: Mission Report November/December 2020 (English)

Appendix P: Mission Report November/December 2020 (French)

Appendix O: *IRAdvocates and Corporate Accountability Lab, Cocoa Petition*, February 14, 2020, https://tinyurl.com/rjxw6mk.

1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and Border Protection

*Commissioner*

DEC 13 2022

Mr. Terrence P. Collingsworth
International Rights Advocates
621 Maryland Ave NE
Washington, DC 20002

Dear Mr. Collingsworth:

This is in response to your October 13, 2022 email regarding the status of the petition filed with U.S. Customs and Border Protection (CBP) by International Rights Advocates (IRA) and Corporate Accountability Lab (CAL) on February 14, 2020, and the supplemental addendum submitted on June 25, 2021, alleging the use of forced child labor to harvest cocoa in Cote d'Ivoire.

CBP is committed to enforcing U.S. law prohibiting the importation of goods made wholly or in part with forced labor. CBP thoroughly investigates credible allegations of the use of forced labor in U.S. supply chains. If evidence reasonably indicates that merchandise is produced by forced labor, as defined in 19 U.S.C. § 1307, and is being or is likely to be imported into the United States, CBP will issue a withhold release order (WRO).

CBP's Office of Trade met with CAL on March 23, 2021 and September 10, 2021 to discuss its petition. During both meetings, the Office of Trade relayed to CAL that the information submitted with the petition was dated and did not provide a sufficient basis for CBP to move forward with enforcement action under 19 U.S.C. § 1307. CBP will accept any additional information IRA and CAL may have, should it become available.

Should you need additional assistance, please do not hesitate to contact me, or have a member of your staff contact John P. Leonard, Deputy Executive Assistant Commissioner, for the Office of Trade, at 202-325-6602.

Sincerely,

Troy A. Miller
Acting Commissioner

ira international rights advocates

January 17, 2022

**Via Email**: troy.a.miller@cbp.dhs.gov
Mr. Troy A. Miller
Acting Commissioner
U.S. Custom and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

cc: John P. Leonard, Deputy Executive Assistant Commissioner
john.leonard@cbp.dhs.gov, john.p.leonard@cbp.dhs.gov

Dear Acting Commissioner Miller,

We are responding to your letter of December 13, 2022 (attached). To say we were shocked that you have described the substantial evidence we submitted of forced child labor in cocoa harvesting in Cote D'Ivoire as "dated" would be an understatement. Our original Petition submitted on February 14, 2020 was explicitly based on evidence of trafficked and forced child labor that we gathered across 2019 and also referred to official government reports from 2019. Our June 25, 2021 Supplemental Petition was explicitly based on interviews, observations, and photos from December 2020 and current government reports. It is hard to imagine given processing and verification time that these submissions could have been more current. The evidence is indeed aging, but only because your office has failed to take action for nearly ***three years***. And to be clear, in our discussions with your staff, we were probing what was taking so long for your office to act on our Petition and no one raised the issue that our submissions were untimely.

Further, as you must be aware, your sister agencies have again flagged forced child labor and child trafficking in cocoa harvesting in Cote D'Ivoire as an ongoing issue. See the U.S. Department of Labor's 2022 List of Goods Produced by Child Labor or Forced Labor (page 25) and the U.S. State Department's 2022 Trafficking in Victim's Report, which reveals (among other things):

> Traffickers also exploit Ivoirian boys in forced labor in the agricultural and service industries, especially cocoa production. West African boys, especially Burkinabe, are exploited in forced labor in agriculture (on cocoa, coffee, pineapple, cashew, and rubber plantations and in animal herding), mining, carpentry, construction, and begging in Cote d'Ivoire. Observers

reported the pandemic's economic impacts, as well as insecurity in neighboring countries, have increased child labor and forced child labor, especially on cocoa farms. Traffickers exploit migrant workers, including Malian, Burkinabe, and internal Ivoirian migrants, in the cocoa sector in forced labor and debt bondage; observers reported recruiters deceive workers about working conditions, including wages, hours, and length of contracts—indicators of forced labor.

In addition, as you likewise should be aware, since the major cocoa companies signed the 2001 Harkin-Engel Protocol, now ***22 years ago***, they promised to end the Worst Forms of Child Labor, including forced child labor, in their cocoa supply chains. Each of them to this day has made new promises and predictions about their future plans (by 2025!) to end this abhorrent practice, but even the companies don't make the outlandish claim that forced child labor is no longer a current issue. There is no legitimate basis to deny there is currently forced child labor harvesting cocoa, "in whole or in part" in Cote D'Ivoire.

I am not sure what is going on at CBP, but the objective fact is CBP has taken no action on a extremely detailed Petition and Supplemental Petition confirming an undisputable reality that, for decades, the major cocoa companies have profited from the long tragedy of the exploitation of children in the cocoa sector. Appropriate action under the statutory authority of CBP is likely, after all of this time, the only event that would push these companies to finally do what they promised back in 2001.

