**2024-2316**

# United States Court of Appeals for the Federal Circuit

INTERNATIONAL RIGHTS ADVOCATES,

*Plaintiff-Appellant,*

– v. –

KRISTI NOEM, Secretary of Homeland Security, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection,

*Defendants-Appellees.*

*On Appeal from the United States Court of International Trade in No. 23-00165, Judge Claire R. Kelly*

## CORRECTED DEFENDANTS-APPELLEES' BRIEF

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge

AIMEE LEE
Assistant Director

CHRISTOPHER A. BERRIDGE
Trial Attorney
International Trade Field Office
U.S. Department of Justice
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (202) 598-7392

*Attorneys for Defendants-Appellees*

*Of Counsel:*

SABAHAT CHAUDHARY
Office of Assistant Chief Counsel
U.S. Customs and Border Protection

# TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT OF THE ISSUE ........ 2

STATEMENT OF THE CASE ........ 2

I. Statutory and Regulatory Background ........ 2

II. Factual Background ........ 4

III. Prior Proceedings ........ 8

SUMMARY OF ARGUMENT ........ 8

ARGUMENT ........ 9

I. Standard of Review ........ 9

II. IRAdvocates Has Not Established an Injury in Fact Necessary for Constitutional Standing ........ 10

A. IRAdvocates's Activities are Purely Issue-Advocacy, and It Does Not Engage in Any Core Business Activities to Demonstrate Injury ........ 10

B. IRAdvocates's Claimed Diversion of Resources and Frustration of Its Mission Do Not Constitute a Sufficient Injury ........ 15

III. IRAdvocates's Alleged Injury is Not Traceable to CBP's Non-Issuance of a WRO ........ 21

IV. IRAdvocates's Alleged Injury is Not Redressable by CBP ........ 23

CONCLUSION ........ 27

## TABLE OF AUTHORITIES

### Cases

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (C.A.D.C. 2006) .......... 17

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 20

*American Anti-Vivisection Society v. U.S. of Agriculture*,
946 F.3d 615 (C.A.D.C. 2020) .......... 17

*Arizona Alliance for Retired Americans v. Mayes*,
117 F.4th 1165 (9th Cir. 2024) .......... 18

*Fair Housing Center of Metropolitan Detroit v. Singh Senior Living, LLC*,
124 F.4th 990 (6th Cir. 2025) .......... 18, 19

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .......... *passim*

*Gladstone Realtors v. Village of Bellwood*,
441 U.S. 91 (1979) .......... 14

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... *passim*

*Hutchison Quality Furniture, Inc. v. United States*,
827 F.3d 1355 (Fed. Cir. 2016) .......... 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 23, 25

*Massachusetts v. Environmental Protection Agency*,
549 U.S. 497 (2007) .......... 25, 26

*McKinney v. U.S. Department of Treasury*,
799 F.2d 1544 (Fed. Cir. 1986) .......... 13, 14

*Military-Veterans Advocates v. Secretary of Veterans Affairs*,
7 F.4th 1110 (Fed. Cir. 2021) .......... 11, 20

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018)........................................................................ 10

*Norsk Hydro Canada, Inc. v. United States*,
472 F.3d 1347 (Fed. Cir. 2006)........................................................................ 10

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
797 F.3d 1087 (C.A.D.C. 2015)........................................................................ 17

*Rimco Inc. v. United States*,
98 F.4th 1046 (Fed. Cir. 2024) ...................................................................9, 10

*Sierra Club v. Morton*,
405 U.S. 727 (1972)...........................................................................................10, 11

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
289 F.3d 89 (C.A.D.C. 2002)........................................................................... 26

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)...........................................................................................25

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
454 U.S. 464 (1982) ..........................................................................................14, 20

**Statutes**

19 U.S.C. § 1307...........................................................................................*passim*

19 U.S.C. § 2071............................................................................................. 3

**Regulations**

19 C.F.R. § 12.42(a)....................................................................................... 4

19 C.F.R. § 12.42(b) ........................................................................... 3, 4, 5, 24

19 C.F.R. § 12.42(d) ........................................................................... 3, 4, 6, 24

19 C.F.R. § 12.42(e) .........................................................................................3, 4

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The Government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

**2024-2316**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**INTERNATIONAL RIGHTS ADVOCATES,**

**Plaintiff-Appellant,**

**v.**

**KRISTI NOEM, Secretary of Homeland Security,**

**PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection,**

**Defendants-Appellees.**

**Appeal from the United States Court of International Trade in Case No. 23-cv-00165, Judge Claire R. Kelly**

## CORRECTED BRIEF OF DEFENDANTS-APPELLEES

## INTRODUCTION

Before this Court is a narrow question of standing to compel the United States to take affirmative enforcement action. As an advocacy organization, Plaintiff-Appellant International Rights Advocates (IRAdvocates) bore the burden to demonstrate to the Court of International Trade that it possessed organizational standing to file suit in that court, but it failed to do so. Weighty precedent on the issue of organizational standing, including a recent United States Supreme Court decision, make clear that IRAdvocates cannot satisfy the constitutional requirements

to file its suit to compel the Defendants-Appellees (the Government) to act. Because IRAdvocates did not and ultimately cannot demonstrate that it suffered an injury in fact, nor was any alleged injury traceable to the Government or redressable by a favorable judicial decision, the Court should sustain the trial court's dismissal of the complaint for lack of jurisdiction.

