# United States Court of Appeals for the Federal Circuit

---

**INTERNATIONAL RIGHTS ADVOCATES,**
*Plaintiff-Appellant*

**v.**

**MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, RODNEY S. SCOTT, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees*

---

2024-2316

---

Appeal from the United States Court of International Trade in No. 1:23-cv-00165-CRK, Judge Claire R. Kelly.

---

Decided: June 5, 2026

---

TERRENCE COLLINGSWORTH, International Rights Advocates, Washington, DC, argued for plaintiff-appellant.

AIMEE LEE, Appellate Section, International Trade Litigation, United States Department of Justice, New York, NY, argued for defendants-appellees. Also represented by CHRISTOPHER BERRIDGE, PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER, BRETT SHUMATE; SABAHAT CHAUDHARY, Office of Assistant Chief Counsel, United States Customs & Border Protection, Washington, DC.

---

Before REYNA, TARANTO, and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

International Rights Advocates filed a complaint before the United States Court of International Trade, alleging that United States Customs and Border Protection has unlawfully withheld or unreasonably delayed action on IRAdvocates' petitions urging Customs to investigate whether cocoa and cocoa products imported from Côte d'Ivoire are produced using forced child labor in violation of section 307 of the Tariff Act of 1930. The Trade Court dismissed IRAdvocates' complaint for failure to establish organizational standing. For the reasons set forth below, we affirm.

## BACKGROUND

### I

Section 307 of the Tariff Act of 1930, codified at 19 U.S.C. § 1307, prohibits the admission of goods into the United States that have been produced, in whole or in part, using forced, indentured, or convict labor. Specifically, section 307 states:

> All goods . . . produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions *shall not* be entitled to entry at any of the ports of the United States, and the importation thereof is hereby *prohibited*, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.
>
> "Forced labor[,"] as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its

> nonperformance and for which the worker does not offer himself voluntarily. For purposes of this section, the term "forced labor or/and indentured labor" *includes forced or indentured child labor*.

19 U.S.C. § 1307 (emphases added). The Secretary of the Treasury delegated authority to the United States Customs Service, now United States Customs and Border Protection, to issue regulations under section 307. *See id.* § 2071.

Customs' implementing regulation for section 307, 19 C.F.R. § 12.42,[1] governs Customs' receipt and requirements for petitions, initiation of investigations, and issuance of Withhold Release Orders to detain shipments at United States ports of entry for potential importation. The implementing regulation permits "[a]ny person outside [Customs] who has reason to believe that merchandise produced [with forced child labor] . . . is being, or is likely to be, imported into the United States" to communicate this belief to Customs. 19 C.F.R. § 12.42(b). The communication must contain "(1) [a] full statement of the reasons for the belief; (2) [a] detailed description or sample of the merchandise; and (3) [a]ll pertinent facts obtainable as to the production of the merchandise abroad." *Id.* "If any information filed with a port director pursuant to paragraph (b) . . . does not conform with the requirements of that paragraph, the communication shall be returned promptly to the person who submitted it," otherwise, "[i]f such information is found to comply with the requirements, it shall be transmitted . . . within 10 days to the Commissioner of [Customs]." *Id.* § 12.42(c). "Upon receipt by the Commissioner . . . of any communication . . . found to

---

[1] We are aware of no other regulations implementing section 307 and IRAdvocates confirmed the same during oral argument. Oral Arg. at 9:56–10:40, https://www.cafc.uscourts.gov/oral-arguments/24-2316_04092026.mp3.

comply with the requirements of [paragraph (a) or (b) of section 12.42], the Commissioner will cause such investigation to be made as appears to be warranted by the circumstances of the case . . . ." *Id.* § 12.42(d). "If the Commissioner . . . finds at any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported, he will promptly advise all port directors accordingly and the port directors shall thereupon withhold release of any such merchandise," such as through a Withhold Release Order. *Id.* § 12.42(e). The importer then would have the opportunity to "establish[] by satisfactory evidence that the merchandise was not . . . produced[] or manufactured in any part with the use of" forced child labor. *Id.* § 12.42(g).