As we approach the third anniversary of our Petition, please let us know if your intention is to in effect dismiss or deny our Petition, are you planning to leave this emergency of child abuse in limbo for several more years, or will you take concrete action that will lead to compliance by the cocoa companies ***with their own promises and announced standards*** to end and prevent the use of forced child labor in cocoa harvesting. We would appreciate a clear response so that we can assess our options.

Sincerely,

Terrence P. Collingsworth
Executive Director
621 Maryland Ave NE
Washington D.C. 20002
tc@iradvocates.org
1-202-543-5811 (office direct)

Corporate Accountability Lab
6214 N. Glenwood Ave.
Chicago, IL 60660
773-346-5545

February 14, 2023

Troy Miller, Senior Official Performing the Duties of the Commissioner
U.S. Custom and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

**Re: Supplemental petition to exclude cocoa produced in Côte D'Ivoire and imported to the U.S. by Cargill, Inc. and Olam.**

Dear Acting Commissioner Miller,

Corporate Accountability Lab (CAL) submits this supplemental petition to the February 2020 and June 2021 petitions filed under Section 307 of the Tariff Act of 1930, 19 U.S.C. § 1307, regarding the importation of cocoa from Côte d'Ivoire.[1] Since February 2020, when CAL and International Rights Advocates filed the first petition, CBP has not issued a Withhold Release Order (WRO) against any cocoa or chocolate goods produced in Côte d'Ivoire. Yet there is ample evidence that since February 2020, Olam, Cargill, and other cocoa and chocolate companies continued to import cocoa and chocolate products produced with forced child labor into the United States.

## I. Introduction

This petition contains new and recently acquired information, including evidence of child trafficking and forced child labor on cocoa farms in Côte d'Ivoire. Based on this and previous information submitted to CBP, we urge CBP to issue a WRO on cocoa produced by two cooperatives, the Coopérative avec Conseil d'Administration Abotre (COOP-CA ABOTRE) and

[1] *See* Corporate Accountability Lab & International Rights Advocates, Re: Petition to exclude cocoa produced in Cote D'Ivoire and imported to the U.S. by Nestle, Mars, Hershey, Barry Callebaut, World's Finest Chocolate, Inc., Blommer Chocolate Co., Cargill, Mondelēz, and Olam unless and until within 180 days any specific "importer establishes by satisfactory evidence that [its] merchandise was not ... manufactured in any part with" forced or trafficked child labor. 19 C.F.R. § 12.42 (g), February 14, 2020, https://corpaccountabilitylab.org/publications; Corporate Accountability Lab & International Rights Advocates, CAL and IRAdvocates Provide New Evidence of Forced Child Labor in Major Chocolate Producers' Supply Chain, Press Release, June 25, 2021, https://static1.squarespace.com/static/5810dda3e3df28ce37b58357/t/60d602b5815e265a8d3e5abb/1624638133368/Press+Release+Supplemental+Petiton+June+2021.pdf; Allie Brudney, CAL and IRAdvocates Provide New Evidence of Forced Child in the Cocoa Sector in Wake of Supreme Court Decision in Nestlé v. Doe, Corporate Accountability Lab, June 25, 2021, https://docs.google.com/document/d/11DjYpTfUylfDceT7DWx4xXVMypakuc-HfdzzUeGn7H0/edit#; Corporate Accountability Lab & International Rights Advocates, Re: Request that you enforce the law to stop forced child labor in cocoa harvesting, February 14, 2022, https://static1.squarespace.com/static/5810dda3e3df28ce37b58357/t/621fc75dd738c01c8657b9be/1646249821792/2.14.22+FINAL+Letter+to+CBP+with+Sign+Ons.pdf.

the Société Coopérative Espoir d'Angouakro (COOP-CA ESPOIR), and therefore on cocoa imported by Cargill and Olam, both of which buy directly from these cooperatives. Both companies commingle the cocoa beans they buy and likely cannot distinguish beans bought from these two cooperatives from cocoa beans bought from other cooperatives. If Cargill and Olam are unable to separate out the beans they buy from these two cooperatives, then all beans bought by these companies from Côte d'Ivoire are tainted and must be stopped from entering the United States.

Forced labor in the West African cocoa industry is a result of poverty and the low prices companies pay cocoa farmers for their cocoa beans. Without a higher and more stable income for cocoa farmers, forced labor will continue. Therefore, to demonstrate that these companies have remediated the forced labor in their supply chains, we request that CBP require companies to:

1. ***Map and publish information on both their direct and indirect supply chains.*** While companies, including Olam and Cargill, have taken big steps to release information about the cooperatives that they source from, they do not have full visibility into their entire supply chains, especially in their indirect supply chains.[2] These companies must immediately map their indirect supply chains, be able to trace their cocoa beans to individual farmers, and make this information publicly available.

2. ***Pay the full Living Income Differential (LID) immediately and move toward the Living Income price over the next twelve months.*** The Voice Network has calculated the current Living Income farmgate price to be $3,166 USD per metric tonne of cocoa produced, more than double the current farmgate price of approximately $1,330 per tonne.[3] Chocolate companies have purchased cocoa at or below the cost of production for decades, making it difficult for farmers to support their families. This creates a significant economic incentive for trafficking and must be addressed before illegal forms of labor will be eradicated.