## STATEMENT OF THE ISSUE

The sole issue in this case is whether IRAdvocates possesses organizational standing to compel the United States, specifically, U.S. Customs and Border Protection (CBP), to take affirmative enforcement action by imposing a withhold release order (WRO) against all cocoa and cocoa products from Côte d'Ivoire sought to be imported into the United States.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

Section 307 of the Tariff Act of 1930, codified at 19 U.S.C. § 1307 (2016)[1], prohibits the admission of goods into the United States that have been produced, in

[1] The statute provides:

> All goods . . . produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.

whole or in part, using forced, indentured, or convict labor.[2] Congress included in the statute a directive for the Secretary of the Treasury[3] to "prescribe such regulations as may be necessary for the enforcement of [19 U.S.C. § 1307]."

Accordingly, CBP promulgated regulations to implement 19 U.S.C. § 1307 at 19 C.F.R. §§ 12.42-12.45 (2017). Relevant for this case is 19 C.F.R. § 12.42, specifically subsections (b), (d), and (e), which govern CBP's receipt of allegations, initiation of investigations, and issuance of WROs, respectively. The regulations permit "[a]ny person outside CBP who has reason to believe that merchandise produced [with forced labor] … is being, or is likely to be, imported into the United States" to communicate this belief to CBP. 19 C.F.R. § 12.42(b). The communication must contain "(1) [a] full statement of the reasons for the belief; (2) [a] detailed description or sample of the merchandise; and (3) [a]ll pertinent facts obtainable as to the production of the merchandise abroad." *Id.* If the belief is communicated to CBP along with sufficient detail to describe the violative merchandise, CBP "will cause [an] investigation to be made as appears to be

---

> For purposes of this section, the term 'forced labor or/and indentured labor' includes forced or indentured child labor.

[2] 19 U.S.C. § 1307 prohibits importation where goods were made, wholly or in part, with forced or indentured child labor, rather than child labor *per se*.

[3] Pursuant to 19 U.S.C. § 2071 and Reorganization Plan No. 26 of 1950 (15 F.R. 4935), the Secretary of the Treasury delegated authority to the United States Customs Service, now CBP, to issue regulations under Section 1307. *See* 19 C.F.R. §§ 12.42-12.45.

warranted by the circumstances of the case." 19 C.F.R. § 12.42(d). CBP "will consider any representations offered by foreign interests, importers, domestic producers, or other interested persons." 19 C.F.R. § 12.42(d). Once CBP undertakes an investigation, and if CBP finds in the course of its investigation that the "information available reasonably but not conclusively indicates that merchandise [produced with forced labor] … is being, or is likely to be imported" into the United States, CBP has the authority to issue a WRO on that merchandise. 19 C.F.R. § 12.42(e). Merchandise subject to a WRO is detained by CBP at a port of entry and the importer of the detained merchandise can either re-export the shipments or provide information showing that the merchandise was not produced in violation of 19 U.S.C. § 1307. *Id.*; Appx4.

## II. Factual Background

CBP is responsible for enforcing laws prohibiting goods made, in whole or in part, with forced labor from entering the U.S. market. Appx162. As indicated in the regulations implementing 19 U.S.C. § 1307, CBP may investigate and act upon its own investigations, 19 C.F.R. § 12.42(a), and also may also investigate allegations from third parties that could assist CBP in enforcing forced labor laws. 19 C.F.R. §

12.42(b). As a result of CBP's enforcement efforts, CBP currently has several dozen active WROs for a variety of goods across the globe.[4]

IRAdvocates is a self-described "organization [that] 'advocates for and with working people around the world'" and is "committed to overcoming the problems of child labor, forced labor, and other abusive practices in the global economy." Appx14-15 (quoting from IRAdvocates's complaint). It accomplishes its mission, in part, by "promoting the enforcement of international labor rights through 'public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups.'" *Id.*

On February 14, 2020, IRAdvocates[5] submitted a petition to CBP pursuant to 19 C.F.R. § 12.42(b), alleging forced child labor in the Ivorian cocoa industry. Appx3; Appx91-114. Relying on evidence that IRAdvocates and others had gathered, the petition alleged that various chocolate companies were using forced child labor to produce cocoa and cocoa products that were being imported into the United States in

---

[4] CBP Withhold Release Orders and Findings Dashboard. https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings. (February 20, 2025).