II

IRAdvocates is a self-described organization that "advocates for and with working people around the world" and "is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy." J.A. 85 ¶ 117. Starting in February 2020, IRAdvocates and its co-allegers submitted several petitions to the Acting Commissioner of Customs pursuant to 19 C.F.R. § 12.42(b). In each petition, IRAdvocates alleged that cocoa and cocoa products being imported into the United States from Côte d'Ivoire have been produced using forced child labor for over two decades in violation of section 307. Notably, IRAdvocates alleged that although Côte d'Ivoire "is the world's top cocoa producer, producing approximately 32% of the world's cocoa," its "cocoa farmers are the lowest paid." J.A. 94 (citation omitted). "The average daily income for a cocoa farmer in [Côte d'Ivoire] is less than what a consumer pays for a single chocolate bar." *Id.* IRAdvocates asserted that "the low price farmers receive for their cocoa[] and the severe imbalances in the value chain" led to human rights risks with "[b]y far the most documented abuse in the cocoa industry" being related to

"the use of child labor, both through local family and social networks and through national and international child trafficking." *Id.*

IRAdvocates also highlighted that, far from being a new problem, the prevalence of forced child labor in the cocoa industry has been apparent to Congress and the major chocolate companies for decades. IRAdvocates explained that, after lobbying against pending legislation that sought to ban the importation of cocoa harvested by child labor, the major cocoa companies signed the 2001 Harkin-Engel Protocol, in which the industry "acknowledged the problem of forced child labor in West Africa" and committed to phasing out such child labor by 2005. J.A. 97 (quoting J.A. 124). By 2020, however, the petitions note that the chocolate companies still failed to fulfill the promises they made in the 2001 Harkin-Engel Protocol.

IRAdvocates further stressed that "there has been clear documentation of trafficked and forced child labor in [Côte d'Ivoire's] cocoa sector for years." J.A. 96. The documentation in the petitions includes reports authored by the United States Department of Labor and State Department. For example, the Department of Labor published an annual report regarding forced child labor in Côte d'Ivoire from 2001 to 2024 and, even as of 2024, the Department of Labor acknowledged that "[c]hildren in Côte d'Ivoire are subjected to the worst forms of child labor, including in forced labor in the harvesting of cocoa" and "sometimes as a result of human trafficking." *E.g.*, U.S. Dep't of Labor, Bureau of International Labor Affairs, Child Labor and Forced Labor Reports: Côte d'Ivoire (2024), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2024/C%C3%B4te-dIvoire.pdf; *see also* J.A. 96 nn.28–29 (collecting sources). The petitions note that the State Department has similarly recognized:

> Within agriculture, [the] worst forms of child labor were particularly prevalent in the cacao and coffee

> sectors. Inspections during the year did not result in investigations into child labor crimes. Penalties were seldom applied and were not a deterrent to violations. The number of inspectors and resources for enforcement were insufficient to enforce the law.

U.S. Embassy in Côte d'Ivoire, Côte d'Ivoire 2018 Human Rights Report (2018), https://www.state.gov/wp-content/uploads/2019/03/Cote-Divoire-2018.pdf.

To demonstrate the ongoing use of forced child labor in the cocoa industry, IRAdvocates further supplied Customs with affidavits, photos, videos, and audio recordings from IRAdvocates' investigations in its petitions. This evidence included first-hand accounts collected by IRAdvocates from current and former child workers regarding their living and working conditions, including: working without the pay or education they were promised, being provided little food, living in isolation, sleeping in lean-to structures made of sticks and tarps, performing hazardous work with machetes, carrying heavy loads of cocoa beans, and using pesticides and herbicides without protective equipment.