3. ***Establish long-term contracts with cooperatives and farmers in Côte d'Ivoire over the next twelve months to ensure economic stability.*** Farmers bear the burden of market volatility, whether driven by commodity prices or by changes in demand. This generates economic precarity and indebtedness, which are both drivers of forced labor. Long-term contracts distribute risk to supply chain actors who are better situated to absorb it, resulting in greater stability across the supply chain.

---

[2] Cargill does not state how much of its supply chain is indirect. *See* Cargill, *Partner Cooperatives*, https://www.cargill.com/sustainability/cocoa/partner-cooperatives [*hereinafter* Cargill, *Partner Cooperatives*]. Olam also does not state how much of its supply chain is direct compared to indirect. *See* Olam, *Olam Cocoa hits 100% traceability target across its direct global supply chain*, Press Release, Sept. 21, 2020, https://www.olamgroup.com/news/all-news/press-release/olam-cocoa-hits-100-percent-traceability-target-across-its-direct-global-supply-chain.html.

[3] *See* Voice Network, "Necessary Farmgate Prices for a Living Income," January 2020, https://www.voicenetwork.eu/wp-content/uploads/2020/01/200113-Necessary-Farm-Gate-Prices-for-a-Living-Income-Definitive.pdf; Ange Aboa & Sofia Chrsensen, *Ivory Coast raises cocoa farmgate price by 9% for 2022/2023 harvest*, Reuters, Sept. 30, 2022, https://www.reuters.com/world/africa/ivory-coast-raises-cocoa-farmgate-price-by-9-20222023-harvest-2022-09-30/ ("Ivory Coast has raised the fixed farmgate price paid to cocoa farmers by over 9% to 900 CFA francs ($1.33) per kilogramme from 825 CFA francs for the main crop of the 2022/2023 season starting on Oct. 1").

We submit that the information we and others have provided to CBP, and that CBP itself has gathered, constitutes an overwhelming basis for any person to have a "reason to believe"[4] that at least some cocoa imported into the United States by Cargill and Olam from Côte d'Ivoire is produced "wholly or in part"[5] with forced or trafficked child labor.

## II. Background

For over twenty years, cocoa and chocolate companies have promised to clean up their cocoa supply chains and eradicate forced child labor. In 2001, eight major chocolate companies signed the Harkin-Engel Protocol, a voluntary protocol in which companies initially promised to eradicate child labor by 2005.[6] Eighteen years after the first missed deadline, and despite years of promises, forced child labor in the West African cocoa industry continues to be found throughout companies' supply chains.

Forced child labor is a direct result of the poverty wages that cocoa farmers earn.[7] These low prices leave the majority of cocoa farmers earning under the World Bank's poverty line of $1.90 per day.[8] Such low incomes make it difficult for farmers to pay for legal forms of labor. As a result, farmers often rely on their families, including their underage children. In some cases, desperate farmers rely on forced labor by children trafficked from neighboring Mali, Burkina Faso, and Togo.

Over the past few years, the Ivorian government has taken increasing action against traffickers. In 2022, at least 392 traffickers were arrested and 2,116 children were rescued "from abusive situations."[9] This has resulted in at least a few prosecutions.[10]

---

[4] 19 C.F.R. § 12.42 (b).

[5] § 307 of the Tariff Act of 1930, 19 U.S.C. § 1307 ("Section 307").

[6] Protocol for the Growing and Processing of COcoa Beans and Their Derivative Products in a aManner that Complies with ILO Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor, 2001, https://www.dol.gov/sites/dolgov/files/ILAB/legacy/files/Harkin_Engel_Protocol.pdf.

[7] Peter Whoriskey & Rachel Siegel, *Cocoa's Child Laborers*, WASHINGTON POST, June 5, 2019, https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/; Antonie C. Fountain & Friedel Huetz-Adams, *Cocoa Barometer 2020*, 2020, at 12, https://www.voicenetwork.eu/wp-content/uploads/2020/12/2020-Cocoa-Barometer.pdf [*hereinafter Cocoa Barometer*]; *The True Price of Cocoa From Ivory Coast*, True Price and IDH, 2016, at 16, https://www.chocolatemakers.nl/wordpress/wp-content/uploads/2016/04/TP-Cocoa.pdf.

[8] *See, e.g.*, *Cocoa Barometer*, p. 40, *supra* note 7 (showing a graph for farmer income in Ghana); Francisco Ferreira, et al, *The international poverty line has just been raised to $1.90 a day, but global poverty is basically unchanged. How is that even possible?*, *World Bank Blogs*, Oct. 5, 2015, https://blogs.worldbank.org/developmenttalk/international-poverty-line-has-just-been-raised-190-day-global-poverty-basically-unchanged-how-even (explaining why the World Bank increased the poverty rate to $1.90 per day).

[9] Sarah Johnson, *How Ivory Coast is winning the fight to keep its children out of the cocoa fields*, The Guardian, Dec. 27, 2022, https://www.theguardian.com/global-development/2022/dec/27/how-ivory-coast-is-winning-the-fight-to-keep-its-children-out-of-the-cocoa-fields.