[5] IRAdvocates submitted the petition with co-allegers Corporate Accountability Lab and the Civil Rights Litigation Clinic of University of California Irvine School of Law. Appx3.

violation of 19 U.S.C. § 1307.[6] Appx4. The petition requested that CBP investigate the allegations in the petition and thereafter issue a WRO against all cocoa and cocoa products from Côte d'Ivoire. *Id.* at 3-4.

Following the receipt of the petition, CBP initiated an investigation into the use of forced labor in the Ivoirian cocoa harvesting industry and the potential U.S. importation of goods made with such cocoa. Appx81-82. In furtherance of its investigation, CBP issued requests for information and questionnaires to various importers of cocoa or products made with cocoa from the Côte d'Ivoire relating to various issues pertinent to its investigation. Appx82; Appx139-141.

CBP met with IRAdvocates in March 2020 to discuss the petition. Appx4-5. During the meeting, CBP informed IRAdvocates that, pursuant to 19 C.F.R. § 12.42(d), it had initiated an investigation into the allegations detailed within the petition. *Id.* at 5. CBP met again with IRAdvocates in March 2021 to discuss the petition, during which meeting it updated IRAdvocates that the investigation was ongoing. *Id.*

On June 25, 2021, IRAdvocates submitted a supplemental petition to CBP about Ivorian cocoa and cocoa products produced with forced child labor, along with additional requests for CBP to take particular investigative steps in pursuit of a WRO.

---

[6] The allegations in the petition recognized that determining whether a person (child or adult) is engaged in forced labor is "highly fact intensive and often speculative," and "the extremely sensitive nature of this sector [makes] it difficult to get access to farms and to have people speak freely." Appx91, Appx103-104.

*Id.*; Appx142-161. CBP met again with IRAdvocates in September 2021 to discuss the supplemental petition. Appx5.

On February 14, 2022, IRAdvocates sent CBP a letter with several signatories urging CBP to issue a WRO against Ivorian cocoa and cocoa products. *Id.* at 6; Appx115-122. On August 15, 2022, CBP representatives met with IRAdvocates's co-alleger, Corporate Accountability Lab. Appx6. IRAdvocates sent CBP an email in October 2022 requesting that CBP provide it with an update on the investigation. *Id.* On December 13, 2022, CBP responded with a letter affirming that it is committed to prohibiting the importation of goods made with forced labor and that it thoroughly investigates the use of forced labor in supply chains. *Id.*; Appx162. The letter also conveyed that the information contained in the petitions was stale and did not provide a sufficient basis for an enforcement action under 19 U.S.C. § 1307. Appx162. CBP further welcomed the submission of additional information from IRAdvocates if it became available. *Id.*

IRAdvocates sought to refute CBP's characterization of the information contained in its petitions in a return letter to CBP in January 2023. Appx7; Appx163-164. A month later, IRAdvocates submitted another petition to CBP alleging violations of 19 U.S.C. § 1307 in Ivorian cocoa and cocoa products bound for the United States. Appx7; Appx165-171.

### III. Prior Proceedings

Although CBP was still investigating allegations of forced labor in cocoa imports from Côte d'Ivoire, IRAdvocates filed suit at the Court of International Trade on August 15, 2023, because CBP had not issued a WRO. Appx21. In its complaint, IRAdvocates asked the trial court to compel CBP to issue a WRO, or at least declare that IRAdvocates had submitted sufficient evidence to CBP to warrant a WRO. Appx89. The Government filed a motion to dismiss the complaint for lack of jurisdiction and for failing to state a claim upon which relief could be granted, arguing, in part, that IRAdvocates lacked the constitutionally required organizational standing to bring its action.

After briefing on the motion to dismiss but before oral argument, the United States Supreme Court decided *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The trial court ordered supplemental briefing in light of *Alliance*. Appx8. The trial court considered all the briefings, heard oral argument, and ultimately ruled in favor of the Government, finding that IRAdvocates had failed to establish organizational standing. Appx1-20. This appeal followed.

## SUMMARY OF ARGUMENT

IRAdvocates has failed to demonstrate that it possessed the three elements necessary to establish organizational standing to file this action in the Court of International Trade. As an advocacy organization, IRAdvocates has suffered no injury in fact by expending resources to engage in the type of activity squarely within

its mission: preparing, submitting, and ultimately advocating for petitions to CBP alleging forced labor. IRAdvocates also does not undertake any business activities that fall outside its advocacy efforts. That CBP has not taken the specific action requested by IRAdvocates in its petitions does not give rise to an injury in fact.