Based on the evidence presented by IRAdvocates, Customs initiated an investigation into the use of forced child labor in the Côte d'Ivoire cocoa industry and the potential United States importation of goods made with such cocoa. *See* Appellees' Br. 6, 19. As part of its investigation, Customs issued requests for information and questionnaires to various importers of cocoa or products made with cocoa from Côte d'Ivoire (although the public record does not include any responses). Customs also met with IRAdvocates regarding its first petition about a month after filing and then again a year later. Over a year after IRAdvocates filed its first petition, it filed a first supplemental petition, including new evidence of forced child labor and child trafficking gathered by an investigatory team in November

and December 2020. Customs met with IRAdvocates again a few months later.

Two years after filing its first petition, IRAdvocates—joined by numerous stakeholders, including the AFL-CIO and sixteen sustainable chocolate companies as signatories—sent a letter urging Customs to withhold release of cocoa and cocoa products imported from Côte d'Ivoire. Customs did not respond to the letter but met with IRAdvocates six months later. Two months after their meeting, IRAdvocates sent Customs an email requesting an update on the investigation. Customs responded with a letter affirming that it "is committed to enforcing U.S. law prohibiting the importation of goods made wholly or in part with forced labor" but noting "that the information submitted with the petition was dated and did not provide a sufficient basis for [Customs] to move forward with enforcement action under [section 307]." J.A. 162. IRAdvocates responded by arguing that the evidence was dated only because Customs failed to take action in the three years since IRAdvocates filed its first petition. IRAdvocates then submitted a second supplemental petition to Customs, including new evidence of child trafficking and forced child labor gathered by an investigatory team in September 2022.

Six months later, after hearing nothing from Customs, IRAdvocates filed suit at the Trade Court, alleging that Customs unlawfully withheld and/or unreasonably delayed action on its petitions under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*. Specifically, IRAdvocates alleged that it "suffered financial harm . . . , requiring ongoing and expensive investigations to provide updated information," J.A. 84 ¶ 114, and "expended resources in an ongoing, multi-year effort to obtain enforcement of the Tariff Act by [Customs]," J.A. 86 ¶ 119. IRAdvocates sought declaratory and injunctive relief, asking the Trade Court to compel Customs to issue a Withhold Release Order or at least declare that IRAdvocates submitted sufficient

evidence to warrant such an order. The Government moved to dismiss the complaint for lack of jurisdiction and for failing to state a claim upon which relief could be granted, arguing, in part, that IRAdvocates lacked constitutional standing to bring its action. The Trade Court granted the Government's motion, determining that IRAdvocates failed to establish organizational standing. IRAdvocates appeals. In a letter filed under Federal Rule of Appellate Procedure 28(j), Customs "advise[d the court] that since mid-August 2024, no new information has been received or developed by the agency and that the investigation is not being actively pursued at this time." ECF No. 54. At the same time, counsel for the Government elaborated at oral argument that, to date, Customs has neither withheld release of cocoa and cocoa products imported from Côte d'Ivoire nor denied IRAdvocates' petitions. Oral Arg. at 22:00–26:05. Counsel explained that the investigation is "not active right now . . . but . . . it is still pending," "not just based on IRAdvocates' petition or information," and not confined by a time limit, so Customs is still "looking to see whether it can make a determination either way." *See* Oral Arg. at 22:00–30:42.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

IRAdvocates argues that the Trade Court erred in dismissing its complaint for lack of organizational standing. The Government disagrees, arguing that IRAdvocates cannot show injury-in-fact. For the following reasons, we agree with the Government.

I

We review a dismissal by the Trade Court for lack of subject-matter jurisdiction de novo. *Rimco Inc. v. United States*, 98 F.4th 1046, 1051 (Fed. Cir. 2024) (citing *Hutchison Quality Furniture, Inc. v. United States*,

827 F.3d 1355, 1359 (Fed. Cir. 2016)). As before the Trade Court, we accept as true the well-pleaded factual allegations of the complaint and draw all reasonable inferences in favor of the claimant. *Hutchison*, 827 F.3d at 1359 (citation omitted).