[10] See, e.g., Philippe Kouhon, *Côte d'Ivoire : 4 trafiquants d'enfants arrêtés à Akoupé et déférés devant le parquet (lutte contre le travail des enfants)*, Afriki Presse, Nov. 22, 2022, https://afrikipresse.fr/4-trafiquants-denfants-arretes-a-akoupe-et-deferes-devant-le-parquet/ (stating that on November, 2022, the government arrested four men on charges of child trafficking).

## III. Evidence of Forced Labor and Child Trafficking

The following information was gathered by an investigatory team working with CAL in September 2022. These investigators are experienced at speaking with children in rural Côte d'Ivoire and investigating forced labor and trafficking. The following indicators of forced labor were found: abuse of vulnerability, withholding of wages, withholding of identity documents, and deception.[11]

### A. Trafficking Patterns

In the eastern parts of Côte d'Ivoire, near the Ghanaian border, trafficking patterns have historically brought migrant workers from Mali and Burkina Faso to work on cocoa farms. Trafficking and smuggling across borders, especially along the Ivorian-Ghanaian border, appears to be ongoing and widespread. In September 2022, a Cargill agent near Béttié, in the eastern region of Côte d'Ivoire reported to CAL investigators: "The borders here are not recognized, so there is a lot of trafficking going on. People transit easily. You also know the police are involved. They can see the traffic. They see people with children, and they don't bother to investigate the children."[12] This statement is in line with evidence collected by CAL and others in the past.

While trafficking remains commonplace, the populations coming across the border to the eastern region of Côte d'Ivoire seem to be changing. In the wake of the 2020 election, there was increased conflict between the migrant workers and the local Agni people. Since then, more migrant workers from Togo have arrived in the region. The head of the COOP-CABB Cooperative, from which Cargill buys cocoa,[13] reported that: "The Togolese is a laborer and he works in a classified unprotected forest, in a plantation. When he returns to his country, he brings his brother's children back with him. There are sometimes 10 to 12 children. The children are in the camps. We do not know if this is in agreement with the parents. Do the parents receive the fruits of their children's labor? We don't know. Do the children receive anything? We don't know."[14]

---

[11] *See* International Labour Organization, *ILO Indicators of Forced Labour*, https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.

[12] Exhibit 3; Exhibit 4. The original French is: "Les frontières d'ici ne sont pas reconnues, il y a donc plein de trafic qui se passe. Les gens transitent tranquillement. Vous connaissez aussi l'implication des forces de l'ordre. Ils constatent le trafic. Ils voient des personnes avec les enfants et ne prend pas la peine d'enquêter sur les enfants."

[13] Cargill, *Partner Cooperatives*, *supra* note 2.

[14] Exhibit 3, para. 5; Exhibit 4, para. 5. In this case, "brother" refers to someone from the same ethnic group, not to someone related by blood. The original French is: "Le togolais est manœuvre et il travaille dans une forêt classée non protégée il donc une plantation. Lorsqu'il retourne au pays, il fait venir les enfants de son frère. Ils sont parfois 10 à 12 enfants. Les enfants sont dans les campements. Nous ne savons pas si c'est en accord avec les parents. Est-ce que les parents reçoivent le fruit du travail de leurs enfants ? Nous ne savons pas. Est-ce que les enfants reçoivent quelque chose ? Nous ne savons pas."

The Cargill agent also reported that: "The issue of trafficking is widely observed among Togolese laborers. In our certification system, we require the laborers' identity documents; otherwise we do not give the certification."[15] This suggests that trafficking in the region is widespread and well-known to those living and working there.

### B. Instances of Forced Child Labor

In September 2022, investigators spoke with two children, ages 12-13 and 15, who were trafficked from Togo to the eastern regions of Côte d'Ivoire a few years ago to work on cocoa farms, where they continue to work. The following indicators of forced labor were found: abuse of vulnerability, withholding of wages, deception, and withholding of identity documents.[16]

Many trafficking networks in the eastern region of Cote d'Ivoire are based on ethnic and family relationships.[17] This is also true in the case of the two trafficked boys with whom the investigators spoke. The boys confirmed that their "guardian," who they called "boss,"[18] is also Togolese.[19] From speaking with the children, the investigators learned that the boys had been "sent by their parents to the 'guardian,' who then took them to work on cocoa farms in Côte d'Ivoire. In these situations, the parents typically know the boss, as they are from the same ethnic and familial groups. The children are given to the guardian, who brings them to Côte d'Ivoire, pretending that they are his own children when they cross the border."[20]

***Abuse of vulnerability***: Children are inherently vulnerable. Although their parents consented to the children leaving to work on a cocoa farm, children cannot consent to being trafficked or to doing hazardous labor, such as using machetes and carrying heavy loads, key steps in producing cocoa. Children are especially vulnerable when they rely on a non-family member for food, pay, and housing, as in the case of these boys. In this case, the boss is taking advantage of the children's young ages and the fact that they are far from home to keep them working on the cocoa farm.