Because IRAdvocates has not demonstrated any injury in fact, it lacks standing as a matter of law to sue to compel CBP to act. But in addition to failing to prove injury, IRAdvocates cannot show that CBP caused its alleged injury or that judicial relief would redress its alleged injury. CBP did not cause IRAdvocates to divert any resources it would not otherwise have used in pursuit of its issue-advocacy mission. IRAdvocates, like any organization, "cannot spend its way into standing" by incurring costs aimed at compelling the Government to act in a certain way. *Alliance*, 602 U.S. at 394. Further, even if the trial court had ordered CBP to act on IRAdvocates's petitions, IRAdvocates could not have demonstrated that CBP would likely act in a manner favorable to IRAdvocates and issue a WRO.

## ARGUMENT

### I. Standard of Review

This Court reviews dismissals granted from the Court of International Trade for lack of subject-matter jurisdiction *de novo* as a question of law. *Rimco Inc. v. United States*, 98 F.4th 1046, 1051 (Fed. Cir. 2024) (citing *Hutchison Quality Furniture, Inc. v. United States*, 827 F.3d 1355, 1359 (Fed. Cir. 2016)). As was true below, this Court accepts factual allegations in the complaint as true for the purpose of this inquiry and

further draws all reasonable inferences in favor of the claimant. *Id.*; *see also Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018). However, the burden of establishing jurisdiction remains with the "party invoking it." *Rimco*, 98 F.4th at 1051 (citing *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006)).

## II. IRAdvocates Has Not Established an Injury in Fact Necessary for Constitutional Standing

Fundamentally, a party bringing suit must satisfy the prerequisites of standing under Article III of the U.S. Constitution. The trial court correctly held that IRAdvocates, as a public interest organization, failed to show that it satisfied any of the requirements for organizational standing, including the existence of a concrete, particularized injury in fact. Appx9-20. The court's finding that IRAdvocates lacked any such injury is supported by the record and by itself justifies the trial court's dismissal of this action.

### A. IRAdvocates's Activities are Purely Issue-Advocacy, and It Does Not Engage in Any Core Business Activities to Demonstrate Injury

The requirement to show a particularized injury obligates a plaintiff to show that it has a personal stake in the case, and not just "a general legal, moral, ideological, or policy objection to a particular government action." *Alliance*, 602 U.S. at 381. This prerequisite is crucial in the context of organizational standing. An advocacy organization may have a compelling interest in an issue or problem, but such an interest no matter how longstanding the interest or qualified the organization, is not enough to establish injury. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). This Court

in *Military-Veterans Advocacy v. Secretary of Veterans Affairs*, 7 F.4th 1110 (Fed. Cir. 2021), has recognized that demonstrating an injury must be more than a "setback to [an] organization's abstract social interests." *Id.* at 1129 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). If a compromised ideological interest were enough, there would be "no objective basis" to disallow a suit by a special interest organization. *Id.* (quoting *Sierra Club*, 405 U.S. at 738).

The two seminal Supreme Court cases addressing the requirements for organizational standing, including the kind of injury needed to maintain such standing, are *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Appx11-18. *Havens* held that organizational standing requires a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources." *Havens*, 455 U.S. at 379. *Alliance* adheres to these principles, while clarifying and confirming the very limited nature of the qualifying injury.

In *Havens*, the Supreme Court considered whether the Housing Opportunities Made Equal (HOME) organization had standing to challenge Havens Realty Corp.'s racial steering practices, which included providing false information to renters about the availability of apartments. HOME was a nonprofit organization whose mission was "to make equal opportunity in housing a reality …". *Havens*, 455 U.S. at 368. In determining whether HOME had organizational standing, the *Havens* Court conducted the same inquiry as in the case of an individual seeking standing and

assessed whether HOME had a "personal stake" in the outcome of the controversy. *Id.* at 378.

The *Havens* Court recognized that proving a "personal" stake required HOME to do more than merely point to a setback to its issue-advocacy activities. The *Havens* Court identified the central question as whether Havens Realty's "steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," causing "more than simply a setback to the organization's abstract social interests." *Id.* at 379. The Court pointed out that HOME's activities included, in addition to its advocacy pursuits, the "operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Id.* at 368. The Court concluded that HOME adequately alleged an injury because Havens Realty's steering activities had "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* at 369.