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). The "irreducible constitutional minimum of standing" consists of three elements. *Id.* First, a plaintiff must personally present an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See id.* (citation modified). This requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation modified). Second, there must be a causal connection between the injury and the conduct complained of—that is, plaintiff's injury must be "fairly . . . trace[able]" to the challenged "putatively illegal conduct of the defendant," and not the result of independent action of some third party not before the court. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Finally, it must be "likely" that the injury will be redressable by the requested relief. *Lujan*, 504 U.S. at 561.

Advocacy organizations, like IRAdvocates, must demonstrate the same requirements to show standing. *Mil.-Veterans Advoc. v. Sec'y of Veterans Affs.*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) (citation omitted); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) ("[O]rganizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." (citation omitted)). The burden of establishing jurisdiction rests on the party invoking it. *Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006) (citation omitted). The case here turns on

whether IRAdvocates has established a "concrete and demonstrable injury to the organization's activities." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Supreme Court has distinguished between organizations that have plausibly alleged that their business activities have been impeded and thus have suffered a concrete and demonstrable injury from those that have merely alleged that their organizational social policy interests have been compromised by government action or inaction. The Supreme Court's decisions in *Havens* and *Alliance for Hippocratic Medicine* govern and inform our analysis of what side of the line this case falls on, and the decision of the United States Court of Appeals for the D.C. Circuit in *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006), cited by IRAdvocates, is also instructive. We discuss each case in turn.

In *Havens*, the Supreme Court held that advocacy organization HOME had standing to challenge real estate company Havens Realty's racial steering practices. HOME's organizational purpose was "to make equal opportunity in housing a reality," and "[i]ts activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Havens*, 455 U.S. at 368 (citations omitted). In holding that HOME had suffered a real and concrete injury, the Court emphasized that Havens Realty's unlawful racial steering practices directly unraveled and frustrated HOME's nondiscriminatory counseling and referral services, requiring HOME to expend significant resources to identify and counteract Havens Realty's misinformation. *Id.* at 379. The Court thus recognized that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

More recently, in *Alliance for Hippocratic Medicine*, the Supreme Court held that pro-life medical associations lacked standing to challenge Food and Drug Administration regulations that made the abortion pill mifepristone easier to access. *See All. for Hippocratic Med.*, 602 U.S. at 372–73. Framing their injury, the medical associations claimed that the "FDA ha[d] 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id.* at 394 (citation omitted). The Court began its analysis by stressing that an organization cannot demonstrate a concrete injury based on abstract social policy interests regardless of the organization's intense or longstanding commitment to furthering those interests, strong opposition to the government's conduct, or qualifications to advocate for the interests. *Id.* (first citing *Valley Forge*, 454 U.S. at 486; and then citing *Sierra Club*, 405 U.S. at 739).

The Court also rejected the medical associations' specific allegations that the FDA's inaction caused them to conduct their own studies on mifepristone, engage in public advocacy and education, and "expend considerable time, energy, and resources" drafting citizen petitions to the FDA. *Id.* The Court determined that, unlike the organization in *Havens*, the medical associations did not suffer a concrete injury because the FDA's regulations did not impede the medical associations' advocacy businesses. *Id.* at 395. At most, the Court reasoned, the medical associations were forced to collect and disseminate their own information about mifepristone, but they did not (and could not) allege an informational injury because the FDA was not required to disseminate such information. *Id.* at 395–96. The Court explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394.