***Withholding of Wages***: These two boys work on the cocoa farm all year. They told the investigators that they receive a small amount of money at the end of each year, while the boss takes the rest. The children said: "We are paid at the end of the year; the money is paid back to the guardian at the end of the harvest; it is the boss who keeps and gives us a little."[21] While the boys receive a small amount of money at the end of each year, it is unclear if their parents are paid for their work – although it is unlikely.[22]

---

[15] Exhibit 3, para. 9; Exhibit 4, para. 9. The original in French is: "La question de la traite est beaucoup observée chez les manœuvres togolais. Dans notre système de certification, on exige d'avoir les pièces d'identité des manœuvres sinon on ne donne pas la certification."
[16] *See* International Labour Organization, ILO Indicators of Forced Labour, https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.
[17] Exhibit 1, para. 4; Exhibit 2, para. 4.
[18] In French they referred to the man as "patron."
[19] Exhibit 1, para. 4; Exhibit 2, para. 4.
[20] Exhibit 1, para. 4; Exhibit 2, para. 4.
[21] Exhibit 1, para. 5; Exhibit 2, para. 5. In French, the children said: "Nous sommes payés à la fin de l'année ; l'argent est reversé au tuteur à la fin de la récolte ; c'est le patron qui garde et nous donne un peu."
[22] Exhibit 1, para. 5; Exhibit 2, para. 5.

***Deception***: The children told the investigators that after working on the cocoa farm for between three and five years, they will be given a piece of land to farm themselves. The older child even told the investigators that he thinks he will receive this plot of land in about one year. However, investigators think this is unlikely as there was no evidence to support the child's belief.[23]

***Withholding of Identity Documents***: The children also reported that the boss has their birth certificates in his possession. Birth certificates are the primary form of identification for children in Côte d'Ivoire and in much of West Africa. While speaking with the boys, the investigators asked them: "Do you have identity documents and who keeps them?"[24] In response, the younger boy told them: "Yes, I have papers, my boss keeps them."[25] The second boy did not even respond, probably because the "boss" was standing next to him at the time.

The boss told the investigators that he sells his cocoa to two cooperatives: Coopérative avec Conseil d'Administration Abotre (COOP-CA ABOTRE) and the Société Coopérative Espoir d'Angouakro (COOP-CA ESPOIR), both near Abengourou.[26] While the investigators were told that the cooperatives sell to Cargill, both COOP-CA ABORTE and COOP-CA ESPOIR are listed on Olam Food Ingredients's (OFI) website as cooperatives from which they source.[27] Olam is a major importer of cocoa and provides cocoa to numerous brands, and even claims that one in five chocolate bars uses Olam's cocoa.[28] Olam Food Ingredients is a group within Olam, spun out in 2020 during a reorganization of the company.[29] Mars buys from Olam,[30] as does Mondelez,[31] Ferrero,[32] Hershey,[33] and other major brands.

## IV. Conclusion

---

[23] Exhibit 1, para. 5; Exhibit 2, para. 5.
[24] Exhibit 1, para. 7; Exhibit 2, para. 7. The original French is: "Et tes papiers, qui les garde ?"
[25] Exhibit 1, para. 7; Exhibit 2, para. 7. The original in French is: "Et tes papiers, qui les garde ?" En réponse, le plus jeune enfant sur la première photo a dit : "Oui j'ai papier, c'est mon patron qui garde."
[26] OFI, *Sustainable cocoa suppliers in Côte d'Ivoire*, 2022, https://www.ofi.com/content/dam/olamofi/sustainability/sustainability-pdfs/COTE-D%27IVOIRE-ofi-sustainable-cocoa-suppliers-2022.pdf.
[27] OFI, *Sustainable cocoa suppliers in Côte d'Ivoire*, 2022, https://www.ofi.com/content/dam/olamofi/sustainability/sustainability-pdfs/COTE-D%27IVOIRE-ofi-sustainable-cocoa-suppliers-2022.pdf.
[28] OFI, https://www.ofi.com ("1 in 5 chocolate bars consumed globally use our cocoa beans and product").
[29] OFI, Olam Food Ingredients, https://www.olamgroup.com/about-olam/group-overview/olam-food-ingredients.html.
[30] Mars, *Mars Cocoa Supply Chain Disclosure – Tier 1 2020 Update - August 31, 2021*, Aug. 31, 2021, https://www.mars.com/sites/g/files/jydpyr316/files/2021-09/2021%20T1%20MARS%20COCOA%20SUPPLY%20CHAIN%20DISCLOSURE%20-2021-31%20august.pdf.
[31] Mondelez, *MDLZ Cocoa Life Tier 1 and Tier 2 Suppliers - 2021*, https://www.mondelezinternational.com/-/media/Mondelez/Snacking-Made-Right/Sustainable-Snacking/Sustainable-Ingredients/MDLZ-Cocoa-Life-Tier-1-and-Tier-2-Suppliers.pdf.
[32] Ferrero, *Cocoa tier-1 suppliers and farmer groups, Fiscal Year 2020/2021 (1st September 2020 – 31st August 2021)*, https://www.ferrerosustainability.com/int/sites/ferrerosustainability_int/files/2022-03/cocoa-supply-chain_fy-2021_1.pdf.
[33] Hershey, *Cocoa Supply Chain Traceability*, https://www.thehersheycompany.com/en_us/home/sustainability/sustainability-focus-areas/responsible-sourcing/priority-ingredients-and-materials/cocoa-sourcing.html.