The Supreme Court in *Alliance* crystallized the distinction between issue-advocacy concerns and separate business activities for purposes of assessing organizational standing. The *Alliance* plaintiffs, four pro-life medical associations and several individual doctors, challenged the Food and Drug Administration's (FDA) actions regarding the regulation of mifepristone, a drug used to terminate pregnancies, making it easier for doctors to prescribe and for pregnant women to obtain the drug. *Alliance*, 602 U.S. at 376. Plaintiffs did not prescribe or use mifepristone, and the

FDA did not impose any requirements on plaintiffs. *Id.* at 374. When considering the organizational standing of the medical associations, the *Alliance* Court emphasized that organizations may "sue on their own behalf for injuries they have sustained." *Id.* at 393 (citing *Havens*, 455 U.S. at 379 n.19). The *Alliance* Court made clear, however, that an organization cannot establish injury by asserting the right of others. "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might only have a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

The *Alliance* Court reaffirmed that more than issue-advocacy is required to establish an injury in fact in its discussion of *Havens*—noting that, crucially, the organization in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395. The Court explained that the false information provided by Havens Realty about apartment availability "perceptibly impaired" HOME in its counseling and referral services, meaning that the defendant's "actions directly affected and interfered with" HOME's "core business activities" distinct from its advocacy activities. *Id.* In contrast, the FDA's relaxation of the regulation of mifepristone in *Alliance* did not present any similar impediment to the medical associations' business. *Id.* at 395.

This Court's pre-*Alliance* decision in *McKinney v. U.S. Department of Treasury*, 799 F.2d 1544 (Fed. Cir. 1986), is consistent with *Alliance* and *Havens*. *McKinney* considered organizational standing in a challenge to a denial of a petition pursuant to

Section 307 to bar importation of goods produced in the U.S.S.R., and it articulated that "[t]he mere assertion of a right to have the Government act in accordance with the law is not sufficient, in and of itself, to satisfy the injury requirement." *McKinney*, 799 F.2d at 1550. This Court emphasized that the purported injury cannot be abstract, conjectural or hypothetical, but rather must be actual or threatened or, stated another way, suffered or likely to be suffered. *Id.* at 1549, 1557 (citing *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).

The trial court properly recognized the principle articulated in the foregoing decisions that an organization must prove an actual injury by showing harm to a "business activity independent from [] issue-advocacy functions." Appx18. The trial court recognized that in *Havens*, unlike in this case, the challenged action presented a concrete harm to the organization. Appx12. In particular, the trial court correctly observed that HOME had suffered a concrete harm to a core business activity, namely its provision of counseling services, because "HOME's counseling had directed its clients to Havens Realty, and Havens Realty lied about available housing to those clients and sabotaged the work HOME had accomplished." *Id.* (citing *Havens,* 455 U.S. at 368-69). As the trial court expressed, "[a]t issue was an asset with value – stemming from HOME's core business – rather than an abstract societal interest; Havens Realty's actions damaged that asset." Appx13 (citing *Havens*, 455 U.S. at 379.) In contrast, the trial court explained, the plaintiffs in *Alliance* failed to

show that the relaxing of restrictions on access to mifepristone "obstruct[ed] a core business" of the organizations. Appx14.

The trial court also properly concluded that, like the medical organizations in *Alliance,* IRAdvocates had failed to demonstrate harm to any core business activity. Appx14-15. The trial court recognized that IRAdvocates is solely an issue-advocacy organization and self-describes as an organization that "advocates for and with working people around the world … and is committed to overcoming the problems of child labor, forced labor, and other abusive practices in the global economy." App. Br. at 1. It "promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups." *Id.* Unlike the HOME organization in *Havens*, IRAdvocates can point to no "asset with value" that is a separate and independent "core business" that it performs apart from its advocacy activities. The absence of any concrete injury to a core business activity is fatal to its claim to organizational standing.

### B. IRAdvocates's Claimed Diversion of Resources and Frustration of Its Mission Do Not Constitute a Sufficient Injury

IRAdvocates attempts to establish standing by arguing a "diversion of resources" injury relying on an erroneous reading of *Havens* as well as several pre-*Alliance* cases. App. Br. at 24-26, 29-35. While *Havens* stated that an organization could plead an injury in fact if a defendant's action "perceptibly impaired" an

organization's activities with a "consequent drain on the organization's resources," *Havens*, 455 U.S. at 379, the *Alliance* Court made clear that *Havens* was not endorsing a general diversion of resources theory of standing. The *Alliance* Court explained that *Havens* was "an unusual case" that should not be expanded beyond its context. *Alliance*, 602 U.S. at 396. As relevant here, the *Alliance* Court held that it "is incorrect" to read *Havens* to mean that "standing exists when an organization diverts its resources in response to a defendant's actions" that merely frustrate the pursuit of its advocacy mission. *Id.* at 395.