In *Abigail Alliance*, the D.C. Circuit held that advocacy organization Abigail Alliance survived a motion to dismiss by adequately pleading facts to support standing to challenge the FDA's authority to restrict terminally ill patients' access to investigational drugs because "[t]he challenged regulations . . . caused a drain on Abigail Alliance's resources and time." *Abigail All.*, 469 F.3d at 132–33 (citation omitted). The court acknowledged that "an organization is not injured [simply] by expending resources to challenge" government conduct. *Id.* at 133 (citation omitted). But the court, relying on *Havens Realty*, determined that Abigail Alliance "met [the organizational standing] threshold by alleging that it actively engages in 'counseling, referral, advocacy, and educational services,'" *id.* (quoting complaint), and that it "had to divert significant time and resources from [its counseling, referral, advocacy, and educational] activities toward helping its members and the public address the unduly burdensome requirements that the FDA impose[d] on experimental treatments," *id.* at 132–33 (citation omitted).

II

Turning to the case before us, we hold that IRAdvocates has not established that it suffered a concrete injury and thus that it has standing to challenge Customs' inaction in response to its petitions. On appeal, IRAdvocates alleges that it suffered two injuries: (1) a drain on its resources caused by its efforts to convince Customs to act on its petitions, and (2) the denial of one of few litigation tools available to it to achieve its mission. Appellant's Br. 19. We address each in turn.

A

IRAdvocates alleges that it "suffered financial harm [due] to the inaction of [Customs], requiring ongoing and expensive investigations to provide updated information." J.A. 84 ¶ 114; Appellant's Br. 29–43. Specifically, IRAdvocates' complaint asserts:

> Due to the failure/refusal of [Customs] to properly enforce the law, . . . IRAdvocates has expended its own resources to investigate allegations of forced child labor in Côte d'Ivoire, and to initiate its own campaign to prevent the importation of this illegal merchandise. Further, IRAdvocates has expended resources in an ongoing, multi-year effort to obtain enforcement of the Tariff Act by [Customs].

J.A. 85–86 ¶ 119. Based on this alleged injury, IRAdvocates contends that it is positioned similarly to the organizations in *Havens* and *Abigail Alliance* and unlike the medical associations in *Alliance for Hippocratic Medicine*. We are not persuaded.

IRAdvocates' allegation that it suffered financial harm because it invested resources to compel Customs to issue a Withhold Release Order seems more akin to the alleged injury in *Alliance for Hippocratic Medicine*. Indeed, instead of asserting that any of its activities have been impeded, IRAdvocates alleges that its mission has been compromised by Customs' inaction. As the Supreme Court has explained, however, "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct," *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Valley Forge*, 454 U.S. at 486), "no matter how longstanding the interest and no matter how qualified the organization," *id.* (quoting *Sierra Club*, 405 U.S. at 739). Moreover, an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*; *see Abigail All.*, 469 F.3d at 133 ("[A]n organization is not injured by expending resources to challenge the regulation itself; we do not recognize such self-inflicted harm.").

Notably, unlike the plaintiffs in *Havens* and *Abigail Alliance*, IRAdvocates has not alleged that its customer-service activities have been impeded such that it has suffered

a concrete and demonstrable injury. It is not enough to claim that it has been required to expend its own resources to maintain its social policy interests; IRAdvocates must allege that its customer-service activities have been diminished or precluded due to the government's inaction. The complaint alleges "IRAdvocates promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government[,] and business groups." J.A. 85 ¶ 117. However, IRAdvocates has not asserted that Customs' failure to act on the petitions caused IRAdvocates to divert resources from its educational, research, litigation, or legislation activities. For example, IRAdvocates has not alleged that Customs' inaction caused it to divert resources from making educational documentaries or prevented it from representing individuals in litigation. IRAdvocates has not alleged that it or its members produce more costly ethical chocolate and are underpriced by chocolate makers who use less-expensive cocoa made by forced child labor. Nor has IRAdvocates alleged that it or its members have invested in obtaining ethical certifications (e.g., Fair Trade, Rainforest Alliance) that have been tarnished by the lack of adequate monitoring enabled by Customs' inaction.