This petition documents two specific instances of forced child labor in the Ivorian cocoa industry. There is evidence that the cocoa these children help to produce – by cutting down pods, collecting pods, opening them and removing the beans, and assisting with drying and fermenting – is sold to the COOP-CA ABOTRE and COOP-CA ESPOIR cooperatives. We urge CBP to issue a WRO immediately against these cooperatives and the companies that buy from them.

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or Preempted Limitation Recognized by Krafsur v. Davenport, 6th Cir.(Tenn.), Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (5716)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fiszer, Justin 11/21/2024
For Educational Use Only



Code of Federal Regulations
Title 19. Customs Duties
Chapter I. U.S. Customs and Border Protection, Department of Homeland Security; Department of the Treasury (Refs & Annos)
Part 12. Special Classes of Merchandise (Refs & Annos)
Merchandise Produced by Convict, Forced, or Indentured Labor

19 C.F.R. § 12.42

§ 12.42 Findings of Commissioner of CBP.

Effective: June 8, 2017
Currentness

(a) If any port director or other principal Customs officer has reason to believe that any class of merchandise that is being, or is likely to be, imported into the United States is being produced, whether by mining, manufacture, or other means, in any foreign locality with the use of convict labor, forced labor, or indentured labor under penal sanctions, including forced child labor or indentured child labor under penal sanctions, so as to come within the purview of section 307, Tariff Act of 1930, he shall communicate his belief to the Commissioner of CBP. Every such communication shall contain or be accompanied by a statement of substantially the same information as is required in paragraph (b) of this section, if in the possession of the port director or other officer or readily available to him.

(b) Any person outside CBP who has reason to believe that merchandise produced in the circumstances mentioned in paragraph (a) of this section is being, or is likely to be, imported into the United States may communicate his belief to any port director or the Commissioner of CBP. Every such communication shall contain, or be accompanied by:

(1) A full statement of the reasons for the belief;

(2) A detailed description or sample of the merchandise; and

(3) All pertinent facts obtainable as to the production of the merchandise abroad.

(c) If any information filed with a port director pursuant to paragraph (b) of this section does not conform with the requirements of that paragraph, the communication shall be returned promptly to the person who submitted it with detailed written advice as to the respects in which it does not conform. If such information is found to comply with the requirements, it shall be transmitted by the port director within 10 days to the Commissioner of CBP, together with all pertinent additional information available to the port director.

(d) Upon receipt by the Commissioner of CBP of any communication submitted pursuant to paragraph (a) or (b) of this section and found to comply with the requirements of the pertinent paragraph, the Commissioner will cause such investigation to be

made as appears to be warranted by the circumstances of the case and the Commissioner or his designated representative will consider any representations offered by foreign interests, importers, domestic producers, or other interested persons.

(e) If the Commissioner of CBP finds at any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported, he will promptly advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise pending instructions from the Commissioner as to whether the merchandise may be released otherwise than for exportation.

(f) If it is determined on the basis of the foregoing that the merchandise is subject to the provisions of the said section 307, the Commissioner of CBP, with the approval of the Secretary of the Treasury, will publish a finding to that effect in a weekly issue of the Customs Bulletin and in the Federal Register.

(g) Any merchandise of a class specified in a finding made under paragraph (f) of this section, which is imported directly or indirectly from the locality specified in the findings and has not been released from CBP custody before the date of publication of such finding in the Federal Register shall be considered and treated as an importation prohibited by section 307, Tariff Act of 1930, unless the importer establishes by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding.

(h) The following findings made under the authority of section 307, Tariff Act of 1930 are currently in effect with respect to the merchandise listed below:

| Merchandise | Country | T.D. |
|---|---|---|
| Furniture, clothes hampers, and palm leaf bags. | Ciudad Victoria, Tamaulipas, Mexico | 53408<br>54725 |

**Credits**

[53 FR 51253, Dec. 21, 1988; 55 FR 40166, Oct. 2, 1990; T.D. 95–78, 60 FR 50024, Sept. 27, 1995; T.D. 99–27, 64 FR 13674, March 22, 1999; T.D. 00–52, 65 FR 45875, July 26, 2000; CBP Dec. 17–04, 82 FR 26584, June 8, 2017]