In *Alliance,* the medical associations alleged that as a result of FDA's actions they incurred costs and expended time, energy, and resources drafting petitions to the FDA, as well as engaging in public advocacy. *Alliance*, 602 U.S. at 394. The associations alleged that all these activities consumed considerable resources to the detriment of their other priorities. *Id.* The *Alliance* Court rejected this argument and held that the associations' diversion of resources from these advocacy activities did not establish standing. *Id.* at 393-97. IRAdvocates's position is nearly identical to that of the medical associations in *Alliance* as IRAdvocates's perceived injury is the time and resources it expended to prepare for meetings with CBP, make trips to Côte d'Ivoire to gather new information to supplement its allegations, and organize a letter among civil society organizations. App. Br. at 31-33. These activities were all pursued in support of its advocacy activities and do not constitute the type of diversion of resources that supports an injury in fact.

As the *Alliance* Court held, a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Alliance,* 602 U.S. at 394. As *Alliance* highlights, if a diversion of resources could confer standing it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Alliance,* 602 U.S. at 395.

IRAdvocates's reliance on three pre-*Alliance* cases to support its alleged injury due to the impairment of its advocacy mission is unavailing. App. Br. at 24-26 (citing *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006); *American Anti-Vivisection Society v. U.S. Dep't of Agriculture*, 946 F.3d 615 (D.C. Cir. 2020); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015)). In all three decisions, the D.C. Circuit applied an injury analysis that relied on injury to an organization's mission and responsive spending or expenditures to defendants' action or inaction. Whether it was expressed as the existence of a "direct conflict between the defendant's conduct and the organization's mission," *Abigail Alliance*, 469 F.3d at 133, that defendant's action caused the organization to spend on activities that were not part of "normal annual expenditures," *American Anti-Vivisection*, 946 F.3d at 619, or that the defendant's action or omission to act "injured the [organization's] interest" resulting in expenditure of resources to "counteract that harm," *PETA*, 797 F.3d at 1094, *Alliance* clarifies that

the expending of resources that are not core business activities of the organization, independent from advocacy work, will not suffice for injury in fact. Accordingly, to the extent these decisions can be read as holding that a diversion of resources that impairs an organization's mission is sufficient to establish a concrete organizational injury, such holdings would no longer be valid following *Alliance*.

Indeed, multiple courts of appeals have recognized that *Alliance* abrogated their prior decisions holding that a diversion of resources is sufficient to establish an advocacy organization's standing. *See Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1174-78 (9th Cir. 2024); *Fair Housing Center of Metropolitan Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025). In *Arizona Alliance*, the Ninth Circuit rejected a frustration of mission and a diversion of resources injury concerning plaintiffs' challenge to the cancellation provision of Arizona's election laws. *Arizona Alliance,* 117 F.4th at 1170, 1176-78 (explaining that the "distinctive theory" of organizational standing in *Havens* "extends *only* to cases in which an organization can show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action.") (emphasis in original). As the *Arizona Alliance* court stated, under *Alliance* "plaintiffs here must allege more than that their mission or goal has been frustrated – they must plead facts showing that their core activities are directly affected by defendant's conduct." *Id.*; *see also id.* (plaintiffs "must do more than merely claim that Arizona's law caused them to spend money in response to it."). Similarly,

the Sixth Circuit in *Fair Housing Center* noted that *Alliance* clarified that the expenditure of resources in opposition to a defendant's actions is insufficient to establish standing under *Havens*. *Fair Housing Center*, 124 F.4th at 992. Moreover, "[i]t is not enough to broadly gesture toward 'a drain on an organization's resources' and call it a day, as some of our pre-*Alliance* cases have done." *Id.*

IRAdvocates repeatedly claims that its injury stems from "CBP's failure to act on its Section 307 Petition and the consequent drain on its resources in attempting to convince CBP to take the required statutory action." App. Br. at 19. As a point of clarification, CBP has not failed to act because CBP acted on the petition by investigating the allegations. IRAdvocates goes on to elaborate that CBP's failure to act deprives IRAdvocates of the "[use of] an extremely important tool [of 19 U.S.C. § 1307] to fight the exploitation of forced child labor in cocoa harvesting." App. Br. at 42. But IRAdvocates does not enforce 19 U.S.C. § 1307, CBP does; so it is not IRAdvocates's "tool" to use. And the claimed perceptible impairment is that IRAdvocates must continue to advocate for CBP's enforcement of 19 U.S.C. § 1307. IRAdvocates's advocacy is far afield of the counseling services that were injured in the "unusual" *Havens* case. *Alliance*, 602 U.S. at 395-96.

IRAdvocates filed a petition pursuant to Section 307 alleging forced child labor in the supply chain of cocoa and cocoa products in the Côte d'Ivoire, which is under investigation and pending with CBP. In any event, the *Alliance* Court made clear that "[a] citizen may not sue based only on an 'asserted right to have the Government act

in accordance with law.'" *Alliance*, 602 U.S. at 381 (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)). Nor may an organization sue "because of strong opposition to the government's conduct." *Id.* at 394 (citing *Valley Forge*, 454 U.S. at 486). The standing requirement prevents the courts from becoming a place for the "vindication of value interest of concerned bystanders." *Alliance*, 602 U.S. at 382 (quoting *Allen*, 468 U.S. at 756).