Although IRAdvocates argues that it has demonstrated something more here, we are not persuaded. Like the medical associations in *Alliance for Hippocratic Medicine* who incurred costs to oppose FDA's actions, IRAdvocates claims to have standing because it incurred costs to oppose Customs' inaction. *All. for Hippocratic Med.*, 602 U.S. at 394. IRAdvocates specifically alleges that its injury arose from investing its resources in investigating forced child labor, initiating its own campaign to prevent the importation of cocoa and cocoa products from Côte d'Ivoire, and seeking enforcement of section 307 by Customs. The "costly steps IRAdvocates took . . . to obtain [Customs'] compliance with [section 307]" include costs to prepare for meetings with

Customs, collect and prepare additional evidence to include in their supplemental petitions, and draft communications to Customs. Appellant's Br. 31–33. But, as the Supreme Court explained, standing does not exist simply because an organization has diverted its resources in response to the defendant's actions or inactions. *All. for Hippocratic Med.*, 602 U.S. at 394–95.

The Supreme Court's rationale applies equally to the expenses IRAdvocates incurred after Customs notified it that the information in its first two petitions was dated.[2] These costs were voluntary, self-inflicted, and directed toward advocating against Customs' inaction. Just as an organization cannot spend its way into standing, it also cannot do so by spending *more* money to gather information and advocate against a defendant's action after the agency tells them the initial information has gone stale. *See id.*

B

IRAdvocates next asserts injury because Customs' failure to act on IRAdvocates' petitions denied it a major tool—i.e., section 307—in its limited arsenal of tools to litigate against forced child labor. Appellant's Br. 19–29. IRAdvocates did not, however, allege this injury in its complaint or before the Trade Court and it is now forfeited. *See In re*

---

[2] Notably, nearly all the expenses identified by IRAdvocates—including those related to the latest investigatory trip to Côte d'Ivoire—occurred during Customs' prolonged investigation and before Customs informed IRAdvocates that the information was stale. *See* Appellant's Br. 31–33 (listing costs); *see* J.A. 162 (indicating that IRAdvocates' evidence submitted as of December 13, 2022, was stale); *see also* J.A. 165–71 (explaining that the additional evidence in IRAdvocates' second supplemental petition was collected in September 2022).

*Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) ("[F]orfeiture is the failure to make the timely assertion of a right." (citation omitted)). But even if the argument is not forfeited, the alleged injury is not sufficient for Article III standing.

"[T]he grant of a procedural right alone," like that to petition Customs to investigate whether certain products being imported into the United States are produced with the use of forced child labor, "cannot serve as the basis for Article III standing unless the procedures in question are designed to protect some threatened concrete interest of petitioners' that is the ultimate basis of [their] standing." *US Inventor, Inc. v. U.S. Pat. & Trademark Off.*, 156 F.4th 1306, 1311 (Fed. Cir. 2025) (quoting *Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 433 (D.C. Cir. 2002)); *see Consumer Watchdog v. Wis. Alumni Rsch. Found.*, 753 F.3d 1258, 1261–62 (Fed. Cir. 2014) (holding an agency's denial of requested administrative action is insufficient to confer standing). Section 307 and its implementing regulation allow anyone to petition Customs to investigate whether certain products being imported into the United States are produced with the use of forced child labor. *See* 19 C.F.R. § 12.42(a)–(b). However, the ability to petition Customs to initiate an investigation does not inherently protect any interest of the petitioners. *See Gettman*, 290 F.3d at 433 ("The fact that Congress may have given all interested parties the right to petition the agency does not in turn 'automatic[ally]' confer Article III standing when that right is deprived." (alteration in original) (citation omitted)). And IRAdvocates has failed to show that it has a "concrete interest apart from the procedural injury." *US Inventor*, 156 F.4th at 1314 (quoting *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 28 (D.C. Cir. 2002)).

## CONCLUSION

We have considered IRAdvocates' other arguments and find them unpersuasive. For the foregoing reasons, we

conclude that the Court of International Trade did not err in dismissing the case for lack of subject matter jurisdiction.

**AFFIRMED**