SOURCE: 28 FR 14710, Dec. 31, 1963; T.D. 85–107, 50 FR 26194, June 25, 1985; T.D. 89–1, 53 FR 51253, Dec. 21, 1988; T.D. 89–26, 54 FR 6881, Feb. 15, 1989; T.D. 90–3, 55 FR 1810, Jan. 19, 1990; T.D. 90–72, 55 FR 37705, Sept. 13, 1990; T.D. 90–78, 55 FR 40166, Oct. 2, 1990; T.D. 93–27, 58 FR 19349, April 14, 1993; T.D. 93–66, 58 FR 44130, Aug. 19, 1993; T.D. 94–1, 58 FR 69470, Dec. 30, 1993; T.D. 95–29, 60 FR 18348, April 11, 1995; T.D. 96–42, 61 FR 24889, May 17, 1996; T.D. 96–46, 61 FR 28500, June 5, 1996; T.D. 96–64, 61 FR 43961, Aug. 27, 1996; T.D. 00–52, 65 FR 45875, July 26, 2000; T.D. 00–81, 65 FR 68886, Nov. 15, 2000; T.D. 01–26, 66 FR 16853, March 28, 2001; T.D. 02–14, 67 FR 15098, March 29, 2002; 68 FR 51869, Aug. 28, 2003; CBP Dec. 04–28, 69 FR 52599, Aug. 27, 2004; CBP Dec. 05–32, 70 FR 58013, Oct. 5, 2005; CBP Dec. 05–31, 70 FR 53061, Sept. 7, 2005; CBP Dec. 05–10, 70 FR 11540, March 9, 2005; CBP Dec. 08–32, 73 FR 49937, Aug. 25, 2008; CBP Dec. 08–17, 73 FR 23342, April 30, 2008; CBP Dec. 09–01, 74 FR 2846, Jan. 16, 2009; 75 FR 12445, March 16, 2010; CBP Dec. 10–04, 75 FR 13677, March 23, 2010; CBD Dec. 10–29, 75 FR 52450, Aug. 26, 2010; 78 FR 40629, July 8, 2013; CBP Dec. 13–12, 78 FR 40390, July 5, 2013; CBP Dec. 16–10, 81 FR 53920, Aug. 15, 2016; CBP


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fiszer, Justin 11/21/2024
For Educational Use Only



Dec. 16–12, 81 FR 57458, Aug. 23, 2016; CBP Dec. 17–04, 82 FR 26583, June 8, 2017; CBP Dec. 17–15, 82 FR 50071, Oct. 30, 2017, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 19 U.S.C. 66, 1202 (General Note 3(i), Harmonized Tariff Schedule of the United States (HTSUS)), 1624.; Section 12.1 also issued under 21 U.S.C. 371(b);; Section 12.3 also issued under 7 U.S.C. 135h, 21 U.S.C. 381;; Section 12.4 also issued under 21 U.S.C. 381(b);; Section 12.6 also issued under 7 U.S.C. 1854;; Section 12.10 also issued under 7 U.S.C. 151–162;; Section 12.15 also issued under 19 U.S.C. 1558;; Section 12.16 also issued under 7 U.S.C. 1592(b);; Sections 12.21 through 12.23 also issued under 42 U.S.C. 262;; Section 12.26 also issued under 18 U.S.C. 42;; Section 12.28 also issued under 18 U.S.C. 42, 19 U.S.C. 1527;; Section 12.34 also issued under 19 U.S.C. 1202 (additional U.S. Note to Chapter 36, HTSUS);; Section 12.37 also issued under 27 U.S.C. 203;; Section 12.39 also issued under 19 U.S.C. 1337, 1623;; Sections 12.40 and 12.41 also issued under 19 U.S.C. 1305;; Sections 12.42 through 12.44 also issued under 19 U.S.C. 1307, Pub.L. 105–61 (111 Stat. 1272), and Public L. 114–125 (130 Stat. 122);; Section 12.50 also issued under 42 U.S.C. 6301;; Sections 12.73 and 12.74 also issued under 19 U.S.C. 1484, 42 U.S.C. 7522, 7601;; Section 12.85 also issued under 19 U.S.C. 1623, 46 U.S.C. 4302, 4306, 4310;; Sections 12.95 through 12.103 also issued under 15 U.S.C. 1241–1245;; Sections 12.104 through 12.104i also issued under 19 U.S.C. 2612;; Section 12.104j also issued under Pub.L. 108–429, 118 Stat. 2600; 19 U.S.C. 2612;; Section 12.104k also issued under Pub.L. 114–151, 130 Stat. 369; 19 U.S.C. 2612;; Sections 12.105 through 12.109 also issued under 19 U.S.C. 2094;; Sections 12.110 through 12.117 also issued under 7 U.S.C. 136 et seq.;; Sections 12.118 through 12.127 also issued under 15 U.S.C. 2601 et seq.;; Section 12.140 also issued under 19 U.S.C. 1484, 2416(a), 2171;; Section 12.142 also issued under 19 U.S.C. 1484; section 3301 of Pub.L. 110–246.; Section 12.150 also issued under 19 U.S.C. 1595a and 1618; 22 U.S.C. 401.; Section 12.152 also issued under 19 U.S.C. 1484, 1498; the Clean Diamond Trade Act (Pub.L. 108–19, 117 Stat. 631 (19 U.S.C. 3901 et seq.)); Executive Order 13312 dated July 29, 2003.