IRAdvocates's argument that its injury also lies in the deprivation of its ability to use litigation to further its organizational mission similarly lacks merit. App. Br. at 20-21, 27. This injury is no different from its other advocacy related injuries, and the *Alliance* Court held that neither the frustration of a mission nor the diversion of resources confers standing. *Alliance*, 602 U.S. at 394-95. This Court similarly held pre-*Alliance* that the "use of resources for litigation, investigation in anticipation of litigation, or advocacy" does not constitute Article III injury. *Military-Veterans*, 7 F.4th at 1129.

In sum, IRAdvocates must do more than allege injury to its advocacy related interests – whether in the form of resources, litigation, or governmental inaction. Because it has failed to do so, it does not possess the requisite injury to support constitutional standing, and for this reason the trial court's decision should be sustained.

## III. IRAdvocates's Alleged Injury is Not Traceable to CBP's Non-Issuance of a WRO

Dismissal of this case is also warranted because IRAdvocates has failed to show that any cognizable injury is traceable to any inaction on the part of the agency. Appx19. IRAdvocates maintains that CBP's "failure to act on" its petitions required IRAdvocates to spend considerable resources to "develop supplemental evidence … in an effort to encourage CBP to take [] action" on its petitions. App. Br. at 44. But as the trial court found, this logic is flawed. Appx18 (citing *Alliance*, 602 U.S. at 394). Courts have repeatedly rejected the idea that costs voluntarily incurred by an advocacy organization in response to a challenged action constitute injuries caused by that action. *Alliance*, 602 U.S. at 394 (underscoring that organizations cannot "spend [their] way into standing" by expending resources to advocate).

The costs that IRAdvocates incurred in expenditures gathering and presenting its petitions to CBP fall directly in line with its mission of advocating against forced labor practices worldwide. Indeed, as the trial court explained, IRAdvocates acknowledged in its complaint that it regularly takes trips to Africa to gather information about forced labor in the region independent of CBP's actions. Appx18. Such trips and associated activity, no matter the number or the cost, are squarely within the ambit of costs associated with IRAdvocates's broader issue-advocacy mission, which predated this case. *See id.*

IRAdvocates's challenges to the trial court's conclusion are unavailing. First, IRAdvocates contends that the trial court "relied solely on its conclusion" that IRAdvocates's expenditures were related to its issue-advocacy function. App. Br. at 43-44. Not true. The trial court looked to the complaint in its entirety, a complaint that is replete with references to IRAdvocates's efforts *prior to* submitting its first petition to CBP, Appx18, as support for its conclusion that IRAdvocates routinely engaged in the type of expenditures it claims as injury, apart from and well before its efforts to challenge CBP's alleged inaction in this matter.

Second, IRAdvocates argues that the trial court's analysis fails to consider that even if it generally incurred certain types of expenses as part of its overall mission, it would not have incurred certain *specific* expenses but for CBP's failure to act on its petition. Once again, IRAdvocates mischaracterizes the court's ruling. The trial court presumed that IRAdvocates took additional trips to provide CBP with supplemental information in order to, as IRAdvocates states, "encourage CBP to take [] action." App. Br. at 44. The trial court correctly concluded that these specific costs could not be attributed to CBP's conduct. Appx18-19. As the Supreme Court held in *Alliance*, causation cannot be established for the purpose of organizational standing by an organization voluntarily "expending money to gather information and advocate against the defendant's action[,]" or in this case, lack of desired action. *Alliance*, 602 U.S. at 394.

In sum, CBP's non-issuance of a WRO has not caused IRAdvocates to divert any resources it does not already divert for issue-advocacy purposes, resources it can still divert into advocating for CBP's enforcement of 19 U.S.C. § 1307. Accordingly, IRAdvocates finds itself with the same causal shortcoming faced by the plaintiffs in *Alliance*: it cannot establish that its alleged injury is fairly traceable to CBP, and the trial court's ruling on this point should be sustained.

## IV. IRAdvocates's Alleged Injury is Not Redressable by CBP

Finally, IRAdvocates also cannot show that the injury it asserts would be redressed by the trial court ordering CBP to act. The trial court found that ordering CBP "to act" on IRAdvocates's petition could have resulted in CBP concluding that a WRO is not warranted for Ivorian cocoa and cocoa products or CBP concluding its investigation altogether without taking any type of action. In that event, the alleged injury in the form of money spent convincing CBP to issue a WRO would not be redressed. Appx19. After all, CBP is not legally bound to take a particular enforcement pathway just because it received a petition. Appx17.