Notes of Decisions (22)

Current through November 19, 2024, 89 FR 91283. Some sections may be more current. See credits for details.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 19. Customs Duties
Chapter 4. Tariff Act of 1930
Subtitle II. Special Provisions
Part I. Miscellaneous

19 U.S.C.A. § 1307

§ 1307. Convict-made goods; importation prohibited

Effective: March 10, 2016
Currentness

All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.

"Forced labor", as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term "forced labor or/and indentured labor" includes forced or indentured child labor.

**CREDIT(S)**

(June 17, 1930, c. 497, Title III, § 307, 46 Stat. 689; Pub.L. 106-200, Title IV, § 411(a), May 18, 2000, 114 Stat. 298; Pub.L. 114-125, Title IX, § 910(a)(1), Feb. 24, 2016, 130 Stat. 239.)

Notes of Decisions (22)

19 U.S.C.A. § 1307, 19 USCA § 1307
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.

If you view the Full Docket you will be charged for 2 Pages $0.20

**General Docket**
**United States Court of Appeals for the Federal Circuit**

**Court of Appeals Docket #:** 24-2316 **Docketed:** 09/13/2024
International Rights Advocates v. Mayorkas
**Appeal From:** United States Court of International Trade
**Fee Status:** fee paid

**Case Type Information:**
**1)** Civil US
**2)** -
**3)** -

**Originating Court Information:**
**District:** --12-1 : 1:23-cv-00165-CRK
**Trial Judge:** Claire R. Kelly, Judge
**Date Filed:** 08/15/2023

| **Date NOA Filed:** | **Date Rec'd COA:** |
| --- | --- |
| 09/09/2024 | 09/09/2024 |

| | | |
|---|---|---|
| 09/13/2024 | 1 | Appeal docketed. Received: 09/09/2024. [1032046]<br>Entry of Appearance due 09/27/2024. Certificate of Interest is due on 09/27/2024. Docketing Statement due 10/15/2024. Appellant's brief is due 11/12/2024. [GWK] [Entered: 09/13/2024 12:43 PM] |
| 09/27/2024 | 2 | Entry of Appearance for Aimee Lee; Justin R. Miller; Christopher Berridge; Sabahat Chaudhary as counsel for Appellees Alejandro Mayorkas and Troy Miller. Service: 09/27/2024 by email. [1035392] [24-2316] [Aimee Lee] [Entered: 09/27/2024 11:06 AM] |
| 09/27/2024 | 3 | Docketing Statement for the Appellant International Rights Advocates. Service: 09/27/2024 by email. [1035608] [24-2316] [Terrence Collingsworth] [Entered: 09/27/2024 04:50 PM] |
| 09/27/2024 | 4 | Entry of Appearance for Terrence Collingsworth as counsel for Appellant International Rights Advocates. Service: 09/27/2024 by email. [1035611] [24-2316] [Terrence Collingsworth] [Entered: 09/27/2024 04:53 PM] |
| 09/27/2024 | 5 | Certificate of Interest for Appellant International Rights Advocates. Service: 09/27/2024 by email. [1035613] [24-2316] [Terrence Collingsworth] [Entered: 09/27/2024 04:54 PM] |
| 10/18/2024 | 6 | Notice to Appellees Alejandro Mayorkas and Troy Miller: The record of this case indicates that no Docketing Statement under FCR 47.6 has been filed. Failure to file required documents may result in dismissal or other action as deemed appropriate by the court. *See* FCR 25(h). Service as of this date by the Clerk of Court. [1040864] [GWK] [Entered: 10/18/2024 03:16 PM] |
| 10/18/2024 | 7 | Docketing Statement for the Appellees Alejandro Mayorkas and Troy Miller. Service: 10/18/2024 by email. [1040891] [24-2316] [Christopher Berridge] [Entered: 10/18/2024 04:03 PM] |
| 11/12/2024 | 8 | OPENING BRIEF FILED by Appellant International Rights Advocates. Service: 11/12/2024 by email. [1046038] [24-2316] This document is non-compliant. See Doc No. [10] [Terrence Collingsworth] [Entered: 11/12/2024 09:22 AM] |
| 11/12/2024 | 9 | APPENDIX FILED by Appellant International Rights Advocates. Service: 11/12/2024 by email. [1046045] [24-2316] This document is non-compliant. See Doc No. [10] [Terrence Collingsworth] [Entered: 11/12/2024 09:33 AM] |
| 11/19/2024 | 10 | NOTICE OF NON-COMPLIANCE: The submission of Appellant International Rights Advocates, Opening Brief, Appendix [8], [9], is not in compliance with the rules of this court (see attached). Compliant document due on 11/26/2024. Unless ordered otherwise, the deadline for any responsive filing runs from service of the original version. Service as of this date by the Clerk of Court. [1048241] [GWK] [Entered: 11/19/2024 04:01 PM] |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/20/2024 08:49:50 | | | |
| **PACER Login:** | Collingsworth | **Client Code:** | |
| **Description:** | Case Summary | **Search Criteria:** | 24-2316 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing with the United States Court of Appeals for the Federal Circuit by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.

Date: November 12, 2024

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiff-Appellant*