Moreover, even if imports of cocoa from the Ivory Coast were halted, there is no certainty that a WRO, or any action taken by CBP for that matter, would end forced child labor in the Ivory Coast. Appx19 (citing *Alliance*, 602 U.S. at 385, requiring a "predictable chain of events leading from government action to the asserted injury"; and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) stating that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed

by a favorable decision.'"). The trial court recognized that regulation of imports affects the commerce of the United States and not the labor practices of another country. Accordingly, "[t]here is no guarantee that action from CBP will immediately, or even eventually, put an end to forced child labor in the Ivory Coast." Appx19.

On appeal, IRAdvocates offers no effective response to the trial court's explanation that the only action CBP must take in response to a properly submitted petition alleging forced labor in merchandise bound for the United States is to "cause [an] investigation" into the allegations. 19 C.F.R. § 12.42(d). IRAdvocates does not dispute that such an investigation was commenced. *See* Appx5-7 (citing IRAdvocates's complaint). Instead, IRAdvocates brought this action because CBP has not taken certain action preferred by IRAdvocates in response to that investigation, namely issuing a WRO. But this is only one permissible action that CBP can take in response to its investigation, and thus even if the trial court granted the relief that IRAdvocates seeks – that is, to compel CBP "to act" on its petitions – CBP could "act" by closing the investigation entirely and categorically denying any further enforcement action. Appx19. Thus, IRAdvocates has failed to show that its injury is necessarily redressable by the action it seeks.

IRAdvocates claims on appeal that even the termination of CBP's investigation without any action would be a "victory" because it would show that CBP "must act" on a petition submitted pursuant to 19 C.F.R. § 12.42(b). App. Br. at 53. However, it strains credulity to argue that such a decision from CBP would qualify as an "injury

redressed" for IRAdvocates's apparent substantial expenditure of resources advocating for the imposition of a WRO.

IRAdvocates relies on the Supreme Court's ruling in *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007) to assert that it is entitled to shortcut the normal redressability requirements for plaintiffs. App. Br. at 46. In *Massachusetts*, the Supreme Court found that the Commonwealth of Massachusetts had standing to sue the Environmental Protection Agency (EPA) because it had been accorded a procedural right to protect its concrete interests in the integrity of its coastal land and could therefore sue to compel withheld agency action with respect to the Clean Air Act. *Massachusetts*, 549 U.S. at 517-18, 521-23 (citing *Lujan*, 504 U.S. at 572 n.7). The Supreme Court found that that the Clean Air Act afforded the Commonwealth of Massachusetts procedural protection because the Act required the EPA to prescribe emissions standards that impacted harmful air pollution across states. *Id.* at 519-20. But the Supreme Court found that the redressability (and immediacy) requirements could only be suspended in this context because there was still a concrete and particularized injury that was fairly traceable to the defendant. *Id.*; *Lujan*, 504 U.S. at 572 n.7 (while procedural rights can be considered "special," procedural rights cannot be asserted "for persons who have no concrete interests affected[.]"); *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) (recognizing that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation … is insufficient to create Article III standing."). Massachusetts

did not need to show that the EPA's enforcement of the Clean Air Act would fully redress Massachusetts's concrete injury—loss of coastal land—just that the EPA's withheld action could help reduce the risk of that injury. *Id.* at 525-26.

Here, IRAdvocates has not shown that it has been vested with a right to procedural protection under 19 U.S.C. § 1307. *Massachusetts*, 549 U.S. at 518 (citing *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94–95 (C.A.D.C. 2002)). Unlike the Clean Air Act's protections afforded to states, Section 307 of the Tariff Act of 1930 has no such protections for issue-advocacy groups like IRAdvocates. Without this showing, IRAdvocates cannot demonstrate that it has a procedural right that triggers a relaxed redressability standard. But even if IRAdvocates can demonstrate that it was entitled to a procedural right affording a relaxed redressability standard, unlike the Commonwealth of Massachusetts, IRAdvocates still cannot show a concrete injury and thus cannot avail itself of this special treatment for redressability. Accordingly, as with the first two elements of organizational standing, IRAdvocates fails to establish redressability, and the trial court's finding should be affirmed.

## CONCLUSION

For these reasons, the judgment of the Court of International Trade should be affirmed.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

By: JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Christopher A. Berridge
CHRISTOPHER A. BERRIDGE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
26 Federal Plaza, Room 346
New York, New York 10278
Telephone: (202) 598-7392
Email: Christopher.Berridge@usdoj.gov

Of Counsel:

SABAHAT CHAUDHARY
Office of Assistant Chief Counsel
U.S. Customs and Border Protection

February 27, 2025

Attorneys for Defendants-Appellees

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,239 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Christopher A. Berridge*
CHRISTOPHER A. BERRIDGE